**2013-1668**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

STRYKER CORPORATION, STRYKER PUERTO RICO, LTD.,
and STRYKER SALES CORPORATION,

*Plaintiffs-Appellees*,

v.

ZIMMER, INC. and ZIMMER SURGICAL, INC.,

*Defendants-Appellants*,

and

ZIMMER ORTHOPAEDIC SURGICAL PRODUCTS,

*Defendant.*

Appeal from the United States District Court for the Western District of
Michigan in No. 1:10-cv-1223, Judge Robert J. Jonker.

## BRIEF FOR DEFENDANTS-APPELLANTS ZIMMER, INC. and
## ZIMMER SURGICAL, INC.

Donald R. Dunner
Kara F. Stoll
Garth D. Baer
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000
Counsel for Zimmer, Inc. and
Zimmer Surgical, Inc.

**January 22, 2014**

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Zimmer, Inc. and Zimmer Surgical, Inc. certify the following:

1.    The full name of every party represented by me is:

      Zimmer, Inc., Zimmer Surgical, Inc.

2.    The name of the real party in interest represented by me is:

      Zimmer, Inc., Zimmer Surgical, Inc.

3.    All parent corporations and any publicly held companies that own ten percent or more of the stock of the parties represented by me are:

      Zimmer Holdings, Inc.

4.    The names of all law firms and the partners and associates that appeared for the parties now represented by me in the trial court are:

> FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
> Donald R. Dunner, Kara F. Stoll, Garth D. Baer
>
> KIRKLAND & ELLIS LLP
> Ron Sklar, Bryan S. Hales, David Kenneth Callahan, Eric D. Hayes, Kristina Nicole Hendricks, Louis A. Klapp, Mark Alan Pals, Michael I. Cohen, Adam R. Brausa
>
> RYNBRANDT & ASSOCIATES
> Kevin A. Rynbrandt

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE
    JURISDICTION ..........................................................................1

STATEMENT OF THE ISSUES ........................................................2

PRELIMINARY STATEMENT ..........................................................3

STATEMENT OF THE FACTS ..........................................................6

I.    Background..............................................................................6

II.    The '329 Patent.......................................................................7

    A.    The Specification ........................................................7

    B.    The Claims of the '329 Patent....................................9

    C.    Related Prosecution History......................................10

III.    The '807 Patent....................................................................11

    A.    The Specification ......................................................12

    B.    The Claims ...............................................................15

    C.    Prior Art Relevant to the '807 Patent.......................16

IV.    The '383 Patent....................................................................20

    A.    The Specification and Claims ...................................20

    B.    Prior Art Relevant to the '383 Patent.......................21

V.    The Accused Devices ...........................................................23

    A.    Location of the Motor in the Accused Devices .................24

    B.    The Accused Products' Front End .....................................26

VI.    District Court Proceedings ...................................................27

A.    Infringement of the '329 Patent ...........................................27

    1.    Claim Construction ("Handle") ................................27

    2.    Infringement Under the District Court's
        "Handle" Construction...........................................28

B.    The '807 Patent .................................................................31

    1.    Summary Judgment of Infringement ........................31

    2.    Anticipation..........................................................31

C.    The '383 Patent's Invalidity Based on Obviousness ..........32

    1.    Zimmer's Evidence of Obviousness........................32

D.    Enhanced Damages and Attorneys' Fees............................37

E.    Marking the '383 Patent.....................................................38

SUMMARY OF THE ARGUMENT ....................................................40

ARGUMENT.......................................................................................44

I.    Standard of Review ..................................................................44

II.    The Accused Products Do Not Infringe the '329 Patent..............46

A.    The Court Erred in Its Construction of "Handle" ...............46

B.    Under the Proper Construction of "Handle," Zimmer's
    Accused Devices Cannot Infringe as a Matter of Law ........50

C.    Even Under the District Court's Claim Construction,
    the Court Erred in Denying JMOL of
    Noninfringement of the '329 Patent....................................51

    1.    Substantial Evidence Does Not Support the
        Jury's Finding of Literal Infringement ....................51

    2.    The Jury's DOE Infringement Finding Was
        Incorrect as a Matter of Law...................................53

III. The District Court Erred in Denying Zimmer's Motion for JMOL of Invalidity of the '807 Patent ........................................................... 54

IV. The Court Erred in Granting Summary Judgment of Infringement of the '807 Patent ...................................................... 56

V. The District Court Erred in Denying JMOL of Obviousness of the '383 Patent ............................................................................ 58

    A. The Obvious Motivation to Combine ................................................. 58

    B. Stryker's Teaching-Away Argument Fails ......................................... 59

    C. Stryker's Secondary Considerations Lack Nexus to the Claims ........................................................................................ 60

    D. The PTO Rejected Similar Claims ....................................................... 63

VI. The District Court Erred in Denying JMOL of No Willful Infringement and in Awarding Treble Damages Because Zimmer's Defenses Were Not Objectively Reckless .................................... 65

    A. Zimmer's '329 Patent Noninfringement Defense Was Not Objectively Reckless .................................................................... 65

    B. Zimmer's '807 Patent Invalidity and Noninfringement Defenses Were Not Objectively Reckless .......................................... 66

    C. Zimmer's '383 Patent Invalidity Defense Was Not Objectively Reckless ...................................................................... 67

VII. The District Court's Instruction on Marking Was Erroneous and the District Court Erred in Denying JMOL Limiting Damages on the '383 Patent to Exclude Presuit Damages ........................... 68

VIII. The District Court's Damages Calculation and the Award of Attorneys' Fees Should be Vacated ............................................................. 70

CONCLUSION .................................................................................................. 71

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Services, Inc.*,
674 F.3d 1365 (Fed. Cir. 2012) ............................................................... 68

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*,
682 F.3d 1003 (Fed. Cir. 2012) ....................................................... 46, 65

*Bettcher Industries, Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) ................................................................ 46

*Cohesive Technologies, Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) .............................................................. 65

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) .............................................................. 64

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) .............................................................. 60

*ICON Health & Fitness, Inc., In re*,
496 F.3d 1374 (Fed. Cir. 2007) .............................................................. 59

*Japikse, In re*,
181 F.2d 1019 (CCPA 1950) ................................................................... 64

*J & M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001) .............................................................. 45

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) .............................................................. 61

*Jonsson v. Stanley Works*,
903 F.2d 812 (Fed. Cir. 1990) ......................................................... 49, 50

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012) .............................................................. 52

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).................................................................................. 59

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc) .................................................. 45

*Medtronic Navigation, Inc. v. BrainLAB Medizinische*
   *Computersysteme GmbH*,
   603 F.3d 943 (Fed. Cir. 2010) ......................................................... 60, 66

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ............................................................ 44

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ............................................................ 49

*Orion IP, LLC v. Hyundai Motor America*,
   605 F.3d 967 (Fed. Cir. 2010) ............................................................. 45

*Ormco Corp. v. Align Technology, Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007) ...................................................... 28, 62

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ............................................................ 54

*Senior Technologies, Inc. v. R.F. Technologies, Inc.*,
   76 F. App'x 318 (Fed. Cir. 2003) (unpublished) .................................... 54

*Source Search Technologies, LLC v. LendingTree, LLC*,
   588 F.3d 1063 (Fed. Cir. 2009) ............................................................ 55

*Southwall Technologies, Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ....................................................... 49, 53

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
   620 F.3d 1305 (Fed. Cir. 2010) ............................................................ 67

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
   550 F.3d 1356 (Fed. Cir. 2008) ............................................................ 44

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
   No. 5:09-cv-01201, 2012 WL 4483158 (N.D. Cal. Sept. 27, 2012),
   *aff'd*, 734 F.3d 1332 (Fed. Cir. 2013) .................................................. 66

*Teleflex, Inc. v. Ficosa North America Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ............................................................ 45

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ................................................... 53

*Tokai Corp. v. Easton Enterprises, Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) ......................................... 61, 62

*Wang Laboratories, Inc. v. America Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) ............................................... 49

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
520 U.S. 17 (1997).................................................................. 45

*Western Union Co. v. MoneyGram Payment Systems, Inc.*,
626 F.3d 1361 (Fed. Cir. 2010) ............................................... 63

*White v. Burlington Northern & Santa Fe Railway Co.*,
364 F.3d 789 (6th Cir. 2004) ................................................... 45

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
683 F.3d 1356 (Fed. Cir. 2012) ............................................... 61

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010) ............................................... 60

## STATUTES

35 U.S.C. § 284......................................................................... 38

35 U.S.C. § 285......................................................................... 38

35 U.S.C. § 287(a) ............................................................. 39, 69

## OTHER AUTHORITY

*American Heritage College Dictionary* (3d ed. 1997) ................................. 57

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2001) ........................ 57

*Random House Webster's College Dictionary* (2000) ................................. 57

*The Compact Oxford English Dictionary* (2d ed. 1999) .............................. 57

## STATEMENT OF RELATED CASES

Counsel are aware of no other cases that may be affected by this Court's decision.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The U.S. District Court for the Western District of Michigan (Honorable Robert J. Jonker) had jurisdiction over the patent-infringement action giving rise to this appeal under 28 U.S.C. § 1338(a). The U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal under 28 U.S.C. § 1295(a). Zimmer timely filed its notice of appeal from the September 5, 2013 Final Judgment, in accordance with 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a) on September 19, 2013.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred when, inconsistently with the specification and the prosecution history, it construed the "handle" of a gun-shaped irrigation device to include the gun's barrel, and whether there was substantial evidence to support the infringement verdict, given that Zimmer's motor is located in the barrel, not in the handle, as the asserted '329 patent claim requires.

2.     Whether the district court erred in denying JMOL of (a) anticipation of the '807 patent, thereby allowing Stryker to take advantage of the district court's broad construction of "lock assembly" to show infringement, but then allowing Stryker to ignore that same construction to distinguish the prior art; and (b) obviousness of Stryker's '383 patent where all of the elements of the asserted claims are undisputedly in the prior art and there is a clear motivation to combine, and Stryker's only defense was that if one just physically substituted an electric motor for the prior art's pneumatic one, the device would not work absent other simple modifications.

3.     Whether the district court erred in construing the term "receive" and granting summary judgment of infringement of the '807 patent when there is at least a genuine, material factual dispute as to whether the accused devices

have "a front end for receiving the discharge tube and the suction tube," as the asserted claims require.

4.     Whether the district court erred in denying JMOL of no willful infringement and in trebling Stryker's damages even though Zimmer's invalidity and noninfringement defenses were objectively reasonable.

5.     Whether the district court erred in denying a new trial on marking as to the '383 patent where the court erroneously instructed the jury that a patentee need only mark its products with a related patent number instead of the number of the asserted patent.

## PRELIMINARY STATEMENT

Stryker's three patents-in-suit, U.S. Patent Nos. 6,022,329 ("the '329 patent"), 7,144,383 ("the '383 patent"), and 6,179,807 ("the '807 patent"), are all directed to a simple mechanical invention: a so-called "pulsed lavage or irrigation" device that squirts pulsed fluid (e.g., saline) from a plastic gun-shaped handpiece to an operating site.  As the district court explained, it is a "motorized squirt gun for surgeons."  A1023:8.  The patents fall within a crowded, heavily patented, technological field and disclose a narrow improvement, if any.

The first of Stryker's three patents-in-suit, the '329 patent, issued in February 2000.  In that same year, Stryker sued Davol, another manufacturer

of pulsed lavage devices, for infringing the '329 patent, and Stryker employees inspected and tested the accused Zimmer devices. But it was not until 2010, nearly a decade later, that Stryker sued Zimmer for infringement of the patents-in-suit. Indeed, it was not until Zimmer invested ten years in the accused products and Zimmer's customers (surgeons) grew accustomed to those products that Stryker filed suit.

Zimmer now appeals from the judgment awarding Stryker over $248 million[1] in damages, of which only $76 million was compensatory. Even with the equities of a ten-year delay weighing in Zimmer's favor and the existence of objectively-reasonable defenses to each of the patents-in-suit, the court awarded Stryker treble damages and attorneys' fees totaling an additional $160 million beyond the compensatory damages.

With respect to the '329 patent, the court's judgment is based on an erroneous construction of the term "handle." The court construed the "handle" of the gun-like handpiece to include the barrel, notwithstanding that Stryker specifically defined the handle as being distinct from the barrel

---

[1] The total award included over $210 million in trebled compensatory damages, over $18 million in trebled supplemental damages, over $12 million in prejudgment interest, and $8 million in attorneys' fees. A2; A24220.

both in the patent's specification and in the prosecution history to distinguish prior art in this crowded field.

The district court also erred in granting summary judgment of infringement of the '807 patent.  The court not only misconstrued the claim term "receive," but also ignored material factual disputes regarding whether the accused handpieces "receive" the associated tip.  In the context of mechanical inventions involving the male-female type of connections disclosed in the specification, the word "receive" means more than merely coupling.  Instead, the ordinary meaning of "receive" in the context of such mechanical devices is "to act as a receptacle or container for."  Moreover, the specification discloses that it is important that the handpieces "receive" or act as a container for the tip (and not the other way around) for a specific reason: to prevent clogging.

The district court also erred in denying Zimmer's motion for JMOL of invalidity of the '807 patent.  The district court should have granted JMOL because, under Stryker's proffered construction of the term "lock assembly," Zimmer's own prior-art device taught each and every element of the asserted claims.  During the *Markman* hearing, both the district court and Stryker understood that the patent could well be invalid under Stryker's broad construction because "even a paperclip or rubber band" would qualify as the

5

claimed lock assembly. The district court did not, however, hold Stryker to that same claim construction when analyzing validity.

Finally, the district court erred in denying Zimmer's motion for JMOL of obviousness of the '383 patent. Zimmer relied on the same prior art used by the U.S. Patent and Trademark Office ("PTO") to reject even narrower claims, and the only difference between the claims and the primary reference was that the claims required an electric motor, whereas the reference used a pneumatic one. Because substituting a pneumatic motor for an electric one involves only routine skill and yields fully predictable results, no reasonable jury could conclude that the '383 patent was not obvious.

Contrary to the district court's rationale in finding Zimmer objectively reckless, this was at least "a close case." Thus, at a minimum, this Court should reverse the finding of willful infringement and award of attorneys' fees.

## STATEMENT OF THE FACTS

### I.  Background

Stryker and Zimmer both design, manufacture, and sell orthopedic pulsed lavage irrigation devices. These devices are commonly used in orthopedic surgeries to deliver pulsed fluid (e.g., saline) from a gun-shaped handpiece and associated tip to an operating site. In addition to delivering

pulsed fluid, the devices have a suction tube for removing debris and fluid. This appeal involves three Stryker patents, all directed to pulsed irrigation handpieces and discussed in turn below.

## II. The '329 Patent

### A. The Specification

The '329 patent is directed to a pulsed irrigation handpiece with an electric motor (36) located in the handle (12) between the top and bottom of the handle. *See* A323 (4:1-9); A307 (Fig. 4) (reproduced below, labels added).



For the '329 patent, the critical issue in this appeal is whether the handpiece's barrel (13) is also part of the handle (12) or whether the barrel and handle are distinct.

The patent's specification indicates the handle and barrel are separate areas.  The first sentence of the Detailed Description explains that "[a] pulsed irrigation handpiece 10 (FIGS. 1 and 2) embodying the invention comprises a hand-held housing 11 having a *handle 12 and barrel 13* which extends forward from the upper end of the handle 12."  A323 (3:27-30) (emphasis added); *see also* A305 (Fig. 1) (reproduced below).



The '329 patent goes on to state that "a pulsed irrigation handpiece embodying the present invention . . . is conveniently shaped to be held either as a pistol or a wand (by the *handle* [12] *or barrel* [13])."  A322 (1:26-35) (emphasis added).  That the handpiece could be held as a wand—with the physician's hand gripping the barrel (13) instead of the handle (12)—does

8

not transform the barrel (13) into the handle (12). The '329 patent's specification also makes clear that the handle is just one part of the housing in describing "the handle 12 *of* the housing 11." A326 (10:3) (emphasis added). Nowhere does the patent suggest that the entire housing could be the handle. Further, as shown in the figures and described in the specification, the motor (36) is located in handle (12), not in barrel (13). A324 (5:52).

### B.   The Claims of the '329 Patent

Claim 2 was the only asserted claim, and is reproduced below:

2. A pulsed irrigation surgical handpiece, comprising:
a hollow housing comprising a handle;

an elongate trigger movably mounted on said housing;

an irrigation liquid tube extending along said handle;

*an electric motor spaced between the top and bottom of said handle and located in said handle* adjacent said irrigation tube;

a pump comprising a member driven by said electric motor, said pump being connected to said irrigation liquid tube for pumping irrigation liquid for delivery to a surgical site, said motor having a rotating pinion gear rotatably engagable with and driving a face gear, said face gear being operatively drivingly coupled to an eccentric member for rotation of said eccentric member by said motor, said driven member opposing said eccentric member, and a yoke located between a portion of said driven member and said eccentric member for converting rotation of said eccentric member to reciprocation of said portion of said driven member.

A332 (emphasis added to disputed terms).

9

Like the specification, claim 2 treats the handle as just one part of the handpiece, reciting a "hollow housing *comprising* a handle." *Id.* (22:2) (emphasis added). Nonasserted claim 4, which depends from claim 2, explicitly states that the housing has a handle and barrel. *Id.* (22:37-38) ("said housing including a barrel extending forward from the top portion of said handle").

## C.    Related Prosecution History

The '329 patent is a continuation of U.S. Patent Application No. 08/599,133 ("the parent '133 application"). A302. Much like asserted claim 2, which recites "an electric motor . . . located in said handle," claim 39 of the parent '133 application recites "locating said motor in said handle." A16672. During prosecution of the parent '133 application, the patent examiner rejected claim 39 over U.S. Patent No. 4,583,531 to Mattchen. A16692-706. In successfully distinguishing pending claim 39 over Mattchen and convincing the examiner to allow its claims, Stryker argued:

> [I]n contrast [to pending claim 39], Mattchen's motor and pump are coaxially aligned, both being in the barrel of the Mattchen handpiece. Although the Mattchen handpiece has a handle which is angled with respect to the barrel, the Mattchen motor is not in the handle or at an angle to the barrel.

A16681.  Figures 1 and 4 from the Mattchen patent are reproduced below and show Mattchen's "pistol-shaped" handpiece and the position of motor assembly (46) (highlighted in yellow) in the barrel (14), separate from the handle (16).  A16698 (4:31-33).  As shown in Figure 4, motor assembly (46) is in the back nub of barrel (14).



A16693; A16695; A16698 (4:23-30); A16700 (7:13-8:25).

## III.   The '807 Patent

At trial, the parties disputed whether Zimmer's accused handpieces had "a front end for receiving the discharge tube and the suction tube," as

11

the asserted claims require. As explained in more detail below, the parties also disputed whether the prior art disclosed a "lock assembly" for releasably securing the discharge and suction tube to the body.

### A. The Specification

The '807 patent is directed to an irrigation handpiece to which a tip assembly is attached. A353 (1:29-30). Like prior-art irrigators, the tip assembly includes a discharge tube and a suction tube, and the handpiece includes a conduit through which the sterile fluid is squirted into the discharge tube and a suction tube "through which the discharged fluid is removed from the site to which it is applied." *Id.* (1:45-47). The fluid and any debris flow from the suction tube through the handpiece, and then out into a separate suction system. *Id.* (1:49-53).



A336 (labels added).

The Background of the Invention explains that one problem with prior-art irrigators is that "the suction conduits integral to the handpieces

occasionally clog" because "the material drawn away from the site to which the irrigator is applied is often in solid or semi-solid form."   A353 (2:8-11). As the specification explains, these clogs can "significantly reduce the utility of the irrigator."   *Id.* (2:13-14).   Another problem "associated with some known irrigators is how the tip assembly is connected to the handpiece" because "[s]ome tip assemblies sometimes do not properly mate with their complementary handpieces so as to result in . . . leaks."   *Id.* (1:60-2:2).   The Background of the Invention explains that leakage around the suction conduit is "especially prone to occur."   *Id.* (2:2-6).

The '807 patent is thus directed to "a suction conduit that is not prone to clogging" or leaking.   *Id.* (2:47-48).   In particular, the inventors set out to eliminate those problems in the prior art by ensuring that "neck 192 of suction tube 48 seats in drain tube 50," and not the other way around.   A358 (11:30).   This clog and leak-preventing configuration is shown in Figure 8 (reproduced below, labels added).



A344.  As the specification explains, because the suction tube "seats in drain tube," there "is essentially no leakage of the fluid and material as it flows into the drain tube," and, further, the diameter of the suction tube does not decrease and, thus, "the interface between the two tubes 48 and 50 is not a constriction that could potentially serve as a clog point."  *See* A358 (11:29-43).  Thus, as depicted in Figure 1 (reproduced below), the '807 patent discloses a handpiece with a hole that *receives* an inserted tip and suction tube 48—and "not the other way around."  *See* A337 (labels added); A9935.



The '807 patent's specification also discloses a "tip lock" on the handpiece to secure the tip assembly to the handpiece.  The tip lock includes an "inner surface of [a] face plate" that "seats against" a flange on the tip.  A357 (10:27-28).  The patent explains that the tip assembly is fastened by simply pushing it far enough into the handpiece to "displace

the tip lock," until eventually a "spring plate 160 forces the tip lock" to seat against the flange. *Id.* (10:23-26). The patent is careful to note that "there is no requirement that all versions of the invention employ the described tip lock," and that "[o]ther versions of the invention may employ other tip locks and even other tip assemblies." A363 (21:41-44).

## B.    The Claims

The '807 patent's important leak and clog-preventing feature is reflected in the claims. All of the asserted claims (claims 45 and 50-52) require a handpiece with "a front end for *receiving* the discharge tube and the suction tube." A366 (27:32-34) (emphasis added). All of the asserted claims also require "a lock assembly . . . for releasably securing the discharge tube and the suction tube to [the] body." *Id.* (27:35-37). Claim 45 is the only independent asserted claim and recites:

> 45. An irrigating handpiece for receiving a tip assembly having a discharge tube and a suction tube, said irrigating handpiece including:
>
> a body at least partially shaped to form a handgrip *and a front end for receiving the discharge tube and the suction tube*;
>
> a *lock assembly* mounted to the front end of said body *for releasably securing* the discharge tube and the suction tube to said body;
>
> a discharge head disposed in said body, said discharge head having an open end adjacent the front end of the body for

receiving the discharge tube wherein, said discharge head receives irrigation fluid and discharges the irrigation fluid through the open end into the discharge tube; and

a single piece drain tube, said drain tube having a first end mounted in said body and a second end integral with the first end that extends outside of and away from said body, the first end of said drain tube being adjacent the front end of said body and being in fluid communication with the suction tube.

A366 (emphases added to disputed terms).

## C.    Prior Art Relevant to the '807 Patent

At trial, Zimmer asserted that, as interpreted by Stryker, the '807 patent's asserted claims were so broad that Zimmer's own prior-art pulsed lavage device, the Zimmer Varapulse, anticipated them. Stryker agreed that Varapulse met all of the claim limitations except one: "a *lock assembly* mounted to the front end of said body for releasably securing the discharge tube and the suction tube to said body." A1703:11-A1704:10. At trial, the '807 patent's validity therefore turned on whether Varapulse had a lock assembly. *Id*.

During claim construction, the district court construed "lock assembly" as "components that work together to secure or fasten the tip to the hand piece," which was Stryker's proffered construction. A88-89. Stryker made it very clear that its broad construction was no accident. During the *Markman* hearing, counsel for Stryker explained that "[t]he intent

16

was absolutely not to limit the patent any more than the language. We have to live by it on the other side of the coin, of course, which is the invalidity analysis. That's for another day. We understand that." A7093:24-A7094:2. The district court challenged Stryker on whether the patent could be valid with such a broad construction because even a paperclip and rubber band would be a "lock assembly" under Stryker's construction. A7092:9-12; A7096:22-25. After conceding that a paperclip and rubber band would qualify, Stryker brushed off the issue, explaining that "the answer to that, Your Honor, is that's an issue on validity." A7097:11-12; A7098:10-12. The district court agreed: "Well, it certainly would be a validity issue." A7097:13-14.

The prior-art Varapulse handpiece includes two tapered male nozzles that connect to matching holes on the tip. A17411. The Varapulse handpiece housing also has a groove that holds the male nozzles in place:



*Id.*

The groove in the handpiece and tapered male nozzles work together to secure the tip to the handpiece. A2321:7-A2322:23. Indeed, the Varapulse device's instructions (reproduced below) direct that the tapered nozzles are to be "[p]ushed on until connection is *secure*," the exact term used in the district court's claim construction:



A17356.

In addition, Stryker's named inventor and its expert witness admitted that such nozzles and matching holes qualify as a "lock assembly" under the district court's "secures or fastens" claim construction. Mr. Henniges, a named inventor on the '807 patent, admitted that nozzles and matching holes on another prior-art device "fastened" the tip to the handpiece. A1317:15-17. Later, Stryker's expert witness admitted that Mr. Henniges was right that such nozzles and matching holes "fastened" the tip to the handpiece. A1707:4-7. Under the district court's construction, "fastens" is all that is required of the claimed lock assembly. A7059-60.

19

## IV.   The '383 Patent

### A.   The Specification and Claims

The '383 patent is a continuation of the '329 patent and therefore shares a common specification.  The '383 patent issued in 2006, six years after the '329 patent.  A369.  It differs from the earlier patents in that it broadly requires "a single electric motor disposed in said housing" as opposed to the handle, a "control assembly disposed in said housing to regulate the speed of said motor," and "a battery pack separate from said housing."  A402 (21:58-67).

Stryker asserted claims 1-3, 8, 10, 11, 13, 14, 17, 19, 20, 22, 24, 27, 38, 40, and 46 from the '383 patent.  A7774.  Independent claim 1 is representative and recites:

> 1. A medical irrigator comprising:
>
> a housing shaped to be hand held and having a front end; an inlet tube extending to said housing;
>
> a pulse pump capable of operating at a variable rate disposed in said housing and having an outlet conduit that opens to the housing front end, said pump configured to receive fluid from said inlet tube and discharging the fluid through said outlet conduit;
>
> *a single electric motor disposed in said housing* and connected to said pump for actuating said pump, said motor operable at variable speeds to control the pumping rate of said pump;

*a control assembly disposed in said housing to regulate the speed of said motor*;

a suction tube disposed in said housing that has an open end adjacent the front end of said housing that extends away from the front end;

*a battery pack separate from said housing*; and

a flexible conductor assembly extending from said battery pack to said housing for supplying energy stored in said battery pack to said motor.

A402 (emphases added to disputed terms).

## B.   Prior Art Relevant to the '383 Patent

At trial, Zimmer presented evidence that the '383 patent's asserted claims would have been obvious in view of three prior art references: Grulke (U.S. Patent No. 5,046,486 (A25436-57)), Drews II (U.S. Patent No. 4,817,599 (A25037-45)), and Bales (U.S. Patent No. 5,350,356 (A25085-117)). Of particular relevance to this appeal, Grulke discloses a pulsed lavage device with a pneumatic motor, whereas the claims require an electric motor. *See* A25436 (Abstract); A25445 (2:13-42). But Drews II discloses a pulsed lavage device with an electric motor, control assembly, separate battery pack, and wires. *See* A25037 (Abstract). It is undisputed that, when combined, Grulke and Drews II disclose each and every limitation of claims 1-3, 8, 10, 11, 13, 14, 17, 20, 22, 24, 38, and 40. *See* A2713:13-A2724:22. In addition, Bales discloses attaching an electric wire to an irrigation tube in

a pulsed lavage device, as dependent claims 19, 27, and 46 require. A25085 (Abstract). Below, Stryker did not dispute that the combined prior art references collectively disclosed each element of the asserted '383 patent's claims. *See* A2713:13-A2724:22.

During the discovery phase in the district court proceedings below, the patent examiner relied on Grulke and Drews II to reject nearly identical claims pending in Stryker's U.S. Patent Application No. 11/563,504 ("the '504 application"), a continuation of the '383 patent. A19733. As Zimmer's expert demonstrated, each asserted claim of the '383 patent has a narrower corresponding claim in the '504 application. A2413:13-A2415:9. For example, other than trivial rewordings, the '504 application claim 31 differed from '383 patent claim 1 in only one respect: claim 31 required an additional limitation relating to a tip assembly. A402; A17278; A2386-88.

During prosecution of the '504 application, the PTO examiner rejected claims 31-50 as being obvious in view of Grulke and Drews II. A17226-37. The examiner explained:

> It would have been obvious to a person having ordinary skill in the art at the time the invention was made to modify the irrigator, of Grulke et al, with the pump operating at a variable rate, *the gas pressure-driven motor being substituted with an electric motor . . . .*

22

A17227-28 (emphasis added).   At the same time, the examiner also contradicted Stryker's argument that the combination would have been inoperative because Grulke's control assembly for a pneumatic motor would not work with an electric motor, reasoning:

> It would have been obvious to a person having ordinary skill in the art at the time the invention was made to modify the control assembly, of the modified irrigator of Grulke et al and Drews, with a switch, as taught by Drews, as the speed of the motor and pump is proportional to the amount of pressure applied by the user to the switch to provide for variable speed operation of the motor and pump (column 3, lines 56-62).

A17227-29.   Stryker did not attempt to overcome the examiner's rejection. Instead, Stryker abandoned the application.   A2388:13-22.

## V.   The Accused Devices

Stryker asserted that Zimmer's Pulsavac Plus, Pulsavac Plus LP, and Pulsavac Plus AC (collectively, "Pulsavac") devices infringe the '329 and '807 patents.   Because Zimmer's Pulsavac Plus AC does not include a built-in battery pack as required by the '383 patent's asserted claims, Stryker accused only the Pulsavac Plus and Pulsavac Plus LP of infringing the '383 patent.   A7775-76.   Thus, at least with respect to the '383 patent, it is undisputed that Zimmer had available noninfringing alternatives.   *Id*.

23

## A.     Location of the Motor in the Accused Devices

Claim 2 of the '329 patent requires "an electric motor spaced between the top and bottom of said handle and located in said handle."  A332. Below, the parties disputed whether the accused product's motor—located in the back nub of the barrel, and not between the top and bottom of the handle, as shown in the images below—meets this limitation.



A9829 (annotations added); *see also* A8209.

Zimmer's design documents explain that, when designing the Pulsavac, "[i]t was the consensus that the motor and pump be kept in the top portion of the gun and *not the handle*."  A8388 (emphasis added). According to the documents, the engineers placed the motor in the nub at the back of the barrel to allow "noise from the motor and pump to resonate and not be muffled by the operator's hand."  *Id.*  The motor was also intentionally placed in the nub because it might "over heat[] and possibly

24

injur[e] the operator."  A8394; *see* A2307:16-24.  Zimmer's design documents also note that "the motor located in the handle would create problems in keeping the handle small."  A8384.  Further, Zimmer presented uncontested testimony that the motor was placed behind the hand when in the primary "pistol" holding position to create an ergonomically balanced handpiece.  A2307:1-08:10.

Zimmer's design documents also show that, although the Pulsavac was designed with "the option of two different handgrip positions," A8400, including one on the front portion of the barrel, neither handgrip position includes the nub at the back of the barrel.



A8206-07; A9829 (emphasis added).  The design documents also make clear that only these two areas were designed to be held by a hand because the designers of the Pulsavac decided "[t]he final model will have . . . [r]ibbing

details for the handle grip areas." A8409; *see also* A8417; A8422; A8206-07 (¶24). No other areas have such ribbing details.

**B. The Accused Products' Front End**

All of the '807 patent's asserted claims require "a front end *for receiving* the discharge tube and the suction tube." A366 (emphasis added). The front end of Zimmer's Pulsavac, however, does not *receive* the suction and drain tubes. Instead, in the Pulsavac, the front end of the handpiece has two male nozzles, one to insert into the suction tube and one to insert into the discharge tube. A9935-36.

The Accused Device:



*See id.* Thus, unlike in the '807 patent, "the female openings on the tip receive the tapered male nozzles of the handpiece," not the other way around as required by the '807 patent's claims. A9936 (¶¶96-97). Stated

26

differently, Zimmer's Pulsavac devices have a drain flow path that "flows from a wider tube [i.e., the suction tube] to a narrower tube," and thus have the same "clogging problem" that the '807 patent purports to have solved. A9932-33.

## VI. District Court Proceedings

### A. Infringement of the '329 Patent

#### 1. Claim Construction ("Handle")

Below, the parties disputed the proper construction for "handle." Stryker's proffered construction was "a portion of a device designed to be held by a hand or hands." A80-81. For its part, Zimmer proposed giving the term its plain and ordinary meaning, and explained that Stryker's construction was too broad because it ignored the important distinction between the handpiece's "barrel" and "handle." *Id.*; *see supra* at 7-11. The district court nonetheless adopted Stryker's proffered construction, defining the handpiece's handle as any "portion of the device designed to be held by a hand or hands." A81.

The district court refused to refine its construction even after Zimmer explained that, during prosecution of the related parent application, Stryker explicitly disclaimed an interpretation of "handle" that would include the barrel (and, in particular, the back nub of the barrel) to distinguish its claims over the Mattchen patent. A105-06; *see supra* at 10-11. Despite its clear

27

statement that a motor located in the nub of a barrel "is not in the handle," Stryker argued that differences between the claims in the parent application (where it made the disclaimer) and asserted claim 2 were such that the disclaimer could not apply to claim 2. Specifically, Stryker argued (and the court eventually agreed) that "[t]he 133 patent application distinguished between the 'handle' and the 'barrel' of the handpiece; claim 2 of the '329 patent draws no such distinction." A106 (citation omitted). Zimmer responded that the correct test for whether claim disavowal attaches to a later-filed related application is whether the same claim limitation is at issue in both applications, not whether one of the applications adds additional limitations. A16614 (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007)).

### 2. Infringement Under the District Court's "Handle" Construction

After the jury found that the accused products infringed claim 2 of the '329 patent both literally and by equivalents, Zimmer moved for JMOL on the ground that there was no evidence showing the nub of the barrel in the Pulsavac was "designed to be held by a hand or hands," as the court's construction required. A16617-25. Zimmer pointed to evidence establishing that its devices were designed to be gripped only on the two areas having textured grooves, which do not include the area where the

28

motor is located. *Id.*; *see supra* at 24-26. Zimmer also explained that all of Stryker's infringement evidence focused solely on whether the Pulsavac *could* be held by the nub at the back of the barrel, not whether it was designed to be so held, as the court's construction required. A16622-24.

Specifically, Stryker relied heavily on deposition testimony from Mr. May, a Pulsavac designer. A20130-31; A8288 (154:19-25). While Mr. May pointed to the area encasing the motor on the Pulsavac handpiece and stated that "you can technically say that's a handle," he said so because he felt that "[y]ou *might* be able to palm it." A8288 (154:22-25) (emphasis added). He did not know whether surgeons actually do so. Mr. May also explained the true design purpose of the "nub," stating that "[t]his needed to be there because there's a motor behind this casing, and it had to be rounded off." A20130-31; A8288 (154:19-25). Stryker also relied on testimony from Mr. Donaldson, a Zimmer Pulsavac project leader, who testified that "I mean infinitely you could hold it on your hand, you could hold it like this, you could hold it like this, or you could hold it like this or you could hold it like this and use this finger. There is several different ways to hold it." A20131; A18125 (199:11-16). For its part, Zimmer explained that this testimony from Mr. May and Mr. Donaldson does not address how the Pulsavac was *designed* to be held. Rather, the testimony merely describes

29

hypothetically how someone *could* hold the Pulsavac, which is irrelevant under the district court's construction of "handle." A16623-24.

Turning to the jury's infringement finding under the doctrine of equivalents ("DOE"), Zimmer asserted that prosecution history estoppel precludes Stryker recapturing via DOE what it disclaimed during prosecution. A16625-26. Zimmer also explained that Stryker's DOE infringement theory—that placing the motor in a portion of the device *not* designed to be held by the hands is equivalent to placing the motor in a portion of the device designed to be held by the hands—vitiates the "handle" limitation and thus is legally impermissible. A16626-27. Finally, Zimmer explained that the Pulsavac could not infringe under Stryker's DOE theory because there are substantial differences between the claimed invention (with a motor in the handle) and the accused device (which has a motor in the barrel). In particular, Zimmer's design documents show that placing the Pulsavac's motor in the nub at the back of the barrel serves three undisputed functions different from the claimed motor in the handle: (1) it allows for a smaller and more ergonomic handle than one built to contain a motor; (2) it avoids the handle getting warm due to heat from the motor; and (3) it facilitates an ergonomically balanced handpiece by placing the motor behind the hand in the primary holding position. A16627-28.

### B.    The '807 Patent

#### 1.    Summary Judgment of Infringement

The district court granted summary judgment of infringement of the '807 patent's asserted claims, each of which requires "a front end for receiving the discharge tube and the suction tube."  A366.  In opposing Stryker's motion for summary judgment of infringement, Zimmer asserted that, at a minimum, there was a genuine factual dispute as to whether the front end of the Pulsavac "receives" the discharge tube and suction tube since, in fact, the reverse is true: those tubes "receive" the front end of the Pulsavac.  A9837-38; *see supra* at 26-27.  The district court nonetheless granted summary judgment of infringement, reasoning that "Zimmer's reading of 'receive' is artificially narrow," and that "[n]othing about the word 'receives' requires a certain type of connector," notwithstanding that dictionaries define "receive" as "to act as a receptacle or container for." A118; *see infra* at 57.

#### 2.    Anticipation

At trial, Zimmer presented evidence showing that the prior art Varapulse device had the requisite "lock assembly" as the court had construed the term—i.e., as any "components that work together to secure or fasten the tip to the hand piece."  *See supra* at 14-19.

31

For its part, Stryker presented evidence directed *not* to whether Varapulse's friction-fit nozzle had components that "work together to secure or fasten the tip to the hand piece," but rather to whether the friction-fit nozzles had components that "lock" the tip in place under a more narrow definition of "lock." For example, Stryker's expert testified that Varapulse has "just a friction fit. It is – it is the furthest thing from a lock or lock assembly you can imagine." A19525. Other witnesses testified that the Varapulse did not have "a device that locked the tip" or "a locking mechanism," and that unlike a friction fit, Stryker's lock assembly "actually lock[ed] two pieces together such that they don't decouple." A19526-27. Conspicuously absent from Stryker's proffered testimony was evidence suggesting that Varapulse's tip was not "secured or fastened" to the handpiece. *See* A19524-27. The district court later denied Zimmer's motion for JMOL, but without expressly discussing Zimmer's "lock assembly" evidence or argument. A12-16.

### C. The '383 Patent's Invalidity Based on Obviousness

#### 1. Zimmer's Evidence of Obviousness

As explained above, Zimmer presented evidence that the asserted claims of the '383 patent would have been obvious in view of Grulke and Drews II or Grulke, Drews II, and Bales. Zimmer's expert explained to the

jury that a person of ordinary skill in the art would have been motivated to combine the teachings of Grulke with Drews II because Grulke's pneumatic motor required a large pressurized air tank, which could have been eliminated with the use of an electric motor and associated control components, as taught by Drews II. A2385:16-24. Zimmer's expert also explained that the two references are from the same field of art (surgical irrigators), and that the elements in the references were not used in any new or unusual way, but rather were used according to their known functions to produce a predictable result. A2372:18-A2373:2; A2374:15-19; A2384:22-A2385:15; A2399:9-16. Zimmer's expert further explained that Bales is from the same field of art and that a person skilled in the art would have been motivated to combine the teachings of Bales with Grulke and Drews II to avoid a jumble of tubes and wires. A2399:17-20.

In response, Stryker did not dispute that the combined prior art disclosed each and every element of the '383 patent's asserted claims and, further, that the PTO found narrower claims obvious based on the same two primary references Zimmer relied on. *See* A2713:13-A2724:22 (Stryker's expert responding to Zimmer's obviousness combinations). Instead, Stryker offered what it called a "teaching-away" theory, asserting that one of ordinary skill would not combine Grulke and Drews II (as the PTO did)

because a *literal* combination of the actual parts used in Grulke and Drews II would be inoperative. A2719:14-23. Stryker did not, however, explain why one skilled in the art would not know how to make the routine, necessary modifications to change from a pneumatic motor to an electric one. Stryker also asserted that Grulke "teaches away" from using electric motors by promoting an integrated pump and motor, which Stryker asserted would not be possible if the pneumatic design was converted to electric. A2717:22-A2719:9. But Stryker did not explain why teaching advantages of using a pneumatic motor teaches away from using an electric motor as an obvious alternative having different trade-offs and advantages.

Stryker also presented alleged evidence of secondary considerations of nonobviousness, including commercial success, industry praise, copying, and long-felt need. Zimmer responded that Stryker did not tie its alleged secondary considerations to the claimed invention. A17137-43. For example, as Zimmer noted, Stryker's expert argued that the commercial success of products covered by the '383 patent was driven by the device's ability to provide adequate fluid pressure. A17139; A2682:22-A2684:25. But the '383 patent's claims do not claim a device requiring a particular amount of fluid pressure and instead are directed to a generic "medical irrigator," which would include low-pressure irrigators like that in Drews II.

34

*See* A402-05. Further, it was undisputed that several devices on the market already provided high fluid pressure, including Zimmer's prior-art Pulsavac I, Pulsavac II, and Pulsavac III. *See* A1197:24-A1198:2) (Stryker's engineer noting the power of Zimmer's capital-equipment devices). The features allegedly driving demand were thus already being sold.

Likewise, Stryker never tied its evidence of alleged industry praise to the claimed invention's merits beyond what was readily available in the prior art, as this Court's precedent requires. A22134-35. Stryker relied on testimony from a Zimmer Pulsavac engineer, who called Stryker's SurgiLav "pioneering," and supposedly praised "Stryker's battery powered systems, with their quick setup and lack of capital equipment requirements." A19745. Although Zimmer's engineer admitted that Stryker was "the first one[] on the market" with battery-powered systems, A1466:15-25, there was no dispute that quick-setup, battery-powered pulsed lavage systems that did not require capital (i.e., external, reusable) equipment existed in the prior art. Specifically, Drews II disclosed a pulsed lavage device with an electric motor and separate battery pack. *See* A25037 (Abstract). Thus, Stryker's alleged industry praise was not tied to any features that were not already in the prior art.

35

The same is true of Stryker's alleged evidence of copying. *See* A19746-48. Below, Stryker alleged that Zimmer copied Stryker's dual-valve configuration, metal shaft, wiring, and visual design. *Id.* But Zimmer responded that these features are all unclaimed. *See* A22135; A402-05.

Stryker also argued that there was a long-felt, unmet need to remove the large boxes or tanks that came with older pneumatic-motor pulsed lavage devices. A19748; A1766:22-A1767:3. But Zimmer presented evidence that electric-powered lavage devices that predated the '383 patent, such as the Drews II device, did not have a large box or tank, and there was thus no long-felt need solved by the '383 patent. *See* A25037.

Stryker made no effort to rebut Zimmer's assertion that it would have been obvious to combine Grulke and Drews II with Bales. Stryker's only argument was that "[y]ou never even get to think about Bales, because you would never combine Grulke with Drews II." A2721:1-2.

Even though the PTO found that similar (indeed, even narrower) claims would have been obvious in view of the same primary prior-art references, the jury ultimately found the '383 patent not obvious, and the district court denied Zimmer's JMOL motion. A63-64; A12-16.

### D. Enhanced Damages and Attorneys' Fees

Following the jury's willful infringement verdict, Zimmer sought JMOL of no willful infringement based on the objective prong. Among other things, Zimmer noted that:

● When the district court denied Stryker's motion for summary judgment of infringement of the '329 patent, it noted that "Zimmer ha[d] produced evidence that would allow the jury to decide in its favor on this issue." A114.

● In denying Stryker's motion for summary judgment of validity for the '807 patent, the court explained that "Zimmer can plausibly argue to a jury that a friction fit qualifies as 'components that work together to secure or fasten the tip to the handpiece.'" A138.

● As for the '383 patent, during the discovery phase of this litigation, the PTO rejected as obvious claims that were even narrower and more difficult to invalidate than those in the '383 patent, based on the same two primary prior-art references that Zimmer relied on at trial. *See supra* at 22-23. Instead of challenging the PTO's obviousness conclusion, Stryker simply abandoned the claims. *Id.*

The district court nonetheless concluded that Zimmer's defenses were not objectively reasonable and trebled Stryker's $70 million lost-profit

award under 35 U.S.C. § 284. A58-60. The court recognized that if an "accused infringer's position is susceptible to a reasonable conclusion of no infringement," the infringer's conduct cannot be objectively unreasonable, but reasoned that "while it was conceivable that the jury could have accepted one or more of Zimmer's defenses, it was far from likely." A25-26. The court also emphasized that the jury rejected Zimmer's defenses for all three Stryker patents. A26.

In awarding treble damages, the district court emphasized the one-sidedness of the case, notwithstanding its (and the PTO's) contrary conclusions earlier in the case. A38. The district court also awarded attorneys' fees under § 285, basing its "exceptional case" finding on its willful infringement finding. The court stated:

> Here, the Court and the jury both found, by clear and convincing evidence, that Zimmer willfully infringed the 329, 807, and 383 patents. (See, e.g., Verdict, doc. # 381, at 6-7.) That is sufficient to support a finding of an exceptional case.

A51. The court also emphasized that the case "was not terribly close." A52.

## E. Marking the '383 Patent

Zimmer sought a new trial based on the district court's marking instruction for the '383 patent. On appeal, this issue is particularly important in the event this Court reverses the judgment with respect to the '329 and '807 patents, but allows the '383 patent judgment to stand.

38

It is undisputed that Stryker did not provide Zimmer with actual notice of the alleged infringement until December 10, 2010, when it filed this lawsuit. A122. Therefore, Zimmer can only be liable for infringement before that date if Stryker provided constructive notice by adequately marking its products with its patent number. A123. Below, there was no dispute that Stryker only properly marked less than 84% of the embodiments of the '383 patent. A126. In other words, Stryker sold over 820,000 unmarked units before it fixed its marking problem on the eve of trial. A7402-03; A19887:23-A19888:14.

Even though the patent-marking statute, 35 U.S.C. § 287(a), states that constructive-notice marking requires "fixing [on the patented article] the word 'patent' or the abbreviation 'pat.', together with *the number of the patent*" (emphasis added), the district court at Stryker's urging instructed the jury that, in deciding whether Stryker complied with the marking statute by marking substantially all of its products, the jury could consider "whether some portion of the Stryker products not marked with a particular patent number were marked with other related patent notices." A13568. Stryker took advantage of the instruction by showing the jury a chart in which Stryker supposedly made up for failing to mark with the '383 patent by marking with another patent:

39



A29502; A1987:15-A1988:6. Stryker also reiterated the same point during

closing arguments. A2991:6-12.

## SUMMARY OF THE ARGUMENT

The district court committed numerous errors and its judgment should

be reversed. For the '329 patent, the district court erred by construing the

"handle" of the gun-like handpiece to include any "portion of the device

designed to be held by a hand or hands," and thus include portions of the

barrel. The patent's specification, claims, and related prosecution history

plainly establish that the device's barrel is distinct from its handle. Even

under the district court's overly-broad construction, however, the jury's literal-infringement verdict cannot stand. Zimmer's design documents confirm that Zimmer intentionally put the accused device's motor in the nub at the back of the barrel and not in either of the two areas that were designed to be gripped, i.e., the areas with grooves. For its part, Stryker only put forth evidence showing that the nub portion of the Pulsavac *could* be held, not that it was actually *designed* to be held or even that it was actually held that way by any surgeons. The jury's DOE infringement finding was also legally incorrect because (1) Stryker cannot recapture what it disclaimed during prosecution via the doctrine of equivalents; (2) the three functional reasons that drove Zimmer to put its motor in the nub at the back of the barrel and not in the handle make the differences between the claim and the accused device substantial, and no reasonable jury could conclude otherwise; and (3) Stryker's DOE theory improperly vitiates the "handle" limitation.

The district court also erred in denying Zimmer's JMOL motion of invalidity of the '807 patent. Under Stryker's proffered construction of "lock assembly," Zimmer's own prior-art device taught each and every element of the asserted claims. At Stryker's prompting, the district court broadly construed "lock assembly" as "components that work together to secure or fasten the tip to the handpiece." A88-89. Stryker conceded that,

41

under this construction, it did not matter whether the components locked the tip to the handpiece, so long as they "secured or fastened" the two pieces together. But, at trial, Stryker ignored its own construction by presenting evidence directed not to whether the groove and nozzles "secured or fastened" the tip to the handpiece, but rather whether the handpiece had components that "lock" the tip in place. In short, although Stryker advanced a broad construction to support its infringement argument, it improperly advanced a different, narrow one to avoid the prior art.

The district court also erred in granting summary judgment of infringement of the '807 patent. The court misconstrued the claim term "receive" because, in the context of the male-female type of connections disclosed in the specification, the word "receive" means "to take in," "hold," or "contain." Thus, as the '807 patent makes clear, the handpieces "receive" or act as a container for the tip (and not the other way around) to prevent clogging and leaking as fluid flows from the tip into the handpiece. At minimum, there is a genuine issue of material fact as to whether the accused products receive the tip, and the district court erred in granting summary judgment.

For Stryker's third patent, the '383 patent, the district court erred in denying JMOL that the patent is obvious as a matter of law. The prior-art

42

Grulke reference discloses the same pulsed lavage device as the '383 patent claims, but with a pneumatic motor instead of an electric one. Because substituting an electric motor for a pneumatic one involves only routine skill and yields fully predictable results, no reasonable jury could conclude that the '383 patent was not obvious. The PTO confirmed that the '383 patent is obvious when it rejected even narrower claims in a related application based on the same two primary references Zimmer relied on at trial.

Even if the Court ultimately upholds infringement and/or validity for any or all of Stryker's three patents, it should reverse willful infringement because Zimmer's defenses were, at a minimum, objectively reasonable. For two of the three patents (the '329 and '807 patents), the district court itself recognized that Zimmer's defenses were reasonable when it denied Stryker's summary judgment motions, holding that reasonable jurors could decide in Zimmer's favor. For the '383 patent, the reasonableness of Zimmer's obviousness defense is supported by the fact that the PTO relied on the same primary prior-art references to reject even narrower claims. Moreover, as noted above, the only difference between the claims and the primary reference was that the claims required an electric motor rather than a pneumatic one. Even if this Court reverses on just one of Stryker's defenses, it should reverse the objective willfulness finding because the

district court's reasoning was predicated on the view that Zimmer has lost on all of its defenses.

The district court's marking instruction was also clearly erroneous. Although the relevant statute requires that Stryker mark substantially all of its products with "the number of the patent," the court instructed the jury that Stryker could satisfy its marking requirement (and thereby collect presuit damages) by marking its products with a different, related patent number. The instruction clearly prejudiced Zimmer and, if the Court finds that the only valid patent infringed was the '383 patent, this Court should remand for a new trial on marking.

## ARGUMENT

### I. Standard of Review

This Court reviews a grant of summary judgment de novo. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1365 (Fed. Cir. 2008). The Court must "draw[] all reasonable inferences in favor of the nonmovant" and "[s]ummary judgment is appropriate only when 'there is no genuine issue as to any material fact.'" *Id.* (citation omitted). The Federal Circuit reviews a district court's denial of JMOL under regional-circuit law, *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1365 (Fed. Cir. 2008), and the Sixth Circuit reviews such decisions de novo, reversing when there is "no

legally sufficient evidentiary basis for a reasonable jury to find for the prevailing party," *White v. Burlington N. & Santa Fe R.R. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (citation omitted).

This Court reviews the district court's claim construction de novo. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). Infringement, both literal and under the doctrine of equivalents, is a question of fact, reviewed for substantial evidence. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002). However, this Court reviews de novo the applicability of any "legal limitations on the application of the doctrine of equivalents," including prosecution history estoppel and claim vitiation. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997); *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001).

Anticipation is a question of fact reviewed for substantial evidence. *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010). While obviousness is an ultimate question of law reviewed de novo, it requires underlying factual determinations, which are reviewed for substantial evidence. *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1342 (Fed. Cir. 2010).

45

The threshold objective prong for willful infringement is a question of law subject to de novo review. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012). "The legal sufficiency of jury instructions on an issue of patent law is a question of Federal Circuit law which this court reviews de novo . . . ." *Bettcher Indus., Inc. v. Bunzl USA, Inc*., 661 F.3d 629, 638 (Fed. Cir. 2011). This Court orders a new trial when errors in the instructions as a whole clearly misled the jury. *Id.*

## II. The Accused Products Do Not Infringe the '329 Patent

### A. The Court Erred in Its Construction of "Handle"

The district court erred in adopting Stryker's overly-broad construction of "handle" to include any "portion of the device designed to be held by a hand or hands," and thus include portions of the barrel. The specification, claims, and prosecution history all demonstrate that the handle is distinct from the barrel. By construing "handle" to include any "portion of the device designed to be held by a hand or hands," the district court improperly blurred this distinction.

First, the specification gives the word "handle" a special meaning, illustrating and describing the "handle" of the handpiece as being distinct from the barrel. *Supra* at 7-10. The specification explains that "the

invention comprises a hand-held housing 11 having a handle 12 and a barrel 13 which extends forward from the upper end of the handle 12." A323 (3:28-32). The specification maintains this distinction between the "handle" and the "barrel" even though the handpiece is "shaped to be held . . . by the handle *or barrel*." A322 (1:34-35) (emphasis added). Thus, the specification demonstrates that whether or not a particular area can be held by a hand is not a way to distinguish the handle from the barrel. Instead, the specification discloses that even if a physician holds the "barrel," it does not turn barrel (13) into a handle (12). *See id.*

Like the specification, the plain claim language treats the handle as just one part of the handpiece, distinct from the barrel. First, claim 2's requirement of "an electric motor *spaced between the top and bottom of said handle*" suggests a substantially vertical handle (with a top and bottom) as opposed to the horizontal barrel. A332 (22:5-7) (emphasis added). In addition, claim 4, which depends from claim 2, explicitly states that the housing has a handle and a separate barrel, confirming that the handle is distinct from the barrel. *Id.* (22:37-38) ("said housing including a barrel extending forward from the top portion of said handle"). Finally, claim 2 requires "a hollow housing *comprising* a handle." *Id.* (22:2) (emphasis

47

added). If the handle and barrel were not separate, the entire handpiece would be the handle; it would not "comprise" a handle.

The district court's construction also contradicts statements Stryker made while prosecuting the parent '133 application. Stryker distinguished the prior art Mattchen patent from claims requiring "locating said motor in said handle" by telling the PTO that a motor located in the back nub of the Mattchen barrel is "not in the handle." *Supra* at 10-11. This is the same motor location as in the accused devices:



**Mattchen Prior Art**          **Accused Device**

*See* A16615 (labels added). Stryker's expert admitted as much at trial:

Q.    Now, one thing we can agree on, Mr. Sheehan, is that the motor in the Pulsavac Plus is in the same location as the motor shown in Mattchen basically, yes?

A.    I have no problem with that.  Nominally -- to the extent there are similarities, that's nominally the same position, sure. That was the point of the Patent Office.

A1684:10-15.

Because "[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution," *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995), this Court should reverse the district court's construction and clarify that the claimed "handle" cannot include the barrel and, particularly, the nub of the barrel.  While Stryker made its statements distinguishing Mattchen during prosecution of a parent application, this Court has held that "[a]s long as the same claim limitation is at issue [here, the term "handle"], prosecution disclaimer made on the same limitation in an ancestor application will attach."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003); *see also Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

Stryker's arguments to the contrary are unavailing.  While Stryker asserted that its statements distinguishing Mattchen do not apply to claim 2

49

because the parent application claims required both a handle and a barrel whereas claim 2 only requires a handle, Stryker's statements were specifically directed to the meaning of "handle," a term also used in claim 2. As such, Stryker's disclaimer should apply with equal force to asserted claim 2. *See Jonsson*, 903 F.2d at 818 (rejecting patentee's argument that the disclaimer from a prior application should not attach because the prior application included "limitations glaringly absent" from the asserted claim at issue). Adding the "barrel" limitation to the application's claims did not change the location or size of the "handle." Moreover, as this Court has explained, "we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega*, 334 F.3d at 1334.

### B. Under the Proper Construction of "Handle," Zimmer's Accused Devices Cannot Infringe as a Matter of Law

As properly construed, the accused devices cannot infringe claim 2 of the '329 patent as a matter of law. Claim 2 requires "an electric motor spaced between the top and bottom of said handle and located in said handle." A332. In Zimmer's devices, the motor is not in the handle. Instead, Zimmer intentionally placed the motor in the barrel (which has no top or bottom in the same sense as does the handle) and, more specifically,

in the nub at the back of the barrel.  *Supra* at 24-26.  As such, Zimmer's devices cannot, as a matter of law, infringe either literally or under the doctrine of equivalents, for at least the reasons discussed below.

### C. Even Under the District Court's Claim Construction, the Court Erred in Denying JMOL of Noninfringement of the '329 Patent

#### 1. Substantial Evidence Does Not Support the Jury's Finding of Literal Infringement

Even under the district court's overly-broad claim construction, the infringement verdict cannot stand.  Zimmer's design documents confirm what a cursory look at the accused device clearly shows.  In the accused Pulsavac devices, there are only two grooved areas that are "designed to be held by a hand or hands":



*See supra* at 25-26.  The nub on the back of the barrel is not one of them.

Stryker cannot point to any evidence demonstrating that the nub at the back of the barrel was "*designed* to be held by a hand," as required under the district court's construction. Rather, as explained *supra* at 28-31, the evidence Stryker introduced at trial merely demonstrates the ways in which the Pulsavac devices *could* possibly be held. Even Stryker's best evidence—deposition testimony from a Pulsavac designer that "whether or not some doctors use that, I mean, you can technically say that's [i.e. the nub is] a handle"—does not show that the nub was "designed to be held by the hand." *Supra* at 29. At best, the designer was simply agreeing it is possible to hold the handpiece by the nub. There is no evidence that a surgeon would actually hold the handpiece by the nub, let alone that the nub was "designed to be held by the hand."

Stryker's conclusory expert testimony that the accused device meets the district court's construction, *see* A1600:13-A1602:16, also cannot overcome the plain deficiency in Stryker's proffered evidence. *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268 (Fed. Cir. 2012) (reversing the denial of JMOL on invalidity and vacating on infringement despite contrary expert testimony).

### 2. The Jury's DOE Infringement Finding Was Incorrect as a Matter of Law

First, "prosecution history estoppel limits the range of equivalents available to a patentee by preventing recapture of subject matter surrendered during prosecution of the patent." *Southwall Techs.*, 54 F.3d at 1579. As explained *supra* at 10-11, during prosecution of the '329 patent's parent application, Stryker narrowed the meaning of handle when it argued the motor in the nub of the barrel in Mattchen was "not in the handle." *Supra* at 10-11. Therefore, a motor in the same location as in the Mattchen device cannot be equivalent to a motor located in the handle. *Southwall Techs.*, 54 F.3d at 1581.

Further, to support DOE infringement, Stryker must present "particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test." *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). But the record plainly shows that Zimmer placed the motor in the back nub of the Pulsavac's barrel to accomplish at least three very specific functions not present in the '329 patent's device: an ergonomic handle that can be smaller because it does not contain a motor, a handle that does not get warm from the motor's heat, and a handpiece ergonomically balanced by placing

the motor behind the hand. *Supra* at 30. There is no record evidence that rebuts these substantial functional differences. The jury's DOE infringement finding thus cannot stand as a matter of law.

Last, Stryker's DOE infringement theory is legally improper because it plainly vitiates the "handle" limitation. *See Senior Techs., Inc. v. R.F. Techs., Inc.*, 76 F. App'x 318, 321 (Fed. Cir. 2003) (unpublished) ("[I]n a binary choice situation where there are only two structural options, the patentee's claiming of one structural option implicitly and necessarily precludes the capture of the other structural option through the doctrine of equivalents." (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-46 (Fed. Cir. 2001)).

## III. The District Court Erred in Denying Zimmer's Motion for JMOL of Invalidity of the '807 Patent

At trial, the '807 patent's validity turned on a single issue—whether the Varapulse prior-art device had a "lock assembly." The undisputed evidence demonstrates that Varapulse does, in fact, disclose the "lock assembly" as Stryker and the district court defined the term. At Stryker's prompting, the district court broadly construed "lock assembly" as "components that work together to secure or fasten the tip to the hand piece." A88-89. When the district court challenged Stryker on whether the '807 patent could be valid with such a broad construction because even a

paperclip and rubber band might meet that limitation, Stryker acknowledged the validity problem, but assured the court that "[w]e have to live by it on the other side of the coin, of course, which is the invalidity analysis. That's for another day. We understand that." A7093:24-A7094:2. But when the day did come, the district court let Stryker dodge the validity issue by ignoring the "secures or fastens" construction, focusing instead on whether the tip "locked" on to the handpiece. *See supra* at 31-32. The court did so even though Stryker's counsel said just the opposite at the *Markman* hearing—i.e., that under the "secures or fastens" construction, it did not matter whether the tip had a lock:

> THE COURT: But where in your construction are any of those structural elements limited? *Haven't you just said effectively components -- I don't care whether it's a lock or not --* it's a component that achieves the function.
>
> MR. VOGLER: *That's right . . . .*

A7095:21-25 (emphases added).

"[I]t is axiomatic that claims are construed the same way for both invalidity and infringement." *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009). The district court recognized in granting infringement summary judgment that "secure or fasten" was all that was required. A117. The same definition must apply to the validity issue.

55

The Varapulse's instructions plainly state that the tip is "secure[ed]" to the handpiece. *Supra* at 18-19. Moreover, Stryker's named inventor and expert witness both conceded that a nozzle and corresponding hole connection like Varapulse's fall within the district court's broad construction of "lock assembly." *Supra* at 19. Indeed, both admitted that a nozzles-and-matching-holes structure "fastened" the tip to the handpiece. *Id.* As such, no reasonable jury could find that the prior art failed to disclose "securing or fastening" the tip in place as required by Stryker's and the district court's claim construction; therefore, the jury verdict of no anticipation should be reversed.

## IV.  The Court Erred in Granting Summary Judgment of Infringement of the '807 Patent

The district court erred in granting summary judgment of infringement of the '807 patent because the front end of Zimmer's accused devices do not "receive" the suction and drain tubes as the '807 patent's asserted claims require. The district court's construction of "receive" is too broad in the context of the '807 patent. At the very least, there is a genuine issue of material fact precluding summary judgment.

As explained *supra* at 12-14, the '807 patent purports to solve the clogging and leaking problems in the prior art by ensuring that the front of the handpiece *receives* the suction tube—i.e., the suction tube "seats in" the

handpiece—so there "is essentially no leakage of the fluid and material," and the interface between the suction tube and the handpiece "is not a constriction that could potentially serve as a clog point." *See* A358 (11:29-43). While the claim language "receives" is not identical to "seats in," in the context of this mechanical invention where the specification emphasizes the importance of certain elements receiving others instead of the reverse, the word "receives" means more than merely coupling. Indeed, the plain meaning of "receive," as demonstrated by dictionary definitions, is "to take in," "hold," or "contain." *See, e.g.*, *Random House Webster's College Dictionary* (2000) (defining "receive" as "6. to hold, bear, or contain: *The socket receives the plug*"); *American Heritage College Dictionary* (3d ed. 1997) (defining "receive" as "8. To take in, hold or contain"); *The Compact Oxford English Dictionary* (2d ed. 1999) (defining "receive" as "5. a. To take in; admit as to a receptacle or containing space"); *Merriam-Webster's Collegiate Dictionary* (10th ed. 2001) (defining "receive" as "2 a: to act as a receptacle or container for").

To prove infringement, Stryker ignored this limitation by asserting that the accused products "receive the tip assembly," even though they work oppositely. As shown *supra* at 26-27, the suction and drain tubes receive the front end of the Pulsavac, not the other way around. The Pulsavac design

57

thus has the same problem the '807 patent purports to solve. The accused products do not meet this limitation and, accordingly, this Court should reverse the district court's summary judgment. At a minimum, there is a genuine issue of material fact regarding whether the accused products receive the tip.

## V.    The District Court Erred in Denying JMOL of Obviousness of the '383 Patent

The obviousness question on appeal is whether one of ordinary skill in the art would have been motivated to replace the pneumatic motor and associated pneumatic motor control in Grulke (which disclosed every claim element except the electric motor) with an electric motor and associated control as suggested by Drews II (which disclosed a pulsed lavage device with an electric motor in the handpiece). Stryker did not argue the different claims separately or dispute Zimmer's reliance on a third reference (Bales) combined with Grulke and Drews II, contending instead that "[y]ou never even get to think about Bales, because you would never combine Grulke with Drews II." A2721:1-2. Thus, all the asserted claims rise or fall together on the combination of Grulke and Drews II. *See supra* at 21-23.

### A.    The Obvious Motivation to Combine

As Zimmer's expert explained, there was an obvious motivation to combine the references, as replacing Grulke's pneumatic motor and

components with Drews II's electric motor and components would have eliminated the need for large gas tanks. A2385:16-24. The combination uses the claimed elements according to their known functions to produce a predictable result. *Supra* at 32-33. Stryker did not contest any of that.

### B.    Stryker's Teaching-Away Argument Fails

Stryker's only response to the intuitive motivation to combine was to offer a teaching-away theory—that one of ordinary skill would not combine Grulke and Drews II because physically connecting the actual parts would not work. As Stryker's expert explained the problem, the pump disclosed in Grulke was designed to work with a pneumatic motor, and was therefore incompatible with an electric motor. A2717:22-A2719:23. But the Supreme Court has rejected the notion that one of skill in the art is such an "automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Stryker's teaching-away argument also ignores that a person of ordinary skill would combine not only Drews II's electric motor, but its control assembly (and other electric components) with the design of Grulke. A2385:10-15. One of ordinary skill in the art is not so robotic that he could do nothing more than physically connect a choking-based pneumatic control assembly to control an electric motor. *See In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007) (noting that "we do not ignore the

modifications that one skilled in the art would make to a device borrowed from the prior art").

Stryker's assertion that Grulke "teaches away" from using electric motors by promoting an integrated pump and pneumatic motor is also legally incorrect because nothing in Grulke suggests electric motors are undesirable for handheld pulsed lavage devices. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed."). Stryker's teaching-away argument is wrong as a matter of law.

## C. Stryker's Secondary Considerations Lack Nexus to the Claims

Because the prior art discloses each and every element of the '383 patent's claims, and because there is an obvious reason why one of ordinary skill in the art would combine the references, Stryker had to defend its patents on tangential evidence of secondary considerations. But secondary considerations cannot overcome a strong showing of obviousness where the alleged invention merely combines known elements according to their known functions. *E.g.*, *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).

60

Moreover, Stryker's reliance on secondary considerations fails for the independent reason that "a nexus between the [secondary consideration] and the novel aspects of the claimed invention must exist for evidence of [the secondary consideration] to be given significant weight in an obviousness analysis," and Stryker failed to set forth evidence of the nexus. *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012).

For example, Stryker and the district court both relied on testimony from a Zimmer Pulsavac engineer who called Stryker's SurgiLav "pioneering," and allegedly praised "Stryker's battery-powered systems, with their quick setup and lack of capital equipment requirements." A19745; A2; A23. But, this Court has held that "[i]f [a secondary consideration] is due to an element in the prior art, no nexus exists." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2011); *see also J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("[T]he asserted [secondary consideration] of the product must be due to the merits of the claimed invention *beyond what was readily available in the prior art*." (emphasis added)). Here, there is no dispute that quick-setup, battery-powered pulsed lavage systems that did not require capital equipment existed in the prior art. *See supra* at 35. Even if Stryker was the first to commercialize battery-powered lavage

61

devices with electric motors in orthopedic surgery, the asserted claims are in no way limited to devices for use in orthopedic surgery. Instead, they are drawn broadly to cover any "medical irrigator." A402. There is no dispute that Drews II had already disclosed battery-powered lavage devices with electric motors. *See* A25037 (Abstract). Stryker's alleged industry praise for a feature Stryker was not the first to invent is simply not legally relevant to obviousness.

Stryker's evidence of commercial success also fails as a matter of law. This Court has held that, if commercial success is due to an unclaimed feature, it is irrelevant. *Ormco*, 463 F.3d at 1324. Further, if sales were due to elements in the prior art rather than the claims, no nexus exists. *Tokai*, 632 F.3d at 1369-70. At trial, Stryker's expert argued that the products' high fluid pressure drove their success. A2682:22-A2684:25. But the '383 patent does not claim a device having high fluid pressure. The claims are broadly drawn to any irrigators, including low-pressure irrigators like that of Drews II. *See* A402-05. Further, devices already being sold on the market like Zimmer's prior-art Pulsavac I, Pulsavac II, and Pulsavac III provided high fluid pressure. *See* A1197:24-A1198:2). Because the features allegedly driving demand were already being sold, Stryker's alleged commercial success is not relevant to obviousness.

This Court's decision in *Western Union Co. v. MoneyGram Payment Systems, Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010), is instructive. There, Western Union asserted demand for their product was driven by formless money transfer. The Court explained:

> Western Union does not claim that it invented a formless money transfer system or that systems such as Orlandi Valuta are not prior art to the claimed invention. It cannot therefore claim any commercial success that arose from features of the system found in the prior art as a consideration for nonobviousness of its claimed invention.

*Id.* So too here. Stryker did not invent the high-pressure irrigators and, what is more, the claims are not so limited.

Finally, Stryker's assertions of long-felt need and copying are legally irrelevant because, as explained *supra* at 34-36, there is no nexus to the claimed inventions. Specifically, the features that Zimmer allegedly copied are not claimed. Further, Stryker's argument that there was a long-felt but unmet need to remove the large boxes or tanks (i.e., capital equipment) that came with older pneumatic-motor irrigators ignores both that (1) these features are unclaimed and (2) Drews II disclosed these features.

## D.     The PTO Rejected Similar Claims

The PTO confirmed Zimmer's invalidity case, rejecting claims that were even narrower and more difficult to invalidate than those at issue here, based on the same two primary prior-art references, on the ground that

"it has been held that rearranging parts of an invention involves only routine skill in the art." A17229; *supra* at 22-23. Below, Stryker did not contest that the PTO found narrower claims obvious in view of the same two primary references Zimmer relied upon. A19733-36.

The PTO recognized that these combinations were obvious because they required nothing more than the rearranging of well-known parts: substituting the pneumatic motor and associated control assembly in Grulke with the electric motor and control assembly disclosed in Drews II. A17227-29 (citing *In re Japikse*, 181 F.2d 1019 (CCPA 1950)). That the PTO found narrower claims obvious in light of the same two primary prior-art references asserted in this case confirms the invalidity of the '383 patent. *Accord Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1350 (Fed. Cir. 2010) ("A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness.").

Stryker's reaction to the '504 application's rejection, both at trial and before the PTO, was telling. Stryker offered no evidence to rebut the PTO's rejection of the narrower claims based on the same prior art. Stryker also did not respond to the PTO even though the rejection came during the discovery phase of this litigation. Instead, Stryker simply abandoned the application. A17222; A2388:13-22.

64

## VI. The District Court Erred in Denying JMOL of No Willful Infringement and in Awarding Treble Damages Because Zimmer's Defenses Were Not Objectively Reckless

Stryker cannot satisfy the objective prong of the willfulness test as a matter of law. "[T]he ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge." *Bard*, 682 F.3d at 1008. Here, Zimmer's plausible defenses presented at trial—even if ultimately unsuccessful—preclude any finding of willful infringement.

### A. Zimmer's '329 Patent Noninfringement Defense Was Not Objectively Reckless

As fully explained *supra* at 46-54, Zimmer's accused devices cannot infringe the '329 patent because the motor is not in the "handle" as the claims require. Zimmer reasonably relied on the '329 patent's distinction between a "handle" and a "barrel," as well as the clear and unequivocal statements Stryker made during prosecution of the parent patent. Stryker told the PTO that the Mattchen prior-art device's motor was "not in the handle," when the motor was located in the exact same place as Zimmer's accused devices. *See Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008) (reliance on prosecution-history statements that apparently limit application of claims, even if erroneous, precludes finding

65

of willfulness). At a minimum, Zimmer's defense was not unreasonable. Indeed, the district court recognized as much during summary judgment when it denied Stryker's motion, holding that "[w]hether this portion of [Zimmer's accused] product was 'designed to be held' is a question of fact on which reasonable jurors could disagree. Zimmer has produced evidence that would allow the jury to decide in its favor on this issue." A113-14. *See Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("The district court's characterization of [plaintiff's] claims as frivolous is undermined by the fact that the court denied [defendant's] motions for summary judgment and denied each of its motions for JMOL filed during the trial."); *Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. 5:09-cv-01201, 2012 WL 4483158, at *13 (N.D. Cal. Sept. 27, 2012), *aff'd*, 734 F.3d 1332 (Fed. Cir. 2013) ("In general, a lawsuit which survives a motion for summary judgment is not objectively baseless.").

### B. Zimmer's '807 Patent Invalidity and Noninfringement Defenses Were Not Objectively Reckless

As explained *supra* at 54-58, Zimmer had both strong invalidity and noninfringement defenses for the '807 patent. Stryker's expert conceded that Zimmer's Varapulse had seven of eight claimed limitations. A1703:14-

A1704:10. As for the eighth limitation, Stryker's own engineer and expert witness admitted that the nozzle/hole structure in Varapulse "fastens," which is all the district court's construction required. *Supra* at 19. Indeed, the district court itself suggested that Zimmer's invalidity argument was reasonable when it denied Stryker's motion for summary judgment, explaining that "Zimmer can plausibly argue to a jury that" the prior-art Varapulse device anticipated the '807 patent. A138. In addition, as explained *supra* at 56-58, there is at least a genuine, material factual dispute as to whether the accused Pulsavac infringes because the accused handpieces do not "receive" suction and discharge tubes; rather, the devices have the same clogging problem that the '807 patent purports to have solved.

### C. Zimmer's '383 Patent Invalidity Defense Was Not Objectively Reckless

Below, Stryker did not even try to refute that all elements of the asserted claims were shown in Zimmer's proposed combinations. *Supra* at 21-22. In *Spine Solution*, this Court upheld validity, but rejected willfulness, reasoning that although ultimately wrong, the obviousness defense was reasonable since all elements were disclosed in the prior art. *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319-20 (Fed. Cir. 2010). There is also a perfectly rational reason why a skilled artisan would have been motivated to combine the teachings of the Grulke

reference with Drews II, as Zimmer's expert explained.  The Grulke device's pneumatic motor required a large pressurized air tank, which could have been eliminated by using an electric motor and associated components, as taught by Drews II.  A2385:16-24.

Stryker also did not dispute that the PTO rejected claims that were even narrower and more difficult to invalidate than those in the '383 patent, based on the same two primary prior-art references.  *See supra* at 22-23. That, too, shows that Zimmer's conduct was not objectively reckless.  *See, e.g.*, *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1377 (Fed. Cir. 2012) (noting "the PTO's rejection of [a] reissue application" in finding conduct not objectively reckless (internal citation omitted)). Given the PTO's obviousness finding of nearly identical claims based on the same primary prior-art references, Zimmer cannot have willfully infringed the '383 patent as a matter of law.

## VII.  The District Court's Instruction on Marking Was Erroneous and the District Court Erred in Denying JMOL Limiting Damages on the '383 Patent to Exclude Presuit Damages

The district court's instruction that, in determining whether Stryker marked substantially all of its products with the '383 patent number, the jury could consider "whether some portion of the Stryker products not marked with a particular patent number were marked with other related patent

notices," was erroneous and prejudicial, warranting a new trial. With its instruction, the district court contradicted the requirement in § 287(a) that Stryker mark substantially all of its products with "the number of the patent." A22. According to the statute's plain language, a party cannot satisfy the marking requirement for a particular asserted patent simply by marking the products with another, albeit related, patent number.

The district court held that its instruction was not erroneous because "Zimmer has not pointed to a single case holding that marking a product with a given patent is necessarily not an effective means of notifying other parties that the product is also covered by other, related patents . . . ." A21. But neither the district court nor Stryker could find a case holding that a party may comply with the marking requirement by marking its products with a different, albeit related, patent number. *See* A21-22; A18253-55. The case law's silence on the issue simply reflects the clarity in the statute, which expressly requires a patentee to mark its products with "the number of the patent," not the number of a related patent. § 287(a).

The court also held that "Zimmer has not produced any evidence that the challenged instruction was prejudicial." A22. But there is no dispute that Stryker used the instruction to its advantage (and Zimmer's detriment) by showing the jury a chart in which Stryker makes up for failing to mark its

products with the '383 patent by marking with another patent. *See supra* at 39-40. Indeed, in closing argument, Stryker's counsel never asserted that marking 84% of its products with the '383 patent was sufficient to mark "substantially all" as required by the marking statute. Instead, Stryker's sole argument to the jury was that it had marked "substantially all" of its products with the '383 patent because it had marked the products not marked with the '383 patent with the numbers of other, related patents. As such, the instruction clearly prejudiced Zimmer and, if the Court finds that the only valid patent infringed was the '383 patent, this Court should at a minimum remand for a new trial on marking.

## VIII. The District Court's Damages Calculation and the Award of Attorneys' Fees Should be Vacated

If this Court reverses or vacates infringement or validity on the '807 and '329 patents, it should also vacate the damages award because the '383 patent alone cannot support anything near the full award. Specifically, the damages calculation would be different because there is no dispute that noninfringing alternatives (i.e., the nonaccused Pulsavac Plus AC) exist for the '383 patent, *see supra* at 23, and Stryker would thus not be entitled to lost profits. In addition, the damages period for the '383 patent is shorter because it issued in 2006, six years after the '807 and '329 patents. A302; A336; A369.

Moreover, the court below was clear that its decision to treble damages was based on what it determined to be the one-sidedness of the case. A58-59. The district court gave no indication that it would come to the same conclusion if Zimmer won on one or more patents. *See id*. The same is true for the district court's conclusion that this was an exceptional case and its decision to award Stryker attorneys' fees. Indeed, the district court's award of attorneys' fees is predicated on its determination of willfulness. Accordingly, if this Court disagrees with the district court on willfulness, it should also overturn the district court's exceptional-case finding. A51-52. Moreover, if this Court reverses or vacates infringement or validity on any of the asserted patents, it should also vacate the exceptional-case finding since, in finding the case exceptional, the district court emphasized the one-sidedness of this case. *Id*.

## CONCLUSION

For the reasons set forth above, Zimmer respectfully requests that this Court reverse the district court's final judgment. At a minimum, this Court should remand for further proceedings as urged above.

January 22, 2014

Respectfully submitted,

/s/ Donald R. Dunner
Donald R. Dunner
Kara F. Stoll
Garth D. Baer
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
(202) 408-4000

Counsel for Zimmer, Inc. and Zimmer
Surgical, Inc.

CASE PARTICIPANTS ONLY Case: 13-1668 Document: 18 Page: 81 Filed: 01/22/2014

# ADDENDUM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION,
STRYKER PUERTO RICO, LTD., and
STRYKER SALES CORPORATION,

      Plaintiffs and Counter-Defendants,

v.

ZIMMER INC., and
ZIMMER SURGICAL, INC.,

      Defendants and Counter-Plaintiffs.

_____/

CASE NO. 1:10-CV-1223

HON. ROBERT J. JONKER

## FINAL JUDGMENT AND PERMANENT INJUNCTION

Based on the prior rulings of the Court and the verdict of the jury, and after considering the proposed forms of judgment submitted by the parties, IT IS ORDERED, ADJUDGED, DECLARED and DECREED that the Plaintiffs Stryker Corporation, Stryker Puerto Rico, Ltd., and Stryker Sales Corporation have judgment against Defendants Zimmer Inc. and Zimmer Surgical, Inc., as follows:

1.     That Defendants Zimmer, Inc. and Zimmer Surgical, Inc. have infringed, literally and under the doctrine of equivalents, claim 2 of Stryker U.S. Patent No. 6,022,329, claims 45, 50, 51, and 52 of Stryker U.S. Patent No. 6,179,807, and claims 1, 2, 3, 8, 10, 11, 13, 17, 19, 20, 22, 24, 27, 38, 40, and 46 of Stryker U.S. Patent No. 7,144,383;

2.     That Defendants' infringement of the asserted claims of Stryker U.S. Patent Nos. 6,022,329, 6,179,807, and 7,144,383 was willful;

3.     That this case is exceptional pursuant to 35 U.S.C. § 285;

4.      That enhanced damages are appropriate pursuant to 35 U.S.C. § 284;

5.      That the counterclaims and defenses raised by Zimmer are dismissed with prejudice, and that normal principles of issue and claim preclusion govern any unasserted counterclaims and defenses;

6.      That Stryker is entitled to and awarded lost profits damages in the amount of $70 million;

7.      That Stryker is entitled to and awarded supplemental damages in the amount of $2,351,257.66 for the period December 1, 2012 to February 28, 2013;

8.      That Stryker is entitled to and awarded supplemental damages in the amount of $3,757,635 for the period March 1, 2013 to June 30, 2013;

9.      That Stryker is entitled to and awarded treble damages on its lost profits award as well as its supplemental damages awards;

10.      That Stryker is entitled to and awarded reasonable attorneys' fees in an amount to be determined following the entry of final judgment;

11.      That Stryker is entitled to and awarded prejudgment interest of $11,167,670.50 on the jury award and the supplemental damages incurred from December 1, 2012 to February 28, 2013, prejudgment interest of $1,094,982.78 on the damages incurred from March 1, 2013 to June 30, 2013, and prejudgment interest calculated at a rate of 3.83%, compounded monthly, on Stryker's reasonable attorneys' fees and on any damages for the period July 1, 2013 to the entry of final judgment;

12      That Stryker is entitled to and awarded postjudgment interest in an amount to be calculated in accordance with the statute.

2

**A2**

IT IS FURTHER ORDERED, ADJUDGED, DECLARED and DECREED that Defendants Zimmer Inc. and Zimmer Surgical, Inc. are hereby permanently enjoined from the manufacture, use, importation, sale, or offer for sale within the United States of the pulsed lavage products found to infringe claims 45, 50, 51, and 52 of U.S. Patent No. 6,179,807, and products no more than colorably different therefrom.

Dated:    September 5, 2013       /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      UNITED STATES DISTRICT JUDGE

**A3**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION,
STRYKER PUERTO RICO, LTD., and
STRYKER SALES CORPORATION,

      Plaintiffs and Counter-Defendants,

                                       CASE NO. 1:10-CV-1223

v.

                                       HON. ROBERT J. JONKER

ZIMMER INC., and
ZIMMER SURGICAL, INC.,

      Defendants and Counter-Plaintiffs.

_____/

## ORDER REGARDING PARTIES' POST-VERDICT MOTIONS

### I.    BACKGROUND

      Stryker and Zimmer are the two principal participants in the market for orthopedic pulsed

lavage devices. A modern, orthopedic pulsed lavage device is a combination spray-gun and suction-

tube, used by medical professionals to clean wounds and tissue during surgery. In 2010, Stryker sued

Zimmer, alleging that Zimmer's line of Pulsavac Plus pulsed lavage devices infringed three of

Stryker's patents--U.S. Patent No. 6,022,329 ("the 329 patent"), U.S. Patent No. 7,144,383 ("the 383

patent"), and U.S. Patent No. 6,179,807 ("the 807 patent"). After claims construction and a round

of summary judgment, one infringement claim and 22 invalidity defenses remained for trial. So did

a series of remedial issues. (See Order Regarding Stryker's Motion for Partial Summary Judgment

of Infringement, doc. # 247).

      After two weeks of trial--featuring hundreds of exhibits and more than a dozen witnesses--

and multiple days of deliberation, the jury returned a verdict unequivocally in Stryker's favor. In

**A4**

particular, the jury found: (1) that the Pulsavac Plus products infringed claim 2 of the 329 patent; (2) that Zimmer failed to establish any of its 22 invalidity contentions; and (3) that Stryker was entitled to $70 million in lost profits. (Verdict, doc. # 381.) The jury also found that Zimmer willfully infringed the valid claims under the patents in suit. (*Id.*)

The jury's verdict for Stryker means that the post-verdict motions must be evaluated against the prevailing narrative at trial. Here is a summary of that narrative. Through the proceedings, the jury learned that pulsed lavage devices had, for years, served an important function in surgical procedures--cleaning out wounds and removing necrotic tissue from wound sites. Early-model pulsed lavage devices were bulky and required a centralized power source. They had to be wheeled around a hospital, from one room to another. Stryker solved the problems associated with the size and power needs of pulsed lavage devices by designing a portable, disposable, battery-powered, hand-held pulsed lavage device. Zimmer's Manufacturing Manager and Rule 30(b)(6) witness agreed that the Stryker products were "pioneering."

Zimmer had no answer for Stryker's new technology and saw its market share fall precipitously, to the point where Zimmer's presence in the pulsed lavage marketplace was at risk. Rather than relying on their own engineers to develop an alternative, Zimmer hired an independent contractor with no experience in pulsed lavage devices. In essence, Zimmer handed the independent contractor a copy of Stryker's product and said, "Make one for us." Under those conditions, it is not surprising that the finished Zimmer product turned out to look and function like Stryker's product. Nevertheless, Zimmer got its product to market quickly and in direct competition with Stryker. In doing so, it did not seek advice of outside patent counsel to assess the potential for infringement of Stryker's patents, or to opine on the validity of Stryker's patents.

2

**A5**

Once Zimmer introduced its competing product, there was fierce, direct market competition between Stryker and Zimmer. Zimmer constantly sought to lure customers away from Stryker and had a fair amount of success in doing so with its new product. Then, in 2007, Zimmer was forced to pull its product from the market due to technical problems. Zimmer had received so many complaints about its product that it decided to cease production entirely and not re-start production until December 2008, when it reentered the market. Upon reentering the market, Zimmer recaptured most of the market share it had forfeited by its year-plus absence.

Stryker filed this suit against Zimmer in 2010, alleging infringement of the 329, 807, and 383 patents. Zimmer lost every argument it advanced at claim construction, then lost most of the disputed claims on summary judgment. It lost all of its remaining claims at trial. At the time the jury announced its verdict, Zimmer had not changed its product design.[1] This is consistent with both the market and litigation strategy that Zimmer has followed for years. Zimmer chose a high-risk/high-reward strategy of competing immediately and aggressively in the pulsed lavage market and opted to worry about the potential legal consequences later. When Stryker sued, Zimmer's able counsel offered the most plausible defenses that were available to them given Zimmer's pre-litigation market conduct. Ultimately, however, the trial proofs demonstrated that this was not a close case. The

---

[1] On May 21, 2013, almost four months after the close of trial and weeks after the parties completed their third and final round of briefing on their post-verdict motions, Zimmer unilaterally filed a brief attempting to move to introduce new evidence of a recently-completed redesign of the Pulsavac Plus (doc. # 531). Stryker promptly moved to strike (docket # 534). The Zimmer redesign referenced in the unilateral filing (docket # 531) was not available to the jury at trial. Nor was the redesign raised in the course of the parties' extensive post-verdict briefing. Moreover, Stryker has not had an opportunity to conduct discovery of Zimmer's redesign or the individuals responsible for it. In light of those factors, the Court grants Stryker's motion to strike (docket # 534). In addressing the parties' post-verdict motions, the Court will not consider the information Zimmer unilaterally submitted after the jury returned its verdict, and after the parties completed post-verdict briefing.

relative quality of the expert testimony on liability was notably favorable to Stryker. On damages, the quality of the expert testimony was closer, but still favored Stryker. Zimmer ultimately stuck with an "all or nothing" damages defense--rather than trying to chip away at Stryker's proposed lost profit number or its alternative theory--and lost, as the jury's verdict demonstrates.

Both sides have brought a number of post-verdict motions. Zimmer has brought ten post-verdict motions for judgment as a matter of law ("JMOL") or for a new trial. Specifically, Zimmer has moved: (1) for JMOL to preclude Stryker from recovering lost profits damages from before November 5, 2010 (doc. # 369); (2) for JMOL as to the invalidity of claim 2 of the 329 patent, or, in the alternative, for a new trial on the validity of claim 2 (doc. # 401); (3) for JMOL barring Stryker from recovering pre-suit damages under the doctrine of laches (doc. # 418); (4) for JMOL of non-infringement of claim 2 of the 329 patent, or, in the alternative, for a new trial on the issue of non-infringement of claim 2 (doc. # 425); (5) for JMOL limiting Stryker's damages because Stryker failed to mark its pulsed lavage devices in accordance with 35 U.S.C. § 287(a) and for a new trial on the issue of marking (doc. # 430); (6) for a new trial (doc. # 435); (7) for JMOL that Stryker's asserted claims under the 383 patent are invalid, or, in the alternative, for a new trial on the validity of those claims (doc. # 438); (8) for JMOL that claims 45, 50, 51, and 52 of the 807 patent are invalid, or, in the alternative, for a new trial on the validity of those claims (doc. # 442); (9) for JMOL that Zimmer did not wilfully infringe Stryker's patents (doc. # 447); and (10) for JMOL to preclude Stryker from receiving lost profits damages and limiting Stryker's reasonable royalty recovery, or, in the alternative, for a new trial on damages (doc. # 453). Stryker has brought five post-verdict motions, seeking (1) a permanent injunction against Zimmer or, in the alternative, an ongoing royalty (doc. # 396); (2) supplemental damages (doc. # 414); (3) a finding of an

4

**A7**

"exceptional case" and an award of attorney's fees (doc. # 410); (4) an award of prejudgment interest (doc. # 399); and (5) enhanced damages for willful infringement (doc. # 405).

Both parties' post-verdict motions are addressed in this Order. The Court does not believe oral argument is necessary to illuminate the issues exhaustively briefed by the parties. For the reasons set out below, each of Zimmer's motions is **DENIED** and each of Stryker's motions is **GRANTED**.

## II.     ZIMMER'S POST-VERDICT MOTIONS

Zimmer is not entitled to prevail on any of its post-verdict motions.

### A.     Motion for JMOL to Preclude Stryker from Recovering Lost Profits Damages from Before November 5, 2010 (doc. # 369)

Zimmer's first motion is for judgment as a matter of law ("JMOL") to preclude the Stryker plaintiffs from recovering lost profits damages from before November 5, 2010, on the ground that Stryker Sales Corporation lacks constitutional standing to sue for lost profits from before that date. A party is entitled to lost profits damages from an infringer if, during the period of infringement, the party had the right to exclude others from making, using, selling, or offering to sell inventions practicing the patents-in-suit. See *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) (citing 35 U.S.C. § 271(a) and *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The question raised by Zimmer's motion is whether Stryker Sales Corporation had that right before November 5, 2010. See *id.* (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007)).

At the outset, the parties dispute whether Stryker's motion is properly characterized as asserting a lack of standing or merely as arguing against a particular damages theory. The distinction is an important one. Constitutional standing is a component of federal subject matter jurisdiction,

5

**A8**

meaning a party's lack of standing may be raised at any time in the litigation. See *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002) ("Article III standing is a jurisdictional requirement that cannot be waived, and such may be brought up at any time in the proceeding."); see also FED. R. CIV. P. 12(h)(3) (issues concerning a court's subject matter jurisdiction may be raised at any time). A motion to limit damages, on the other hand, goes to the merits of a party's claim and, therefore, may be waived if not included in the final pre-trial order. See *Rockwell Int'l Co. v. United States*, 549 U.S. 457, 474 (2007) ("[C]laims, issues, defenses or theories of damages not included in the pretrial order are waived."); *Ghandi v. Detroit Police Dep't*, 823 F.2d 959, 962-63 (6th Cir. 1987) ("[A]n attempt to pursue any issue not listed in the [final pre-trial] order may be rejected by the Court."). The issue was not preserved in the final pre-trial order in this case. (See Order Accepting Parties' Pretrial Order, doc. # 345; Proposed Final Pretrial Order, doc. # 338.)

Zimmer casts its motion as asserting that Stryker lacks standing to pursue lost profits damages from before November 5, 2010. But Zimmer does not contest that Stryker Sales Corporation has standing to pursue lost profits damages after that date. Zimmer acknowledges, then, that Stryker Sales Corporation has standing to pursue *some* lost profits damages; it simply believes that Stryker is not entitled to *all* the lost profits damages it seeks. The dispute underlying Zimmer's motion, in other words, is not whether Stryker has claimed an injury that might entitle it to lost profits damages; it is the extent of that injury. That is the essence of the difference between a motion to limit damages and a motion challenging standing. Cf. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (to survive a standing challenge, a plaintiff need only demonstrate that it has "standing for each claim [it] seeks to press and for each form of relief that is sought") (internal quotations omitted). Because Zimmer's motion is one to limit lost profits damages, rather than a motion challenging Stryker's

6

**A9**

standing to pursue lost profit damages altogether, it is waived unless Zimmer raised it in the pre-trial order. A review of the Court's pre-trial order reveals that Zimmer did not raise the issue there, meaning it waived the argument going forward. (See Proposed Pre-Trial Order, doc. # 338; Order Accepting Pre-Trial Order Subject to Limitations, doc. # 345.) Consequently, Zimmer's motion must be denied as untimely.

Even on the merits, Zimmer is not entitled to prevail. Stryker Sales Corporation or other Stryker affiliates had full control over the patents-in-suit from 2002, when the earliest one issued. Stryker never shared with anyone outside the Stryker family more than a non-exclusive license to practice certain aspects of one of the patents. A series of *nunc pro tunc* agreements executed among the Stryker plaintiffs on November 5, 2010 formalized the rights among the Stryker parties. (See, *Nunc Pro Tunc* Amendment, Pls.' Trial Ex. 124-27.) By their terms, the agreements were retroactive, so that, under the agreements, Stryker Sales Corporation's exclusive license stretches back to January 1, 2002. (*Id.*) No one other than a Stryker party has ever had power to exclude others from practicing the patents-in-suit.

Zimmer complains, first, that Stryker had only a bare license, not an exclusive license. An exclusive license is one that gives the licensee the right to exclude others from making, using, selling, or offering to sell inventions practicing particular patents. See *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010). A bare license, by contrast, is simply a covenant by the licensor not to sue the licensee for using the licensor's property in a specified manner. See *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1032 (Fed. Cir. 1995). Only an "exclusive licensee"--that is, the holder of an exclusive license--may sue for lost profits damages. *Id.* Because Stryker independently gave Davol a limited license to practice the patents-in-suit for

7

**A10**

pulsed lavage devices with batteries in the handpiece, Zimmer contends that Stryker Sales Corporation is precluded from seeking lost profits.

The Court disagrees and concludes that Stryker had the right to seek lost profits as an exclusive licensee. By its terms, Stryker Sales Corporation's license empowered it to exclude others from selling or offering to sell pulsed lavage devices practicing the patents-in-suit with batteries outside the handpieces. (See *Nunc Pro Tunc* Amendment, Pls.' Trial Ex. 126, ¶ 7 (granting Stryker Sales Corporation "Exclusive Sub-Licens[e] and Exclusive Distributor[ship] with Respect to Pulsed Lavage Products"); see also Distribution Agreement, Pls.' Trial Ex. 120, ¶ 2.01 (giving Stryker Sales Corporation rights as "exclusive distributor").) That made the license an exclusive one. The license was exclusive, not because Stryker Sales Corporation was the one and only party practicing the patents-in-suit in certain categories of pulsed lavage devices, but because it gave Stryker Sales Corporation the power to choose who else could practice the patents-in-suit for those categories of pulsed lavage devices (*i.e.*, the power to exclude others from practicing the patents-in-suit). *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) ("Parties that hold the exclusionary rights [under a patent] are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention."); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal.*, 248 F.3d 1333, 1346 (Fed. Cir. 2001) ("A party . . . that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is . . . injured by another entity that makes, uses, or sells the invention."). Stryker Sales Corporation did not lose the power to exclude when it allowed Davol to practice the patents-in-suit, any more than a landowner loses the power to exclude the whole public from his property when he chooses to admit a guest. In particular, Stryker Sales Corporation

8

**A11**

retained the right to keep Zimmer from practicing the patents-in-suit in pulsed lavage devices with batteries outside the handpiece. Thus, Davol's limited license to practice the patents-in-suit did not change the fact that Stryker Sales Corporation's license was exclusive for purposes of this suit.

Zimmer's broader challenge is to the retroactive application of the *nunc pro tunc* agreements. Zimmer contends that the agreements cannot give Stryker Sales Corporation the right to lost profits damages for a period when Stryker Sales Corporation was not actually an exclusive licensee of the patents-in-suit. At bottom, that is just another way of saying that *nunc pro tunc* agreements should not be retroactively effective. As Stryker points out, crediting Zimmer's argument would eliminate the possibility of *nunc pro tunc* agreements, despite their well-established use in the law. Indeed, the Federal Circuit has, in the past, given retroactive effect to *nunc pro tunc* agreements like the ones here at issue. See, e.g., *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1210-11 (Fed. Cir. 1998). Of course, a party may not use *nunc pro tunc* agreements to manufacture standing where it would not otherwise exist. See, e.g., *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). That is not an issue here, though. As noted above, Stryker Sales Corporation unquestionably has standing to sue for lost profits damages in this case, regardless of whether the *nunc pro tunc* agreements are retroactively effective. Consequently, the agreements are enforceable as written, meaning Stryker Sales Corporation is entitled to lost profits damages for any infringement by Zimmer during the period at issue in this litigation. See *Mas-Hamilton Grp.*, 156 F.3d at 1211.

**B.**     **Motions for JMOL as to the Invalidity of Claim 2 of the 329 Patent and the Asserted Claims of the 383 and 807 Patents, or, in the Alternative, for a New Trial on the Validity of Those Claims (doc. ## 401, 438, and 442)**

Zimmer next argues that the jury erred in rejecting Zimmer's invalidity defenses on several claims of the patents-in-suit, so that JMOL on invalidity is appropriate. Rule 50 of the Federal Rules

of Civil Procedure permits a court to render JMOL only if a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. FED. R. CIV. P. 50(a)(1). Phrased differently, the question is "whether a party has produced evidence 'legally sufficient' to warrant a jury determination in that party's favor." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, n.5 (2007) (quoting Fed. R. Civ. P. 50(a)(1)). Rule 50's standard for JMOL mirrors Rule 56's standard for summary judgment so that, in ruling on a motion for JMOL, a court must consider the entire record and draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

The validity of the claims at issue in this case has been thoroughly explored--both before and during this litigation. In deciding to issue the patents-in-suit, the Patent Office conferred a presumption of validity on the claims. At summary judgment, the Court thoroughly considered the validity of several claims in the patents-in-suit. And, at trial, each side spent hours arguing the issue of validity to the jury. At every stage, the decision-maker rejected Zimmer's contention that claims within the patents-in-suit were invalid. Everything about the history of this case suggests that a reasonable jury could readily conclude that Zimmer failed to establish invalidity by the clear and convincing evidence required. See 35 U.S.C. § 282 ("A patent shall be presumed valid."); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) (emphasizing the same); Order Denying Zimmer's Mot. for Summ. J. of Invalidity, doc. # 249; *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (to prevail on motion for JMOL, movant "must overcome the substantial deference owed to a jury verdict"); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012) (same). Zimmer's bare disagreement with the jury's conclusion on validity is not, by itself, a reason to second-guess all those earlier decisions.

10

**A13**

In each of its motions for JMOL on invalidity, Zimmer asserts that Stryker either read nonexistent limitations into the contested claims or misrepresented the law regarding anticipation and obviousness. For instance, with respect to the validity of claim 2 of the 329 patent, Zimmer says "Stryker argued [the] Ito [device] is not a pulsed irrigation handpiece because its water reservoir is too small for knee surgery . . . [notwithstanding that] claim does not require a certain sized water reservoir nor is its use limited to knee surgery." (Def.'s Br. in Supp. of Motion for JMOL, doc. # 402, at 5.) The purported "limitations" of which Zimmer complains, however, are really just distinctions between the prior art references and the claimed inventions. Far from rendering such distinctions impermissible, the law on obviousness expressly requires the jury to consider whether a prior art reference is "from the same field of endeavor [or] reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). Evidence that a device from one field has no clear connection to a second field, or that it would be impractical to use the device in the second field, plainly makes it less likely that the device rendered obvious an invention in the second field. For that reason, Stryker's arguments distinguishing its inventions from Zimmer's prior art references furnish an adequate basis from which a reasonable jury could conclude that the claimed inventions were non-obvious.

More to the point, what Stryker argued at trial is not dispositive for purposes of reviewing a motion for JMOL. The question on JMOL is whether Zimmer can show, based on the record evidence, that the jury could not reasonably have found for Stryker. FED. R. CIV. P. 50(a)(1). But a reasonable jury could very well have found in Stryker's favor on the validity issues, based on the record in this case. In the course of hours of testimony, first by the inventor of the patents-in-suit, and then by Stryker's technical expert, Stryker meticulously distinguished its inventions from

11

**A14**

Zimmer's prior art references--by pointing out why the prior art references did not constitute "prior art" under 35 U.S.C. § 103, by emphasizing why the patents-in-suit were not rendered obvious by the prior art references, and by illustrating why the prior art references did not disclose a particular element from a given claim. (See, e.g, Trial. Tr., doc. # 388, at 20 (testimony by Stryker's technical expert, Neil Sheehan, explaining why a person of ordinary skill in the art would not think the Ito device rendered the patents-in-suit obvious); *id.* at 22-23 (testimony by Sheehan explaining that the Ito device does not, in fact, disclose a yoke)). Zimmer, obviously, disagreed with those distinctions and its own technical expert spent several hours at trial explaining why he thought they were wrong. The jury, however, was entitled to credit Stryker's expert's opinions about whether the claims at issue were anticipated or whether they would have been obvious to one of ordinary skill in the art. It was certainly not unreasonable for doing so, any more than the patent office was unreasonable for granting the patents in the first place, or the Court was unreasonable for denying Zimmer's earlier motions for summary judgment on the basis of invalidity. Because the jury could reasonably have adopted Stryker's distinctions over Zimmer's arguments to the contrary, JMOL is simply not appropriate here.

For many of the same reasons, Zimmer's motions for a new trial on the validity of the contested claims are also denied. Under Rule 59, after a jury trial, "[a] court may, on motion, grant a new trial on all or some of the issues . . . for any of the reasons for which new trials have heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). "Generally, a court may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000); see also

**A15**

*Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (same point). A court reviewing a motion under Rule 59 "must compare and weigh the opposing evidence." *Clay v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir. 2000). However, "while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached." *Conte*, 215 F.3d at 637 (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)).

Stryker's technical expert plausibly distinguished the claimed inventions from Zimmer's prior art references and explained why the claimed inventions would not have been obvious to one of ordinary skill in the art based on those references. Zimmer's bare disagreement with those distinctions does not mean the jury's verdict implicitly adopting them was against the great weight of the evidence. See, e.g., *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353-54 (Fed. Cir. 2012) (noting that, while the question of obviousness is ultimately one of law, the question of what a reference teaches or whether a person of ordinary skill in the art would have been motivated to combine the teachings of separate references are questions of fact, entitled to deference). To the contrary, Stryker's expert on validity issues was clear, understandable, and convincing in his testimony. Consequently, Zimmer is not entitled to a new trial on the validity of any of the asserted claims.

### C.    Zimmer's Motion for JMOL of Non-Infringement of Claim 2 of the 329 Patent, or, in the Alternative, for a New Trial (doc. # 425)

Zimmer's next motion is for JMOL--or, alternatively, a new trial on the issue--of non-infringement of claim 2 of the 329 patent. The sole issue in the motion is whether, as a matter of law, the motor in the Pulsavac Plus devices is in the handle of the devices. At claim construction, the Court defined "handle" to mean "a portion of the device designed to be held by a hand or hands." (Mem. Op., doc. # 106, at 8-9.)

Zimmer's motion for JMOL of non-infringement is substantively identical to Zimmer's earlier motion for summary judgment of non-infringement on the same claim (doc. # 165). It raises the same arguments and relies on the same evidence. At summary judgment, the Court categorically dismissed those arguments and found that a "reasonable jury could conclude that the Pulsavac Plus devices include an electric motor in a part of the housing designed to be held by the hand or hands." (Order Denying Mot. for Summ. J. of Non-Infringement, doc. # 248, at 3.)

The Court sees no reason to upset its earlier conclusions, especially in light of the testimony from multiple witnesses--including the designer of the Pulsavac Plus and the individual in charge of developing the Pulsavac Plus--that the battery in the Pulsavac Plus devices was in a part of the device designed to be held by the hand or hands. (See, e.g., May Dep. Tr., doc. # 458-5, at 6 (testimony of design engineer of Pulsavac Plus explaining that Pulsavac Plus was "designed to be held in multiple locations" and proceeding to demonstrate how "you can technically say [the portion of the Pulsavac Plus housing the motor] is a handle"); see also Trial Tr., doc. # 359, at 28-30 (testimony of Stryker's expert, Neil Sheehan, explaining how Pulsavac Plus meets "handle" limitation under Court's construction of that term)). That testimony affords an entirely legitimate basis from which a reasonable jury could conclude that the motor in the Pulsavac Plus devices was in the handle of the devices. As with practically all issues raised at trial, Zimmer presented some evidence suggesting the opposite conclusion. But that evidence was not so substantial or overwhelming as to render the jury's verdict on infringement of claim 2 categorically unreasonable, or even against the great weight of the evidence. See *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (grant of new trial was inappropriate "where the case came down to a question of who the jury believed").

14

**A17**

Zimmer's other objections--that Stryker's statements during prosecution of an earlier patent foreclosed its infringement claims in this case, and that Stryker is estopped from claiming infringement--were thoroughly addressed and properly rejected at the summary judgment stage. (See Order Denying Mot. for Summ. J. of Non-Infringement, doc. # 248, at 3-5.) Nothing that has happened since summary judgment has affected the validity of the Court's decision.

**D.      Zimmer's Motion for JMOL Limiting Damages Under 35 U.S.C. § 287(a) and for a New Trial on the Issue of Patent Marking (doc. # 430)**

Next, Zimmer argues that it is entitled to JMOL and a new trial because Stryker did not mark substantially all of the commercial embodiments of the patents-in-suit with the appropriate patent numbers. The patent marking statute provides that:

> Patentees . . . may give notice to the public that [a product] is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of a failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a). Compliance with the marking statute does not require that a patentee mark every patented article with the corresponding patents. Rather, it suffices that "substantially all" of the patented articles are properly marked. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). Furthermore, as the patent marking statute suggests, when it is impracticable to mark the product itself, a patentee may comply with the marking statute by marking the patent numbers on the packaging for the product. See, e.g., *Sessions v. Romadka*, 145 U.S. 29, 50 (1892).

15

**A18**

Zimmer urges that Stryker should not be permitted to recover damages from before December 10, 2010 (the day it filed suit in this matter) for four reasons: (1) it failed to mark any of its actual products with the numbers for the patents-in-suit; (2) it failed to provide evidence from which a reasonable jury could conclude that Stryker marked substantially all of its product labels with the numbers for the patents-in-suit; (3) it failed to mark, in any way, over 800,000 of its actual products with the numbers for the patents-in-suit; and (4) it failed to provide evidence from which a reasonable jury could find that Stryker marked substantially all of its products with the 383 and 807 patents before October 14, 2010, and with the 329 patent before August 14, 2006.

The Court addressed and rejected Zimmer's first and third arguments for JMOL at summary judgment. (Order, doc. # 246, at 5-8.) Zimmer has not come forward with any new arguments on either of those fronts, so there is no reason for the Court to revisit its earlier determinations.

Zimmer's second and fourth arguments for JMOL go to the sufficiency of the evidence Stryker presented at trial and, as such, were not addressed in the Court's earlier orders. Neither argument is meritorious however. Zimmer's second argument--that Stryker failed to produce evidence sufficient to convince a reasonable jury that it marked substantially all of its product labels with the numbers for the patents-in-suit--is belied by the record. Stryker employee Jan Haan, for example, testified to having personally reviewed hundreds of documents confirming that Stryker marked the appropriate patent number on the labeling of substantially all of its products during the period in question. (See, e.g., Trial Tr., doc. # 384, at 793-96, 803-05.) Zimmer objects that Haan's testimony did not distinguish between marking the product label and marking the carton label or the instructions for use. Not only does the case law fail to distinguish between marking one form of labeling as opposed to another for purposes of the marking statute, but a sampling of actual product

16

**A19**

labels from the period in question appears to confirm that Stryker marked the product labels, themselves, with the patent numbers. (See Def.'s Tr. Ex. AAU (copies of product labels for numerous product codes, all showing appropriate patent numbers on the product label).) All of which is to say that there was enough evidence for a reasonable jury to conclude that Stryker marked substantially all of the product labels with the appropriate patent numbers.

Zimmer's remaining argument in support of its motion for JMOL is that Stryker failed to provide sufficient evidence of the date when it began marking its labels with the patents-in-suit. Specifically, it argues that no reasonable jury could have found, as did the jury in this case, that Stryker marked substantially all of its patented products with the 329 patent prior to August 14, 2006, and with the 383 and 807 patents prior to October 14, 2010, as there was no evidence at trial of the "date by which [Stryker] began to mark substantially all of its products." (Def.'s Br. in Supp., doc. # 431, at 12.) But the marking statute does not require Stryker to prove that it began marking products on a particular date. It only requires that, for the period for which it seeks damages, Stryker have marked substantially all of its products with the appropriate patent numbers. See *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (under marking statute, damages are computed from the time when the patentee "either began marking its products in compliance with section 287(a)[, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier"). The relevant inquiry, then, is whether Stryker marked substantially all of its products with the 329 and 807 patents between December 10, 2004 and December 10, 2010, and whether it marked substantially all of its products with the 383 patent between December 15, 2006 and December 10, 2010. The parties largely agree that, during those periods, Stryker marked roughly 99.52% of the relevant products with the 329 patent, 99.78% of the relevant products with the 807

patent, and 83.96% of the relevant products with the 383 patents. Although, as Zimmer argued at trial, a reasonable jury might conclude that those numbers did not amount to "substantially all" of the relevant products, it is equally true that a reasonable jury could conclude that, under the circumstances, each of those percentages rises to the level of "substantially all" products. See, e.g., *Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1374-75 (Fed. Cir. 2010) (affirming that marking 88-91% of all the commercial embodiments of a patent sufficed to satisfy the marking statute). Accordingly, Zimmer is not entitled to JMOL on marking.

That leaves Zimmer's motion for a new trial on the issue of marking. Zimmer asserts that the Court erred when it instructed the jury that, in deciding whether Stryker complied with the marking statute, the jury could consider "whether some portion of the Stryker products not marked with a particular patent number were marked with other related patent notices." (See Final Draft Jury Instructions, doc. # 377-1, at Instruction # 29.) An erroneous jury instruction warrants a new trial only if the party moving for a new trial establishes, *inter alia*, that the instructions were legally erroneous and that the instructions had a prejudicial effect on the jury. *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311-12 (Fed. Cir. 2005).

In this case, Zimmer has not established that the challenged instruction was erroneous or that it had a prejudicial effect on the jury. As to whether the instruction was erroneous, Zimmer has not pointed to a single case holding that marking a product with a given patent is necessarily not an effective means of notifying other parties that the product is also covered by other, related patents from the same family as the patent with which the product is marked. To the contrary, in at least some circumstances, marking the product with a closely related patent would appear to provide

18

**A21**

reasonable persons with exactly the sort of constructive notice the patent marking statute is calculated to effect. See, e.g., *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 945-46 (S.D. Ohio 2010) (noting "the [Supreme] Court's long-standing focus on the notice effected by the method of marking the patented article rather than on the precise mechanistic compliance with the statute."). Given the broad, functional reading courts have ascribed to the patent marking statute, the Court's instruction on marking was not so clearly erroneous.

Moreover, even if the Court's instruction was erroneous, Zimmer has not produced any evidence that the challenged instruction was prejudicial. To determine whether an instruction was prejudicial, a court must consider "the entirety of the proceedings, including the jury instructions as a whole." *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 415 (Fed. Cir. 1993). Looking at Jury Instruction 29 in its entirety, it is clear the thrust of the instruction was that the jury should consider whether Stryker had shown, by a preponderance of the evidence, that it marked its products in accordance with the patent marking statute. The instruction defined "marking" as "placing the word 'patent' or the abbreviation 'PAT' with the number of the patent on substantially all of the products it sold that included the patent invention." (Final Draft Jury Instructions, doc. # 377-1, at 42.) That is, almost verbatim, the language Zimmer insists in its motion the Court should have used. It is telling, moreover, that, at trial, Zimmer argued that the challenged language from Instruction 29 actually *helped* Zimmer's case. (See Trial Tr., doc. # 389, at 138 ("So Mr. Vogler's pointing to something he says helps him. It doesn't. It makes it worse.").) On balance, then, the whole of the instructions, together with Zimmer's own arguments from trial, make clear that the jury was not erroneously instructed in a way that prejudiced Zimmer. Thus, there is no basis for granting a new trial.

19

**A22**

### E. Zimmer's Motion for JMOL of No Willful Infringement (doc. # 447)

Zimmer's next motion is for JMOL of no willful infringement. "To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its action constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). "[T]he patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.* Willfulness, then, consists of two elements: (1) an objective element that is often, but not always, a question of law, and (2) a subjective element that is inherently a question of fact, to be decided by the jury. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012).

Zimmer's motion raises several discrete issues, the first of which is whether Stryker presented any evidence at trial from which the jury could have concluded that Zimmer knew or should have known about the asserted patents. Zimmer suggests that Stryker did not, but its suggestion is belied by the record. For example, Stryker's expert, Neil Sheehan, testified that, "Zimmer knew about the patents in suit, and to the extent there are assertions that--I believe there's an assertion they didn't know about the 383. Well, they should have known. They are in the business. They should be looking at each other's patents. That's what people--that's what competitors do." (Trial Tr., doc. # 359, at 50-51.) Furthermore, as discussed above, Stryker presented ample evidence at trial that it marked substantially all of its products with the corresponding patents-in-suit, from which the jury could reasonably have inferred that Zimmer, as Stryker's chief--and, as a practical matter, only--competitor in the pulsed lavage market, either knew or should have known of the patents-in-suit well in advance of the litigation. That is especially true here, where Stryker also

20

**A23**

presented testimony from several members of Zimmer's design team that Zimmer instructed them to review Stryker's patented devices in designing the accused products. (See, e.g., Donizetti Dep., doc. # 458-3, at 3 (noting that Zimmer showed its design team a Stryker product as a model for developing the accused products); see also Trial Tr., doc. # 388, at 14-19, 60-64 (referencing Zimmer's reliance on Stryker products in developing the accused products).) From this, as well, the jury could reasonably have inferred that Zimmer either knew or had reason to know of the patents-in-suit. (See also Def.'s Resp. to Interrog., doc. # 406-2, at 4 (admitting to knowledge of the 329 and 807 patents in 2000 and 2001, respectively).)

The next issue raised in Zimmer's motion is the relevance of Stryker's decision not to seek a preliminary injunction against Zimmer. Zimmer argues that Stryker is not entitled to enhancement of any damages it incurred after filing the suit, since it could have effectively prevented those damages in the first place by seeking a preliminary injunction at the time it filed. As support for its position, Zimmer cites the Federal Circuit's decision in *In re Seagate*, 497 F.3d 1360, 1375 (Fed. Cir. 2007), where that Court observed: "a patentee who does not attempt to stop an accused infringer's activities [by seeking a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct." Zimmer reads *Seagate* as setting an absolute bar on any enhancement of post-filing damages when the patentee does not seek a preliminary injunction. On closer inspection, though, *Seagate* does not bear that reading. For one thing, taken to its logical conclusion, Zimmer's position on *Seagate* would apply, not just to post-filing willfulness damages, but also to pre-filing willfulness damages. After all, following Zimmer's logic, Stryker could have protected itself by filing earlier and seeking a preliminary injunction right away. That result, however, would all but eliminate enhancement of damages, in a way that no

Federal Circuit case has suggested. Additionally, Zimmer's position presumes that Stryker's efforts to obtain a preliminary injunction would have been successful. But there is no such guarantee, particularly given Zimmer's dogged reliance on laches and other defenses. And the idea that Stryker could have prevented Zimmer's ongoing infringement by merely filing for a preliminary injunction is controverted by the fact that, even after Stryker prevailed on dozens of distinct motions and issues pre-trial, Zimmer refused to even modify, let alone halt, its infringing conduct. Thus, the idea that Stryker had it entirely within its power to cut off Zimmer's continuing infringement by means of a preliminary injunction is simply not borne out by the facts of this case. The Court is not inclined to read *Seagate* in a way that requires such counterintuitive results. The case is more naturally read for the proposition that a patentee's decision not to seek a preliminary injunction is relevant to, but not dispositive of, the issue of enhanced damages.

Having addressed Zimmer's two preliminary arguments in this motion, the Court turns to the first prong of the willfulness analysis--whether Zimmer's conduct was objectively reasonable. If an "accused infringer's position is susceptible to a reasonable conclusion of no infringement," the infringer's conduct cannot be objectively unreasonable. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008). Zimmer's central argument on this point is that, because the Court did not grant Stryker's motions for summary judgment on the issues that went to trial, Zimmer's positions on those issues were, necessarily, reasonable. In other words, Zimmer contends that since the Court determined that a reasonable jury might agree with Zimmer's view, Zimmer was not objectively unreasonable in holding that view. The flaw in Zimmer's argument is that there is a difference between an "objectively reasonable" position and a position with which a reasonable jury could agree. The bare fact that some jury, somewhere might adopt Zimmer's position does not mean

22

**A25**

Zimmer's position is objectively reasonable. See *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009) ("[T]he fact that an issue was submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement . . . ."). To the contrary, an action is objectively unreasonable if "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

In this case, while it was conceivable that the jury could have accepted one or more of Zimmer's defenses, it was far from likely. For instance, at trial, the jury heard testimony that Zimmer all-but instructed its design team to copy Stryker's products. Along the same lines, Zimmer's lead engineer, Bill Donizetti, acknowledged Stryker's inventions to be "pioneering," suggesting they were novel and, therefore, non-obvious. On top of all that, Stryker's evidence regarding secondary considerations of non-obviousness made it dramatically less likely that Zimmer's invalidity arguments were reasonable. Specifically, Stryker clearly established that its inventions: (1) were a major commercial success; (2) solved a long-felt, unmet need to free up operating room space and replace large capital equipment with a self-contained, disposable device; (3) were copied by others, including Stryker's two leading competitors; (4) were licensed by Davol; and (5) were praised by others, including Zimmer. (See Trial Tr., doc. # 384, at 25-28 (expert testimony on secondary considerations of non-obviousness); Trial Tr., doc. # 388, at 10-20 (same).) Given the considerable evidence that Stryker's patents were neither anticipated nor obvious, there was an objectively high likelihood that Zimmer's actions constituted infringement of Stryker's valid patents. While that high likelihood was not necessarily a certainty--and, thus, did not allow summary judgment on all of Stryker's claims--it was high enough to satisfy the requirements for objective willfulness.

23

**A26**

On the subjective willfulness prong, substantial evidence supports the jury's finding that Zimmer willfully infringed Stryker's patents. In assessing whether infringement is subjectively willful under the totality of the circumstances, fact-finders should consider: (1) whether the infringer copied the patentee's commercial products; (2) whether the infringer presented evidence that it obtained opinions of counsel to justify its infringing actions; (3) whether the infringer attempted to avoid infringement by designing around the patents; and (4) whether the infringer acted in accordance with the standards of commerce. See *K-TEC v. Vita-Mix Corp.*, 696 F.3d 1364, 1378 (Fed. Cir. 2012); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 398 (Fed. Cir. 2008); *Creative Internet Adver. Corp. v. Yahoo! Inc.*, No. 6:07-cv-354, 2009 WL 2382132, at *2 (E.D. Tex., July 30, 2009). At trial, evidence of copying came from Donizetti, who admitted that Zimmer instructed Donizetti's design team to model its design after features of Stryker's products. (See, e.g., Trial Tr., doc. # 358, at 126 ("Q: And you copied. I mean, you stated just a second ago you copied. A: Yes."); *id.* at 125 ("Q: That's what Zimmer copied from Stryker, isn't it? A: I guess you could say that.").) By contrast, Zimmer presented no evidence that it obtained the advice of counsel as to whether its accused products infringed Stryker's patents. Zimmer acknowledged at trial that it did not take any actions to stop selling the accused products, even after the Court found that Zimmer was infringing several claims of the patents-in-suit. And, finally, Zimmer offered no evidence that its behavior-- copying a competitor's product, without attempting to design around the competitor's patents and without first seeking clearance from counsel on infringement concerns--was in keeping with standards of commerce in the medical device industry. All told, the jury had ample justification for finding, as a subjective matter, that Zimmer willfully infringed the patents-in-suit.

**F.   Zimmer's Motion for JMOL to Preclude Stryker from Receiving Lost Profits Damages and to Limit Stryker's Reasonable Royalty Recovery, or Alternatively for a New Trial on Damages (doc. # 453)**

Zimmer's next motion for JMOL challenges the jury's decisions on damages. It includes five arguments for JMOL. First, Zimmer argues that Stryker's *nunc pro tunc* agreements were insufficient to confer standing on any of the Stryker plaintiffs in this suit. Next, Zimmer argues that the jury erred in disregarding Zimmer's arguments that it could easily have offshored its manufacturing facilities and/or changed its infringing design to eliminate any possible infringement. Third, Zimmer argues that the jury's royalty base improperly included Zimmer's foreign sales revenue when it should have counted only domestic sales revenue. Fourth, Zimmer argues that the jury erred in calculating damages by basing its calculations on the entire value of the patented devices, since it should have calculated damages based solely on the value of the patented features. Finally, Zimmer argues that the jury's 25% royalty rate is unsupported by the evidence and "legally inappropriate." In the alternative, Zimmer argues that a new trial is warranted because the jury's damages findings were against the great weight of the evidence.

With respect to Zimmer's first JMOL argument, the Court has largely addressed Zimmer's standing arguments earlier in this Order and concluded that Stryker Sales Corporation had an exclusive license to market and sell the patented devices, such that it has standing to sue. See *supra* Part III.A. The only twist in Zimmer's argument this time around is Zimmer's pointing to a distribution agreement between Stryker Sales Corporation and Stryker Puerto Rico. (See PTX-125, doc. # 471-5.) True, the distribution agreement provides that "Stryker Corporation holds an exclusive right and exclusive sub-license to utilize [the patents-in-suit] . . . to market and sell Pulsed Lavage Products." (*Id.* at 3.) Other language in the agreement, however, makes clear that it excludes "Pulsed

25

**A28**

Lavage Products or any other products subject to any exclusive distribution agreement between [Stryker Puerto Rico] and Stryker Corporation," including the products at issue in this case. (*Id.* at 2.) Indeed, the agreement expressly states that, "Nothing in this Agreement should be construed in a manner that controverts the exclusivity of Stryker Corporation's exclusive right and exclusive sub-license under the Pulsed Lavage Patents." (*Id.* at 3.) Thus, the distribution agreement does not change the Court's earlier finding that Stryker Sales Corporation had an exclusive sub-license to market and sell pulsed lavage devices practicing the patents in suit.

Stryker's other evidence of non-exclusivity is no more compelling. For example, the fact that Bruce Henniges happened to use the word "share" in describing the licensing arrangement between the Stryker plaintiffs is not legally significant for the simple reason that Henniges is not in a position to authoritatively interpret the agreements' terms. Likewise, the fact that Stryker's licenses may be revoked at any time does not make them any less exclusive in the absence of revocation. Zimmer has not identified, and the Court has not found, any cases suggesting otherwise. Zimmer has failed to show why the Stryker plaintiffs lack standing, as exclusive licensees, to pursue lost profits damages.

Zimmer's next argument is that the jury improperly disregarded Zimmer's two proposed non-infringing alternatives: (1) moving its manufacturing and sales operations overseas, or (2) utilizing a two-piece drain tube so as to avoid infringement. Zimmer's principal evidence of the viability of offshoring was: (1) Stryker's damages expert, Catharine Lawton's testimony that companies make business decisions to move manufacturing locations "based on the opportunities and issues they face"; (2) Zimmer employee Joan Fishel's testimony that Stryker moved its Var-A-Pulse manufacturing operation from Ohio to North Carolina in 2001; and (3) a draft Zimmer strategic plan containing the words "Offshore/outsourcing manufacturing," but with the words

26

**A29**

"Offshore/outsourcing" crossed out. None of that evidence establishes that it was feasible for Zimmer to offshore its manufacturing and sales operations for the accused products. Indeed, the fact that the word "offshore/outsourcing" are crossed out in the strategic plan memo suggests exactly the opposite: that it was deemed impracticable for Zimmer to move manufacturing locations. That conclusion was buttressed by Fishel's testimony that offshoring "was never something that Zimmer wanted to do." (See Trial Tr., doc. # 387, at 151 (counsel for Stryker reading Fishel's testimony).)

In the face of the evidence suggesting that offshoring was not a viable alternative, Zimmer produced no concrete evidence that relocating its manufacturing centers would actually work. It never came forward with a plan for outsourcing, never said where it would relocate to, never said how much it would cost to offshore, and never said when it would have made the move. Zimmer did not have to go into exhaustive detail about its offshoring plans, but, to rely on offshoring as a defense in this case, it plainly must do more than merely declare that it could have moved its operations out of the country. The jury can hardly be blamed for rejecting a defense that has no concrete evidentiary support. See *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("Mere speculation or conclusory assertions will not suffice to overcome the inference [of impracticability that attaches to proposed non-infringing alternatives not actually implemented in the damages period].").

The same holds true with Zimmer's proposed design-around--using a two-piece drain tube, rather than the single-piece drain tube covered by the patents-in-suit. Because Zimmer only manufactured and sold a single piece drain tube, the law presumes that a two-piece drain tube was not commercially available. *Id.* Zimmer's attempts throughout the proceedings to prove that a two-piece drain tube was commercially available were largely unavailing. Zimmer first came forward

27

**A30**

with a two-piece drain tube concept as part of its damages expert's report. Reviewing the proposed design, Stryker's technical expert observed that it was unclear whether the proposed tube, as constructed by Zimmer, would even fit in the existing handpiece. (Trial Tr., doc. # 359, at 79-80.) Zimmer then proposed another two-piece drain tube, made by cutting the Pulsavac Plus suction tube approximately eight inches below the handpiece, then adding an external connector to re-connect the suction tube. (Trial Tr., doc. # 385, at 212-13.) When asked about the proposed design-around, however, Zimmer's own expert admitted that it was still a single piece drain tube and that, from an engineering vantage point, the proposed design around was not "a good decision." (Trial Tr., doc. # 387, at 49.) In short, Zimmer's evidence that a two-piece drain tube was a viable, non-infringing alternative to infringement was far from overwhelming, and the jury could reasonably have concluded, from the record before it, that Zimmer's proposed design-around was not commercially feasible.

Zimmer's next JMOL argument is that the jury applied the wrong royalty base by including non-infringing sales from Zimmer's foreign affiliates to foreign end users. According to Zimmer, the jury should only have accounted for the value of Zimmer's sales from its Dover facility to its foreign affiliates, since the foreign sales are not covered by the Patent Act. What Zimmer's argument overlooks is that it is the manufacture of infringing products in this country--not just the sale of infringing products--that constitutes the infringement for which Stryker is entitled to damages "adequate to compensate for infringement." See 35 U.S.C. §§ 271(a), 284. Zimmer does not dispute that it manufactured its infringing products in America, nor does it dispute that it realized value from this infringement by selling its products both in the United States and abroad. The jury's decision to include the profits Zimmer realized abroad as a result of its domestic infringement was a

reasonable way of ascertaining the value Zimmer ultimately realized from its infringement. The testimony of Stryker's damages expert, Catharine Lawton, confirmed as much and the jury was not unreasonable for adopting that testimony over Zimmer's competing account of damages calculations. See *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010) (inclusion of foreign revenue as part of royalty base is fundamentally a question of fact, to be decided by the jury).

Zimmer's fourth JMOL argument is that the jury wrongly based its damages calculations on the total value of the Stryker products, rather than on the value the patents-in-suit contributed to those products. Zimmer says that, under the "entire market value rule," the jury should only have considered the percentage of revenues or profits attributable to the patents, themselves, rather than to the whole product.

At the outset, Zimmer waived its "entire market value" argument by failing to propose a jury instruction on the rule at trial. See FED. R. CIV. P. 51(c); see also *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 733 (7th Cir. 2004) (appellant waived argument by failing to propose jury instruction on the subject of the argument). Because the jury had no way of knowing about the "entire market value rule," it cannot be faulted for failing to apply it. Even had the jury been apprised of the "entire market value rule," moreover, there is no basis for Zimmer's argument that the rule precludes the jury's royalty calculations in this case. The general rule is that royalties must be based on the value of the "smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). What the smallest salable patent-practicing unit is appears to be a classic question of fact. Lawton explained in great detail at trial why the patents-in-suit could not be parsed out into individual components, but, rather, were inseparable elements of the whole pulsed lavage handpiece. (Trial Tr.,  doc. # 384, at 140 ("And all of these

29

**A32**

products, the tips and the splash shields and the tubing, it all functions together . . . . So all of these types of products function together in a functional unit.") From Lawton's testimony, in particular, the jury had an ample basis from which to conclude that the smallest salable unit in this case was the pulsed lavage handpiece. Zimmer, by contrast, presented no evidence that the patents-in-suit could be separated from the handpieces, so as to be independent, saleable units. Thus, the jury was not unreasonable in deciding that the smallest salable patent-practicing unit here was the pulsed lavage handpiece as a whole, and using the value of the whole device in its royalty calculations.

Zimmer's final JMOL argument is that the jury's 25% royalty rate is unsupported by the record. There is, however, substantial evidence in the record from which the jury could have concluded that a 25% royalty rate was appropriate. For example, after a detailed analysis of the parties, the market for pulsed lavage devices, and the nature of the patents-in-suit, Lawton opined to the jury that the parties would have negotiated a royalty rate of 32.2%. (*Id.* at 199-217 (detailing basis for Lawton's royalty calculations).) That figure was not some arbitrary percentage; it was supported by evidence, referenced throughout the trial, all tending to show that Stryker's inventions had made it the dominant player in the pulsed lavage market, so that Zimmer was rapidly losing market share with its competing devices to the point that Zimmer was in danger of being forced out of the pulsed lavage market entirely. (See *id.* at 203-17.) Furthermore, testimony from Stryker's technical expert, Neil Sheehan, confirmed that Stryker's patents were difficult to design-around, so that a higher royalty would be expected. Finally, because Stryker and Zimmer were, in effect, the only two competitors in the market, there was evidence that they would have preferred to maintain the exclusivity of their patented inventions. (*Id.* at 206-07.) From those facts, and based on her calculations of both parties' expected profits under various scenarios, Lawton determined that a

30

**A33**

32.2% royalty was appropriate. That the jury ultimately departed downward from this figure does not make its ultimate decision arbitrary. See, e.g., *Spectralytics, Inc. v. Cordis Corp*, 649 F.3d 1336, 1346-47 (Fed. Cir. 2011) ("The jury was entitled to choose a damages award within the amounts advocated by the opposing parties."); *Monsanto Co. v. McFarling*, 488 F.3d 973, 979-81 (Fed. Cir. 2007), cert. denied, 128 S. Ct. 871 (2008) (affirming jury award of reasonable royalty rate in between parties' proffered royalty rates). More likely, it means that the jury rejected some of the advantages Lawton attributed to Stryker in her hypothetical negotiation. Whatever the jury's reasons, though, the fact remains that there was ample evidence from which the jury could have concluded that a 25% royalty rate was reasonable.

The last part of Zimmer's motion asks for a new trial on damages, arguing that the damges verdict is against the great weight of the evidence. Zimmer's argument, in essence, is that the cumulative effect of the jury's various errors in calculating damages warrants a new trial. For the reasons set out above, the Court does not agree that the jury's decisions were erroneous, especially not so erroneous as to warrant a new trial. Rather, the jury's findings on damages were supported by substantial evidence, making a new trial inappropriate.

### G.   Zimmer's Motion for a New Trial (doc. # 435)

Next is Zimmer's motion for a new trial. Zimmer argues that a new trial is warranted because: (1) the Court allowed Stryker to reference the Court's summary judgment rulings on infringement; (2) the Court prevented Zimmer from reciting to the jury the Court's statements on the reasonableness of some of Zimmer's positions; and (3) the Court instructed the jury to answer questions regarding remedies regardless of its finding on liability.

31

**A34**

With respect to its first argument--that Stryker should not have been allowed to introduce evidence of the Court's rulings from summary judgment that Zimmer had infringed several of Stryker's claims--Zimmer understates the relevancy of the Court's earlier rulings. As the Court emphasized at trial, its prior rulings--referred to as the "litigation scorecard"--were necessary factual predicates to Stryker's argument that Zimmer did not change its marketing or sales position after various milestones in the litigation. (Trial Tr., doc. # 359, at 574-76.) In addition to serving as a factual predicate for Stryker's change of position argument, moreover, the litigation scorecard also buttressed Stryker's willfulness argument to the extent it showed Zimmer's infringement defenses to have been unreasonable. Because the litigation scorecard bears at least some connection to the reasonableness of Zimmer's defenses, it was properly before the jury.

Not only was the litigation scorecard relevant, but any prejudicial effect it might have had was minimal. To begin with, the issue summary chart--to which Zimmer assented before trial--made it clear to the jury that the Court had decided most of the infringement claims in Stryker's favor prior to trial. (See Issue Summary Chart, doc. # 352-1, at 1.) Thus, Stryker's references to the Court's earlier references did not tell the jury anything it did not already know. If anything, referencing the Court's earlier infringement rulings was necessary to avoid confusing and help the jury understand why it was being asked to decide certain infringement questions but not others. Furthermore, the Court carefully explained in its jury instructions that its earlier rulings on some claims at summary judgment were in no way probative on the claims the jury was asked to decide. (See, e.g., Jury Instructions, doc. # 377-1, at 15 ("In deciding your infringement issue, do not use my infringement decisions to sway your decision in either direction.").) The Court thereby made clear to the jury that its previous rulings were only useful for purposes of framing the questions before the jury, not to

suggest a particular answer to any of those questions. On balance, then, the relevance of the litigation scorecard substantially outweighed any prejudice from it.

Zimmer's second argument for a new trial is that the Court did not allow Zimmer to read to the jury the Court's statements on the reasonableness of some of Zimmer's positions. As the Court noted at trial, there are obvious problems with placing the Court in the position of a witness whose statements are to be read to the jury. Most notably, the Court is not subject to cross-examination, so introducing its statements is problematic from an evidentiary perspective. See FED. R. EVID. 605 (presiding judge may not testify in trial as a witness). Moreover, because of the Court's role in directing the case, allowing the Court's statements into evidence runs the risk that the jurors will place undue emphasis on those statements, possibly to the exclusion of other relevant evidence.

Furthermore, the bare fact that Zimmer was unable to quote the Court's opinions to the jury did not necessarily prevent it from making its case. Just as Stryker pointed to the Court's earlier rulings as evidence of willfulness, Zimmer was also free to point out that the Court had expressly declined to grant summary judgment on the claims now before the jury, implying there were reasonable disputes about infringement on those claims. See, e.g., *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1235 (Fed. Cir. 2011) (defendant argued that district court's denial of plaintiff's "request for a preliminary injunction and the closeness of the inequitable conduct case indicate[d] that it did not act despite an objectively high likelihood of infringement"). Just as Stryker's witnesses expounded on the meaning of the Court's rulings, Zimmer's expert was free to opine on the reasonableness of Zimmer's arguments in light of the Court's refusal to grant summary judgment to Stryker on those claims. All of this was available to Zimmer without using the Court's own words. Thus, Zimmer cannot show that it was prejudiced from the Court's decision not to allow its own

words into evidence, any more than Stryker was prejudiced by the Court's refusal to allow other language from the Court's opinions--much more favorable to Stryker--into evidence.

Zimmer's final argument for a new trial is that the Court erred in instructing the jury to answer questions of remedy regardless of its findings on infringement and invalidity. Zimmer argues that, in so doing, the Court implied to the jury that some sort of remedy was warranted in the case. But the Court's instructions did no such thing. Indeed, the jury was expressly instructed that the Court's asking them to answer questions of remedy in no way implied that they were to find against Zimmer. (Jury Instruction No. 25, doc. # 377-1, at 34 ("You should not interpret the fact that I am giving instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should, or should not, win this case. I am instructing you on damages only so that you will have guidance to answer the questions on remedial issues for our use in the event plaintiff ultimately prevails.").) Courts in other patent cases routinely ask juries to answer such questions in exactly the manner the Court did. See, e.g., KEVIN F. O'MALLEY ET AL., FED. JURY PRAC. & INSTR. § 106:02 (6th ed.) ("The fact I have instructed you as to the proper measure of damages should not be considered as indicating any view of mine as to which party is entitled to your verdict in this case."). To suggest that the Court's instructions somehow prejudiced the jury is really just to say that the jury was incapable of listening to and following those same instructions.

Even if Zimmer could show some prejudice from any or all of the alleged errors, moreover, that prejudice would not rise to the level necessary to grant a new trial. See, e.g., *Brooks v. Toyotomi Co., Ltd.*, 86 F.3d 582, 588 (6th Cir. 1996) ("A court should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result. The simple fact that a grant of a new trial might result in a different outcome is not a valid basis for disturbing a jury's verdict

34

**A37**

which is otherwise based upon legally sufficient evidence."). In this case, the evidence overwhelmingly favored Stryker, a fact reflected in the one-sidedness of the jury's verdict and the proceedings leading up to it. Zimmer has not suggested any reason for thinking that Stryker's evidence at trial--even without the evidence Zimmer challenges in its motion for a new trial--was legally insufficient to support the jury's verdict. On those facts, a new trial is simply not warranted.

### H.   Zimmer's Motion for Judgment Barring Pre-Suit Damages Under the Defense of Laches (doc. # 418)

Zimmer's final motion is for judgment barring pre-suit damages under the equitable defense of laches. Zimmer argues that Stryker knew of the infringing Pulsavac Plus products at least as early as 2000, and that Stryker's delay in filing suit against Zimmer until 2010 resulted in the loss or destruction of evidence that would have been valuable to Zimmer's defense. Zimmer brings its motion under Rule 52(c), which addresses judgment on partial findings. Although, by its terms, Rule 52(c) applies only to bench trials, because Zimmer's laches defense deals with a question of equity, and because the jury was therefore not allowed to consider laches at trial, the Court may properly address it here. In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of a bench trial.[2] That, in turn, means the court does not view the evidence through a particular lens or draw inferences favorable to either party. See *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006). Moreover, the court is free to make findings on the issue in accordance with its own view of the evidence. See *id.* A court's fact-finding authority under Rule 52© is limited, however, by the

---

[2] Both parties elected to rely only on the evidence presented to the jury for this defense.

35

**A38**

fundamental principle that, on issues presented to the jury, the court may not make a finding contrary to a jury-found fact. See *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508-10 (1959).

To succeed on a laches defense, an accused infringer must ordinarily show that (1) the patentee delayed in filing the suit for an unreasonable length of time, and (2) that the delay actually prejudiced the alleged infringer. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Actual prejudice may be either economic or evidentiary. *Id.* at 1033. Economic prejudice exists only when the accused infringer changes its economic position as a result of the patentee's delay in filing suit. *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 50 F.3d 770, 775 (Fed. Cir. 1995). Evidentiary prejudice arises only where the defendant is unable "to present a full and fair defense on the merits." *A.C. Aukerman Co.*, 960 F.2d at 1033. Even when an accused infringer shows undue delay and some form of actual prejudice, however, the Court still has discretion to decide against finding laches. *Id.* at 1036 (emphasizing that laches is, at bottom, a discretionary doctrine).

At summary judgment, the Court considered and denied most of the laches arguments Zimmer now raises, specifically finding that Zimmer had not made the required showing of evidentiary prejudice. (See Order Denying Mot. for Summ. J. Barring Pre-Suit Damages Pursuant to Defense of Laches, doc. # 251.) Zimmer nevertheless insists that it is now entitled to laches because, at trial, Stryker took advantage of Zimmer's inability to produce the lost or destroyed evidence. Stryker's conduct at trial, Zimmer says, established precisely the sort of evidentiary prejudice that supports a grant of laches. The Court disagrees and finds, as a matter of fact, that Zimmer did not suffer evidentiary prejudice attributable to any delay by Stryker.

Zimmer argues it was prejudiced because it could not show certain devices and documents to the jury, as those documents were allegedly lost or destroyed before Stryker filed suit. At trial, however, Zimmer's witnesses testified in detail about those same devices and the subject matter of those same documents, introduced photographs of allegedly destroyed devices, and otherwise demonstrated for the jury the content of the evidence they could not procure directly. (See, e.g., Trial Tr., doc. # 386, at 179 (introducing photograph of allegedly destroyed Pulsavac I device in the course of Zimmer's technical expert's trial testimony).) Because Zimmer was able to thoroughly convey to the jury the information it would have conveyed had it had access to the allegedly lost or destroyed evidence, Zimmer cannot credibly argue that the alleged loss of evidence materially prejudiced its case. And without such a showing of prejudice, laches is inappropriate. *Cleveland Newspaper Guild, Local 1 v. Plain Dealer Publ'g Co.*, 839 F.2d 1147, 1153 (6th Cir. 1988) (laches requires showing of actual prejudice).

Laches is doubly inappropriate here given the volume of documentary and testimonial evidence Zimmer otherwise compiled for this case--almost twenty hours of witness testimony and thousands upon thousands of pages of documents. As the Court observed in denying Zimmer's motion for summary judgment on the basis of laches: "The sheer size of the record in this matter belies the claim that Zimmer's defense might fail for want of additional information. More importantly, the record does not disclose any critical evidentiary gap for Zimmer that is fairly traceable to Stryker's alleged delay." (Order Denying Mot. for Summ. J. Barring Pre-Suit Damages Pursuant to Defense of Laches, doc. # 251, at 8.) What was true before trial remains true now. The Court concludes, therefore, that Zimmer has not shown evidentiary prejudice sufficient to warrant a grant of laches.

Zimmer raises one genuinely new argument in its Rule 52© motion, an argument not addressed in the Court's summary judgment order (doc. # 251). Zimmer's new argument is that, had Stryker sued sooner, Zimmer would have considered and implemented potential design-arounds, saving it time and money. That argument has both an evidentiary and economic aspect to it. In terms of establishing evidentiary prejudice, Zimmer might be suggesting that, had Stryker forced it to consider and implement the design-arounds, then, at trial, Zimmer could have pointed to its attempts to implement the design-arounds as evidence of their feasibility. In other words, because Stryker did not force Zimmer to implement the design-arounds, Zimmer has no evidence that the design-arounds were feasible. That argument fails because nothing about it suggests that any evidence was actually lost or destroyed as a result of Stryker's delay in bringing suit. At trial, Zimmer remained free as ever to explain the feasibility of its potential design-arounds and, indeed, it did so on several occasions-- not just at trial, but in a number of its filings. Moreover, there was nothing to prevent Zimmer from implementing the design-arounds before Stryker brought the suit. In that sense, the fact that Zimmer lacks evidence of the feasibility of the design-arounds can hardly be blamed on Stryker.

Alternatively, Zimmer's argument about design-arounds might be viewed as an argument showing economic prejudice, *i.e.*, that Zimmer forewent a less costly alternative because Stryker did not sue for infringement. That argument fails for several reasons. Most obviously, there is no evidence that Zimmer actually would have resorted to its proposed design-arounds had Stryker sued at an earlier date (see *infra*). Indeed Zimmer's position in this litigation--that Stryker's patents are invalid and unenforceable--suggests it would not have sought to completely overhaul its products or productions systems to avoid infringing those patents. Had Zimmer seriously contemplated implementing the design-arounds, moreover, it could have done so after Stryker filed this lawsuit,

38

**A41**

thereby avoiding possible liability for supplemental damages. The fact that Zimmer did nothing to alter the infringing products or their manufacture after Stryker filed this lawsuit suggests that it has not seriously contemplated the proposed design-arounds. Granting laches on the basis of those design-arounds would, therefore, be inequitable. See *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371-72 (Fed. Cir. 2001) (defendant's firm belief that its product was non-infringing, coupled with continuation of infringing conduct after being contacted by patentee, demonstrated lack of economic prejudice); *James River Corp. v. Hallmark Cards*, 915 F. Supp. 968, 978 (E.D. Wis. 1996) ("An infringer's continuation of infringing activity is probative of a lack of prejudice.").

Finally, also with respect to Zimmer's proposed design-arounds, the jury's award implicitly rejected Zimmer's claim that its proposed design-arounds would have saved it from infringement. At trial, Stryker asked for $70 million in lost profit damages. Zimmer argued that figure was excessive because it could have avoided infringement at any time by implementing its proposed design-arounds. The jury's decision to award Stryker all the lost profit damages it sought implies that it totally rejected Zimmer's proposed design-around defense. Thus, there is simply no basis for granting Zimmer's laches argument based on the availability of its proposed design-arounds. As Zimmer has established neither economic nor evidentiary prejudice, it is not entitled to prevail on its Rule 52(c) motion for judgment based on the defense of laches.

* * * * *

After thoroughly reviewing each of Zimmer's ten post-trial motions, the Court finds no basis for departing from the jury's verdict. In light of the evidence presented at trial, the jury reached a reasonable result, one the law does not empower this Court to disturb.

39

**A42**

III.     **STRYKER'S POST-VERDICT MOTIONS**

Stryker is entitled to prevail on each of its five post-verdict motions.

A.     **Motion for a Permanent Injunction or, in the Alternative, an Ongoing Royalty (doc. # 396)**

Stryker's first motion is to permanently enjoin Zimmer from manufacturing the infringing Pulsavac Plus devices, to the extent those devices infringe the 807 patent.[3] At summary judgment, the Court found that the accused Pulsavac Plus devices infringed the 807 patent, and, at trial, the jury rejected Zimmer's validity challenge. Thus, the only issue here is remedy.

A court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A patentee is entitled to a permanent injunction where: (1) it has suffered an irreparable injury; (2) remedies available at law, such as money damages, are inadequate to compensate for that injury; (3) a remedy is warranted in light of the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Federal Circuit has acknowledged "the long tradition of equity practice granting injunctive relief upon a finding of infringement in the vast majority of patent cases." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012).

1.     **Irreparable Injury**

Zimmer's infringement has harmed--and continues to harm--Stryker by depriving it of market share and diminishing Stryker's right to exclude others from practicing its patents, all to the direct

---

[3] The injunction Stryker seeks does not cover infringement of the 329 and 383 patents because both of those patents expired earlier this year.

and immediate advantage of Stryker's only major competitor in the orthopedic pulsed lavage market (Zimmer). As to the first of these sources of harm, the record establishes by a preponderance of the evidence that Zimmer's sale of infringing products costs Stryker between 15-18% market share. (See, e.g., PTX-166 Excerpts, doc. # 465-5, at 3 (showing loss of market share).) Loss of market share to an infringer is a textbook example of irreparable harm. See *Presidio Components, Inc.*, 702 F.3d at 1363 ("This [loss of market share] squarely supports a finding of irreparable harm."); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) ("Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.'"). The loss is all the more significant in this case because Stryker has demonstrated a reluctance to license its patented technologies to competitors. See *Presidio Components, Inc.*, 702 F.3d at 1363 ("The district court correctly found Presidio's unwillingness to license favored finding irreparable injury."). While it is true that Stryker did grant Davol a limited license to practice the 329 patent,[4] the record discloses no license to practice the 807 patent at issue on this motion. Thus, Zimmer's infringement of the 807 patent did not just deprive Stryker of significant market share, but it did so using technology that Zimmer could not otherwise obtain.

---

[4] The license was limited in two ways. First, it was limited in the sense that Davol is not a significant player in the orthopedic pulsed lavage market, so any competition with Stryker would, as a practical matter, be minimal. (See Trial Tr., doc. # 385, at 168-69 (Zimmer representative testifying that Davol does not compete effectively in the orthopedic area).) Second, the license was limited because it expressly restricted Davol to practicing the patent in devices with batteries *in* the handpiece. (See Trial Tr., doc. # 387, at 127 (Zimmer's damages expert testifying that the Davol license restricted Davol to selling the device with batteries in the handpiece).) Stryker's primary market is for pulsed lavage devices with batteries *outside* the handpiece. (See, e.g., Trial Tr., doc. # 387, at 134 (Stryker's damages expert testifying that 90% of Stryker's pulsed lavage sales are for devices with batteries outside the handpiece).)

41

**A44**

On top of all that, both parties recognize that the orthopedic pulsed lavage market consists, for practical purposes, of just two players: Stryker and Zimmer. (See, e.g., Trial Tr., doc. # 385, at 168-69 (testimony from Zimmer brand manager acknowledging that Stryker and Zimmer are the two major competitors in the orthopedic pulsed lavage device market).) Those two companies are fiercely competitive with one another because, in a two player industry, one player's gain is almost invariably the other player's loss. For that reason courts have consistently treated infringement by a direct competitor as an important factor favoring a finding of irreparable harm. See, e.g., *Presidio Components, Inc.*, 702 F.3d at 1363-64 ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."). In this case, there is no doubt that Zimmer's infringement not only cost Stryker market share and deprived it of the exclusive use of proprietary technology, but that it directly benefitted Stryker's only rival in the orthopedic pulsed lavage industry. That is more than enough to establish irreparable injury.

Zimmer makes two arguments as to why its ongoing infringement does not irreparably harm Stryker, but neither argument is availing. Zimmer's first argument is that Stryker's alleged delay in seeking injunctive relief--by, for example, not seeking a preliminary injunction at the outset of this action--shows that Stryker has not suffered irreparable harm. But the Federal Circuit has "never held that failure to seek a preliminary injunction must be considered as a factor weighing against a court's issuance of a permanent injunction." *Mytee Prods., Inc. v. Harris Research, Inc.*, 439 Fed. App'x 882, 888 (Fed. Cir. 2011). Indeed, there is no obvious reason why it should be considered. To the contrary, an infringer's past successful infringement should not become a sort of de facto license to

42

**A45**

continue infringing. Infringement does not cease to be a problem just because the patent holder has not pursued a particular remedy.

Zimmer's other argument against finding irreparable harm is that Stryker has not shown that Zimmer's infringement of the 807 patent is what caused Stryker to lose market share. The premise of Zimmer's argument is that the 807 patent only covers a component of a pulsed lavage device, so that demand for the device might be driven by something other than demand for the component covered by the 807 patent. That premise is plainly flawed, since, by its express terms, the 807 patent covers the entire pulsed lavage handpiece. (See 807 Patent, doc. # 470-2, at 34 (disclosing "An irrigating handpiece for receiving a tip assembly having a discharge tube and a suction tube, said irrigating handpiece including . . .").) As a result, demand for the 807 patent technology is inextricably linked to demand for the whole handpiece. At trial, Zimmer made the same flawed argument to the jury as one basis for rejecting Stryker's damage theory. The verdict demonstrates that the jury also rejected Zimmer's theory. Zimmer's attempt to parse the 807 patent into separable components, and thereby negate Stryker's claim of irreparable injury, must therefore fail.

## 2. Inadequacy of Remedies at Law

Courts have consistently recognized that the financial harm accompanying loss of market share to an adjudged infringer is inherently difficult to quantify, so that damages will seldom be an adequate remedy. See, e.g., *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (monetary loss from loss of market share "is particularly difficult to quantify"). Likewise, because the right to exclude others from using a patented invention has value in and of itself, independent of its impact on the patentee's financial statements, monetary damages tend to be an inadequate remedy for continued infringement. *Presidio Components, Inc.*, 702 F.3d at 1363 ("[The] historical

43

**A46**

practice of protecting the right to exclude through injunctive relief is not surprising given the difficulties of protecting this right solely with monetary relief."). For those reasons, money damages will not adequately compensate Stryker for Zimmer's infringement.

Zimmer argues that, because the jury awarded Stryker damages for past infringement, damages must also be a suitable remedy for future infringement. By that reasoning, any award of damages for past infringement would militate against injunctive relief for future infringement. This Court cannot sanction an approach so at odds with Federal Circuit precedent. See, e.g., *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement.").

### 3.  Balance of Hardships

The balance of hardships in this case also favors granting Stryker's request for an injunction. Denying Stryker's motion would force Stryker to compete against its own technology, an outcome that "places a substantial hardship on [the patentee]." *Bosch*, 659 F.3d at 1156. By contrast, the only hardship Zimmer would face from an injunction would be having to stop infringing, something the law does not treat as a legitimate hardship. *i4i Ltd. P'ship*, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief.").

### 4.  Public Interest

The public interest also weighs in favor of granting a permanent injunction. The public has a strong interest in maintaining the integrity of the patent system by enforcing a patent owner's right to exclude. See *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (acknowledging district court's conclusion that "it is generally in the public interest to uphold patent

rights"); *Smith & Nephew, Inc. v. Synthes*, 466 F. Supp. 2d. 978, 985 ("As a general matter, the public maintains an interest in protecting the rights of patent holders, and injunctions serve that interest."). Without an injunction, there is every reason to believe that Zimmer will continue violating Stryker's right to exclude, undermining the policies that underlie the patent laws.

Zimmer counters that an injunction is contrary to the public interest because Stryker will probably raise prices on its pulsed lavage devices if Zimmer's infringing products are forced off the market. At the outset, Zimmer's argument is purely speculative. There is no concrete evidence that Zimmer's exit from the market will inevitably cause Stryker to increase prices for its pulsed lavage devices. Even taking Zimmer's speculation as true, moreover, Zimmer's argument proves too much. Every patent is a form of limited monopoly power from an economic perspective, but Congress has made the judgment that the value of the patent system outweighs whatever temporary monopoly profit may accrue to the patent holder. The Federal Circuit has repeatedly suggested that any potential short-term price reductions that infringement may trigger are usually outweighed by the long-term costs of infringement, including diminished incentives to invent and erosion of respect for the patent laws. See, e.g., *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("The innovation incentive of the patent is grounded on the market exclusivity whereby the inventor profits from his invention.").

### 5. Timing of the Preliminary Injunction

Since all four injunction factors support granting Stryker's motion for a permanent injunction, it is clear that Zimmer should be permanently enjoined from producing or selling infringing products. The only remaining question is whether the injunction should be stayed until some future date. The Court may exercise its discretion to stay an injunction by considering: (1)

whether Zimmer made a strong showing that it is likely to succeed on the merits; (2) whether Zimmer will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure Stryker; and (4) whether delaying the stay is in the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

None of the four considerations for staying an injunction supports doing so here. Zimmer is unlikely to succeed on its argument that the 807 patent is invalid, for all the reasons that prompted the Court to reject that same argument at summary judgment and that prompted the jury to reject it at trial. (See Order Denying Zimmer's Motion for Summary Judgment of Invalidity, doc. # 249; Verdict, doc. # 381, at 2-3.) As noted above, an immediate injunction will only injure Zimmer to the extent Zimmer will no longer be allowed to infringe Stryker's patents, something it had no right to do in the first place. By contrast, staying the injunction means that Stryker will continue to lose market share to Zimmer and will continue to be deprived of its right to exclude others (especially its chief competitor) from practicing its patents. Lastly, the public's interest in enforcing the patent laws favors giving the injunction immediate effect in this case. For those reasons, Zimmer must be immediately and permanently enjoined from manufacturing, marketing, or selling any products found to have infringed the 807 patent, including the infringing Pulsavac Plus products.

### B. Motion for Supplemental Damages (doc. # 414)

The jury's $70 million lost profits award to Stryker only reflected the damages Stryker had suffered through November 30, 2012. That is because, at the time of trial, Zimmer's most up-to-date sales data only stretched through November 30, 2012. Zimmer has now produced supplemental sales data for its infringing products, reflecting sales from December 1, 2012 through Feburary 28, 2013. Based on that supplemental data, Stryker's damages expert has calculated Stryker's additional lost

46

**A49**

profits for that time frame to be $2,351,257.66. Stryker now asks for an award of supplemental lost profits damages in that amount.

The patent damages statute provides that a patentee is entitled to "damages adequate to compensate for [] infringement," including damages for sales not accounted for at trial, such as post-verdict sales. 35 U.S.C. § 284; see *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1213 (Fed. Cir. 2011) ("[A] patentee is not fully compensated if the damages award did not include future lost sales."). Zimmer concedes as much, but denies that Stryker is entitled to supplemental damages in this case because, it says, the jury's award is not supportable. Zimmer's arguments as to why the jury's award is not supportable are the same ones it made it made in its Post-Trial Motion No. 8 on Damages (doc. # 454). The same reasons that compelled the Court to reject those arguments in addressing Zimmer's Post-Trial Motion No. 8 on Damages compel the Court to reject them here, as well. The methodology underlying Stryker's supplemental damages calculations is not unreasonable, just as it was not unreasonable at trial. (See Ex. B, doc. # 415-2 (setting out updated damage schedules).) Therefore, consistent with the text of the patent damages statute, the Court grants Stryker's motion for supplemental lost profit damages in the amount of $2,351,257.66.

### C. Motion for Finding of Exceptional Case and for an Award of Attorneys' Fees (doc. # 410)

Stryker's next motion is for an award of attorneys' fees under 35 U.S.C. § 285. Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Determining whether to award attorneys' fees under § 285 is a two-step process. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed Cir. 2012). "First, [the] prevailing party must establish by clear and convincing evidence that the case is 'exceptional.'" *Id.* "Second,

if the case is deemed exceptional, a court must determine whether an award of attorneys' fees is appropriate." *Id.*

There are no ironclad rules for what makes a case "exceptional." The Federal Circuit, for example, has said that "[a] case may be deemed exceptional under § 285 where there has been willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012). Even if a case is found to be exceptional, moreover, the law gives courts considerable discretion in deciding whether to award attorney's fees. See *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1191-92 (Fed. Cir. 2012).

Stryker argues that this case is "exceptional" for two reasons. First, it says that Zimmer's willful infringement was so pronounced as to warrant a finding of an exceptional case. Second, it says that Zimmer's conduct of the litigation was so unreasonable and vexatious as to warrant a finding of an exceptional case. The Court need only address Stryker's first argument to find this case "exceptional." While it is true willful infringement does not *require* a finding of an exceptional case, "[d]istrict courts have tended to award attorneys' fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards." *S.C. Johnson & Son, Inc. v. Carters-Wallace Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986). Here, the Court and the jury both found, by clear and convincing evidence, that Zimmer willfully infringed the 329, 807, and 383 patents. (See, e.g., Verdict, doc. # 381, at 6-7.) That is sufficient to support a finding of an exceptional case. *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial

48

**A51**

court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute.") (emphasis in original).

Having found this case to be "exceptional," the Court must consider whether to award attorneys' fees. The decision on attorney's fees is left largely to the Court's discretion. *Bard Peripheral Vascular, Inc.*, 670 F.3d at 1191-92. Exercising that discretion, the Court concludes that an award of attorneys' fees is appropriate in this case, based on the principles animating § 285. In particular, § 285 is meant to prevent the waste of judicial resources that comes from willful infringement and the oftentimes unnecessary litigation it engenders. *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, No. 08-cv-1307, 2012 WL 1436569, at *8-*9 (W.D. Penn. Apr. 25, 2012). By pursuing this action, Zimmer has forced Stryker and this Court to expend considerable resources in the name of a case that, for the most part, was not terribly close.[5] That is the essence of the harm that § 285 was designed to remedy. See *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992) ("The statutory purpose of such award is to reach cases where the interest of justice warrants fee-shifting."); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) ("The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit."). Accordingly, the Court awards Stryker its reasonable attorneys' fees.

---

[5] This is in no way a comment on the quality of Zimmer's counsel's advocacy throughout these proceedings. Counsel for Zimmer has consistently made the best of a bad case, presenting arguments that were lucid and thoughtful. The problems with Zimmer's positions lie not in the quality of counsel's advocacy, but in the flagrancy of Zimmer's underlying infringement. No advocate could rescue Zimmer from that problem.

49

**A52**

### D. Motion for Prejudgment Interest (doc. # 399)

Stryker's fourth motion is for prejudgment interest on: (1) the $70 million in lost profit damages the jury awarded it; (2) the $2,351,257.66 in supplemental damages the Court awards it (see Part III); and (3) its reasonable attorneys' fees (see Part IV). The patent damages statute provides that, "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors Corp. v. Devex*, 461 U.S. 648, 655 (1983). This is because "[a]n award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment. *Id.* at 655-66. Despite that, an award of prejudgment interest is not mandatory. "For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* at 657.

Zimmer argues that Stryker's undue delay in bringing this action justifies denying Stryker prejudgment interest. At the outset, it is not at all clear that Stryker's delay was "undue." For example, although some low level Stryker employees tested the allegedly infringing products in 2000, there is no evidence that anyone at Stryker with a knowledge of that company's patents knew of the infringing devices before 2005, by which time Stryker was on the verge of receiving additional

patent protection (the '383 patent). Less than two years later, Zimmer recalled its infringing products, shut down its manufacturing facilities, and abandoned the market until December of 2008, during which time there was no reason for Stryker to pursue an infringement claim. For those reasons, Stryker's delay in bringing this suit is not necessarily undue, as Zimmer assumes.

Furthermore, no court has ever said that any kind of delay in filing suit *requires* a denial of prejudgment interest. See, e.g., *Devex*, 461 U.S. at 657 ("[I]t *may* be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit.") (emphasis added). Quite the opposite, courts have routinely noted that denial of prejudgment interest is the exception, not the rule, because denying prejudgment interest thwarts § 284's overriding aim of affording patent holders complete compensation. See, e.g., *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986) ("The normal procedure under *Devex* is to award prejudgment interest from the date of infringement to the date of payment, since only such award will satisfy 'Congress' overriding purpose [in section 284] of affording patent owners complete compensation.'") (quoting *Devex*, 461 U.S. at 655); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) ("[P]rejudgment interest is the rule, not the exception."). There must be something exceptional about Stryker's delay, therefore, to justify denying it prejudgment interest.

One thing that could make a delay in filing suit "exceptional" would be if the delay actually harmed the infringer. Indeed, in the vast majority of cases where courts have declined to award prejudgment interest, they appear to have done so either because the plaintiff's delay in filing suit prejudiced the defendant or because the plaintiff harmed the court and the defendant by failing to comply with court orders after filing the suit. See, e.g., *Crystal Semiconductor Corp. v. TriTech*

51

**A54**

*Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (prejudgment interest denied because plaintiff engaged in self-serving litigation tactics that prejudiced defendant); *Minemyer v. R-Boc Representatives, Inc.*, No. 07-C-1763, 2012 WL 2423102, at *3 (N.D. Ill. June 26, 2012) (prejudgment interest denied where plaintiffs failure to comply with court orders caused three year delay of trial). But where the infringer is not prejudiced by the patentee's delay in filing suit and the patentee proceeded responsibly after filing suit, it is difficult to discern a good reason to deny prejudgment interest, especially given § 284's compensatory aim. After all, the delay does not harm the infringer financially. To the contrary, the principal financial consequence of a patentee's delay in filing suit is that the infringer gets to keep and make use of the proceeds from infringement for a longer period of time. See *In the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1394 (N.D. Ill. 1993). Thus, unless there is some legitimate reason to punish the patentee for its delay in filing suit--as, for example, where the patentee's delay unduly prejudices the infringer--the Court sees no reason to withhold prejudgment interest. As Zimmer has not demonstrated that Stryker's delay in filing suit prejudiced it in any meaningful way, prejudgment interest is appropriate here.

That leaves two questions. First, at what rate should prejudgment interest be calculated? The case law makes clear that determining the appropriate rate is largely left to the Court's discretion. See, e.g, *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) ("A trial court is afforded wide latitude . . . and may award interest at or above the prime rate."). In this case, Stryker has proposed that interest be awarded at a rate of 3.83%, reflecting Stryker's weighted-average interest rate, excluding required fees, for all its borrowing during the damages period. The Court believes that rate is a reasonable one, insofar as it fairly accounts for what Stryker has shown

it ultimately paid to borrow money it would have had absent Zimmer's infringement.[6] (See Lawton Decl., doc. # 400-1, at ¶¶ 9, 12.) Zimmer argues that there is no evidence Stryker would have borrowed money even had Zimmer not infringed, but that argument is entirely speculative. The fact that Stryker chose not to use the cash it had available during the damages period to avoid borrowing does not mean it would have borrowed had it had the additional $70 million in lost profits on hand. On top of that, Stryker's proposed rate is considerably below the prime rate, which courts routinely use when calculating prejudgment interest. See, e.g., *Trading Techs., Int'l v. eSpeed, Inc.*, No. 04-C-5312, 2008 WL 345604, at *11 (N.D. Ill. Feb. 5, 2008) ("In determining the rate of prejudgment interest awards in patent infringement cases, courts in this circuit have routinely used the prime rate."). Thus, prejudgment interest will be calculated at a rate of 3.83%.

The other remaining question is whether interest will be compounded monthly, as Stryker requests, or quarterly, as Zimmer suggests. Resolution of this question, also, is left largely to the Court's discretion. See *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). Zimmer's argument that interest should be compounded quarterly is based on the fact that Davol pays Stryker a royalty for use of a Stryker patent on a quarterly basis. But the damages in this case are for lost profits from infringing sales, not loss of a reasonable royalty, and Stryker accumulates sales revenue for its patented devices on a daily, not quarterly, basis. From that vantage point, then, Stryker's proposal that interest be compounded monthly is conservative. The Court agrees with Stryker, then, that compounding

---

[6] Zimmer argues that Stryker has not adequately shown that it borrowed money at the rate it claims. In this respect, however, the report of Stryker's damages expert suffices to establish that Stryker's weighted-average interest rate was 3.83%.

interest on a monthly basis is appropriate in this case. As such, Stryker is entitled to an award of $11,167,670.50 in prejudgment interest on the jury award and supplemental lost profit damages Stryker incurred from December 1, 2012 to February 28, 2013. In addition, for the same reasons the Court found this to be an "exceptional case," the Court awards Stryker additional prejudgment interest, calculated at a rate of 3.83% and compounded monthly, on its reasonable attorney's fees. See *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988) ("[A] district court does have authority, in cases of bad faith or other exceptional circumstances, to award prejudgment interest on the unliquidated sum of an award made under Section 285.").

### E. Motion for Enhanced Damages (doc. # 405)

Stryker's final motion is for enhanced damages under 35 U.S.C. § 284, based on Zimmer's willful infringement. Under § 284, "the court may increase the damages up to three times the amount found or assessed" at trial. 35 U.S.C. § 284; *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1191 (Fed. Cir. 2012). Whether and to what extent enhanced damages should be awarded "remains firmly within the scope of the district court's reasoned discretion, informed by the totality of circumstances." *Bard Peripheral*, 670 F.3d at 1191. "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). In evaluating the egregiousness of the defendant's conduct, courts typically rely on the nine *Read* factors, which are:

(1) whether the infringer deliberately copied the patentee's ideas or design;
(2) whether the infringer investigated the scope of the patent and formed a good faith belief that it was invalid or not infringed;
(3) the infringer's conduct during litigation;
(4) the infringer's size and financial condition;

(5) closeness of the case;
(6) duration of the infringing conduct;
(7) remedial actions, if any, taken by the infringer;
(8) the infringer's motivation for harm; [and]
(9) whether the infringer attempted to conceal its misconduct.

*Id.* at 826-27.

In this case, all nine *Read* factors favor substantial enhancement of the jury's award. As to the first factor, multiple trial witnesses testified that Zimmer deliberately copied Stryker's patented inventions. (See, e.g., Trial. Tr., doc. # 358, at 105 (testimony of Zimmer engineer and Rule 30(b)(6) witness that Zimmer copied Stryker); Olson Dep. Tr., doc. # 406-1, at 8 (testimony of Pulsavac Plus design engineer noting that use of gear drives, like the ones ultimately incorporated in the Pulsavac Plus devices, "would be probably copying").) On the second factor, Zimmer presented no evidence that it investigated the scope of Stryker's patents to form a good faith belief about invalidity or infringement, militating in favor of enhancement. The third factor also favors enhancement, to the extent Zimmer needlessly delayed in producing requested information concerning its application for a patent for the Pulsavac Plus. (See Stryker's Br. in Support of Mot. for Enhanced Damages, doc. # 406, at 11-14 (detailing Zimmer's persistent refusal to turn over requested information)).) With respect to the fourth factor, Zimmer is a multi-billion dollar company with reported annual profits in excess of three-quarters-of-a-billion dollars. (See Ex. N, doc. # 408-4.) A $70 million verdict sounds large in the abstract, but in context, it may not be enough, without enhancement, to deter infringing conduct. As to the fifth factor, as the Court noted earlier and as reflected in the jury's verdict, this was not a close case. Every major decision--from claim construction through post-verdict motions--went against Zimmer. (See, e.g., Verdict, doc. # 381 (finding for Stryker on every issue).) On the sixth factor, Zimmer's infringement spans more than a decade, from 2000 all the way

55

**A58**

through the present--a considerable amount of time. And, with respect to the seventh factor, at no point during its 12-plus years of infringement did Zimmer take any remedial action to stop infringement or mitigate damages, including during the two-plus years covered by this litigation. In fact, to this very day, Zimmer continues to manufacture and sell the infringing products. The eighth factor counsels in favor of enhancement principally because Zimmer and Stryker are the only major competitors in the orthopedic pulsed lavage device market, so that Zimmer's infringement of Stryker's patents can only have been motivated by a desire to harm Stryker by depriving it of market share. See, e.g., *Parker Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07-CV-1374, 2011 WL 976559, at *17 (N.D. Ohio Mar. 17, 2011) (motivation to take business from "fierce competitor" weighed in favor of enhanced damages). Finally, on the ninth factor, although Zimmer did not attempt to hide the entirety of its misconduct, it did attempt to prevent Stryker from discovering certain aspects of its infringement in the run up to trial. See Stryker's Br. in Support of Mot. for Enhanced Damages, doc. # 406, at 11-14 (detailing Zimmer's persistent refusal to turn over certain requested information before trial).)

Because the *Read* factors so overwhelmingly favor enhancement, the real question here is not whether enhancement is warranted, but how much enhancement is appropriate. Given the one-sidedness of the case and the flagrancy and scope of Zimmer's infringement, the Court concludes that treble damages are appropriate here. See, e.g., *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1226 (Fed. Cir. 2006) (affirming treble damages award); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1353, 1371 (Fed. Cir. 2004) (affirming double damages award after finding only four *Read* factors).

The last question in this case is whether Stryker is also entitled to treble damages on the Court's award of supplemental damages. The Court answers that question in the affirmative. Zimmer acknowledges that enhancement of post-verdict supplemental damages may be warranted based on "the egregiousness of the defendant's conduct based on all the facts and circumstances." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011). In this case, the same factors that warrant treble damages on the jury's lost profits award counsel in favor of awarding treble damages on the Court's award of supplemental damages. Indeed, the case for treble damages on the supplemental damages award is even stronger than it is for the jury's lost profits damages award, since, during the time period addressed by the supplemental damages award, Zimmer had already been found to infringe two of the three patents-in-suit, and should have been aware of the strong likelihood of an unfavorable verdict. See *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) (affirming treble damages for court's award of supplemental damages, "based on the 'egregiousness' of Defendants' conduct in continuing to sell the accused products after the jury found infringement."). At bottom, there is simply no good reason *not* to treble the award of supplemental damages here when the Court has determined that treble damages are appropriate for pre-November-30th lost profits.

**THEREFORE IT IS ORDERED THAT** Zimmer's Motions for Judgment as a Matter of Law and/or for a New Trial (doc. ## 369, 401, 425, 430, 435, 438, 442, 447, 453) are **DENIED**.

**IT IS FURTHER ORDERED THAT** Zimmer's Motion for Judgment Barring Pre-Suit Damages Pursuant to the Defense of Laches (doc. # 418) is **DENIED**.

**IT IS FURTHER ORDERED THAT** Stryker's Motion to Strike Zimmer's Supplemental Brief to Disclose the Release of the Redesigned Pulsavac Plus (doc. # 534) is **GRANTED**.

**A60**

**IT IS FURTHER ORDERED THAT** Stryker's Motion for a Permanent Injunction (doc. # 396) is **GRANTED**. Upon entry of final judgment, Zimmer will be permanently enjoined from manufacturing, marketing, or selling any products found to have infringed the 807 patent, including the infringing Pulsavac Plus products.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Supplemental Damages (doc. # 414) is **GRANTED**. Supplemental lost profit damages in the amount of $2,351,257.66 shall be included in the Final Judgment.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for a Finding of Exceptional Case and for an Award of Attorneys' Fees (doc. # 410) is **GRANTED**. Zimmer shall pay Stryker its reasonable attorneys' fees.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Prejudgment Interest (doc. # 399) is **GRANTED**. Prejudgment interest of $11,167,670.50 on the jury award and supplemental lost profit damages Stryker incurred from December 1, 2012 to February 28, 2013 shall be included in the Final Judgment. In addition, Zimmer shall pay Stryker prejudgment interest, calculated at a rate of 3.83% and compounded monthly, on Stryker's reasonable attorneys' fees.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Enhanced Damages (doc. # 405) is **GRANTED**. The Court awards Stryker treble damages on the jury's $70 million verdict and on the Court's $2,351,257.66 supplemental damages award.

Final Judgment incorporating these rulings shall be entered.

**IT IS SO ORDERED.**

DATED:    August 7, 2013        /s/ Robert J. Jonker
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE

**A61**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORP., et al.,

          Plaintiffs/Counter-Defendants,

                                      CASE NO. 1:10-cv-1223

v.

                                        HON. ROBERT J. JONKER

ZIMMER, INC., et al.,

          Defendants/Counter-Plaintiffs.
_____/

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This is a patent infringement case. Stryker Corporation, Stryker Puerto Rico, Ltd., and Stryker Sales Corporation (collectively, "Stryker") allege that Zimmer Inc. and Zimmer Orthopaedic Surgical Products (collectively, "Zimmer") are infringing one or more of three Stryker patents, including U.S. Patent Nos. 6,022,329 (the "'329 patent"), 6,179,807 (the "'807 patent"), and 7,144,383 (the "'383 patent"). (Compl., docket #1, ¶¶ 11-13.) Both companies work in the medical technology field, developing and marketing products relating to various medical specialities. (*Id.* ¶¶ 6-10.) The patents at issue in this case pertain to pulsed lavage irrigation systems, which are commonly used in orthopedic surgeries and wound management to remove blood and other debris from surgical sites. (Stryker's Br., docket # 66, at 5.)

At the Court's invitation, the parties have identified terms for which they believe construction is most important to advance the case, and they have proposed competing constructions of most of these terms. (Jt. State., docket # 61.) The Court heard oral argument on the parties' proposed

1

A74

constructions on January 18, 2012. This Claim Construction Memorandum contains the Court's construction of these disputed terms.

## CLAIM CONSTRUCTION PRINCIPLES

When the meaning of a claim's language is disputed, the court must construe the claim as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370, 116 S. Ct. 1384 (1996). Proper claim construction begins with the language of the claims themselves. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "'In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention. 35 U.S.C. § 112, ¶ 2.'" *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (internal quotations omitted)). The Court must give claim terms the ordinary and customary meaning ascribed to them by "a person of ordinary skill in the art in question at the time of the invention, i.e, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

When interpreting a claim as understood by a person of ordinary skill in the art, the court first examines the intrinsic evidence before it, which includes not only the claim language, but also the written description and the prosecution history of the patent. *Phillips*, 415 F.3d at 1319. Terms that have a plain and ordinary meaning typically do not need to be construed, as their meaning is clear from the term itself. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010). A court considers the written description "because it is relevant not only to aid in the claim

2

**A75**

construction analysis, but also to determine if the presumption of ordinary and customary meaning is rebutted." *Brookhill-Wilk 1, LLC*, 334 F.3d at 1298. In fact, the specification is usually "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The prosecution history may also be considered to "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

A court may also consider extrinsic evidence, such as dictionaries, treatises, and expert or inventor testimony, in construing patent claims. *See id.* Technical dictionaries may help a court understand "the meaning of particular terminology to those of skill in the art of the invention." *Id.* at 1318. Likewise, expert testimony may be useful for explaining the technology at issue and how the particular invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular claim in the patent or in prior art has a particular meaning in the pertinent field. *See id.*

While a court may consider both intrinsic and extrinsic evidence, intrinsic evidence is generally more reliable and thus generally entitled to greater weight when construing a claim term. *See id.* at 1320-21. What ultimately controls, however, is the language of the claims themselves: "[T]he court's focus [must] remain[] on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* at 1323. Thus, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1995)).

**A76**

**CLAIM ANALYSIS**

1.      *'329 Patent, Claim 2: "trigger"*

The parties propose the following constructions of the term "trigger" as it appears in claim

2 of the '329 patent:

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '329, col.22, l.3: an elongate <u>trigger</u> movably mounted on said housing; | A lever pulled by a finger or fingers to activate a device or mechanism (Jt. State., docket # 61.) | Resilient lever designed to be pulled in a single direction (Jt. State., docket # 61.) |

The parties agree that a trigger in claim 2 is a lever pulled by a user. (Zimmer's Br., docket # 76,

at 9.) The parties also agree that the purpose of the trigger is "to activate a device or mechanism,"

although Zimmer argues that the inclusion of this stated purpose "is an unnecessary addition to the

definition." (*Id.* at 9 n.4.(citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288

(Fed. Cir. 2008) (holding that claim language stating a "purpose or intended use," often found in the

preamble, is typically not limiting))). The issue is whether the trigger in claim 2 must "inherently

return[] to its initial, resting position once the pulling force has been removed." (*Id.*)

Zimmer argues that "unidirectional pulling and resiliency are characteristics inherent to a

trigger." (*Id.* at 10.) Zimmer's bases this argument largely on the '329 patent specification, which

describes a "trigger lever 242 . . . bendable . . . in a resilient manner," and that "[u]pon release of the

trigger by the user, the natural resilience of the trigger lever 242 unbends it back to its . . . forward

position . . . without need for a separate return spring." ('329 patent, docket # 77-1, at 13:39-56.)

Stryker counters that a person of ordinary skill in the art would understand the "trigger" to describe

any lever that could be pulled to operate a device or mechanism without necessarily returning to its

4

**A77**

resting position after being pulled by a user, and that Zimmer's construction is improperly limited to "the precise embodiment described in the specification." (docket #66, at 12.)

The starting point is the language of claim 2 itself. *See Phillips*, 415 F.3d at 1317. Nothing in the language of claim 2 requires the trigger to be resilient. (docket # 77-1, at 22:3.) The only word directly modifying "trigger" is "elongate," which in no way requires or implies resilience. To the extent the specification describes resilience as one feature of the trigger on the preferred embodiment, the absence of any resilience requirement in the claim itself suggests that Stryker in no way meant to limit the trigger in claim 2 to resilient, elongate triggers, as opposed to all elongate triggers. The Federal Circuit has made clear that "one of the cardinal sins of patent law . . . [is] reading a limitation from the written description into the claims." *Phillips*, 415 F.3d at 1319-20; *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) ("As noted, this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claims to that depicted scope."). While the trigger lever 242 described in the specification is made of a resilient plastic material that allows it to return to its original resting position after being released by a user, it is the function of the trigger—to engage the motor and allow for "power pulsing" of the wound site—that defines it and sets it apart from other types of levers (resilient or otherwise). Contrary to Zimmer's position, the inclusion of the trigger's function is a necessary and appropriate component of its definition, and the addition of the word "resilient" is not.

The extrinsic evidence also supports Stryker's proposed construction. For example, the dictionary definition discussed in both parties' briefs defines "trigger" as "1. The lever pressed by the finger to discharge a firearm. 2. Any similar device used to release or activate a mechanism." AMERICAN HERITAGE ILLUSTRATED ENCYCLOPEDIC DICTIONARY 1758 (1987). Although the firearm

provides a helpful illustration of a trigger, the definition of trigger is obviously not limited to firearm applications. Rather, the term is used to describe any similar lever that releases or activates a mechanism. *See also* CHAMBERS CONCISE DICTIONARY 1141 (1991) (defining "trigger" as "a lever that releases a catch so as to fire a gun or set a mechanism going; anything that starts a train of actions"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1261 (1991) (defining a "trigger" as a "movable part by which a mechanism is actuated"). The prior art is full of examples of the term "trigger" being used in a variety of applications that do not necessarily incorporate inherent resilience into the definition. (docket ## 87-91, Exs. O-AA.)[1] Therefore, the Court is persuaded that a person of ordinary skill in the art would construe "trigger" consistent with Stryker's proposed definition, and not the narrower definition Zimmer advocates. The Court therefore adopts Stryker's proposed construction of the term.

### 2. '329 Patent, Claim 2: "handle"

The parties propose the following constructions of the term "handle" as it appears in claim 2 of the '329 patent:

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '329, col.22, l.2: a hollow housing comprising a <u>handle</u>; | A portion of a device designed to be held by a hand or hands. (Jt. State., docket # 61.) | Plain and ordinary meaning; no construction necessary (Jt. State., docket # 61.) |

The first question is whether to construe the term at all. Zimmer argues that no construction is

---

[1] Indeed, as Stryker notes in its Reply Brief, Zimmer's own engineering and marketing materials relating to the allegedly infringing device appear to treat its device's rocker switch as a type of trigger even though it is not resilient. (docket # 86, at 6.) This is obviously not dispositive, though it provides further confirmation of the Court's construction in this case.

required because the term "has a well-understood meaning that is clear to persons of ordinary skill in the art," and that "fact and expert witnesses are capable of proffering testimony regarding whether an accused product satisfies the term handle, so the jury can decide the fact inquiry." (docket # 76, at 11.) Consequently, Zimmer does not propose a claim construction. Stryker argues a construction is necessary, given the parties' inability to agree on the term's meaning in this case. (docket # 66, at 13.)

"When the parties raise an actual dispute regarding the proper scope of . . . [a] claim[], the court, not the jury, must resolve the dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* (citing *Phillips*, 415 F.3d at 1312-13). It is true in this case that Stryker to some extent relies on plain and ordinary meaning even though it advocates construction of the term. But construction is still appropriate because Zimmer argues the plain and ordinary meaning of the term necessarily excludes something Stryker claims for it. Because the parties disagree, claim construction is required.

At issue is claim 2 of the '329 patent, which provides that the claimed "pulsed irrigation surgical handpiece" includes "a hollow housing comprising a handle; . . . an irrigation liquid tube extending along said handle; [and] an electric motor spaced between the top and bottom of said handle and located in said handle . . . ." (docket # 77-1, at 22:1-8.) Stryker argues the claim language and specification "supports a broad construction of 'handle' according to its plain and ordinary meaning." (docket # 66, at 13.) Specifically, Stryker constructs "handle" to mean "a portion

7

**A80**

of a device designed to be held by a hand or hands." (*Id.*) Zimmer objects to Stryker's construction because it would impermissibly construe "handle" to "read not only on the handle but also on what one of ordinary skill in the art would understand to be the barrel of a pistol-shaped device." (docket # 76, at 12.)

The Court adopts Stryker's proposed claim construction. According to the specification, "[t]o use the apparatus for irrigation of a surgical site, the user grips the handpiece, either by the handle 12, in a pistol-like manner, or where the barrel 13 joins the handle 12, in a wand like manner." (docket # 77-1, at 20:48-51.) A person of ordinary skill in the art would interpret the specification consistent with Stryker's position—that the irrigation device's handle is the portion of the device designed to be held by a hand. The '329 claim language also supports this interpretation, as claim 2 does not necessarily require the inclusion of a barrel, which is a feature of the preferred embodiment that appears to be captured in dependent claim 4. (*Id.* at 22:1-42.) Moreover, despite Zimmer's concerns, Stryker's construction would not necessarily include the definition "barrel 13" within the definition of "handle 12." Rather, it would depend on whether the barrel 13 of an allegedly infringing product was "designed to be held by a hand"—a question that the Court leaves for subsequent motion practice and, as necessary, trial.[2] Finally, the Stryker construction is also consistent with the extrinsic evidence. *See, e.g.*, WEBSTER'S UNABRIDGED DICTIONARY 642 (1989)

---

[2] The Court does not rely on Stryker's argument based on Figure 4 of the '329 patent. (docket # 66, at 13.) In Figure 4, the term "housing handle" is identified with specification reference numerals 11, 12, and 15, which Stryker argues is persuasive intrinsic evidence in support of its position. (*Id.*) The use of "handle" in these discrete instances appears to be a typographical error. Indeed, other than the instances cited in Stryker's brief, reference numeral 11 is consistently defined as the "housing" throughout the '329 specification, and numerals 12 and 15 are used to describe the left- and right-hand sides of the housing, and not component parts of the "handle." (*See, e.g.*, docket # 67-2, '329 patent, at 3:28-39.)

(defining "handle" to mean "a part of a thing made specifically to be grasped or held by the hand");
WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 550 (1991) (defining "handle" to mean "a part that is designed especially to be grasped by the hand.")

### 3. '329 Patent, Claim 2: "adjacent"

The parties propose the following constructions of the term "adjacent" as it appears in claim 2 of the '329 patent:

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '329, col.22, l.5-7: an electric motor spaced between the top and bottom of said handle and located in said handle <u>adjacent</u> said irrigation tube; | Close to or lying near (Jt. State., docket # 61.) | Plain and ordinary meaning; no construction necessary (Jt. State., docket # 61.) |

Once again, the parties dispute whether this term requires construction. Zimmer argues that construction is not necessary because Stryker's definition simply "replaces one commonly word with several." (docket # 76, at 17.) Stryker counters that its proposed definition is consistent with the term's plain meaning and the evidence of record, and that because Zimmer refuses to adopt the construction, a dispute exists as to the term's definition, which creates a question that the Court must address as a matter of law. (docket # 66, at 15-16.) Because a claim construction dispute exists, and for the reasons discussed above in the context of the Court's "handle" analysis, the Court engages in a claim construction analysis of "adjacent." *See O2 Micro Int'l Ltd.*, 521 F.3d at 1360.

Here, Stryker's proposed construction of "adjacent" as "close to or lying near" is consistent with the claim language and the specification. The preferred embodiment in the specification

9

describes a "DC energizable electric motor 36" that "is snugly housed in the space between the left and right . . . shell parts 30 and 31" that surround the motor 36, and a liquid hose 160 that is located between the shell parts 30 and 31 and the housing 11.  (docket # 77-2, at fig. 4, 4:1-8, 9:40-58.)  The claim language describes an electric motor that is located within the handpiece's handle "adjacent said irrigation tube."  (*Id.* at 22:5-7.)  Nothing in the intrinsic—or extrinsic evidence for that matter—reveals any reason to deviate from the meaning of the word routinely used in other constructions.  Courts routinely construct terms such as "adjacent," often providing definitions similar to what has been advocated here.  *See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (construing "adjacent" as "not distant"); *Totes Isotoner Corp. v. Panther Vision, LLC*, No. 09-cv-1064, 2010 WL 55673, at *10 (N.D. Ill. Jan. 4, 2010) (construing "adjacent" as "closely proximate"); *Aero Indus., Inc. v. Quick Draw Tarpaulin Sys., Inc.*, No. 1:05-cv-0439, 2009 WL 838684, at *11 (S.D. Ind. Mar. 27, 2009) (construing "adjacent" to mean "close to, next to, or lying near"); *Bridgelux, Inc. v. Cree, Inc.*, No. 9:06-cv-240, 2008 WL 2325623, at *10-*11 (E.D. Tex. June 3, 2008) (construing "adjacent" to mean "near or next to").  The parties are then required to provide competent testimony as to how a person of ordinary skill in the art interprets "adjacent," "close to," or "lying near" in the technology at issue—in this case, pulsed lavage irrigation systems.

Zimmer asserts that because the irrigation handpiece at issue is by its nature compact and self-contained, adopting Stryker's definition "would effectively read the [adjacent] limitation[] out of the claim," and that "Stryker could argue that virtually all the parts are close to or near to one another."  (docket # 76, at 17.)  Zimmer's concern is without merit.  As the Federal Circuit has repeatedly emphasized, claim construction must be consistent with the understanding of "a person

10

**A83**

of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312. In other words, the term "adjacent" is not interpreted in a vacuum, but rather is informed by the field of technology, what is considered common knowledge in the field, and the invention itself. *See id.* For example, what constitutes "close" in horseshoes is markedly different than when dealing with hand grenades. Context makes all the difference.

Accordingly, the Court adopts Stryker's proposed construction of the claim term.

### 4. '807 Patent, Claim 45: "lock assembly"

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '807, col.27, l.35-37: a lock assembly mounted to the front end of said body for releasably securing the discharge tube and the suction tube to said body; | Components that work together to secure or fasten the tip to the hand piece (Jt. State., docket # 61.) | Subject to 35 U.S.C. § 112 ¶ 6. Function: releasably securing the discharge tube and the suction tube to said body Structure: a tip lock, a spring plate, a biasing bar, and a flange on a tip assembly (Jt. State., docket # 61.) |

Claim 45 of the '807 patent provides for "a lock assembly mounted to the front end of said body for releasably securing the discharge tube and the suction tube of said body." ('807 patent, docket # 77-2, at 27:35-37.) The basic dispute here is whether the "lock assembly" of claim 45 is subject to a means-plus-function analysis under 35 U.S.C. § 112 ¶ 6. Zimmer argues that a person of ordinary skill in the art would not understand "lock assembly" to connote structure, and that as a result, the claimed structure must be limited to the embodiment disclosed in the specification—a tip lock, spring plate, biasing bar, and flange that work together to secure the tip assembly to the body of the irrigation handpiece. (docket # 61.) Stryker counters that a person of ordinary skill

11

**A84**

would understand "lock assembly" as a structural term, and that section 112 ¶ 6 does not apply. Instead, Stryker broad construes "lock assembly" as "components that work together to secure or fasten the tip to the hand piece." (*Id.*)

The Court first considers whether the "lock assembly" in claim 45 is indeed structural under section 112 ¶ 6, which provides that:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6. This type of claim analysis applies to "purely functional limitations that do not provide the structure that performs the recited function," *Phillips*, 415 F.3d 1311, which generally includes the hallmark "means" language that creates a rebuttable presumption that section 112 ¶ 6 applies. *See Personalized Media Commc'n, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998). "By contrast, a claim term that does not use 'means' will trigger the rebuttable presumption that section 112 ¶ 6 does not apply." *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-72 (Fed. Cir. 2003) (citations omitted). "When a claim terms lacks the word 'means,' the presumption can be overcome if the challenger demonstrates that 'the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011). "[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Id.; see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1362 (Fed. Cir. 2004) ("[W]e have seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form. In fact, we have identified only one published

12

opinion since [*Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996)] in which we have done so.") Given the absence of any "means" language with respect to the "lock assembly" term in claim 45, Zimmer bears the burden of overcoming the presumption against applying section 112 ¶ 6—a burden it fails to carry in this case.

Zimmer argues that the Court must engage in a mean-plus-function analysis because "lock assembly" is simply too indefinite if not limited to the structure explicitly disclosed in the '807 patent specification. (docket # 76, as 19.) This argument is unavailing. As the Federal Circuit explained in *Lighting World, Inc. v. Birchwood Lighting, Inc.*,

> In considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies structures by their function.

382 F.3d at 1360 (citations omitted). In *Lighting World*, the Court recognized the possibility that applying these principles may result in a broad construction of a particular claim term that "renders a claim more vulnerable to attack for invalidity, but that the risk is one that the "claim drafter assumes by choosing broad structural terms rather than choosing to claim in means-plus-function format." *Id.* at 1362.

Applying these rules of construction to the "lock assembly" in claim 45, the Court concludes that a person of ordinary skill would understand "lock assembly" to connote structure, and section 112 ¶ 6 therefore does not apply. Claim 45 provides for "a lock assembly mounted to the front of said body for releasably securing the discharge tube and the suction tube to said body." (docket # 77-2, at 27:35-37.) A person of ordinary skill in the art would understand this claim term as

13

**A86**

describing a structure that locks the tip assembly 30 to the handpiece 22 of the irrigation system. (*Id.* at 10:12-13.) While Zimmer correctly notes that the term would cover a broad range of structures if not subject to section 112 ¶ 6, the term is structural nonetheless. Consequently, the Court declines to apply the section 112 ¶ 6 analytical framework to "lock assembly" or otherwise limit its scope to the embodiment disclosed in the specification.

Zimmer's reliance on *Toro Co. v. Deere & Co.*, 355 F.3d 1313 (Fed. Cir. 2004), is unavailing. In *Toro*, the Federal Circuit held that the term "control mechanism" as used in the patent at issue did not provide sufficient structural description for a person of ordinary skill in the art to understand its meaning to connote structure. *Id.* at 1325. Zimmer attempts to analogize *Toro* to the present case, arguing that the "lock assembly" in claim 45 similarly lacks structure. This analogy fails to persuade the Court for two reasons. First, unlike the "lock assembly" in the '807 patent, the patentee in *Toro* used the terms "control means" and "control mechanism" interchangeably in the claim language, leading the court to conclude section 112 ¶ 6 applies. *Id.* at 1323, 1325. In other words, the intrinsic evidence provided a clear indication that "control mechanism" was not a structural term, but was rather a functional limitation synonymous with "control means." Here, Stryker gave no such indication in the '807 claim language, as it did not use "lock assembly" interchangeably with "locking means" anywhere in the '807 patent. Second, when construing "assembly" in a variety of mechanical and electrical applications, courts have consistently held that "assembly" connotes sufficient structure to avoid section 112 ¶ 6. *See, e.g.*, *Kegel & Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1427 (Fed. Cir. 1997); *Alto-Shaam, Inc. v. Cleveland Range, LLC*, No. 7:09-cv-018, 2010 WL 2382249, at *16-*18 (N.D. Tex. June 7, 2010); *Fitness Quest Inc. v. Monti*, No. 5:06-cv-2691, 2007 WL 2359821, at *8 (N.D. Ohio Aug. 16, 2007). Indeed, in *Lighting World*

14

**A87**

(which was decided after *Toro*), the Federal Circuit held "connector assembly" was structural, and that the term should not be limited to the structure disclosed in the specification. 382 F.3d at 1363. While not dispositive, these other constructions further support the Court's conclusion, as do dictionary definitions, which define "assembly" as a noun connoting structure. *See, e.g.*, AMERICAN HERITAGE ILLUSTRATED ENCYCLOPEDIC DICTIONARY 42 (1987).

Although section 112 ¶ 6 does not apply, the Court must still provide a claim construction of the term. The '807 specification explains that a common problem with prior surgical irrigation handpieces was their tendency to leak during use. (docket # 77-2, at 1:59-2:6.) According to the specification, leakage was particularly common when the handpiece's tip assembly was subject to side loading. (*Id.*) To address this problem, the '807 patent provides for a lock assembly that secures the tip assembly 30 to the handpiece 22. (*Id.* at 10:13-14.) The preferred embodiment teaches a tip assembly 30 that is pushed towards the handpiece 22 until the flange 186 of the discharge tube 32 passes through the opening 154 of the lock assembly. (*Id.* at 10:17-19.) "As the discharge tube 32 passes through the opening 154, [the] tapered surface 188 of [the] flange 186 abuts the complementary beveled surface 155 around [the] opening 154. Further insertion of the discharge tube 32 thus serves to displace the tip lock 152 upwardly. Once [the] flange 186 passes beyond [the] tip lock 152, [the] spring plate 160 forces the tip lock 152 to return to its initial position," thereby mechanically locking the tip assembly 30 to the handpiece 22. (*Id.* at 10:19-31.)

While only providing a single embodiment of the lock assembly, the specification makes clear that "there is no requirement that all versions of the invention employ the described tip lock. Other versions of the invention may employ other tip locks and even other tip assemblies." (*Id.* at 21:40-43.) Stryker argues that a person of ordinary skill in the art would understand "lock assembly"

15

**A88**

to mean "components that work together to secure or fasten the tip to the hand piece." The Court agrees, as this definition is consistent with not only the claim itself, but also the preferred embodiment in the specification, which teaches a design that uses several components to secure the tip assembly 30 to the handpiece 22. Extrinsic dictionary evidence provide further confirmation of the Court's construction, as "lock" is defined as "a device used to provide restraint," and "assembly" is defined as "the putting together of manufactured parts to make a completed product." AMERICAN HERITAGE ILLUSTRATED ENCYCLOPEDIC DICTIONARY 991 (1987).

Accordingly, the Court construes "lock assembly" to mean "components that work together to secure or fasten the tip to the hand piece."

5. '383 Patent, Claim 1: "motor operable at variable speeds"

The parties propose the following constructions for "motor operable at variable speeds" in claim 1 of the '383 patent:

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '383, cl.1, col.21, l.58-61: a single electric motor disposed in said housing and connected to said pump for actuating said pump, said motor operable at variable speeds to control the pumping rate of said pump; | A motor that can operate at more than one speed (Jt. State., docket # 61.) | Motor with continuously varying speed (Jt. State., docket # 61.) |

The parties disagree on the meaning of the phrase "operable at variable speeds." Stryker argues that "motor operable at variable speeds" includes any motor that can operate "at more than one speed." (Jt. State., docket # 61.) In contrast, Zimmer submits that the claim term is limited to only those

16

**A89**

motors that can run at "continuously varying speed[s]." (*Id.*)

The Court adopts Stryker's proposed construction because it is consistent with the intrinsic evidence of record, and Zimmer's is not. Claim 1 of the '383 patent provides for "a single electric motor," with the "motor operable at variable speeds to control the pumping rate of said pump." (docket # 77-3, at 21:58-61.) A person of ordinary skill in the art would understand the use of the term "variable" that modifies "speed" to mean a motor operating at more than one speed. However, there is nothing in the plain language of claim 1 that inherently requires a continuous spectrum of speed. In fact, Zimmer's proposed construction tacitly recognizes this by using the core claim language in its proposed construction and simply adding the modifier "continuously" to it. The claim language, in contrast, does not include the limiting modifier, or anything like it.

The specification of the '383 patent reinforces the point. It describes the preferred embodiment of the medical irrigator. The specification describes a motor 36 that a user can turn on using a trigger lever 242 that is made of bendable, resilient plastic. (*Id.* at 14:54-64.) The rest position of the trigger lever 242 allows the motor 36 to remain in the "off" position. (*Id.*) When a user exerts a "light pull on the trigger lever 242," the motor 36 turns on, and "electric current is fed to the motor 36 only from half the battery collection," causing the motor 36 to run "at only a preselected fraction of its full speed and the pump unit 100 outputs irrigation liquid pulses at a desired frequency and amplitude, which are less than the maximum available" ("lower power pulsing"). (*Id.* at 14:64-15:10.) "Further pulling in of the trigger lever 242 by the user . . . establishes electrical contact . . . [that] appl[ies] the full series of voltage . . . to the motor 36 to operate the latter at its full speed and thereby drive the pump unit 100 at its full output" ("high power pulsing"). (*Id.* at 15:11-15:25.) In sum, the preferred embodiment teaches a motor with three

17

discrete predetermined speed settings: "off," lower power pulsing (which engages half of the battery pack power source), and high power pulsing (which engages all of the battery pack power source). (*Id.* at 21:1-2.) It does not include a continuous spectrum of varying speeds.

The problem with Zimmer's proposed construction is that it unduly limits the claim term to "continuously variable speed" motors, excluding the preferred embodiment just discussed. Zimmer's construction would require the irrigator to operate on a continuous speed spectrum, excluding motors that only operate at predetermined, discrete speed settings. The Federal Circuit has repeatedly held, "[a] claim construction that excludes the preferred embodiment is rarely, if ever, correct." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010). Zimmer's proposed construction runs afoul of this fundamental principle, as it would exclude the preferred embodiment disclosed in the specification, and nothing in the intrinsic or extrinsic evidence supports that.

At oral argument, Zimmer relied almost exclusively on the prosecution history to support its narrower definition of the term, but the reliance is misplaced. The record before the Court provides no reason to infer that Stryker's amendment during prosecution—which cancelled virtually all of its original claims and substituted new ones—was intended to narrow the type of motor the allowed claims cover. "Unless altering claim language to escape examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1439 (Fed. Cir. 2000). The record does not provide any evidence that indicates Stryker amended its claims to disavow any portion of the claim language's plain

18

**A91**

meaning.[3] Consequently, the Court declines to narrow its construction on this basis, instead adopting Stryker's construction of "motor operable at variable speeds" to mean "a motor that can operate at more than one speed."

> 6-7.   *'383 Patent, Claim 10, 38: "variable speed electric motor"*
> *'383 Patent, Claim 20: "motor operating at variable speeds"*

The parties also disagree as to the construction of "variable speed electric motor" in claims 10 and 38 of the '383 patent, and "motor operating at variable speeds" in claim 20, as illustrated below:

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '383, cl. 10, col.22, l.53-55:<br>a single, <u>variable speed electric motor</u> in said housing that is connected to said pump that actuates said pump so as to regulate the pumping rate of said pump;<br><br>'383, cl. 38, col.26, l.5-7:<br>a single, <u>variable speed electric motor</u> disposed in said housing connected to said pump for actuating said pump at variable rates; | An electric motor that can operate at more than one speed (Jt. State., docket # 61.) | Electric motor with continuously variable speed (Jt. State., docket # 61.) |

---

[3] Stryker's claim amendment replaced all mention of "plural speed motors" with "variable speed motors" without any discussion as to the difference between the two, and narrowing the claim term based on this modification is not warranted.

19

| ‘383, col.23, l.56-59: a single electric motor disposed in said housing and connected to said pump to actuate said pump, said <u>motor operating at variable speeds</u> to regulate the pumping rate of said pump; | A motor that can operate at more than one speed (Jt. State., docket # 61.) | Motor with continuously varying speeds (Jt. State., docket # 61.) |

With respect to these claim terms, each party simply proposes the same construction as in claim 1, with the only exception that both parties' construction of "variable speed electric motor" in claims 10 and 38 provides the additional limitation that the motor must be electric. Because the constructions proposed for claims 1, 10, 20, and 38 all replicate each other, the Court will apply the same analysis to all of these claims and adopt Stryker's construction of the terms. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1377 (Fed Cir. 2004).

Accordingly, the Court construes "variable speed electric motor" as "an electric motor that can operate at more than one speed," and construes "motor operating at variable speeds" as "a motor that can operate at more than one speed."

8. *'383 Patent, Claims 1, 20, and 38: "control assembly"*

| **Claim Term** | **Stryker's Proposed Claim Construction** | **Zimmer's Proposed Claim Construction** |
|---|---|---|
| ‘383, cl.1, col.21, l.62-63: a <u>control assembly</u> disposed in said housing to regulate the speed of said motor; <br><br> ‘383, cl. 20, col.23, l.66-col.24, ln.4: | Components that work together to energize the motor (Jt. State., docket # 61.) | Subject to 35 U.S.C. § 112 ¶ 6. <br><br> Function: <br> - Claim 1: regulate the speed of said motor <br> - Claim 20: control the speed of said motor and regulate the pumping rate of said pump <br> - Claim 38: supplying a variable |

20

A93

| | |
|---|---|
| a <u>control assembly</u> integral with said housing, said control assembly having a switch member moveably mounted to said housing and said control assembly being configured to apply a variable energization signal from said battery pack to said motor so as to control the speed of said motor and regulate the pumping rate of said pump.<br><br>'383, cl. 38, col.26, l.15-24:<br>a <u>control assembly</u> attached to said housing and connected between said at least one conductor of said motor for supplying a variable potential energization signal to said motor, said control assembly having a single switch member that is moveably attached to said housing that selectively makes/breaks a connection between said at least one conductor and said motor and that establishes the potential of the energization signal supplied to said motor. | potential energization signal to said motor<br><br><u>Structure</u>: an L-shaped trigger member with an elongate trigger lever, a single switch contact support arm, a single conductive contact blade, two posts integral with the housing that are configured for electrical contacts to be mounted on them, two electrically-conductive, spring-like metal contacts mounted to said posts, and two electrically conductive contacts protruding rearwardly from the motor, one being a springy rectangular piece that is bent intermediate its ends in a dogleg fashion.<br><br>(Jt. State., docket # 61.) |

21

**A94**

Similar to the issue between the parties regarding the "lock assembly" claim construction, the parties disagree as to whether "control assembly" requires the Court to engage in a means-plus-function analysis under 35 U.S.C. § 112 ¶ 6. Zimmer argues that the term "does not convey sufficiently definite structure to one of ordinary skill in the art," and the claim term must therefore be limited to the structures disclosed in the '383 patent specification. (docket # 76, at 25.) Stryker disagrees, arguing that "[i]n the context of the '383 patent, a person of ordinary skill would understand the term 'control assembly' to mean 'components that work together to energize the motor.'" (docket # 66, at 22.) Zimmer bears the burden of proving section 112 ¶ 6 applies. *Thyssenkrupp*, 649 F.3d at 1356. The Court concludes that Zimmer has not carried its burden.

Claims 1 and 38 of the '383 patent both provide for a control assembly in the housing of the handheld irrigator "to regulate the speed of [the] motor" by "apply[ing] a variable energization signal" to the motor from the irrigator's battery pack "to control the speed of said motor" and to "regulate the pumping rate of [the] pump." (docket # 77-3, at 23:66-24:4; 26:15-24.) As discussed above, the term "assembly," though broad, would connote structure to a person of ordinary skill in the art. *See Lighting World*, 382 F.3d at 1363; *Kegel*, 127 F.3d at 1427; *Alto-Shaam*, 2010 WL 2382249 at *16-*18; *Fitness Quest*, 2007 WL 2359821, at *8. Stryker did not utilize means-plus-function language within the claim, and the Court sees no reason to apply section 112 ¶ 6 in its absence, given the structure the term "control assembly" connotes as used in the '383 patent.

Even though section 112 ¶ 6 does not apply, a construction is still necessary in light of the parties' disagreement as to the term's plain and ordinary meaning. Claims 20 and 38 state that the control assembly includes a "switch member," and that the assembly must be configured "to apply a variable energization signal" from the batteries in order to power and control the speed of the

22

**A95**

motor and regulate the irrigation pump rate. (*Id.* at 23:66-24:4; 26:15-24.) Against this backdrop, a person of ordinary skill in the art would construe the "control assembly" in the '383 patent as "components that work together to energize the motor," which is the construction Stryker proposes and the Court adopts as to this claim term. *See Lighting World, Inc.*, 382 F.3d at 1360 (holding that structural definitions may identify their function).

This construction is further confirmed when claims 20 and 38 are read in conjunction with dependent claims 22 and 40, which recite additional structural requirements of the control assembly. Claim 22 provides a claim requirement that further requires the control assembly to include two electrical conductors that are positioned so that "a switch member can be . . . positioned to: connect neither of said cable conductors to said motor; connect the first said cable conductor to said motor; or connect the second said cable conductor to said motor." (docket # 77-3, at 24:20-29.) Claim 42 requires a similar cable conductor configuration. (*Id.*) If the Court adopted Zimmer's narrow definition, the construction of the independent claims would render the dependent claims superfluous—an outcome strongly disfavored when construing a claim term. *See, e.g.*, *Phillips*, 415 F.3d at 1315; *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006); *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004).

The extrinsic evidence further confirms the Court's construction. Generally speaking, "control" is commonly used to describe "any set of instruments used to operate, regulate, or guide a machine." AMERICAN HERITAGE ILLUSTRATED ENCYCLOPEDIC DICTIONARY 381 (1987). And as previously noted, "assembly" is defined as "the putting together of manufactured parts to make a completed product." *Id.* at 42. Taken together, the Court is persuaded "control assembly" would be understood in common parlance to refer to a structure comprised of "parts that work together to

23

**A96**

operate, regulate, or guide a machine." Here, the "control assembly" in Claims 1 and 38 serve the express purpose of engergizing the motor of the irrigator. Accordingly, the Court construes "control assembly" as "components that work together to energize the motor."

> 9.      '383 Patent, Claim 10: "switch assembly"

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '383, col.22, l.63-col.23, l.9: A switch assembly mounted to said housing for selectively establishing a connection between at least one of said conductors and said motor, said switch assembly having a switch element moveably attached to said handle, said switch assembly being configured so that:<br><br>when said switch element is in a first position, said switch assembly does not supply an energization signal to said motor;<br><br>when said switch element is in a second position, said switch assembly supplies a first energization signal from said battery pack to said motor; and<br><br>when said switch element is in a third position, said switch | Components that work together to make, break or change an electric circuit<br>(Jt. State., docket # 61.) | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>Function: selectively establishing a connection between at least one of said conductors and said motor<br><br>Structure: a single conductive contact blade, two posts integral with the housing that are configured for electrical contacts to be mounted on them, two electrically-conductive, spring-like metal contacts mounted to said posts, and two electrically conductive contacts protruding rearwardly from the motor, one being a springy rectangular piece that is bent intermediate its ends in a dogleg fashion<br><br>(Jt. State., docket # 61.) |

24

A97

| assembly supplies a second energization signal from said battery pack to said motor. | | |
|---|---|---|

With respect to the "switch assembly" in claim 10 of the '383 patent, the core issue is once again whether the term connotes sufficient structure for a person of ordinary skill in the art to understand its meaning. Zimmer submits that "'switch assembly" does not connote sufficiently definite structure to one of ordinary skill in the art and thus should be construed under section 112 ¶ 6, which would limit the "switch assembly" to embodiments disclosed in the specification. (docket # 76, at 27.) In contrast, Stryker argues "switch assembly" should not be limited to the embodiments in the specification under section 112 ¶ 6, but rather should be construed as "components that work together to make, break or change an electric circuit." (docket # 61.)

Claim 10 of the '383 patent provides for a "switch assembly mounted to said housing for selectively establishing a connection between at least one of" the conductors included in the irrigation handpiece to the motor. (docket # 77-3, at 22:63-67.) Claim 10 further provides that the switch assembly includes a "switch element moveably attached to [the] handle" and that the switch assembly must be configured so that it provides an "off," "first energization signal," and "second energization signal" from the device's battery pack to the motor. (*Id.* at 22:63-23:10.) Given that the hallmark means-plus-function language is absent from the '383 patent, Zimmer once again bears the burden to prove that section 112 ¶ 6 should apply.

Based on the claim language and other intrinsic evidence, however, the Court concludes a person of ordinary skill in the art would consider "switch assembly" to connote structure, and declines to apply section 112 ¶ 6. In addition to including the structural term "assembly" within the

claim, the claim provides further limitations that confirm "switch assembly" is indeed structural. For example, the switch assembly includes a "switch member," which the parties do not dispute is a structural term, and is mounted on the housing of the irrigation handpiece. A person of ordinary skill would necessarily consider "switch assembly" as a structural term, given the structural definitions and positioning descriptions provided for in the claim language itself. Consequently, the Court holds that section 112 ¶ 6 does not apply.

The specification also supports this construction. As noted above, the "switch assembly" must be configured "for selectively establishing a connection between at least one of said conductors and said motor." (*Id.* at 22:63-67.) A person of ordinary skill in the art would understand that a number of different switch assembly configurations could accomplish this functional requirement. The parties agree that the preferred embodiment discloses a structure consistent with Zimmer's proposed claim construction. Contrary to Zimmer's position, however, the Court concludes a person of ordinary skill in the art, who at a minimum possesses "a bachelor's degree in mechanical engineering and 2-3 years of industry experience relating to the design of medical devices," would not be limited to this disclosed configuration. (docket # 79, Milroy Decl. ¶ 18.) Rather, a person of ordinary skill in the art would define "switch assembly" as components that work together to make, break or change an electric current.

The extrinsic evidence confirms this construction. A "switch" is commonly defined as "a device for making, breaking, or changing an electric circuit." CHAMBER'S CONCISE DICTIONARY 1081 (1991). Taken together with the definition of "assembly" discussed above, a person of ordinary skill in the art would construe a "switch assembly" to mean "components that work together for making, breaking, or changing an electrical circuit." The Court concludes that this definition,

26

**A99**

although expansive, conveys sufficient structure to be understood by one of ordinary skill in the art, and would indeed be the definition a person of ordinary skill in the art would associate with "switch assembly."

Accordingly, the Court adopts Stryker's proposed definition of the claim term.

10.     '383 Patent, Claims 20 and 38: "switch member"

| Claim Term | Stryker's Proposed Claim Construction | Zimmer's Proposed Claim Construction |
|---|---|---|
| '383, cl. 20, col.23, l.66-col.24, ln.4: a control assembly integral with said housing, said control assembly having a switch member moveably mounted to said housing and said control assembly being configured to apply a variable energization signal from said battery pack to said motor so as to control the speed of said motor and regulate the pumping rate of said pump. '383, cl. 38, col.26, l.15-24: a control assembly attached to said housing . . . said control assembly having a single switch member that is moveably attached to said housing that selectively makes/breaks a connection between said | A part for directing an electric current (Jt. State., docket # 61.) | Electrically conductive contact blade (Jt. State., docket # 61.) |

27

A100

| at least one conductor and said motor and that establishes the potential of the energization signal supplied to said motor. | | |
|---|---|---|

The parties disagree as to the construction of "switch member" in claims 20 and 38 of the '383 patent. Stryker proposes a broad construction, arguing that the "switch member" should be construed to include any part that directs an electric current. (docket # 61.) Zimmer proposes a much more limited definition, essentially seeking to limit "switch member" to an electric conductive contact blade, such as the one disclosed in the preferred embodiment. (*Id.*) Neither party has proposed a convincing construction for the term.

Stryker's proposed definition is overly broad. While its construction would certainly encompass the contact blade disclosed in the '383 specification, it would also include conductors, motors, wires, and any other structure that is physically capable of "directing an electric current." A person would not have such a broad understanding of "switch member," particularly as it is used in the '383 patent. Stryker's definition would improperly encompass various other claim limitations (the conductors and electric motor, for example), rendering claim terms superfluous and the claim itself nonsensical. In contrast, Zimmer's definition is unduly restrictive, seeking to limit the "switch member" to the type disclosed in the preferred embodiment—a conductive contact blade. A person of ordinary skill in the art would not adopt such a limited definition. The contact blade 253 simply serves to make, break, or otherwise change the electricity flow in the handpiece's electrical circuit, and a person of ordinary skill would construe the switch member as such.

Accordingly, the Court construes "switch member" as "a component for making, breaking, or changing an electric circuit." This construction is preferable, as it is consistent with the '383

**A101**

patent as a whole. As discussed above, a person of ordinary skill in the art would understand "switch" to mean "a device for making, breaking, or changing an electric circuit." CHAMBER'S CONCISE DICTIONARY 1081 (1991). In construing "switch assembly," the Court adopted the fundamental definition of "switch," and sees no principled reason to depart from this definition here.

## CONCLUSION

This Claim Construction Memorandum addresses only the limited patent terms the parties selected for construction at this time, hoping this Court's construction would facilitate framing and resolution of the issues on dispositive motion practice or trial. The Court anticipates addressing any further claims construction issues in the context of dispositive motion practice, and preparation of the final pretrial order and jury instructions on any claims or defenses that go to trial.

**IT IS SO ORDERED**.

Dated:      February 1, 2012              /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE

29

**A102**

US006022329A

# United States Patent [19]

**Arnett et al.**

[11] **Patent Number:** 6,022,329

[45] **Date of Patent:** *Feb. 8, 2000

[54] **IRRIGATION HANDPIECE WITH BUILT IN PULSING PUMP**

[75] Inventors: **Jeffery D. Arnett**, Kalamazoo; **Nicholas V. Gately**, Portage; **David H. Grulke**, Battle Creek; **Ruth A. Hilsbos**, Saline; **James L. Sertic**, Kalamazoo, all of Mich.

[73] Assignee: **Stryker Corporation**, Kalamazoo, Mich.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/009,657**

[22] Filed: **Jan. 20, 1998**

**Related U.S. Application Data**

[63] Continuation of application No. 08/559,133, Nov. 17, 1995, Pat. No. 5,718,668, which is a continuation of application No. 08/049,144, Apr. 19, 1993, Pat. No. 5,470,305.

[51] Int. Cl.$^7$ ........................................ A65M 3/00

[52] U.S. Cl. .......................... **601/155**; 239/926; 239/373; 604/35; 604/153; 604/43; 601/161

[58] Field of Search .................................... 601/154, 155, 601/160, 161, 162, 163, 165; 604/33, 35, 39, 43, 153; 128/DIG. 10, DIG. 12; 433/80; 74/523, 537, 538, 489; 200/522, 532.2, 293.1; 239/525, 526, 373; 222/333

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 509,220 | 11/1893 | Gustafson . |
| 602,666 | 4/1898 | Schroeder . |
| 738,503 | 9/1903 | Waters . |
| 790,353 | 5/1905 | Estlingen . |
| 1,317,851 | 10/1919 | Arnett . |
| 1,503,279 | 7/1924 | Nixon . |
| 1,538,007 | 5/1925 | Schellin . |
| 1,846,596 | 2/1932 | Hertzberg . |
| 2,012,886 | 8/1935 | Lowry . |
| 2,112,629 | 3/1938 | Lloyd . |
| 2,139,653 | 12/1938 | Belfrage . |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 0 258 901 | 3/1988 | European Pat. Off. . |
| 1 325 670 | 3/1963 | France . |
| 24 16 099 | 4/1975 | Germany . |
| WO94/19030 | 9/1994 | Japan . |
| 1 264 138 | 2/1972 | United Kingdom . |
| 2 063 674A | 6/1981 | United Kingdom . |
| WO81/01794 | 7/1981 | WIPO . |
| WO81/02335 | 8/1981 | WIPO . |
| WO85/03982 | 9/1985 | WIPO . |
| WO86/04247 | 8/1986 | WIPO . |
| WO91/12830 | 9/1991 | WIPO . |
| WO92/21388 | 12/1992 | WIPO . |
| WO93/17733 | 9/1993 | WIPO . |
| WO94/13335 | 6/1994 | WIPO . |
| WO94/23773 | 10/1994 | WIPO . |

**OTHER PUBLICATIONS**

Pulsavac, Operations Manual Pulsatile Lavage Debridement System (15 sheets) Jun. 1983 Snyder Laboratories, Inc. Dover, Ohio 44622.

(List continued on next page.)

*Primary Examiner*—Danton D. DeMille
*Attorney, Agent, or Firm*—Flynn, Thiel, Boutell & Tanis, P.C.

[57] **ABSTRACT**

A pulsed irrigation handpiece comprises a pulsed irrigation liquid outlet for applying liquid pulses to a surgical site, a pump unit reciprocatingly driveable for pumping pulses of irrigation liquid through the outlet, an electric powered drive unit for reciprocatingly driving the pump unit, and a housing containing the pump and drive units. A irrigation inlet hose leads from the pump unit out of the handpiece housing and is connectable to a remote irrigation liquid source. An irrigation inlet hose adjacent the remote end thereof and electric conductors extending along the irrigation inlet hose transfer electric power from the supply unit to the drive unit in the handpiece. Removable tips are alternatively removably attachable to the irrigation liquid outlet adjacent the front end of the handpiece.

**10 Claims, 17 Drawing Sheets**



## 6,022,329

Page 2

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 2,197,995 | 4/1940 | Crowley . | 4,215,476 | 8/1980 | Armstrong . |
| 2,243,299 | 5/1941 | Travers . | 4,248,589 | 2/1981 | Lewis . |
| 2,494,088 | 1/1950 | Dulity . | 4,250,872 | 2/1981 | Tamari . |
| 2,531,793 | 11/1950 | Sulek . | 4,257,416 | 3/1981 | Prager . |
| 2,595,491 | 5/1952 | Schweikert . | 4,267,947 | 5/1981 | Wasserstrom . |
| 2,634,885 | 4/1953 | North . | 4,275,726 | 6/1981 | Schael . |
| 2,662,485 | 12/1953 | Ilfrey . | 4,276,023 | 6/1981 | Phillips et al. . |
| 2,684,049 | 7/1954 | Hollis . | 4,278,078 | 7/1981 | Smith . |
| 2,727,678 | 12/1955 | Henderson . | 4,282,867 | 8/1981 | Du Toit . |
| 2,733,713 | 2/1956 | Kabnick . | 4,290,454 | 9/1981 | Sheler . |
| 2,781,154 | 2/1957 | Meredith . | 4,294,251 | 10/1981 | Greenwald et al. . |
| 2,802,466 | 8/1957 | Thomas . | 4,300,748 | 11/1981 | Kreeley . |
| 2,847,007 | 8/1958 | Fox . | 4,313,699 | 2/1982 | Steels . |
| 2,874,696 | 2/1959 | Bried . | 4,314,560 | 2/1982 | Helfgott et al. . |
| 2,908,273 | 10/1959 | Huston . | 4,346,869 | 8/1982 | MacNeill . |
| 2,993,654 | 7/1961 | Norton . | 4,350,477 | 9/1982 | Mazal . |
| 3,001,288 | 9/1961 | Freedman . | 4,395,205 | 7/1983 | McCullough . |
| 3,014,623 | 12/1961 | Horn et al. . | 4,424,010 | 1/1984 | McCullough . |
| 3,039,272 | 6/1962 | Frick . | 4,424,055 | 1/1984 | Herman . |
| 3,044,465 | 7/1962 | Anderson et al. . | 4,428,345 | 1/1984 | Bertsch et al. . |
| 3,048,121 | 8/1962 | Sheesley . | 4,428,748 | 1/1984 | Peyman et al. . |
| 3,070,089 | 12/1962 | Dick . | 4,436,495 | 3/1984 | McCullough . |
| 3,135,259 | 6/1964 | Evans . | 4,445,819 | 5/1984 | Walling . |
| 3,227,158 | 1/1966 | Mattingly . | 4,449,827 | 5/1984 | Karkiewicz . |
| 3,237,306 | 3/1966 | Staunt . | 4,451,069 | 5/1984 | Melone . |
| 3,263,618 | 8/1966 | Carpenter . | 4,460,358 | 7/1984 | Somerville et al. . |
| 3,295,371 | 1/1967 | Smith . | 4,468,221 | 8/1984 | Mayfield . |
| 3,316,845 | 5/1967 | Schumann . | 4,472,120 | 9/1984 | McCullough . |
| 3,353,537 | 11/1967 | Knox et al. . | 4,482,345 | 11/1984 | Chow et al. . |
| 3,359,909 | 12/1967 | Johnson et al. . | 4,484,769 | 11/1984 | Lacey . |
| 3,393,673 | 7/1968 | Mattingly . | 4,489,750 | 12/1984 | Nehring . |
| 3,416,567 | 12/1968 | VonDardel et al. . | 4,493,694 | 1/1985 | Wuchinich . |
| 3,425,410 | 2/1969 | Cammack . | 4,502,502 | 3/1985 | Krug . |
| 3,426,743 | 2/1969 | Chesnut et al. . | 4,508,532 | 4/1985 | Drews et al. . |
| 3,448,766 | 6/1969 | Schuele . | 4,509,507 | 4/1985 | Yabe . |
| 3,452,746 | 7/1969 | Shanhouse . | 4,512,066 | 4/1985 | McCullough . |
| 3,484,121 | 12/1969 | Quinton . | 4,515,532 | 5/1985 | Walling . |
| 3,508,546 | 4/1970 | Rogers et al. . | 4,519,385 | 5/1985 | Atkinson et al. . |
| 3,515,130 | 6/1970 | Tsujino . | 4,526,573 | 7/1985 | Lester et al. . |
| 3,561,433 | 2/1971 | Kovach . | 4,535,773 | 8/1985 | Yoon . |
| 3,601,164 | 8/1971 | Bruce . | 4,537,182 | 8/1985 | Otani . |
| 3,605,556 | 9/1971 | Erdmann . | 4,537,209 | 8/1985 | Sasa . |
| 3,635,607 | 1/1972 | Grise . | 4,552,130 | 11/1985 | Kinoshita . |
| 3,653,377 | 4/1972 | Rebold . | 4,553,957 | 11/1985 | Williams et al. . |
| 3,702,141 | 11/1972 | Wetterhorn . | 4,561,431 | 12/1985 | Atkinson . |
| 3,713,533 | 1/1973 | Reimels . | 4,561,856 | 12/1985 | Cochran . |
| 3,731,411 | 5/1973 | Lloyd et al. . | 4,580,816 | 4/1986 | Campbell et al. . |
| 3,731,676 | 5/1973 | Rebold . | 4,583,531 | 4/1986 | Mattchen . |
| 3,762,411 | 10/1973 | Lloyd et al. . | 4,592,749 | 6/1986 | Ebling et al. . |
| 3,765,802 | 10/1973 | Leitermann et al. . | 4,596,558 | 6/1986 | Smith et al. . |
| 3,768,472 | 10/1973 | Hodosh et al. . | 4,601,710 | 7/1986 | Moll . |
| 3,771,522 | 11/1973 | Waysilk et al. . | 4,604,089 | 8/1986 | Santangelo et al. . |
| 3,784,235 | 1/1974 | Kessler et al. . | 4,634,420 | 1/1987 | Spinosa et al. . |
| 3,794,031 | 2/1974 | Bloom . | 4,655,197 | 4/1987 | Atkinson . |
| 3,853,245 | 12/1974 | Branch . | 4,655,744 | 4/1987 | Thistle et al. . |
| 3,861,383 | 1/1975 | Kovach . | 4,655,754 | 4/1987 | Richmond . |
| 3,883,074 | 5/1975 | Lambert . | 4,655,765 | 4/1987 | Swift . |
| 3,895,741 | 7/1975 | Nugent . | 4,662,829 | 5/1987 | Nehring . |
| 3,949,753 | 4/1976 | Dockhorn . | 4,667,655 | 5/1987 | Ogiu et al. . |
| 3,965,934 | 6/1976 | Rosenberg . | 4,692,140 | 9/1987 | Olson . |
| 3,982,540 | 9/1976 | Ross . | 4,696,669 | 9/1987 | Menhusen . |
| 3,986,266 | 10/1976 | Vellender . | 4,705,500 | 11/1987 | Reimels et al. . |
| 3,993,054 | 11/1976 | Newman . | 4,741,678 | 5/1988 | Nehring . |
| 4,007,739 | 2/1977 | Bron et al. . | 4,748,970 | 6/1988 | Nakajima . |
| 4,030,495 | 6/1977 | Virag . | 4,764,165 | 8/1988 | Reimels et al. . |
| 4,030,498 | 6/1977 | Tompkins . | 4,765,165 | 8/1988 | Reimels et al. . |
| 4,061,142 | 12/1977 | Tuttle . | 4,776,840 | 10/1988 | Freitas et al. . |
| 4,111,391 | 9/1978 | Pilolla . | 4,799,481 | 1/1989 | Transue, et al. . |
| 4,123,091 | 10/1978 | Cosentino et al. . | 4,817,599 | 4/1989 | Drews . |
| 4,205,676 | 6/1980 | Humphrey et al. . | 4,872,837 | 10/1989 | Issalene et al. . |
| | | | 4,892,469 | 6/1990 | McCullough et al. . |
| | | | 4,911,621 | 3/1990 | McCullough et al. . |

**6,022,329**

Page 3

| | | |
|---|---|---|
| 4,925,450 | 5/1990 | Imonti et al. . |
| 4,927,340 | 5/1990 | McCullough . |
| 4,935,005 | 6/1990 | Haines . |
| 4,941,872 | 7/1990 | Felix et al. . |
| 4,957,483 | 9/1990 | Gonser et al. . |
| 4,978,282 | 12/1990 | Fu et al. . |
| 4,982,739 | 1/1991 | Hemstreet et al. . |
| 5,019,038 | 5/1991 | Linden . |
| 5,046,486 | 9/1991 | Grulke et al. . |
| 5,049,071 | 9/1991 | Davis et al. . |
| 5,053,002 | 10/1991 | Barlow . |
| 5,098,387 | 3/1992 | Wiest et al. . |
| 5,120,305 | 6/1992 | Boehringer et al. . |
| 5,142,723 | 9/1992 | Lustig . |
| 5,170,779 | 12/1992 | Ginsberg . |
| 5,176,629 | 1/1993 | Kullas et al. . |
| 5,186,714 | 2/1993 | Boudreault et al. . |
| 5,188,591 | 2/1993 | Dorsey, III . |
| 5,195,959 | 3/1993 | Smith . |
| 5,197,460 | 3/1993 | Ito . |
| 5,203,769 | 4/1993 | Clement et al. . |
| 5,224,929 | 7/1993 | Remiszewski . |
| 5,261,905 | 11/1993 | Doresey, III . |
| 5,269,750 | 12/1993 | Grulke et al. . |
| 5,295,956 | 3/1994 | Bales et al. . |
| 5,305,735 | 4/1994 | Welden . |
| 5,322,503 | 6/1994 | Desai . |
| 5,336,238 | 8/1994 | Holmes et al. . |
| 5,391,145 | 2/1995 | Dorsey . |
| 5,470,305 | 11/1995 | Arnett et al. . |
| 5,484,402 | 1/1996 | Saravia et al. . |
| 5,514,089 | 5/1996 | Walbrink et al. . |
| 5,562,640 | 10/1996 | McCabe et al. . |
| 5,573,504 | 11/1996 | Dorsey, III . |
| 5,586,977 | 12/1996 | Dorsey, III . |
| 5,718,668 | 2/1998 | Arnett et al. . |

OTHER PUBLICATIONS

Davol Instructions for Use, Simpulse™ Suction/Irrigator (2 sheets) Davol, Inc. 100 Sockanossett Crossroad, Cramston, R102920 Jan. 1985.

Copy of photos of Ethicon, photos of Pfizer, Valley Lambs (10 photos) Jun. 25, 1993.

One–™ Minimal Access Surgery System, Introducing the VAC–™ Handcontrolled Suction Irrigation Instrument, ConMed Aspen Surgical Systems, Conmed Jul. 1992, 10M.

DAVOL—Endo–Flo™ Irrigator, Bard, Davol Inc.; instruction booklet #041002–0, 9011R, Nov. 1990.

Pulsatile Lavage Debridement System, brochure No. 82–010–5150–0146/2.5M CISS Zimmer Inc., Snyder Labs Inc, 1982.

Suction/Irrigation Is No Longer An Issue, Hydro–Dissection System, 556529 PP ICM Jul. 1992, Karl Storz GmbH & Co. Tuttlengen West Germany.

A Fully Integrated Laparoscopic Irrigation and Instrumentation System, Cabot Medical, Langhorne, PA Apr. 1992, 10M L/T (4 sheets)

Advances In Pelviscopy, The Irrigation Pump System, Cabot Medical Langhorne, PA Apr. 1990 (3 sheets).

InteliJET™, Fluid Management System User's Manual, Smith & Nephew Dyonics Inc., copyright 1992, PN1060170.

Davol, Arthro–Flo®, Instructions For Use, 038657–0 901R, C.R. Bard, Inc. Cranston RI, Jan. 1990.

Davol, Arthro–Flo High–Flo Irrigator, Bard, OP–AF0015000 Aug. 1992 5M C.R. Bard Inc. Cranston, RI.

3M Fluid Control System, For Precise Control of all Arthroscopic Procedures, 70–2008–5458–9, 1992 3M.

Davol Simpulse–™ Suction/Irrigator, BARD, 034089–0 (2 sheets) Jan. 1985.

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 58 Page: 175 Filed: 01/22/2014



FIG. 1

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 178 Page: 176 Filed: 01/22/2014



FIG. 2



FIG.4

FIG.3

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 178 Page: 178 Filed: 01/22/2014



FIG.4B

FIG.4C

FIG.4A

# FIG. 5



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 180 Filed: 01/22/2014



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 181 Filed: 01/22/2014



FIG. 8

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 182 Filed: 01/22/2014



FIG.8A

FIG.8B

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 183 Filed: 01/22/2014





FIG. 16

FIG. 17



FIG. 18A

FIG. 19

FIG. 18

FIG. 18B

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 186 Filed: 01/22/2014



FIG. 18C

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 187 Filed: 01/22/2014



FIG.20



FIG.21

Case: 13-1668 CASE PARTICIPANTS ONLY Document 18 Page 188 Filed: 01/22/2014



FIG.26

FIG.27

FIG.28

FIG.22

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18-8 Page: 189 Filed: 01/22/2014



FIG.22A



FIG. 23A

FIG. 23B

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 19 Page: 18 Filed: 01/22/2014

FIG. 24

FIG. 25

FIG. 23

FIG. 29

6,022,329

1

# IRRIGATION HANDPIECE WITH BUILT IN PULSING PUMP

This is a continuation of Ser. No. 08/559,133, filed Nov. 17, 1995, now U.S. Pat. No. 5,718,668, which is a continuation of Ser. No. 08/049,144, filed Apr. 19, 1993 now U.S. Pat. No. 5,470,305.

## FIELD OF THE INVENTION

This invention relates to a surgical irrigation with a built in pulsing pump.

## BACKGROUND OF THE INVENTION

Grulke et al U.S. Pat. No. 5,046,486, assigned to the Assignee of the present invention, discloses a surgical pulsed irrigation handpiece which produces a pulsed irrigation liquid output capable of loosening and floating debris at a surgical site for subsequent removal (as by suction). This prior pulsed irrigation handpiece has been on the market for several years and has proved generally effective for its intended use and hence has been popular in the surgical community.

However, in a continuing effort to improve on existing devices of this general kind, the present invention has been developed. As compared to the above-mentioned prior device, a pulsed irrigation handpiece embodying the present invention is producible at lower cost, produces sharper liquid pulse transients (particularly the pulse "off" transient), requires no connection to any operating room power source (e.g. compressed air) or to an external pump, and instead is self-contained, requires only external connection to a irrigation liquid source (e.g. conventional irrigation liquid bag), provides better suction (when suction is required), is more compact, and is conveniently shaped to be held either as a pistol or a wand (by the handle or barrel).

Other objects, purposes and advantages of the invention will be apparent to those acquainted with apparatus as general kind upon reading the following description and inspecting the accompanying drawings.

## SUMMARY OF THE INVENTION

A pulsed irrigation handpiece comprises pulsed irrigation liquid outlet means for applying liquid pulses to a surgical site, pump means reciprocatingly drivable for pumping pulses of irrigation liquid through said outlet means, powered drive means for reciprocatingly driving said pump means and housing means containing said pump means and drive means.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial view of a handpiece embodying the invention.

FIG. 2 is a laterally exploded pictorial view of the FIG. 1 handpiece.

FIG. 3 is an enlarged elevational view of the FIG. 1 handpiece with the leftward housing part removed.

FIG. 4 is a view similar to FIG. 3 but with the suction hose removed, the left drive unit shell part removed and the drive unit exposed in central cross-section, such that FIG. 4 approximates a central cross-sectional view of the FIG. 1 handpiece.

FIG. 4A is an enlarged fragment of FIG. 4 detailing the rearward portion of the handle.

FIG. 4B is an enlarged fragmentary pictorial view, taken from the front, of the electrical contact support posts seen in FIG. 4A.

2

FIG. 4C is an enlarged fragmentary exploded pictorial view of the electrical contacts, associated with the FIG. 4B posts and associated electrical conductors from the battery supply.

FIG. 5 is an enlarged, exploded, pictorial view of the drive unit of FIG. 2.

FIG. 6 is a sectional view substantially taken on the line 6—6 of FIG. 5, and provides a top view of the bottom drive unit shell part of FIG. 5 (the rightward one of FIG. 2) with the drive components removed to show the interior configuration of that shell part.

FIG. 7 is a sectional view substantially taken on the line 7—7 of FIG. 5, and provides a view similar to FIG. 6 but showing the interior configuration of the other drive unit shell part (the upper one in FIG. 5 and leftward one in FIG. 2).

FIG. 8 is an enlarged central cross-sectional view of a tip unit usable with the handpiece of FIG. 2 and showing same installed in a pump unit shown in central cross-section substantially as in FIG. 4.

FIG. 8A is a reduced size, fragmentary, side elevational view of the apparatus of FIG. 8.

FIG. 8B is a pictorial view of the apparatus of FIG. 8A.

FIG. 9 is an end elevational view of the drive unit, taken from the right end in FIGS. 2 and 3.

FIG. 10 is a sectional view substantially taken on the line 10—10 of FIG. 5 and showing the drive unit with one shell part (the left one in FIG. 2 and top one in FIG. 5) removed to show the motor and transmission.

FIG. 11 is an elevational view of the drive train substantially taken on the line 11—11 of FIG. 10.

FIG. 12 is a central cross-sectional view substantially taken on the line 12—12 of FIG. 10.

FIG. 13 is a fragmentary cross-sectional view substantially taken on the line 13—13 of FIG. 10.

FIG. 14 is a cross-sectional view substantially taken on the line 14—14 of FIG. 10.

FIG. 15 is a sectional view substantially taken on the line 15—15 of FIG. 10.

FIG. 16 is an exploded pictorial view of the pump unit of FIG. 2 in an enlarged scale.

FIG. 17 is a front end elevational view of the pump unit of FIG. 16 taken substantially from the left side of FIGS. 2–4 and 16.

FIG. 18 is a central cross-sectional view of the pump unit of FIG. 17 taken substantially on the line 18—18 of FIG. 17.

FIG. 18A is a fragment of FIG. 18 showing the pump unit at the beginning of an intake stroke.

FIG. 18B is a fragment of FIG. 18 showing the pump nearing the end of an output pulse.

FIG. 18C is a fragmentary enlargement of FIG. 18 showing the valve member.

FIG. 19 is a fragmentary cross-sectional view showing the connection of the pump unit to the liquid supply hose.

FIG. 20 is a pictorial view of the electric power supply unit connected to the FIG. 2 handpiece.

FIG. 21 is a left end view of the FIG. 20 electric power supply unit.

FIG. 22 is an exploded pictorial view of the electric power supply unit of FIG. 20.

FIG. 22A is an electrical schematic of the FIG. 2 handpiece and FIG. 20 electric power supply unit.

FIG. 23 is a central cross-sectional view taken substantially on the line 23—23 of FIG. 22.

6,022,329

FIG. 23A is an enlarged fragmentary pictorial view of the support structure for battery contacts at the forward (left in FIG. 23) end of the electric power supply casing.

FIG. 23B is an enlarged pictorial view similar to FIG. 23A but showing the support structure for battery contacts at the rearward (rightward in FIG. 23) end of the power supply casing.

FIG. 24 is a sectional view substantially taken on the line 24—24 of FIG. 22 and showing the electric power supply unit with its top cover removed.

FIG. 25 is a sectional view substantially taken on the line 25—25 of FIG. 22 and showing the underside of the cover of the power supply casing.

FIGS. 26, 27 and 28 are enlarged pictorial views of battery contacts of FIG. 22.

FIG. 29 is an enlarged fragmentary pictorial view of an embodiment of the liquid supply and electric wiring harness of the apparatus of FIGS. 2 and 20 but showing a modification in the attachment of the electrical and liquid handling components.

In the following detailed discussion the terms "up", "down", "right" and "left", and variations thereon, refer to structural elements in their positions in specified drawing figures.

## DETAILED DESCRIPTION

A pulsed irrigation handpiece 10 (FIGS. 1 and 2) embodying the invention comprises a hand-held housing 11 having a handle 12 and a barrel 13 which extends forward from the upper end of the handle 12 at about a 130° to 150° (here about 145°) angle thereto.

The housing 11 is hollow and, for convenience in assembling the handpiece 10, is constructed as laterally opposed concave left and right housing parts 14 and 15 (FIG. 2). The housing parts 14 and 15 are preferably molded rigid plastic elements held together rigidly by any convenient means, here comprising undercut snap fit tabs 16 protruding from the top and bottom edges of the right housing part 15 to snap over an interior edge flange (not shown) on the top and bottom edge of the left housing part 14. If desired, precise registry together of the two housing parts can be assisted by laterally projecting pins 20 distributed along the edges of one housing part (here the left housing part 14) piloted in holes 21 (FIG. 4) in the opposed edges of the other housing part (here 15). Upon completion of assembly of the handpiece 10, the two housing parts 14 and 15 may be adhesively bonded together. The handpiece is intended to be a disposable item and therefore access to the interior of the housing for purposes of repair is not needed.

### Drive Unit

The drive unit 25 (FIGS. 2–15) is self contained in its own shell 26 (FIG. 2). For convenience in assembly, the shell 26 comprises two opposed concave shell parts 30 and 31 respectively disposed to the left and right in FIG. 2. The shell parts 30 and 31 are preferably of rigid molded plastics material. When the drive unit 25 has been assembled, as in FIGS. 2 and 9, the shell parts 30 and 31 are held fixedly together by any convenient means, here by resilient snap connection of generally U-shaped clips 32, molded in spaced relation along the perimeter edge of the shell part 31 which overlap the perimeter edge of the shell part 30 and snap over tabs 33 protruding therefrom, as seen in FIGS. 5–7. Precise location of the shell parts 30 and 31 with respect to each other is assisted by locator pins 34 fixedly protruding from the shell part 31 and holes 35 in the opposed portions of the shell part 30.

A conventional DC energizable electric motor 36 (FIGS. 4 and 5) is snugly housed in the space between the left and right (FIG. 2) shell parts 30 and 31 at the rear (left in FIGS. 5–7, 10 and 12) thereof. The motor 36 is snugly axially located between the rear end wall 40 and a transverse internal bulkhead 41 of the shell 26 (FIGS. 5–7, 10 and 12). The rear end wall 40 and bulkhead 41 have opposed parts in the left and right shell parts 30 and 31, as seen in FIGS. 6 and 7.

Rear and front bosses 42 and 43 respectively extend rearward and forward from the cylindrical casing 44 of the motor 36, as seen in FIGS. 10 and 12, and are supported in corresponding coaxial recesses 45 and 46 in the rear end wall 40 and bulkhead 41 respectively, so as to support the motor casing 44 with respect to the shell 26. A flat 47 on the rear boss 42 (FIG. 9) co-acts with a corresponding flat in the surrounding recess 45 to prevent rotation of the motor casing 44 with respect to the shell parts 30 and 31, such that the motor 36 is antirotationally fixed within the shell 26.

The drive unit 25 further includes a transmission 50 (FIG. 5) coaxial with and forward of the motor 36. The transmission includes a reciprocating link member 51 and is driven from the forward extending, rotating output shaft 52 of the motor 36. The shaft 52 extends coaxially forward through the front boss 43 (FIG. 12) of the motor 36.

The transmission 50 (FIGS. 5 and 12) includes a pinion gear 53 fixed on the motor shaft 52 for rotation thereby, and a face gear 54 which, as seen in FIG. 12, underlies the pinion gear 53. The face gear 54 has a relatively large diameter central disk 56 carrying upward facing teeth 55 engaging corresponding teeth on the pinion gear 53 for rotation thereby. The face gear 54 includes a secondary pinion gear 57 fixed coaxially beneath the disk 56, and of substantially lesser diameter, which in turn drives a relatively large diameter output gear 60.

It will be understood that the pinion gear 53, face gear 54, secondary pinion 57 and output gear 60 are all provided with a full circumferential (360°) set of teeth, so that continuous rotation of the motor shaft 52 results in continuous rotation of the output gear 60. For convenience in drawing, some or all the gear teeth are not shown in various of the drawings, the toothed meshing connection of the gears therein thus being only schematically shown. See for example FIGS. 4, 10, 12, 13 and 14.

An output shaft 61 is fixed to and coaxially upstanding from the output gear 60 (FIG. 12) and fixedly rotatably drives an eccentric member 62 (FIGS. 5, 10 and 12) spaced above the output gear 60. In this embodiment, the output shaft is of rectangular cross-section to maximize its torque transmitting capability.

The eccentric member 62 comprises a radially extending disk 63 (FIG. 5) coaxial with the output shaft 61 and fixedly surmounted by an eccentric circular cylinder 64 eccentrically rotatable with the output shaft 61.

The link member 51 is generally T-shaped, as seen in FIG. 13, having a plate-like body 70 overlying the disk 63 of the eccentric member 62 and lying at right angles to the output shaft 61, and further having a plate-like fork 71 fixed at the rightward (FIGS. 5, 10, 12 and 13) end of the plate-like body 70 and extending in a plane substantially parallel to the output shaft 61. The plane of the plate-like fork 71 is perpendicular to the intended direction of reciprocating movement of the link member 51. The body 70, at its end portion remote from the fork 71, has an oblong through opening 72 snugly radially receiving the rotating eccentric cylinder 64 of the eccentric member 62, as seen in FIG. 10.

6,022,329

More particularly, the length direction of the oblong opening 72 extends parallel to the plane of the fork 71 and is of sufficient length to accommodate 360° rotation of the eccentric cylinder 64 without movement of the body 70 parallel to the plane of the fork 71. On the other hand, the width of the oblong opening 72, namely in a direction perpendicular to the plane of the fork 71, corresponds substantially to the diameter of the eccentric cylinder 64, providing a sliding clearance between the body 70 and eccentric cylinder 64, so that rotation of the eccentric cylinder 64 will result in reciprocation of the link member 51 in a direction perpendicular to the plane of the fork 71.

The plate-like body 70 includes a thickened rim 73 (FIG. 5) around the oblong opening 72 and may thus be said to form a yoke for coaction with the eccentric cylinder 64. The side edges of the body 70 are preferably also thickened to form parallel longitudinal guide rails 74 (FIG. 10).

The above discussed moving elements of the transmission 50 are located and movably supported within the shell 26 as follows. The face gear 54 has coaxial downward and upward (FIGS. 5–7, 10 and 12) extending stub shafts 75 and 76 respectively rotatably supported in coaxial bearing bosses 80 and 81 respectively fixed on the opposing faces of the shell parts 31 and 30 (FIGS. 6, 7 and 12). Similarly, the output gear 60 and the eccentric member 62 have respective downward and upward extending stub shafts 82 and 83 coaxial with the output shaft 61 and rotatably supported in respective cylindrical bearing bosses 84 and 85 in the respective shells 31 and 30 (FIGS. 5–7 and 12). The link member 51 is slidably guided for reciprocation in a notch 90 (FIGS. 5 and 7) in the peripheral wall 91 of the left (upper in FIG. 5) shell part 30. The notch 90 has parallel opposed guide faces 92 (FIG. 7) spaced apart to snugly slidably guide therebetween the opposite guide rails 74 of the link member 51, and thus spaced at substantially at the maximum width of the link member. The thickness of the link member is guided for reciprocation between the peripheral edge 93 of the right (lower in FIG. 5) shell 31 and the width wall 94 (FIGS. 5 and 7) of the other shell part 30.

The central length axis LA (FIG. 10) of the link member 51 intersects the central length axis MA of the motor shaft 52 at the axis SA of the output shaft 61 and stub shaft 83 (FIGS. 10 and 12), at an angle equal to the angle between the central length axis of the handle 12 and barrel 13 of the housing 11. Moreover, the length axes of the handle and barrel also intersect at the axis SA of the output shaft 61 when the drive unit 25 is installed in the handpiece housing 11 as hereafter discussed. In effect then, the link member longitudinal axis LA and motor shaft axis MA define the length axis of the barrel 13 and handle 12, respectively, when the drive unit 25 is installed in the handpiece housing 11.

The drive unit 25 is located within the handle 12, as follows. As seen in FIGS. 3 and 4, transverse ribs 95 are molded into the interior surface of the handle 12 at opposing locations in the left and right housing parts 14 and 15 (FIGS. 2–4). For drawing convenience, only the ribs in the right housing part 15 are shown, the ribs in the left housing part 14 being compatible. The ribs 95 locate the drive unit 25 in the rightward/leftward direction in FIG. 2. Further, the drive unit shell bosses 84 and 85 (FIG. 5) protrude sideways from the drive unit shell and are pivotally received in corresponding hollow cylindrical bosses, one of which is shown at 96 in FIG. 2, and which extend toward each other from the interior of the left and right housing parts 14 and 15. The hollow cylindrical boss 96 of the left housing part 14 is not shown but is opposed to and compatible with the housing part 96 shown in the right housing part 15 of FIG. 2. The

drive unit 25 is thus, except for the lateral positioning defined by the ribs 95, pivotally located within the handpiece housing 11 and is thus capable of some pivotal floating in the housing to achieve proper alignment of the longitudinal movement axis LA (FIGS. 7) of the link member 51 with respect to the barrel 13 and a pump unit 100 (FIGS. 2–4 and 16–18) located in the barrel 13 as hereafter discussed.

Pump Unit

Turning now to the pump unit 100, attention is directed to FIGS. 2–4 and 16–18. The pump unit 100 includes a bellows 101 including an axially expandable and contractible flexible bellows wall 114 (FIG. 18) and a forwardly extending, rigid, annular flange wall 102. Such flange wall 102 is loosely telescoped over a rigid rearwardly extending annular flange 103 of a rigid, forwardly extending coaxial bellows housing 104.

The bellows 101 and bellows housing 104 are preferably of molded plastics material. A resilient O-ring 105 (FIGS. 16 and 19) is snugly radially disposed between the radially opposed, axially extending annular flanges 102 and 103, to create a fluid seal therebetween and hence between the bellows 101 and bellows housing 104, and hence to prevent fluid leakage therebetween. The bellows 101 and bellows housing 104 have respective axially spaced radially extending steps 106 and 107 joined to the respective annular flanges 102 and 103 and axially spaced apart at a distance substantially greater than the diameter of the O-ring 105, as seen in FIG. 19. The axial extending flanges 102 and 103 and radially extending steps 105 and 106 define an annular chamber 110 in which the O-ring 105 is axially loosely, and radially snugly and sealingly, disposed. Note that the radially opposed surfaces of the axially extending annular flanges 102 and 103 are cylindrical, such that neither has an annular groove in which the O-ring seats. Thus, the O-ring is free to roll on the radially opposed cylindrical surfaces of the axially extending flanges 102 and 103 and the O-ring 105 does not significantly interfere with axial separation of the bellows 101 and bellows housing 104 from each other.

Instead, such axial separation is prevented, as hereinafter further discussed, by a forwardly-rearwardly (leftwardly-rightwardly in FIG. 2) spaced pair of ribs 111 (FIG. 2) extending radially inward from the interior wall of the right housing part 15 and a corresponding, laterally opposed pair of mirror imaged ribs (not shown) extending laterally inward from the interior wall of the left housing part 14. Such ribs 111 are also schematically indicated in FIG. 18.

The rear (right in FIG. 19) end of the bellows housing axial flange 103 abuts the radially extending step 106 of the bellows 101 and the forward (leftward in FIG. 19) end of the bellows axial flange 102 axially abuts a radial flange 112 which extends radially outward from and forwardly from the bellows housing step 107. The forward end of the bellows axial flange 102 thus radially overlaps the bellows housing step 107 in snug but axially slidable relation thereto. A small forwardly extending annular rib 113 protrudes forwardly from the bellows radial step 106 toward the O-ring 105 to prevent rearward escape of the O-ring 105 from the space between the axially extending flanges 102 and 103, in the event of slight axial shifting of the bellows 101 and bellows housing 104 away from each other.

The above mentioned radially inward extending ribs 111 of the handpiece housing 11 snugly axially oppose and sandwich therebetween the bellows radial step 106 and bellows housing radial flange 112 to positively prevent axial separation of the bellows 101 from the bellows housing 104, when the pump unit 100 is installed in the housing 11.

6,022,329

7

The above-mentioned bellows wall 114 extends rearward from the inner periphery of the radially extending annular step 106 of the bellows 101 (FIG. 18) and consists of an axially collapsible and extensible, flexible, wave cross-section, peripheral wall 114. The bellows wall 114 surrounds an axially expansible and contractible pumping chamber 115. At the rear end of the bellows 101, a radially extending drive end wall 116 closes the rear end of the bellows wall 114 and pumping chamber 115. A stub 120, having a radially enlarged head 121, is fixed to and extends coaxially rearwardly from the drive end wall 116.

To axially reciprocatingly drive (repetitively axially contract and expand) the bellows 101, the above discussed link member 51 (FIG. 5) of the drive unit 25 has its fork 71 provided with a central, radially opening, generally U-shaped slot 122 (FIGS. 11–13). The slot 122 divides the fork 71 into a pair of tines 123 (FIG. 11). The slot 122 opens leftwardly in FIG. 2, namely away from the rightward housing part 15 and toward the leftward housing part 14. Thus, with the drive unit 25 located in the right housing part 12 as seen in FIG. 3, the pump unit 100 can be inserted into the rightward housing part 15, with the stub 120 (FIG. 18) inserted in the slot 122 of the fork 71 (FIG. 11) so as to trap the tines 123 axially between the drive end wall 116 and head 121 of the bellows 101, as generally indicated in FIGS. 3 and 4. To prevent the bellows stub 120 from accidentally radially escaping out the open end of the slot 122 in the fork 71, the central portion 124 (FIG. 11) of the slot 122 is undercut by inward tapering of an intermediate portion 125 of the slot 122 as seen in FIG. 11. The tapered portion 125 of the slot 122 (FIG. 11) defines a snap fit detente for resiliently trapping the bellows stub 120 in the drive unit slot 122. Thus, to install the bellows stub 120 in the slot 122, the bellows stub 120 must be resiliently forced through the tapered portion 125 of the slot 122 and upon passing the latter, the stub resiliently snaps into the central portion 124 of the slot. The inner ends of the tapered portion 125 of the slot resiliently maintain the stub radially inboard thereof, in the central portion 124 of the slot 122.

The stub 120 and hence the bellows 101, and indeed the entire pump unit 100, is thus freely rotatable about its length axis with respect to the fork 71, so that the circumferential orientation of the drive unit 25 and the pump unit 100 is determined by the location thereof in the housing. The drive unit 25 and pump unit 100 are thus, to an extent, free to circumferentially float with respect to each other, about the connection of the stub 120 and fork 71, without interfering with the circumferential location of the drive unit 25 and pump unit 100 in the housing 11. Further, the edges of the slot 122, in particular of the central portion 124 thereof, are rounded in cross-section, as is the stub 120, to permit a modest amount of angular adjustment between the length axes MA and LA of the drive unit 25 and pump unit 100 and to allow the drive unit 25 and pump unit 100 to easily settle into their proper operating positions in the housing 11.

A cylindrical plug 126 is coaxially fixed to the interior side (left side in FIG. 18) of the bellows drive end wall 116 by a coaxial, rearward extending, undercut pin 127 snap fitted in a forwardly (leftwardly in FIG. 18) opening recess in the stub 120. The plug 126 has a diametral slot 130 opening forward from its front end and which faces forward toward a resilient valve member 131 (FIGS. 16 and 18) to maintain liquid communication between the central and radially outer portions of the pumping chamber 115.

The bellows 101 is thus a single element which carries out four different functions, namely sealing at the forward end, changing the pump chamber size in the middle thereof, the

8

rearend acts as a piston and as a drive point. In addition, the front annular flange 102 helps locate the pump unit with respect to the housing barrel.

The pump unit 100 further includes a valve member 131, which is a one piece member of suitable resilient material and which by itself constitutes the entire moveable inlet and outlet valve system for the pump unit 100. More particularly, the valve member 131 comprises a short tubular central portion 132 (FIG. 18) which coaxially connects a forward (leftward in FIG. 18) tapering, duck bill type, outlet valve 133 and a rearwardly and radially outwardly extending umbrella type, inlet valve 134. The umbrella valve 134 is annular and has a central opening 135 which communicates coaxially from the pumping chamber 115 in the bellows 101 forwardly through the tubular central portion 132 and outlet duck bill valve 133 of the valve member 131.

The bellows housing 104 comprises a rear (right in FIGS. 18 and 18C) facing recess having a perimeter defined by the annular flange 103 of the bellows housing 104 and a rear facing radial wall 136 which defines the front end of the pumping chamber 115. The umbrella valve 134 lies coaxially in the resulting recess 103, 136. The forward facing perimeter 137 of the umbrella valve 134, in its closed condition shown in FIGS. 18 and 18C, presses forward against the radial wall 136 to seal thereagainst. The valve member 131 is held against the right (rearward) movement away from the bellows housing wall 136 by axial interference between a rightward facing, radially outward extending, annular step 140 (FIG. 18C) at the rear (right) end of the duck bill valve 133, and a radially inward extending, leftward facing, annular flange 141 of the bellows housing 104. The radially inward directed, annular flange 141 is axially interposed between, and forms a port 142 between, the rear facing recess 103, 136 and a coaxial, forwardly extending, cylindrical, irrigation liquid outlet conduit 143 (FIGS. 18 and 18C). The tubular central portion 132 of the valve member 131 extends snugly axially through the port 142.

To install the valve member 131 in the bellows housing 104, the tapered outlet duck bill valve 133 is pushed forward through the port 142, the umbrella valve step 140 snaps forwardly (leftwardly in FIG. 18C) past the bellows housing flange 141, and the sealing perimeter 137 of the umbrella valve 134 is thereby pulled forwardly resiliently against the rearward facing bellows housing wall 136, leaving the valve member 131 with its duck bill valve 133 and umbrella valve 134 both in their closed condition shown in FIGS. 18 and 18C.

The bellows housing 104 further includes an annular liquid jacket 144 (FIGS. 18 and 18C) surrounding the rear portion of the liquid outlet conduit 143 and defining radially therebetween an annular liquid inlet chamber 145 (FIGS. 18, 18C and 19). The inlet chamber 145 communicates between a radial inlet port 146 (FIGS. 16 and 19), which opens radially outward through the side of the bellows housing 104, and an annular space 147 (FIG. 18C). The annular space 147 is bounded by the forward face 150 and tubular central portion 132 and sealing perimeter 137 of the umbrella valve 134 and the radial face 136 of the recess 103, 136 of the bellows housing 104.

Thus, a rightward pullback of the bellows head 121 axially expands the bellows, from its FIG. 18A position towards its FIG. 18 position. This reduces the pressure within the bellows. This in turn keeps the duck bill valve 133 closed and pulls the sealing perimeter 137 of the umbrella valve 134 rightwardly away from the bellows housing recess

A325

6,022,329

9

radial wall 136 and draws liquid from the port 146 through the annular inlet chamber 145, around the perimeter 137 of the open umbrella valve and into the interior of bellows.

On the other hand, a leftward push forward of the bellows head 121 axially compresses the bellows from its FIG. 18 position toward its FIG. 18B position and raises the pressure in the bellows, to close the umbrella valve 134 and open the duck bill valve 133 and force a pulse of liquid out of the bellows forwardly through the duck bill valve 133 and liquid outlet conduit 143.

Irrigation liquid is drawn to the inlet port 146 of the bellows housing 104 through an elbow 151 (FIG. 19). The outlet end 152 of the elbow and the inlet port 146 are cylindrical, with the elbow outlet end 152 being a snug axially sliding fit in the inlet port 146. An axially elongate, annular groove 153 in the outer periphery of the elbow outlet 152 houses a seal ring, here an O-ring, 154 which bears sealing and rollingly on the radially opposed and surrounding surface of the inlet port 146 to prevent liquid leakage out of the elbow 151 at its interface with the inlet port 146. The elbow 151 is not mechanically interlocked with the inlet port 146 but can slide in and out with respect thereto. The elbow 151 is held in place with its outlet end 152 sealingly within the port 146 by bearing of a portion 155 (FIG. 4) of the handpiece housing barrel 13 against the outboard surface 156 of the elbow 151, with the pump unit installed in the handpiece housing 11. The elbow 151 here fixedly carries a pair of parallel fins 157 (FIGS. 16, 17 and 19). The fins 157 extend radially from the rear inlet end portion of the elbow 151 and axially sandwich therebetween the flanges 106 and 112 of the bellows 101 and bellows housing 104, at least to help the housing ribs 111 (FIG. 18) fins 157 prevent axial separation of the bellows and bellows housing. The housing ribs 111 and fins 157 are more or less evenly circumferentially located around the bellows 101 and bellows housing 104.

An elongate flexible irrigation liquid supply hose 160 (FIGS. 2, 4, 16, 17, 19, 22, 23, 25 and 29) has a forward end 161 which telescopes sealing and fixedly over the rear end 162 of the elbow 151 as seen in FIGS. 19 and 29. Although an annular barb is shown at 162 (for example in FIG. 19) a barbless, cylindrical end 162 is satisfactory. In the assembled handpiece, the irrigation liquid hose 160 extends rearward from the elbow 151 (FIG. 4) in the barrel 13 of the housing and angles downwardly and rearwardly along the bottom of the handpiece handle 12 to exit rearwardly and downwardly through a hole 163 (FIG. 2) in the bottom end wall 164 of the handpiece housing 11. A clamp plate 165 (FIGS. 2, 3 and 4) of bent cross-section has a perimeter groove 166 for receiving the edges of the hole 163 in the housing bottom end wall 164, such that the clamp plate 165 is trapped in and partly closes the hole 163 in the bottom end 164 of the housing handle 12 when the housing is fully assembled. A notch 167 (FIG. 2) in the rightward end of the clamp plate 165 permits exit therethrough of irrigation liquid supply hose 160 from the handpiece housing 11 and snugly and frictionally grips such hose, without crushing or collapsing it, so that such hose 160 cannot easily be pulled out of the housing 11 or off the elbow 151.

The irrigation liquid hose 160 has fixed on the outside thereof, as by extruding or molding integrally therewith, a smaller diameter rib 170 (FIGS. 2, 16 and 17). A plurality (here three) of insulated electrical conductors (wires) 171 have intermediate portions contained within and extending the length of the rib 170. Forward end portions of the insulated wires 171 emerge from the forward end of the rib 170 and carry conventional electrically conductive connec-

10

tors 175. The forward end of the rib 170 extends through the notch 167 (FIG. 2) and ends just inside the bottom portion of the handle 12 of the housing 11, as seen in FIG. 4. The forward ends of the conductors 171, carrying the connectors 175, extend into the lower portion of the handpiece handle 12 for purposes appearing hereinafter.

The insulated electrical conductors 171 extend along the length of the central portion of the liquid supply hose 160 and have rear ends provided with respective electrically conductive connectors 176 (FIGS. 22 and 29), such that electric current can flow from a given rear connector 176 through its corresponding insulated electrical conductor 171 and to its corresponding front electrically conductive connector 175 in a conventional manner. Short rear portions of the conductors 171 are loose and moveable with respect to the liquid supply hose 160 as seen in FIGS. 22 and 29.

The electrical connectors 175 and 176 are conventional crimp type connectors.

Instead of being molded in or otherwise constrained within the generally circular cross section rib 170 in FIG. 2, the elongate central portion of the insulated electrical conductors 171 may be fixed side by side, in a flat array, to the outside of the liquid hose 160, as shown in FIGS. 22 and 29, and such can be accomplished by adhesive bonding or by any other convenient means.

The hose 160, 170 thus serves the dual use of conveying both irrigation liquid and electric operating power.

The length of the central portion of the liquid hose 160, to which the insulated conductors 170 are fixed, preferably extends several feet (for example 8 to 10 feet) from the handpiece 10. The rear end 177 (FIGS. 22 and 23) of the liquid hose is here provided with a fitting 180 of hollow tubular construction open to axial liquid flow therethrough. The fitting 180 comprises a forward end portion 181 (FIG. 23) fixed sealingly telescoped in the rear end 177 of the liquid hose 160, a square central flange 182 (FIG. 22) and a rear end portion (or "spike") 183 having a sharpened tip 184. The tip 184 is capable of conventional insertion into a conventional source S (FIG. 22) of irrigation liquid, for example a conventional supply bag, for conveying irrigation liquid therefrom forward into the hose 160. The square flange 182 prevents rotation of the fitting 180 in the casing 191, which helps when removing the spike 183 from the liquid supply bag. In the embodiment shown, the rear end portion 183 is covered by a protective cap 185 prior to use so that the sharpened tip 184 will not accidentally be dulled.

Thus, the length of the liquid supply hose 160 allows the irrigation liquid source S to be located at a distance from the handpiece and thus out of the way of the surgical personnel at the operating table where the handpiece 10 is to be used.

Electrical Power Supply Unit

To provide operating electrical power to the motor 36, a compact, self contained electrical power supply unit 190 (FIGS. 20–25) is fixed on the rear end portion 177 of the liquid hose 160, and is thus located remotely from the handpiece 10, adjacent to the source S of irrigation liquid.

The power supply unit 190 comprises a casing 191 preferably of rigid molded plastics material. The casing 191 here comprises a relatively deep, substantially rectangular pan 192 (FIG. 2) whose top (as oriented in FIGS. 22 and 23) is fixedly closed by a cover 193. The pan 192 has front and rear end walls 194 and 195 (FIGS. 23, 23A and 24) having fixed upward opening slots 200 each defined by a laterally spaced, opposed pair of U-shaped flanges 201 (FIGS. 23A and 23B). The slots 200 are undercut in that each has a mouth 202 laterally narrower than the remainder of the slot

6,022,329

11

200 and communicating between the remainder of the slot 200 and the interior cavity of the pan 192. The undercut slots 200 are of constant cross-sectional size and shape vertically (i.e. into and out of the page in FIG. 24 and up and down in FIG. 23).

For convenient reference in the drawings, the reference numerals 200 and 201 are suffixed, so that the undercut slots and U-shaped flanges on the front pan wall 194 are indicated by the reference characters 200F and 201F and the undercut slots and U-shaped flanges on the rear pan wall 195 are indicated at 200R and 201R.

The U-shaped flanges 201F defining the slots 200F on the forward end wall 194 start substantially from the pan bottom wall 196 and extend a bit less than half way up the front end wall 194.

On the other hand, the U-shaped flanges 201R of the slots 200R on the rearward end wall 195 of the pan are spaced above the bottom wall 196 of the pan upon respective block-like pillars 203 which define an up-facing bottom 204 for each of the U-shaped flanges 201R on the rear pan wall 195.

Rising from bottom wall 196 of the pan between the two central pillars 203 to a height below the bottoms 204 of the slots 200R thereof, is a central block 205 from which forwardly extends, along the pan bottom wall 196, a T-shaped flange 206 (FIG. 23B) of constant cross section vertically and defining a pair of vertically open and laterally oppositely opening grooves 207 disposed immediately forward from the two central pillars 203 on the rear pan wall 195.

Two such undercut slots 200F are spaced symmetrically side by side on the front pan wall 194. Similarly, and at the same effective lateral spacing, two such slots 200R are spaced laterally side by side on the pan rear wall 195.

Springy, electrically conductive sheet metal battery contacts of three different kinds are indicated at 210 and 211 and 212 and FIGS. 26, 27 and 28 respectively.

A pair of such contacts 210 are provided and each comprises a generally rectangular foot 213 adapted to snugly slide down into a respective undercut slot 200F at the pan front wall 194. Each foot 213 is provided with resilient toes 214 angled out of the plane of the foot 213 and adapted to bite against the interior of the corresponding undercut slot 200F to fix the corresponding battery contact 210 in place therein.

Similarly, each of a pair of battery contacts 212 (FIG. 28) has a resilient fork-shaped foot 215 adapted to fit snugly and slidingly down into the corresponding undercut groove 200R at the rear wall 195 of the pan 192 and with springy toes 216 for fixedly gripping the interior of the corresponding undercut slot 200R.

In a generally similar manner the single, low speed battery contact 211 (FIG. 27) has a resilient U-shaped foot 217 for sliding down over the T-shaped flange 206 (FIG. 23B), with springy toes 218 bent out of the plane of the foot 217 for bitingly engaging the walls of the grooves 207 of the T-shaped flange 206.

Each of the battery contacts 210, 211 and 212 thus slides with its corresponding foot into the desired location with respect to the grooves 200F, 200R and 207 and locks fixedly therein. This is generally indicated in FIGS. 22–24. The battery contacts 210, 211 and 212 have respective resilient fingers 221, 222 and 223 (FIGS. 26, 27 and 28 respectively), two each for the battery contacts 210 and 211 and one each for the battery contacts 212. Such fingers 221, 222 and 223

12

protrude from the respective slots 200F, 200R and 207 into the interior of the pan 192 for electrically contacting batteries 230 (FIG. 22) to be housed in the pan 192. Further, the battery contact 211 and each of the battery contacts 212 (FIGS. 27 and 28 respectively) have an upstanding terminal (224 and 225 respectively) of simple rectangular shape for releasable telescoped engagement within a respective one of the connectors 176 at the rear ends of the three insulated electrical conductors 171 (FIG. 22).

Turning now to the arrangement of the batteries 230 within the pan 192, one embodiment according to the invention advantageously uses batteries of a kind widely available in retail stores, namely AA size alkaline batteries. In addition to their wide availability to the public, these batteries advantageously are inexpensive, have a long shelf life and provide full operating voltage until almost fully discharged. In the embodiment shown, eight such batteries 230 are provided and are individually indicated at B1, B2, B3, B4, B5, B6, B7 and B8. As shown in FIGS. 22–24, ribs 231 extending circumferentially within the pan 192 cradle the batteries 230 fixedly but removably within the pan 192. The polarity of the eight batteries is indicated by "plus" signs marked thereon. As seen in the drawings, the batteries 230 are arranged in four rows of two head-to-tail batteries each. Four of the batteries 230 lie in the bottom (FIGS. 22 and 23) of the pan in two rows of two each and the remaining four batteries 230 lie on top of those.

The ends of the battery rows bear variously on the above discussed battery contacts 210, 211 and 212 as generally indicated for example in FIG. 22 and also in the schematic circuit drawing in FIG. 22A. More particularly, the four batteries B1, B2, B3 and B4 defining a vertical plane nearest to the viewer in FIG. 23 are connected in series from the near connector 212 leftwardly through the top row of batteries, down through the near upstanding connector 210 and thence rightwardly through the bottom pair of batteries to the lower rear connector 211. The remaining four batteries B5–B8 are arranged in a vertical plane behind above-mentioned batteries B1–B4. More particularly, the batteries B5–B8 connect in series from the far side of the lower rear connector 211 forwardly (leftwardly in FIG. 22) to the far connector 210, upwardly therethrough, and then rearwardly back to the far upper connector 212.

The cover 193 (FIGS. 23 and 25) has plural, laterally extending, depending ribs 232 (FIGS. 23 and 25) intended to seat upon the uppermost batteries B1, B2, B7 and B8 and fix the batteries B1–B8 in the pan with the cover 193 fixed in its normal closed position atop the pan 192. The cover is fixedly securable atop the pan by any convenient means, such as snap fit connectors, a portion of which are generally shown in 233 in FIG. 22, and generally like those discussed above with respect to the handpiece housing 11, as at 16, and as generally discussed with respect to the drive unit shell 26, as at 32, 33.

The aforementioned rear end 177 of the hose 160 extends through the casing 191 along the horizontal parting plane between the pan 192 and cover 193, and so lies close adjacent the topmost batteries B1, B2, B7 and B8.

Hollow front and rear bosses 234 and 235 (FIGS. 23 and 25) extend forward and rearward respectively, from the casing 191. At the parting plane between the pan 192 and cover 193, the bosses 234 and 235 are notched (for example at 236 in FIG. 22) for extension therethrough of the rear end 177 of the liquid hose 160. The rear hollow boss 235 is sized and shaped to receive radially therein the square flange 182 (FIG. 23) on the rear end of the liquid hose 160, and thereby

A327

6,022,329

13

axially fix the rear end of the liquid supply hose 160 within the casing 191 and nonrotatably fix the fitting 180 to the battery casing 191. The notch 236 in the front boss portion 234 on the cover 193 is indented by one or more small recesses 237 for receiving axially therethrough the rib 170 containing the insulated electrical conductors 171, whose rear end connectors 176 are respectively fixed to the terminals 224 and 225 of the battery contacts 211 and 212.

Trigger Unit

The handpiece 10 further includes a trigger unit 240 (FIGS. 2–4) for controlling actuation of the motor 36. The trigger unit 240 comprises a generally L-shaped trigger member 241 (FIGS. 2, 4 and 4A) comprising an elongate trigger lever 242. The upper, forward (leftward in FIGS. 2 and 4) end of the trigger lever is pivoted by laterally extending integral pins 243 pivotally receivable in suitable holes in laterally opposed bosses 244 (one of which is shown in FIG. 2) in the opposing lower edges of the housing parts 14 and 15, near the rear end of the barrel 13. Snapping together of the two housing parts 14 and 15 thus captures the pivot pins 243 and pivotally mounts the trigger with respect to the handpiece housing 11.

The trigger lever 242 includes a transverse ridge 245 (FIG. 4) near to but spaced rearwardly from the pivot pins 243 and facing the underside of the barrel 13 and adapted to bear on the underside thereof in the manner of a fulcrum. By far the major length 246 of the trigger lever 242 is to the rear (right in FIG. 4) of the fulcrum ridge 245. This rearward trigger part 246 is relatively rigid in the portion thereof spaced at least somewhat to the rear of the fulcrum ridge 245. Such rigidity is assisted by a forward facing longitudinal reinforcement rib 247 extending rearward along the front face of the trigger lever 242 from a point near the fulcrum ridge 245. The front of the trigger lever 242, to the rear of the fulcrum ridge 245 is, in the embodiment shown, provided with transversely extending ribs 248 to provide the user with a non-slip grip of the trigger lever 242.

The trigger lever 242 is bendable near the fulcrum ridge 245, both to the front and rear thereof, in a resilient manner. In this way, the resilience of the trigger lever tends to hold it in its forward, inactive position shown in FIG. 4, with the fulcrum ridge 245 bearing on the underside of the handpiece barrel 13. On the other hand, when the user grips the handle 12 and squeezes the trigger lever 245 toward it, in the direction indicated by the arrow TA in FIG. 4, the trigger lever bends in the region of the fulcrum ridge 245, tending to straighten from its relaxed convexly forwardly curved configuration of FIG. 4, so that the rear face of the trigger lever can be pulled into the dotted line position 242P, substantially against the front face of the handle 12. Upon release of the trigger by the user, the natural resilience of the trigger lever 242 unbends it back to its solid line forward position shown in FIG. 4. Accordingly, the trigger naturally returns forward to its non-operative position without need for a separate return spring.

The trigger arm 251 fixedly carries a thumb 250 (FIG. 4A) intermediate it ends in the housing handle 15 and which interferes with the housing wall adjacent the hole 252, to prevent the resilient restoring force of the trigger lever 242 from pulling the trigger arm 251 leftwardly (FIG. 4A) out of the housing handle 12.

A plank-like switch contact support arm 251 (FIGS. 2, 4 and 4A) protrudes substantially at a right angle from the rear, or bottom, end of the trigger lever 242 and extends upwardly and rearwardly (in FIG. 4) into the lower portion of the handle 12, loosely through a hole 252 (FIG. 4A) in the

14

opposing bottom wall of the handle. A plate-like electrically conductive contact blade 253 fixedly extends through the thickness of the arm 251, and has a front portion exposed towards said motor and a rear portion exposed toward the bottom end 164 of the handpiece handle.

A pair of rectangular posts 255 and 256 protrude fixedly into the interior of the handle 12 from the inside of the right housing part 15, about midway between the drive unit 25 and the housing bottom end 164 (FIGS. 4A and 4B). Each post 255 and 256 includes a T-shaped flange 260 extending substantially forward toward the drive unit 25. Each T-shaped flange 260 defines a pair of oppositely facing grooves 261 (FIG. 4C).

Electrically conductive, spring-like metal contacts 262 and 263 (FIGS. 4A and 4C) each have a substantially U-shaped foot 264 for reception on the T-shaped flange 260 of the corresponding posts 255 and 256. The contacts 262 and 263 further each have a substantially rectangular, projecting terminal 265 for telescopic fixing thereon, in electrically connected relation, a corresponding one of the front connectors 175 of the three insulated electrical conductors 171. The electrical contacts 262 and 263 further have respective, generally L-shaped, plate-like, flexible contact leaves 266 and 267 (FIG. 4C). The contact leaves 266 and 267 extend toward the drive unit 25 as seen in FIG. 4A.

Protruding rearwardly from the motor 36 are a pair of electrically conductive contacts 270 and 271 (FIGS. 4A and 9). The contact 271 is a conventional terminal (like those at 224, 225 and 265) for receiving one of the front connectors 175 in fixed and electrically conductive relation thereon.

In contrast, the contact 270 is an elongate, springy rectangular piece, bent intermediate its ends in dog-leg fashion, and angling from the rear end of the motor 36 rearwardly and somewhat rightwardly (in FIG. 4A) to a free end portion spaced near the contact leaves 266 and 267.

Gradual pressing of the trigger lever 242 toward the handle housing (rightwardly in FIGS. 4 and 4A) moves the arm 251 and hence the contact blade 253 progressively further into the handle 12 through a series of positions, three of which are indicated in broken lines at 253A, 253B and 253C in FIG. 4A.

The free (rightward in FIG. 4A) end of the arm 251 is beveled at 272 to help it ride over the contacts 266 and 267 as the trigger lever 242 is sequentially squeezed more and more toward the handle 12. The arm 251 is progressively resiliently bent, like a leaf-spring, as its free end rides over the fixed contacts 266 and 267, to firmly press its contact blade 253 against the latter.

Thus, as the trigger lever 242 is pressed toward the handle 12, the beveled free end of the arm 251 rides over the contact leaf 266 past its dotted line position 253A and toward its dotted line position 253B. As the free arm end approaches position 253B, the contact blade 253 slides into electrical contact with the contact leaf 266 and the motor contact 270 to establish electrical connection therebetween. The motor contact 270 resiliently bends to allow continued travel of the contact blade 253 and arm 251 further into the handle, as indicated in dotted line at 270B, and to press firmly against the contact blade 253. Given only a light pull on the trigger lever 242, the arm 251 and contact blade 253 tend to stop in the position indicated in dotted lines at 253B, by reason of the free end of the arm 251 colliding with the contact leaf 267. In this "B" position, electric current is fed to the motor 36 only from half the battery collection, namely batteries B1, B2, B3 and B4 in FIG. 22A. The motor 36 thus runs at only a preselected fraction of its full speed and the pump unit

A328

6,022,329

<table>
<tr><td>15</td><td>16</td></tr>
</table>

**15**

100 outputs irrigation liquid pulses at a desired frequency and amplitude, which are less than the maximum available. The apparatus is thus operated in its low output mode. The colliding of the free end of the trigger arm 251 with the contact leaf 267 gives tactile feedback to the user, that the low output mode of the handpiece has been selected.

Further pulling in the trigger lever 242 by the user causes the beveled free end of the arm 251 to bend rightwardly (FIG. 4A) the contact leaf 267 to a dotted line position indicated at 267C, allowing the free end of the arm 251 to override the contact leaf 267, such that the contact blade 253 moves into its "full-pull" dotted line position 253C and further bends the motor contact 270 its dotted line position 270C. In this final position, the contact blade 253 establishes electrical contact between the motor contact 270 and the contact leaf 267, thereby applying the full series voltage of all eight of the batteries B1–B8 to the motor 36 to operate the latter at its full speed and thereby drive the pump unit 100 at its full output, namely to provide irrigation liquid pulses out of the pump unit 100 at maximum pulse amplitude and frequency.

When the user releases the trigger lever 242, the resiliently bent trigger lever 242, due to its inherent resilience, springs back from its fully pulled-in position indicated in broken lines at 242P, to its solid line rest position indicated at 242 (FIG. 4A).

Suction Hose

A flexible suction hose 280 (FIGS. 2 and 3) is led along within the housing (within the lower part of the housing in FIG. 3) past the drive unit 25 and pump unit 100. The above-mentioned clamp plate 165 includes a tubular structure molded thereinto and defined by a forward nipple 282 in the handle 12 and, in coaxial fluid communicating relation therewith, a rearward nipple 283 which extends rearwardly out of the bottom end 164 of the handpiece handle 12. The rear end portion 281 of the suction hose 280 is sealingly and fixedly telescoped over the front nipple 282. A conventional flexible hose, not shown, is conventionally and sealing telescopingly over the rear nipple 283 for connecting same to a conventional suction source, as schematically indicated at SS in FIG. 3.

The front end portion 284 of the suction nose 280 is sealingly telescoped over a rearward opening nipple 285 on a short suction conduit 286 (FIGS. 2, 3, 16, 17 and 18). The suction conduit 286 (FIG. 18) is fixed side by side, in piggyback fashion, on the periphery of the irrigation liquid conduit 143 and hence is a part of (preferably an integral plastic molded part of) the bellows housing 104.

The clamp plate 165 serves several purposes. It provides a suction hose connection, bears on the irrigation liquid hose where it enters the handpiece housing, and helps align the rear (rightward in FIG. 4) end wall portions of the housing halves as they are assembled together, and in so doing, is itself fixed on the housing. In addition, the clamp plate 165 is of one piece, preferably a plastic molding, and is partially recessed into the handpiece so that it does not make the handpiece look any bigger.

Tip Unit

A tip unit 291 (FIGS. 8, 8A and 8B) is releasably fixable on the front end of the handpiece 10 and extends forward therefrom for applying irrigation liquid pulses and/or suction to a surgical site indicated schematically at SU in FIGS. 8 and 8B. The tip unit 291 (FIG. 8) comprises a coupling 292, a front cover 293 fixed to the front of the coupling 292, and an elongate hollow wand 294 extending forwardly from the coupling and front cover for aiming at a surgical site SU.

**16**

The coupling 292, cover 293 and wand 294 are preferably one piece molded plastic units. The wand 294 is preferably of clear plastics material.

The tip unit 291, and more specifically the coupling 292, is releasably fitted in fluid tight relation to the front of the bellows housing 104 of the pump unit 100 and is releasably latched within the open front end of the handpiece housing barrel 13 as hereinafter discussed.

More particularly, the coupling 292 (FIG. 8) comprises a shallow, forward opening cup 295 having a flat base wall 296 from which forwardly extends a shallow peripheral wall 297, thereby defining a forward opening recess 300. Coaxial irrigation liquid nipples 301 and 302 extend fixing rearwardly and forwardly, respectively, from the base wall 296 and together define a coaxial bore 303 therethrough and through the base wall 296. The rear nipple 301 is snugly but slidably receivable rearwardly into the open front portion of the liquid outlet conduit 143 of the bellows housing 104. An O-ring 304 seats in an annular groove outward facing on the rear nipple 301 and sealingly engages the interior of the liquid outlet conduit 143 to prevent irrigation liquid leakage therebetween.

The wand 294 includes a coaxial, relatively small diameter, irrigation liquid outlet tube 305 which at its rear end is telescoped fixedly and sealingly within the bore 303 of the front and rear nipples 301 and 302 for receiving a pulsed flow of irrigation liquid from the irrigation liquid outlet conduit 143 of the bellows housing 104.

The coupling 292 further includes a suction nipple 306 fixedly extending rearward from the base wall 296 in spaced parallel relation with the irrigation liquid nipple 301. The suction nipple 306 is snugly insertable rearwardly coaxially into the front opening suction conduit 286 of the bellows housing 104. An O-ring 310 is axially sandwiched between the rear end of the suction nipple 306 and a front facing annular step 311 at the rear end of the suction conduit 286 to prevent leakage therebetween.

The coupling 292 further includes a leaf spring-like, generally U-shaped latch arm 312 which extends rearward from the peripheral portion of the base wall 296, curves radially outwardly and forwardly, and extends forward past the front cover 293, in radially outwardly spaced relation from the wand 294. A wedge-shaped, transverse ridge 313 on the exterior base of the latch arm 312 is approximately centered between the front and rear ends of the latch arm. A circumferentially extending, radially inward protruding rib 314 (FIGS. 2, 3 and 8) on the interior face and at the open front end of the right housing part 15 (at the front end of the barrel 13) opposes the latch arm 312, immediately ahead of the ridge 313, with the tip unit 291 installed on the front end of the handpiece 10 as shown in FIG. 8. The ridge 313 has a front facing step which abuts interferingly with the housing rib 314 to releasably block removal of the tip unit from its installed condition shown in FIG. 8. To remove the tip unit from the front end of the handpiece, the user simply presses radially inward against the forward protruding end portion 315 of the springy latch arm 312, sufficient to radially inward displace the ridge 313 out of interfering relation with the rib 314 and thereby unlatch the tip unit from the front end of the handpiece. This allows forward removing the tip unit 291 from the open front end of the handpiece barrel 13 and removing of the irrigation liquid and suction nipples 301 and 306 from the liquid outlet conduit 143 and suction conduit 286 of the bellows housing 104.

The tip unit 291, or any alternative tip unit having a substantially identical coupling and front cover, can be

6,022,329

17

installed operatively on the front end of the handpiece 10 by inserting same into the open front end of the handpiece barrel 13 so that the nipples 301 and 306 enter the liquid and suction conduits 143 and 286 respectively, to their position shown in FIG. 8. During this installation, the forward facing slope of the wedge cross-section transverse ridge 313 slides rearwardly past the housing rib 314, bending the springy latch arm 312 radially inward as generally indicated by the arrow L in FIG. 8, so that the wedge cross-section ridge 313 can snap rearwardly past the rib 314 at the open front end of the housing barrel 13. Thus, the tip unit 314 can be slid axially into the front end of the barrel 13 and upon reaching its innermost position latches itself against unintended removal. In its installed condition of FIG. 8, the tip unit is substantially rigidly fixed with respect to the front end of the bellows housing 104 and hence with respect to the handpiece barrel 13.

The front cover 293 (FIG. 8) comprises a plate 320 which extends radially of the wand 294 and of the length axes of the barrel 13 and the pump unit 100. The peripheral shape of the plate 320 conforms to the cross-sectional shape of the front end of the barrel 13, so that the perimeter of the plate 320 is substantially flush with the outer periphery of the open front end of the barrel 13, and so that the plate 320 effectively covers the open front end of the barrel 13. The peripheral shape of the plate 320 and cross-sectional shape of the front end of the barrel 13 in one embodiment is generally D-shaped, with a generally flat underside and a convexly curved top and sides. The plate 320 is not intended to seal the open front end of the barrel 13 and so need not tightly abut same. Since the peripheral wall 297 of the cup 295 fits easily within the open front end of the barrel 13, the plate 320 extends radially outwardly beyond the cup 295, as seen in FIGS. 8, 8A and 8B.

The front cover 293 includes an annular flange 322 extending axially rearwardly therefrom, radially snugly into the cup 295 of the coupling 292 to bottom rearwardly and sealingly against a resilient gasket 321 which is disposed against the front face of the base wall 296 of the cup 295. Respective holes in the gasket 321 loosely surround the front nipple 302 and leave fully open the communication between the interior of the suction nipple 306 and the interior of the cup 295. The front cover 293 further includes a further annular flange 323 extending fixedly and forwardly from the plate 320 in coaxial alignment with the through hole 324 in the plate 320.

The rearward annular flange 322 of the front cover 293 is fixedly secured within the cup 295 of the coupling 292 by any convenient means, for example by snap fit connectors on the opposing faces of coupling 322 and the peripheral wall 297 of the cup 295. For example, the cup and peripheral wall 297 may be provided with several circumferentially spaced rectangular holes 325 (FIGS. 8A and 8B) for snap fit reception therein of small radially outward extending protrusions schematically indicated at 326 on the outside of the rearward annular flange 322.

The wand 294 further includes a relatively large diameter elongate suction tube 330 (FIGS. 8A and 8B) which loosely coaxially surrounds the irrigation liquid outlet tube 305 (FIG. 8) and extends substantially to the front end of the latter. The rear end portion 331 of the suction tube 330 is radially enlarged to provide a radially shallow, axially elongate flange protruding radially outward therefrom and which is axially trapped between the plate 320 and the gasket 321 backed by the base wall 296. This serves to rigidly fix the suction tube 330 with respect to the coupling 292 and front cover 293. A port 332 in the sidewall of the

18

suction tube 330 near its rear end communicates with a loosely surrounding annular chamber 333 defined between the plate 320 and base wall 296 of the front cover 293 and coupling 292 respectively.

The front end of the irrigation liquid tube 305 is held coaxially fixed within the front end portion of the surrounding suction tube 330 by any convenient means, such as radial, circumferentially spaced, webs 334 (FIG. 8). Accordingly, with a tip unit 291, of the general type above described, installed on the front end of the handpiece, as shown in FIG. 8, irrigation liquid pulses from the pump 100 pass forwardly within the liquid tube 305 and are projected from the front (left in FIG. 8) end thereof, as schematically indicated by the arrows PL. At the same time, liquid and particulate debris at the surgical site SU are drawn into the front (left in FIG. 8) end of the suction tube 330, pass rearwardly along the length thereof, through the port 332 into the chamber 333 and rearwardly through the nipple 306 and suction nipple 285.

With the exception of a few components such as the motor 44, the various electrically conductive contacts, the elongate insulated conductors, the various seal rings (for example 105, 154, 304 and 310, the gasket 321, as well as the suction and irrigation liquid hoses, the remaining major components, while possibly manufacturable of a variety of materials, are economically manufacturable of available molded plastics materials. For example, the valve member 131 may be of rubber or a synthetic substitute or similar resilient plastic. Similarly, the bellows 101 is preferably molded of a suitable resilient plastic material capable of the bellows expansion and contraction movements shown in the drawings. The trigger unit 240 and the latch arm 312, while of substantially rigid plastics material, are elastically bendable to the extent required to suit the present description. Similarly, components to be snap-fitted together are substantially rigid but have sufficient resilience to permit the required described snap fitting.

The present invention can be constructed at relatively low cost and is thus practically manufacturable as a disposable tool, both the handpiece 10 itself and the accompanying electric power supply unit 190 being disposable after use with a single surgery patient.

OPERATION

The apparatus is quickly and easily assembled. The drive unit 25 (FIG. 12) is assembled by, in effect, "dropping in" elements in proper sequence into the right (lower in FIG. 12) shell 31 and covering same with the other shell 30. More particularly, output gear 60, face gear 54 and motor 36 (with attached pinion gear 53 and electric contacts 270 and 271) are "dropped" into their respective locations in the upturned shell part 31, in that sequence. The rectangular shaft 61, topped by the eccentric member 62, drops into the corresponding hole in the output gear 60 and the link member 51 drops onto the eccentric member. The other shell part 30 is then snap fitted over the filled shell part 31, completing the drive unit 25.

The pump unit 100 is assembled by coaxially-telescoping together its elements shown in FIG. 18 and then plugging into the inlet port 146 (FIG. 19) the elbow 151 with the O-ring 154 and hose 160 assembled thereon.

The stub 120 (FIG. 18) of the drive unit 100 can then be snapped into the slot 122 of the drive unit fork 71 (FIG. 2) to connect the drive unit 25 operatively to the pump unit 100. The suction hose 280 can then be connected to the pump unit nipple 285 and to the nipple 282 on the clamp plate 165.

A330

6,022,329

| 19 | 20 |

Thereafter, the two assemblies above described can be laid into the rightward (FIG. 2) housing part **15** in the following order, namely liquid hose **160** (FIG. 4), drive unit **25** and pump unit **100** (FIG. 3) and, last, suction hose **280** and clamp plate **165**.

The trigger unit **240** is then placed, with its rightward (FIG. 2) pivot stub **243** located in the corresponding boss **244** in the rightward housing part **15**, and its arm **251** inserted through the hole **252** (FIG. 4A) into the interior of the handle portion of the rightward housing part **15**, as seen in FIGS. 4 and 4A. The trigger arm **251** is "covered" by the rear portion **281** of the suction hose **280** in FIG. 3. The electrical contacts **262** and **263** are placed on their respective posts **255** and **256** in the rear portion of the rightward housing part **15** and the three forward electrical connectors **175** are secured respectively to the mentioned contacts **262** and **263** and the motor contact **271** (FIG. 4A). Thereafter, the leftward (FIG. 2) housing part **14** can be snap fitted to the rightward housing part **15** to close same and enclose the above mentioned apparatus, shown in FIG. 3, therein.

In the thus assembled handpiece, the drive unit is fixedly located by engagement of its drive axis bosses **84** and **85** (FIG. 5) in corresponding bosses in the housing parts **14** and **15** (see for example at **96** in housing part **15** in FIG. 2). Location of the drive unit **25** is assisted by the ribs **95** within the housing parts **14** and **15** and by snug resilient engagement of the drive unit **25** by the hoses **160** and **280** which flank it.

The drive unit shell **26** is configured to maintain the proper tolerances between meshing gears and related parts. Location of all the drive unit parts in the drive unit shell **26** reduces the need to maintain close tolerances in the larger and less specialized handle housing **11**. Even the housing tolerances, for locating the pump unit **100** with respect to the drive unit **25** in the housing **11**, need not be close since the bellows **101** are flexible enough to bend or otherwise distort to absorb minor mis-alignment or angulation of the reciprocation axis of the link member **51** with respect to the length axis of the pump unit **100**. Indeed, the ribs **95** in the housing **11** permit pivoting of the drive unit **25** about the axis of the bosses **96** to allow the drive unit **25** and pump unit **100** to settle into their own working relative orientation. Accordingly, the precision in the handpiece housing **11** can be concentrated in aspects of fitting together of the two housing halves.

The electric power supply unit **190** (FIG. 22) is quickly and easily assembled. More particularly, the feet of the respective battery contacts **210**, **211**, **212** (FIGS. 26–28) are slid downward into their respective grooves (FIGS. 23A and 23B) in the pan **192** (FIG. 22) with their protruding toes resiliently gripping the sides of the grooves. The rear connectors **176** are connected to the battery contact fingers **224** and **225** in the order shown in FIG. 22A. The batteries B1–B8 are then slipped down into the pan in the orientation shown in FIG. 22 and into electrically conductive engagement with the battery contacts **210**, **211** and **212** indicated in FIG. 22A. The rear portion of the liquid hose **160** is laid atop the batteries as indicated in FIG. 23, with the square flange **182** nonrotatable in the boss **235**, and the cover **193** is snap fitted atop the liquid hose **160** and battery filled pan **192**, as shown in FIG. 23, to complete assembly of the power supply unit. The cap **185** is pressed onto the sharpened tip **184** to protect it prior to use.

The result is a disposable pulsed irrigation handpiece unit which is entirely self-contained, including its own power supply, and which is ready for use upon having its sharpened

tip **184** plugged into a conventional irrigation liquid supply bag or the like, and a conventional manner.

It should be noted that virtually the entire handpiece **10** and power supply unit **190** can be assembled without need for any adhesives, the parts going together with friction or snap fits or, in the case of the joinder of the bellows housing **104** to the bellows **100** and elbow **151**, by being held together by surrounding structure which in turn is snap fitted together. This greatly eases and speeds assembly. A minor exception is that the fitting **180** is here adhesively fixed to the hose **160**.

To use the handpiece assembly in surgery, the cap **185** (FIG. 23) is removed from the pointed tip **183**, which is then plugged into a standard output fitting on a conventional irrigation liquid supply bag. The power supply unit **190**, being fixed to the rear end of the irrigation liquid hose **160**, can be allowed to simply hang from the irrigation liquid supply bag (not shown but schematically indicated at S in FIG. 22). By providing a substantial length of irrigation liquid hose **160** (for example 10 feet), the liquid supply bag S and power supply unit **190** can be located well out of the way of the surgical team during use of the handpiece **10** at the surgical site. Even then, the power supply unit **190** is compact as compared to the adjacent conventional irrigational liquid supply bag (being very little larger than the eight conventional double AA batteries that it houses).

If suction will be desired at the surgical site, the handpiece nipple **283** (FIG. 3) can be connected by a conventional hose not shown to a conventional suction source SS (FIG. 3).

A variety of tip units **291** of differing characteristics (e.g. differing irrigation liquid spray patterns, etc.) may be made available for alternative mounting on the handpiece **10**. One example is shown in FIGS. 8, 8A and 8B.

In any event, the user selects a tip unit **291** having a wand **294** of desired configuration, and rearwardly inserts its coupling **292** into the front end of the handpiece **10**. More particularly, the nipples **301** and **306** of the tip unit are inserted coaxially rearwardly, in sealed relation (see FIG. 8) in the conduits **143** and **286** respectively of the bellows housing **104**. The resilient latch arm **312** enters the barrel **13** of the handpiece housing **11** adjacent to the bellows housing **104** until the plate **320** of the front cover **293** abuts the front end of the handpiece housing barrel **13**. In the last part of this tip installation movement, the wedge shaped ridge **313** (FIG. 8) on the latch arm **312** snaps past the rib **314** of the housing barrel **13** to positively prevent forward removal of the tip unit from the handpiece.

To use the apparatus for irrigation of a surgical site, the user grips the handpiece, either by the handle **12**, in a pistol-like manner, or where the barrel **13** joins the handle **12**, in a wand like manner. In either position, the user has one or more fingers that can bear on and press inwardly the trigger lever **242** from its inoperative rest position shown in solid line in FIG. 4A forward and through its low speed and high speed positions indicated in broken lines at **253B** and **253C** in FIG. 4A. In the first operative position **253B**, the blade **253** connects the low speed (here six-volt) contact **266** to the motor contact **270**. On the other hand, in the fully depressed condition of the trigger, indicated at **253C**, the blade **253** connects the high speed, 12 volt contact **267** with the motor contact **270**. Accordingly, the user can select between "off", lower power pulsing and high power pulsing.

In one embodiment pump stroke was about ¼". In one embodiment shown, the motor speed was about 15,000 rpm and the speed reduction afforded by the transmission was about 15-1, providing the eccentric with about 1,000 rpm speed.

6,022,329

pply

e 10
need
n or
sing
held
itted
inor
d to

185
then
onal
190.
160.
quid
S in
ation
bag
f the
10 at
0 is
riga-
the

iece
hose
).

(e.g.
nade
One

vand
s its
More
t are
G. 8)
llows
el 13
using
front
f this
(FIG.
e tip

e, the
in a
andle
s one
y the
wn in
d and
3 and
, the
t 266
fully
, the
with
select
lsing.
n one
0 rpm
was
) rpm

**21**

Depending on the flow resistance of the particular tip unit attached to the handpiece, the liquid pulse frequency may change. In one example, a handpiece according to the invention produced about 1200 pulses per minute, dispensing about 1600 ml per minute of irrigation liquid in about 1.3 ml liquid pulses. The positive drive of the pump unit by the drive unit and the location of the pump unit, near the front end of the barrel 13 and in direct engagement with the tip unit, provides liquid pulses at the output of the tip unit which have sharp rise and fall slopes. Thus, the relationship of liquid pulse amplitude to time approximates a square wave form, more so than for example, the aforementioned device of U.S. Pat. No. 5,046,486. Further, the force applied to the pulses by the present apparatus is higher (somewhat above one Newton) than in that prior art device, at the full power position of the trigger.

In one embodiment according to the invention, a tab 316 (FIGS. 1 and 8B) extends forward from the front plate 320 of the front cover 293, on the opposite side of the wand 294 from the latch arm 312. To release the latch arm 312 from the housing 11, the user can thus simply simultaneously grip with opposite fingers and pinch toward each other the latch arm 312 and tab 316. In other words the tab 316 provides base toward which to pinch, or pull, the latch arm 312 to release the tip unit 291 from the handpiece 11.

In the present invention, the liquid and suction nipples of the tip unit connect directly to the pump unit 100, and do not contact any part of the handpiece housing 11. Accordingly, neither the pump unit 100 nor tip unit 291 need fit with close tolerances the handpiece housing 11. The connection of the tip unit to the handpiece is merely to latch the tip unit against loss from the handpiece housing and to casually cover the open front end of the handpiece housing. Accordingly, the liquid tight fit is between the nipples of the tip unit and conduits of the pump unit, not with the housing.

Although a particular preferred embodiment of the invention has been disclosed in detail for illustrative purposes, it will be recognized that variations or modifications of the disclosed apparatus, including the rearrangement of parts, lie within the scope of the present invention.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A pulsed irrigation surgical handpiece, comprising:
a hollow housing comprising a handle;
an elongate trigger extending along the front part of the handle;
an irrigation liquid tube extending within said handle from the bottom of said handle along the front part of said handle to the top of said handle;
an electric motor spaced between the top and bottom of said handle and located in the rear portion of said handle behind said irrigation tube;
a pump comprising an axially expandable and contractible bellows driven by said electric motor and connected to said irrigation liquid tube for pumping irrigation liquid for delivery to a surgical site, said motor having top and bottom ends and a rotatable shaft extending longitudinally from said top end toward the top of said handle, said motor bottom end being spaced above the bottom of said housing, a first electrical connector extending from the bottom end of said motor toward said housing bottom, said electrical connector being for connection to an electric battery, a portion of said trigger lying adjacent said motor and being responsive to movement of said trigger for effecting an electrical connection from said motor to an electric battery for electrically energizing said motor.

**22**

2. A pulsed irrigation surgical handpiece, comprising:
a hollow housing comprising a handle;
an elongate trigger movably mounted on said housing;
an irrigation liquid tube extending along said handle;
an electric motor spaced between the top and bottom of said handle and located in said handle adjacent said irrigation tube;
a pump comprising a member driven by said electric motor, said pump being connected to said irrigation liquid tube for pumping irrigation liquid for delivery to a surgical site, said motor having a rotating pinion gear rotatably engagable with and driving a face gear, said face gear being operatively drivingly coupled to an eccentric member for rotation of said eccentric member by said motor, said driven member opposing said eccentric member, and a yoke located between a portion of said driven member and said eccentric member for converting rotation of said eccentric member to reciprocation of said portion of said driven member.

3. The apparatus of claim 2 in which said motor has top and bottom ends and a rotatable shaft extending longitudinally from said top end toward the top of said handle, said motor bottom end being spaced above the bottom of said housing, a first electrical connector extending from the bottom of said motor toward said housing bottom, said electrical connector being for connection to an electric battery, a lower portion of said trigger lying adjacent said motor and being responsive to pull in of said trigger for effecting a further electrical connection from said motor to an electric battery for electrically energizing said motor.

4. The apparatus of claim 2 including a suction adapter comprising a tubular structure and an engaging member fixed transversely thereon for fixedly engaging a free end wall of said handle bottom, said tubular structure having interior and exterior ends respectively extending into and out of said housing, said housing including a barrel extending forward from the top portion of said handle and a tip on the front end of said barrel, said suction tube being connected to said interior end of said tubular structure and running in said handle and barrel to a portion of said tip, said irrigation liquid tube being clamped to said handle bottom free end wall by said engaging member.

5. A pulsed irrigation handpiece, comprising:
a handheld handpiece housing and an associated pulsed irrigation liquid outlet for applying liquid pulses to a surgical site;
a powered driver in said housing;
a reciprocatingly driveable, expansible chamber pump in said housing connected to said driver and outlet for pumping pulses of irrigation liquid through said outlet, said pump having a bellows, said pump having a hollow body with an end toward said bellows, said end having a first annular flange, said bellows being cup shaped and having an end open toward said body and defined by a second annular flange, said flanges being substantially coaxially telescoped one over the other;
a resilient O-ring seal radially resiliently pressed between radially spaced annular surfaces of said telescoped annular flanges, said radially spaced annular surfaces being of axial length exceeding the diameter of said O-ring, said bellows having an expandable and contractible bellows wall and a radially outward extending annular portion defining an annular groove therebetween, said second annular flange extending forward beyond said radially outward extending annular portion, said handpiece housing having spaced

6,022,329

23

inward projecting ribs fixed therein, said ribs respectively engaging said body and entering said annular groove to fixedly grip therebetween said body and bellows and so positively prevent axial separation of said telescoped annular flanges of said body and bellows.

6. The apparatus of claim 5 in which said pump body has a cylindrical irrigation liquid inlet port, said handpiece containing an irrigation liquid supply tube slidably fitted to said body irrigation liquid inlet port, said handpiece housing surrounding said body and liquid supply tube.

7. A pulsed irrigation handpiece, comprising:

a handheld handpiece housing and an associated pulsed irrigation liquid outlet for applying liquid pulses to a surgical site;

a powered driver in said housing;

a reciprocatingly driveable, expansible chamber pump in said housing connected to said driver and outlet for pumping pulses of irrigation liquid through said outlet, said pump having a bellows, said pump having a hollow body with an end toward said bellows, said end having a first cylindrical flange, said bellows being cup shaped and having an end open toward said body and defined by a second cylindrical flange, said flanges being substantially coaxially telescoped one over the other;

a resilient O-ring seal radially resiliently pressed between radially spaced cylindrical surfaces of said telescoped cylindrical flanges, said radially spaced cylindrical surfaces being of axial length exceeding the diameter of said O-ring and said O-ring being of circular cross-

24

section and thereby free to roll axially between said radially spaced cylindrical surfaces in response to relative axial movement between said telescoped flanges without loss of sealing between said cylindrical surfaces.

8. The apparatus of claim 7 in which said body and bellows have radially outward extending annular end portions carrying said axially telescoped cylindrical flanges, said handpiece housing having radially inward projecting ribs fixed therein and axially spaced to fixedly grip axially therebetween said telescoped annular ends of said body and bellows to positively prevent axial separation of said body and bellows.

9. The apparatus of claim 7 in which said pump has a rear end portion driven by said driver and a front end portion, said liquid outlet comprising an elongate tubular tip having a front end for delivering irrigation liquid pulses to a surgical site and a rear end releasably connected directly and in liquid pulse receiving relation to said pump front end portion and releasably mechanically latched directly to said handpiece housing.

10. The apparatus of claim 7 in which said pump body has a cylindrical irrigation liquid inlet port, said handpiece containing an irrigation liquid supply tube having an elbow slidably fitted into said body irrigation liquid inlet port, said elbow carrying a surrounding seal ring bearing rollingly and sealing on the surrounding surface of said inlet port, said handpiece housing loosely surrounding said body and liquid supply tube and elbow and backing said elbow against sliding out of said inlet port.

\* \* \* \* \*

US006179807B1

(12) **United States Patent**

Henniges et al.

(10) Patent No.: **US 6,179,807 B1**

(45) Date of Patent: **Jan. 30, 2001**

(54) **SURGICAL/MEDICAL IRRIGATOR WITH REMOVABLE TIP AND INTEGRATED SUCTION CONDUIT**

(75) Inventors: **Bruce D. Henniges**, Kalamazoo; **Kris D. Eager**, Richland; **David A. Burke**, Portage; **Douglas L. Tyler, Sr.**, Paw Paw; **David H. Grulke**, Battle Creek, all of MI (US)

(73) Assignee: **Stryker Corporation**, Kalamazoo, MI (US)

( * ) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: **09/425,820**

(22) Filed: **Oct. 22, 1999**

**Related U.S. Application Data**

(62) Division of application No. 08/915,431, filed on Aug. 20, 1997.

(51) Int. Cl.[7] ...................................................... A61M 5/32
(52) U.S. Cl. ................................................. 604/35; 604/39
(58) Field of Search ........................... 604/35, 39, 43, 604/21, 66, 67, 131, 902, 151

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 281,535 | 11/1985 | Atkinson et al. . |
| D. 356,146 | 3/1995 | Palmaymesa . |
| 4,489,750 | 12/1984 | Nehring . |
| 4,519,385 | 5/1985 | Atkinson et al. . |
| 4,555,645 | 11/1985 | Atkinson . |
| 4,561,431 | 12/1985 | Atkinson . |
| 4,583,531 | 4/1986 | Mattchen . |
| 4,635,621 | 1/1987 | Atkinson . |
| 4,662,829 | 5/1987 | Nehring . |
| 4,692,140 | 9/1987 | Olson . |
| 4,741,678 | 5/1988 | Nehring . |
| 4,776,840 | 10/1988 | Freitas et al. . |

| | | |
|---|---|---|
| 4,941,872 | 7/1990 | Felix et al. . |
| 4,957,483 | 9/1990 | Gonser et al. . |
| 5,046,486 | 9/1991 | Grulke et al. . |
| 5,269,750 | 12/1993 | Gulke et al. . |
| 5,470,305 | 11/1995 | Arnet et al. . |
| 5,484,402 | 1/1996 | Saravia et al. . |

OTHER PUBLICATIONS

Zimmer, The Zimmer Var–A–Pulse Wound Debridement System, Dec., 1996, 2 pgs.
Zimmer, It's a Matter of Time The Pulsavac System, Dec., 1994, 6 pgs.
Zimmer, Pulsavac Wound Debridement System for Power and Control, Dec., 1996, 8 pgs.
Davol, To Pulsed Lavage, The Choice Is Remarkably Simple, Jan., 1995, 4 pgs.
Davol, Performance Irrigation™ Systems, Pulsed Lavage for Wound Management, Dec., 1995, 2 pgs.
Davol, To Pulsed Lavage, The Choice Is Simple, Sep., 1994, 3 pgs.

Primary Examiner—John D. Yasko
(74) Attorney, Agent, or Firm—Flynn, Theil, Boutell & Tanis, P.C.

(57) **ABSTRACT**

An irrigator (**20**) useful for surgical and medical procedures. The irrigator includes a handpiece (**22**) to which a tip assembly (**30**) is attached. The handpiece (**22**) includes a drain tube (**50**) that extends through the body of the handpiece and outside of the handpiece to the complementary suction system. The tip assembly includes a discharge tube (**32**) that is snap secured into the front of the handpiece and a suction tube (**48**) that seats in the open front end of the drain tube. A removable splash shield (**181**) is attached to the front end of the tip assembly. A trigger (**44**) allows one-handed control of, the position of the handpiece, the on/off state of the irrigator and the rate at which fluid is discharged from the irrigator. A rechargeable power pack (**222**) can be used to supply the energization current needed to activate a number of different handpieces at different speeds.

**54 Claims, 15 Drawing Sheets**





FIG.1



F I G. 2

Case: 13-1668 Case: CASE PARTICIPANTS ONLY Document: 2018 Page: 207 Filed: 01/22/2014



F I G. 3

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 2018 Page: 208 Filed: 01/22/2014

F I G . 4



F I G . 14



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 209 Filed: 01/22/2014 Page: 209 Filed: 01/22/2014



F I G. 5

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 210 Filed: 01/22/2014



FIG.6A

FIG.6B

FIG.6C



F I G. 7



F I G. 7A



F I G. 7B



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 138 Page: 213 Filed: 01/22/2014



F I G. 10

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 48 Page: 214 Filed: 01/22/2014



F I G. 10A



F I G. 19

F I G. 18



F I G. 13

U.S. Patent    Jan. 30, 2001    Sheet 12 of 15    US 6,179,807 B1



F I G. 15

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 178 Page: 217 Filed: 01/22/2014



FIG.17

| FIG.17A | FIG 17B |
|---------|---------|

F I G . 16

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 218 Page: 218 Filed: 01/22/2014



FIG. 17A

U.S. Patent      Jan. 30, 2001      Sheet 15 of 15      US 6,179,807 B1



F I G. 17B



F I G. 17B

US 6,179,807 B1

1

# SURGICAL/MEDICAL IRRIGATOR WITH REMOVABLE TIP AND INTEGRATED SUCTION CONDUIT

This is a division of Ser. No. 08/915,431, filed Aug. 20,1997 pending.

## FIELD OF THE INVENTION

This invention relates generally to an irrigator useful for surgical and medical procedures and, more particularly, to an irrigation handpiece to which complementary tips can be readily coupled.

## BACKGROUND OF THE INVENTION

In many surgical and medical procedures, an irrigator is employed to deliver pulses of fluid to a particular location on or in the body of a person receiving medical attention. For example, during orthopedic surgery, an irrigator may be employed to deliver pressurized pulses of water or saline solution to an exposed surface of the bone in order to clean the bone. There are also some non-surgical procedures performed which likewise make it desirable to apply pulses of water to a specific site on an individual's skin. Thus, if an individual is suffering from some type of bed sore or some other type of skin wound, it is a common practice to use an irrigator to clean the wound prior to applying a dressing to the wound.

A common type of medical/surgical irrigator includes a handpiece to which a tip assembly is selectively attached. Often, inside the handpiece is a small pump that periodically delivers a quantity of pressurized fluid. Alternatively, the pressurized fluid is delivered to the handpiece from an external pump. The fluid is discharged through a discharge tube integral with the tip assembly to the selected site on or in the patient. These irrigators deliver fluid in pressurized pulses for two reasons. One reason is that fluid pulses quickly strike the site to which they are applied and leave the site; this action serves to foster the desirable removal of debris from the site. Secondly, the discrete fluid pulses do not obstruct the view of the site as much as it can be obstructed when exposed to a continuous flow of pressurized fluid.

Most irrigator handpieces, in addition to having a conduit through which the sterile fluid is discharged, have a conduit through which the discharged fluid is removed from the site to which it is applied. Typically the fluid is initially withdrawn from the site through a suction tube, also part of the tip assembly. The fluid, as well as any debris in the fluid stream, then flow through a conduit integral with the handpiece. The handpiece suction conduit is connected to a second suction tube that is connected to a suction system separate from the irrigator. Thus, given their ability to essentially simultaneously clean a site on a patient and remove the debris generated by the cleaning process it should be readily apparent why irrigators have become useful tools for facilitating many medical and surgical procedures.

There are, however, some disadvantages associated with current surgical irrigators. One particular disadvantage associated with some known irrigators is how the tip assembly is connected to the handpiece. When these components are coupled together there should be two leakproof seals: a first seal between the handpiece and the discharge tube through which the irrigating fluid is discharged; and a second seal between the suction tube and the complementary handpiece conduit. Some tip assemblies sometimes do not properly

2

mate with their complementary handpieces so as to result in a leaks. Leakage around a tip assembly suction tube-handpiece joint is especially prone to occur when the tip assembly is exposed to side loading. This side loading occurs when the tip assembly is pressed against tissue and flexes relative to the handpiece.

Still another problem associated with some irrigators is that the suction conduits integral to the handpieces occasionally clog. This clogging occurs because the material drawn away from the site to which the irrigator is applied is often in solid or semi-solid form. Sometimes, especially if this material is relatively large in size, the material will clog the suction conduit in the handpiece so as to significantly reduce the utility of the irrigator.

Moreover, it is desirable to provide medical personnel with some ability to control the rate at which irrigation fluid is discharged from the handpiece. Some handpieces are provided with stepped switches that are incrementally set in order to establish the voltage of the power signal applied to the motor so as to, in turn, set pump speed. One disadvantage of some known handpieces is that these switches are located in positions wherein, with a single hand, it is difficult, if not impossible, to both direct the handpiece and regulate the discharge of irrigating fluid.

Moreover, it also desirable to provide some means for controlling the pattern of the irrigating fluid discharged from the irrigator. To date, one of the more common practices is to simply provide the personnel using the irrigator with a number of different tip assemblies, each with its own nozzle, that causes the irrigating fluid to be discharged in a specific spray pattern. A disadvantage of this practice is that it increases the number of different tips that a medical facility is required to keep in inventory. Still another disadvantage of this practice is that if, during a procedure, a change in fluid flow patterns is desired the medical personnel must spend time switching tips.

Also, while it is common practice to provide handpieces with use-once, disposable battery packs, there are some circumstances when it may be more economical to provide a rechargeable power pack for repeatedly energizing different handpieces.

## SUMMARY OF THE INVENTION

This invention relates to a new irrigator for medical and surgical procedures with a tip assembly readily seals to the complementary handpiece, and a handpiece with a suction conduit that is not prone to clogging and a switch that allows easy control of pump speed. This invention also relates to a tip assembly for a handpiece with a nozzle that allows one to set the spray pattern of the fluid delivered by the nozzle. This invention further relates to a new irrigator with a rechargeable power pack that can provide drive signals of different potentials to the handpiece and that, even after being after discharged numerous times, can be fully recharged.

## BRIEF DESCRIPTION OF THE DRAWINGS

This invention is defined with particularity in the appended claims. The advantages of the invention may be better understood by referring to the following detailed description, in which:

FIG. 1 depicts the basic components of an irrigator of this invention;

FIG. 2 is a view of the handpiece of the irrigator that illustrates the basic components internal to the handpiece;

US 6,179,807 B1

3

FIG. 3 is a perspective view illustrating the relationship of the drain tube to the handpiece;

FIG. 4 is a schematic and diagrammatic illustration of the components of the irrigator that regulate the on/off state of the irrigator as well as flow and the rate at which fluid is discharged from the irrigator.

FIG. 5 is an exploded view of some of the components internal to the handpiece that regulate the speed of the pump;

FIGS. 6A, 6B and 6C are side views illustrating the different positions of the components that regulate pump speed, depicting, respectively, their position when the irrigator is off, operated at low speed, and operated at high speed;

FIG. 7 illustrates the trigger lock employed to lock the irrigator into its high speed operating state;

FIGS. 7A and 7B illustrate how the trigger lock cooperates with the other components internal to the handpiece that lock the irrigator into its high speed operating state;

FIG. 8 is a side, partial cross-sectional view depicting how the tip assembly is inserted in the handpiece;

FIG. 9 is a perspective view of the tip lock internal to the handpiece;

FIG. 10 is a view depicting the basic components of the removable tip assembly including the detachable spray shield;

FIG. 10A is an enlarged view of the front end of the tip assembly depicting the removable shield in a cross-sectional view;

FIG. 11 is a partial cross sectional view illustrating how the tip assembly is locked into the front end of the handpiece;

FIG. 12 is a side, partial cross-sectional view depicting how the tip lock depressed to allow the removal of the tip assembly from the handpiece;

FIG. 13 is a view of an alternative irrigator of this invention wherein the handpiece is powered by a rechargeable battery pack;

FIG. 14 is an isometric, upwardly oriented view of the rechargeable battery pack;

FIG. 15 is an exploded view of the components internal to the rechargeable battery pack;

FIG. 16 is a block diagram of the electronic circuitry internal to the battery pack for both controlling the charging of the cells therein and their discharge by the handpiece;

FIG. 17 is an assembly drawing illustrating how FIGS. 17A and 17B are assembled together to form a schematic diagram of the electronic circuitry of FIG. 16;

FIG. 18 is a view of a nozzle assembly that may be fitted to the forward end of the discharge tube of a tip assembly of the irrigator of this invention; and

FIG. 19 is a cross sectional view of the rotating head of the nozzle assembly of FIG. 18.

## DETAILED DESCRIPTION

FIGS. 1 and 2 illustrate a basic irrigator 20 of this invention. Irrigator 20 includes a handpiece 22 with a pump 24 that discharges pulses of fluid to a specific site on or in the body of the patient. The fluid is stored in a bag 26 and is gravity feed or suction drawn into the handpiece through a supply tube 28. The fluid is discharged from the front end of the handpiece 22 through a removable tip assembly 30. More particularly, tip assembly 30 has a discharge tube 32 in fluid communication with the pump 24 that is directed to

4

the desired discharge site. The mechanical force for actuating the pump 24 comes from a motor 34. Mechanically, the rotational force developed by motor 34 is provided to pump 24 through a gear train 35. The motor 34 is mounted a lower section of the handpiece 22 hereinafter referred to as the handgrip 36.

Current for energizing the motor 34 is supplied by battery pack 38. In the depicted version of the invention, battery pack 38 is provided with a spike 40, for establishing a fluid communication path to the bag 26. The end of supply tube 28 is disposed in battery pack 38 and is connected to the base end of the spike 40, A power cord 42 extends between the battery pack 38 and the handpiece 22 for supplying the energization current to the handpiece. The power cord 42 is shown as being adhesively secured to the outside of supply tube 28. A lever-like trigger 44 attached to the undersurface of the handgrip 36 is depressed to control the on/off state of the motor 34 and motor speed.

Irrigator 20 also presents a suction head to the discharge site so that the discharged fluid and any debris therein can be removed. The force for this suction head comes from a suction system 46 separate from the irrigator 20 and not part of this invention. The suction head is presented to the discharge site through the open end of a rigid suction tube 48 integral with tip assembly 30. Suction tube 48 is placed in fluid communication with suction system 46 through a flexible drain tube 50 that is mounted in the handpiece 22 and extends from the handpiece as a single tube so that it can be coupled to an inlet port, (not illustrated,) integral with the suction system 46.

The control of the drive signal applied to motor 34 to regulate both the on/off state of the irrigator and the rate of fluid discharge is now explained by initial reference to FIG. 4. It should be understood that internal to the battery pack 38 are two series connected cells 56 and 58. In some preferred versions of the invention, each cell 56 and 58 actually consists of four series-connected AA batteries. A circuit for supplying the energization current to the motor 34 is established by one of two power conductors 60 or 62 and a ground conductor 64 connected to the negative terminal of cell 58. Power conductor 60 is shown as being connected to the positive terminal of cell 56. Consequently, the potential across conductors 60 and 64 is the full potential developed across cells 56 and 58. Power conductor 62 is connected to the junction of cells 56 and 58; the potential across conductors 62 and 64 is just the potential developed by cell 58. Conductors 60, 62 and 64 are the conductors internal to power cord 42.

A movable spring 66 serves as the wiper that ties either conductor 60 or 62 to motor 34 to regulate the application of the energization voltage to the motor. One end of spring 66 is connected to a terminal 61 internal to motor 34 to which the positive potential is applied. Spring 66 has a first position wherein it is not connected to either conductor 60 or 62; this is the off position for the irrigator 20. When actuation of the irrigator 20 is desired, spring 66 is moved to a second position in which it is contact with the resistive wire of a wire-wound resistor 68 that is series-connected to conductor 62. In one version of the invention, resistor 68 is a 3 Ohm resistor. Resistor 68 serves as a variable load to regulate the fraction of the potential developed by cell 58 that is applied to the motor 34 When spring 66 is positioned across the full length of the resistor 68, there is the largest voltage drop across the resistor 68. Therefore, a relatively small voltage is applied to the motor 34. The motor 34 and, in turn, pump 24, operate at a relatively slow speed so as to result in the relatively slow discharge of fluid by the irrigator. When

5

faster operation of the irrigator 20 is desired, spring 66 is repositioned along the length of resistor 68 to reduce the voltage drop across the resistor and increase the voltage applied to the motor 34.

When operation of the irrigator 20 at still higher speed is desired, spring 66 is reset to a third position wherein it is spaced from resistor 68 and abuts a fixed contact 70. Contact 70 is connected to the end of conductor 60. Consequently, when spring 66 abuts contact 70, the full potential developed across cells 56 and 58, a high speed drive signal, is applied to motor 34 so as to result in the highest speed operation of the irrigator 20.

Spring 66 is from a conductive material such as plated beryllium copper. The position of spring 66 is set by the selective movement of trigger 44, now discussed by reference to FIGS. 5 and 6A. More particularly, trigger 44 is shaped to have an elongated body 74 located along the lower, downward facing surface of handgrip 36. A finger 76 extends forward from the front end of trigger body 74. Opposed pins 78, (one shown,) extend laterally away from the sides of finger 76 seat in openings, (not depicted) formed in webs 75 integral with the right and left shells 82 and 84, respectively that form the body of handpiece 22. Pins 78 thus pivotally secure trigger 44 to the handpiece 22. A coil spring 86 located between a portion of the body 74 adjacent finger 76 and the opposed surface of the handpiece 22 normally biases trigger 44 so that its body 74 is positioned away from the adjacent lower surface of handgrip 36. When trigger 44 is so positioned, spring 66 is spaced from both resistor 68 and contact 70 so as to place the irrigator 20 in the off state.

Trigger 44 is further formed to have a single leg 89 that extends from the end of the main body 74 distal from finger 76 into the handpiece 22. Shells 82 and 84 are formed to define a slot 90 spaced forward of the rear ends of the handpiece through which leg 89 extends. In the illustrated version of the invention, leg 89 has an arcuate profile centered around the axis of pins 78. A foot 92 is attached to the end of leg 89 seated inside handpiece 22. Foot 92 is greater in width than leg 89.

Returning to FIG. 4 it can be seen that the opposed ends of spring 66 are provided with hooks 65 to facilitate the securement of the spring to the motor 34. Spring 66 is formed with a loop 67 that extends around a post 93 adjacent motor 34 to foot 92 of the trigger 44. Post 93 is actually formed from a first, male post 94 integral with right shell 82 and a female post 95 integral with left shell 84. Loop 67 is fitted over a reduced diameter boss 96 integral with male post 94 that seats in female post 95. The hook 65 integral with spring 66 adjacent loop 67 is secured to the terminal 61 internal to motor 34. The opposed hook 65 is fitted around slots 91, (one slot illustrated,) formed in foot 92 of the trigger 44. When this spring 66 is so positioned, it extends across a non-conductive resistor support 97 secured inside the right shell 82, best seen in FIGS. 5 and 6A. Resistor support 97 has an elongated sleeve-like main casing 98 in which resistor 68 is seated. Tabs 99 extend perpendicular away from the longitudinal axis of main casing 98 at the ends of the casing. A third tab 100 extends from the center of main casing towards the right shell 82. Lower tab 99 and center-located tab 100 seat in complementary sockets 101 and 102, respectively, formed in right shell 82 to hold resistor support 97 in position. The upper tab 99 simply abuts the inside wall of right shell 82 to provide mechanical support for the resistor support 97.

Main casing 98 is formed with a window 103 which exposes the wire coil of resistor 68. Resistor support 97

6

further includes a three-sided mounting bracket 104 which is integral with main casing 98. Mounting bracket 104 is shaped to hold fixed contact 70 which is shaped as U-shaped piece of conductive metal that is compression-secured in the mounting bracket.

The position of spring 66 relative to resistor support 97 is a function of the extent to which trigger 44 is depressed. When trigger 44 is not depressed, spring 66 is located against the lower portion of the main casing 98 so as to be spaced away from both window 103 and fixed contact 70 as seen in FIG. 6A. This is the position of the spring 66 when irrigator 20 is in the off state. When low speed operation of the irrigator 20 is desired, trigger 44 is partially depressed to position spring 66; across window 103, depicted by FIG. 6B. When the spring 66 is so positioned, it abuts resistor 68 so as to allow a low voltage drive signal to be applied to motor 34. By controlling the depression of the trigger 44, the extent to which resistor 68 is placed in series with conductor 62 is controlled. This positioning allows the low speed discharge of the irrigator 20 to be selectively set over a range of operating speeds.

When operation of the irrigator at high speed is desired, trigger 44 is fully depressed. The complete depression of the trigger 44 pivots spring 66 away from resistor 68 and against fixed contact 70, as seen by FIG. 6C. Once the spring 66 and contact 70 abut, the full potential across cells 56 and 58 is applied to the motor 34 so as to cause the irrigator 20 to run at its highest speed.

It will further be observed from FIG. 5 and 6A that left shell 84 is formed with a stepped rib 106 that projects into a space inside the handpiece 22 adjacent the foot 92 of trigger 44. More particularly, rib 106 extends generally perpendicularly relative to the longitudinal axis of the handgrip 36 portion of handpiece 22. Rib 106 is shaped to have a first, lower portion 108 and a second, upper portion 110 located slightly forward of lower portion 108. An angled step 112 in rib 106 serves as the transition section between the lower and upper sections 108 and 110, respectively.

When trigger 44 is depressed to operate the irrigator 20, the forward facing surface of foot 92 presses against the rearward facing surface of rib 106. When the trigger 44 is initially depressed, operated in the low speed state, foot 92 rides against the lower portion 108 of rib 106 as seen in FIG. 6B. Further depression of trigger 44 results in foot 92 seating in the space defined by step 112. If higher speed operation of irrigator 20 is desired, further depression of trigger 44 forces foot 92 out of step 112 and against the surface of upper section 110 of the rib 106. This movement of the trigger causes spring 66 to abut contact 70.

The seating of the foot 92 of trigger 44 against step 112 performs two functions. First, it holds the trigger 44 so that spring 66 is positioned so that there is a minimum voltage drop across resistor 68 and the spring will be spaced away from fixed contact. 70. Thus, the trigger 44 and spring 66 are set to cause the highest possible low speed drive signal to be applied to the motor 34. Secondly, the seating of trigger 44 provides a tactile indication to the person using the irrigator 20 that continued depression of the trigger 44 will cause the irrigator to transition from the low speed operating state to the high speed operating state.

Handpiece 22 further includes a trigger lock 118, now described by reference to FIGS. 5, 7 and 7A, that holds trigger 44 in the fully depressed/high speed operating position. Trigger lock 118 has a flat, rectangularly shaped base 120 that extends into the handpiece 22 through a slot 122 formed rear end of the handpiece. A foot 124 extends

7

perpendicularly across the rear end of base 120 to provide a surface against which an individual can place his/her finger. Extending forward from base 120, trigger lock 118 has a neck 126. Neck 126, while coplanar with base 120, is partially offset to one side of the base. The neck 126 is seated in an opening 128 defined in a flange 130 that extends into the center of the handpiece from right shell 82. Opening 128 is closed by a smaller flange 132 integral with left shell 84 that is aligned with flange 130.

Trigger lock 118 is further formed with a flexible, cantilever spring arm 134 that extends upwards and forwardly from the interface between base 120 and neck 126. In order to facilitate the flexible movement of spring arm 134, trigger lock 118 is formed so that spring arm is relatively thin in comparison to the thickness of base 120 and neck 126. For example, in one version of the invention, trigger lock 118 is formed from high impact polystyrene plastic, base 120 and neck 126 have a thickness of approximately 0.080 inches and spring arm 134 has a thickness of approximately 0.014 inches. The upper edge of spring arm 134 abuts a horizontally extending flange 136 that extends into the center of the handpiece from right shell 82. Owing to the flexible nature of spring arm 134, when trigger lock 118 is pressed forward, the action of the spring arm 134 abutting flange 136 places a rearward-acting force on the trigger lock.

The trigger lock 118 further includes a head 138 that is located adjacent the forward end of neck 126. Head 138 extends perpendicularly across neck 126 to project above the upper surface of the neck. There is also a web 140 that extends downwardly from neck 126. Web 140 is formed to define a slot 143 immediately below neck 126. When trigger lock 118 is fitted in handpiece, a lower, horizontally aligned portion 142 of flange 130 extends through slot 143. This horizontal portion 142 of flange 130 thus provides structural support to hold trigger lock 118 in place. Web 140 itself provides structural rigidity to the neck 126. In the illustrated version of the invention, a flange 144 extends perpendicularly across the forward edge of web 140. Flange 140 is integral with head 138.

After trigger 44 is placed in the high speed operating position, trigger lock 118 is employed to lock it in this position as depicted by FIG. 7B. The person wanting to so set the irrigator 20, presses in on the exposed portion of the trigger lock 118 to cause its forward movement. The forward displacement of the trigger lock 118 positions its neck 126 under the foot 92 of the trigger 44. Downward movement of the trigger 44 upon the release of an actuating grasp is stopped by the trigger lock 118. Instead, the trigger 44 is locked in position so as to hold spring 66 against contact 70. Irrigator 20 is unlocked from the high speed operating state by pressing upwardly on the trigger 44. Once the foot 92 of the trigger 44 clears head 138 of the trigger lock 118, spring arm 134 exerts sufficient force on the trigger lock 118 to move the trigger lock rearwardly, away from the trigger 44. The return of the trigger lock 118 to its initial position allows trigger 44 and spring 66 to be returned to their low speed or off operating positions.

As seen in FIGS. 2 and 8, pump 24 has its own sleeve-like, open ended discharge head 150. Pump 24 is seated in the forward end of the handpiece 22 so that discharge head 150 is directed towards the front end of the handpiece and extends out through an opening, (not identified,) defined by shells 82 and 84. A tip lock 152, seen in FIGS. 8 and 9, is positioned in the front of the handpiece 22 immediately forward of pump discharge head 150 for securing the tip assembly 30 to the handpiece. The tip lock 152 is formed from a single piece of flexible plastic such as a high impact

8

polystyrene. Tip lock 152 is shaped to have a flat face plate 153 that is located in front of the open end of the pump discharge head 150. Face plate 153 is provided with an oval opening 154 through which the rear end of the discharge tube 32 is inserted into the discharge head 150. It will be further noted that the portion of face plate 153 that defines opening 154 has a beveled surface 155 around the upper portion of the opening 154. Tip lock 152 further includes an arcuately shaped base plate 156 that extends perpendicularly rearward from face plate 153. In the illustrated version of the invention, base plate 156 is provided with raised members 158 to facilitate manual depression of tip lock 152. A spring plate 160 integrally formed with tip lock 152 extends rearwardly from the top edge of face plate 153. Tip lock 152 is molded so that in its unbiased state, spring plate 160 projects approximately 96° away from face plate 153.

The upper two-thirds of tip lock 152 are seated within opposed L-shaped brackets 162 that extend forward from shells 82 and 84. Brackets 162 form the most forward facial surface of the front end of handpiece 22. The tip lock 152 is held in place by opposed L-shaped three-sided ribs 164 integral with shells 82 and 84. When the handpiece 22 is assembled, ribs 164 block downward movement of the spring plate 160 so as to prevent tip lock 152 from falling out of the handpiece. The base plate 156 is, however, exposed for manual displacement. Shells 82 and 84 are further formed to define a biasing bar 166 that extends across the width of the handpiece 22. Biasing bar 166 is positioned so as to abut the rear end of spring plate 160. Biasing bar 166 is thus the component internal to the handpiece 22 that acts in opposition to spring plate 160 to urge tip lock 152 downwardly.

Drain tube 50, as seen in FIG. 3, is seated in an elongated channel 170 that extends along the top of handpiece 22. Channel 170 is formed by two external spines 172, each spine being integrally formed with a separate one of shells 82 and 84. Each spine 172 extends the length of the shell 82 or 84 above the portion of the shell 82 or 84 that forms the enclosed body of the handpiece 22. In the depicted version of the invention, spines 172 are formed as curved walls. Also integral with shells 82 and 84 are webs 174, seen in FIGS. 3 and 9, that extend from the inner walls of spines 172 to the adjacent outer surfaces of the shells. Webs 174 are formed to have curved outer surfaces that define the circular cross-sectional profile of channel 170. Spines 172 are formed so that the there are pairs of opposed webs 174 integral with the shells 82 and 84 that are in planar alignment. Spines 172 are further dimensioned so that the top surfaces thereof do not abut.

When handpiece 22 is assembled, drain tube 50 is seated between shells 82 and 84 so as to be seated in channel 170. The opposed webs 174 impose a slight inwardly directed force of the drain tube 50 so as to compress and secure the drain tube 50 to the handpiece. When the tip assembly 30 is coupled to the handpiece 22, suction tube 48 seats in the front end of the drain tube 50. In preferred versions of the invention, shells 82 and 84 are formed so that the two most forward webs, webs 174a and 174b, are positioned rearwardly away from the portion of the drain tube 50 in which the suction tube 48 is seated. This positioning ensures that, when the tip assembly 30 is coupled to the handpiece 22, the compression force developed by webs 174a and 174b holds drain tube 50 in place.

FIGS. 1 and 10 illustrate the basic components tip assembly 30. The discharge tube 32 and the suction tube 48 are connected to each other by a set of spaced apart webs 178. A nozzle 179 is fitted over the open forward end of the

US 6,179,807 B1

9

discharge tube 32 to direct the stream of fluid discharged therefrom. It will be rioted that the nozzle 179 is constructed to define an annular groove 180 around the front end of the discharge tube 32. A splash shield 181 is removably fitted over the open ends of the depicted tube assembly. The rear end of the discharge tube 32, the end that is fitted into the handpiece 22, is provided with a neck 182 that has a reduced outer diameter in comparison to the immediately adjacent portion of the tube. An O-ring 177 is fitted in a groove, (not identified,) formed immediately inward of the open end of the neck 182. The rear end of discharge tube 32 is further formed so as to have an upwardly extending flange 186. Flange 186 extends from a portion of the base having the relatively large outer diameter, as opposed to the reduced diameter neck 182, and extends upwards towards suction tube 48. The flange 186 is shaped so as to have a first tapered surface 188 that extends from the portion of the tube adjacent neck 182. The opposed surface of the flange extends at a right angle away from the discharge tube so as to form a 90° step 190.

The rear end of the suction tube 48 is formed to have a neck 192 with a reduced outer diameter. More particularly, it can be seen that the neck 192 is narrowest at its open end, the end seated in drain tube 50, and widest around the portion that is closest to the rest of suction tube 48. In the depicted version of the invention, a pronounced circular step 194 separates neck 192 from the rest of the suction tube 48 though that may not always be the case. It should be understood that while the outer diameter of neck 192 is less than the outer diameter of the main portion of discharge tube 48, the inside wall of the tube, including neck 192, is of constant diameter. An annular rib 196 extends around the outer surface of suction tube 48 immediately rearward of the front end of the tube. The purpose of rib 196 will be explained hereinafter.

Splash shield 181, now described by reference to FIGS. 10 and 10A, is formed of flexible material such as polyvinyl chloride. The splash shield 181 is formed so as to have a base section 200 of generally oval shape. Base section 200 is formed to define two bores 202 and 204. Bore 202 serves as the discharge bore and is the bore in which the front end of the discharge tube 32 is seated. To facilitate the securement of the splash shield to the discharge tube/suction tube sub-assembly, base section 200 is formed to have an annular lip 206 that extends inside bore 202. When the splash shield 181 is fitted over discharge tube 32, lip 206 in the annular groove 180 between the discharge tube 32 and nozzle 179.

Bore 204 serves as the suction bore and is the bore in which the front end of suction tube 48 is seated. Bore 204 is dimensioned so that when the splash shield 181 is seated over the discharge tube 48, annular rib 196 abuts the inner wall of base section 200 that defines bore 204 to form a seal around the end of the bore 204.

The base section 200 is further formed to define a slit 183 that extends between bores 202 and 204 and opens towards the rear of the splash shield 181. When the splash shield is seated on the discharge tube-suction tube sub-assembly, the most forward web 178 seats in slit 183. In some versions of The invention, the web 178 may fully seat in slit 183.

Extending forward from base section 200, splash shield 181 is shaped to have an open-ended discharge head 208. Discharge head 208 defines a generally conically shaped discharge chamber 210. Discharge bore 202 opens into the center of discharge chamber 210, at the apex of the chamber. Suction bore 204 extends forward of the open end of discharge bore 202, curves towards the longitudinal axis of

10

bore 202 and chamber 210 and opens into the side of discharge chamber 210. In preferred versions of the invention, suction bore 204 is in fluid communication with the chamber 210 through an opening 212 located immediately rearward of the edge of the wall defining the open end of chamber 210.

Splash shield 181 is further shaped to have an outwardly directed lip 214 around the open end of discharge chamber 210. Lip 214 is shaped so that forward surface thereof, the surface that is pressured against tissue has small channels 215. Channels 215 extend from the outer perimeter of lip 214 to the discharge chamber 210.

FIGS. 8 and 11 illustrate how the tip assembly 30 is locked to the handpiece 22. As can be seen in these Figures, tip assembly 30 is positioned towards the front end of the handpiece 22 so that the neck 182 of the discharge tube 32 is inserted through opening 154 of tip lock 152 and into the discharge head 150 of pump 24. The tip assembly 30 is pushed towards the handpiece 22 until flange 186 of the discharge tube 32 passes through opening 154. As the discharge tube passes through opening 154, tapered surface 188 of flange 186 abuts the complementary beveled surface 155 around opening 154. Further insertion of the discharge tube 32, thus serves to displace the tip lock 152 upwardly. Once flange 186 passes beyond tip lock 152, spring plate 160 forces the tip lock to return to its initial position. Thus, as depicted in FIG. 11, the inner surface of face plate 153 of tip lock 152 seats against step 190 of flange 186 to prevent unintended removal of the tip assembly 30. When the tip assembly 30 is so positioned, O-ring 177 forms a seal between discharge tube 32 and the surrounding inside wall of discharge head 150 of pump 24.

The coupling of the tip assembly 30 to handpiece 22 also results in the coupling of suction tube 48 into drain tube 50. More particularly, as the discharge tube 32 is being locked in position, neck 192 of the suction tube 48 is simultaneously seating in the open front end of drain tube 50. Owing to the outwardly directed taper of neck 192, the neck forms its own compression seal against the inside wall of drain tube 50.

It should be understood that, in some preferred versions of the irrigator 20 of this invention, handpiece 22 and tip assembly 30 are designed so that the distance between the front surface of the handpiece and the trailing edge of the closest web 178 is between 0.015 and 0.075 inches. In still more preferred versions of the invention, this distance is approximately 0.030.

Tip assembly 30 is uncoupled from the handpiece 22 by the simple upward depression of base plate 156 of tip lock 152. This action causes the tip lock 152 to move upwardly relative to the handpiece as illustrated in FIG. 12. This displacement of the tip lock 152 serves to space the portion of face plate 153 that defines the upper portion of opening 154 away from tip assembly flange 186. Once this separation occurs, the tip assembly 30 is simply pulled away from the handpiece 22.

Once the tip assembly 32 is coupled to handpiece 22, the irrigator 20 is ready for use. The person using the irrigator only needs one hand to both grasp irrigator 20 and to depress trigger 44 that controls the on/off state of the irrigator and the rate at which it discharges fluid. Should continual high-speed operation of the irrigator be required, all one needs to do is depress trigger lock 118 to hold the trigger in the correct position. Irrigator 20 is then unlocked from high-speed operation by simple depression of trigger 44.

When suction system 46 is actuated, the suction it draws causes a suction head to develop at opening 212 in the splash

US 6,179,807 B1

11

shield **181**. Since opening **212** is located relatively close to the open end of discharge chamber **210**, water and debris are immediately drawn into suction bore **204** upon their movement away from the surface against which the splash shield **181** is placed. This minimizes the extent to which material swirls or otherwise moves through the discharge chamber **210**. An advantage of the immediate removal of this material is that it eliminates the extent to which matter in the discharge chamber **210** obstructs the application of pulses of fluid to the surface to which the irrigator **20** is applied.

In versions of the invention wherein the splash shield **181** is provided with channels **215**, the channels serve as conduits through which air is drawn into the discharge chamber **210**. The venting of air into the discharge chamber around the perimeter of the splash shield-body site interface prevents the tissue still part of the patient from being unintentionally separated from the site to which the irrigator **20** is applied.

Still another advantage of the irrigator **20** of this invention is that splash shield **181** is snap fitted to the rest of the tip assembly **30**. This makes it possible to provide different shields that can be used with a single discharge tube-suction tube subassembly. Consequently, a medical facility does not have to maintain an inventory of different tip assemblies, the only difference between the individual assemblies being their splash shields.

The fluid and other material drawn through the suction tube **48** flows into the suction system **46** through drain tube **50**. Since neck **192** of suction tube **48** seats in drain tube **50**, there is essentially no leakage of the fluid and material as it flows into the drain tube. This is even the case when, owing to side loading, the axis of suction tube **48** angles out of alignment with the axis of the handpiece **22**.

Moreover, the diameter of the bore through drain tube **50** is greater than the diameter of the bore through suction tube **48**. For example, in some versions of the invention, the diameter of the inside wall of suction tube **48** is approximately 0.200 inches and the diameter of the inside wall of the drain tube **50** is 0.250 inches. Thus, the interface between the two tubes **48** and **50** is not a constriction that could potentially serve as a clog point for material passing through the tubes. Moreover, owing to the positioning of drain tube **50** along the upper outer surface of the handpiece **22**, the degree of curvature of the tube is kept to a minimum. In many preferred versions of the invention, the handpiece is formed so that drain tube **50** subtends an arc of greater than 90° and, more preferably, approximately 140° and the inner radius of the tube is greater than 0.75 inches and, in still more preferred versions of the invention, between 0.85 and 0.90 inches. Also, since there is not a "third" tube, connecting the portion of the drain tube **50** internal to the handpiece **22** with its downstream extension, the need to provide an additional fluid connection port to the handpiece is eliminated. The elimination of this fluid connection port, in addition to its cost savings, eliminates another connection point at which the material in the drain tube **50** could potentially clog the tube. Thus, the irrigator **20** of this invention is further designed to minimize the extent to which the material drawn through drain tube **50** will clog the tube.

Still another feature of this invention is that since spines **172** do not abut, drain tube **50** is visible along the top of the handpiece **22**. The drain tube **50** itself is formed out of transparent material. Thus the person using the irrigator need only look clown at the handpiece to view the material being drawn away from the site at which the irrigator is applied. This visual exposure of the drain tube **50** further makes it

12

possible for medical personnel to monitor fluid and, material flow through the portion of the drain tube disposed in the handpiece **22**.

An alternative irrigator **220** of this invention is now initially described with respect to FIG. **13**. Irrigator **220** includes a handpiece **22***a* that is physically similar in structure and function to above described handpiece **22**. Tip assembly **30** is attached to the front of handpiece **22***a* to provide the tubes that serve as conduits through which fluid is discharged from the handpiece and a suction head is presented at the site to which the irrigator is applied. Irrigating fluid is supplied to handpiece **22***a* from bag **26** through supply tube **28***a*. A spike **221** located at the end of the supply tube **28***a* makes the fluid connection between the bag **26** and the tube. Power for energizing the handpiece **22***a* comes from a power pack **222** that is positioned outside the sterile field in which the handpiece **22***a* and tip assembly **30** are employed. The current from power pack **222** is applied to the handpiece **22***a* through a power cable **224**. Power conductors **60***a* and **62***a* and ground conductor **654***a* (FIG. **16**) are disposed within power cable **224**. A plug **226** at the end of power cable **224** plugs into a complementary socket **228** in the power pack **222**. In many preferred versions of the invention, the portions of the supply tube **28***a* and power cable **224** that extend from handpiece **22***a* are adhesively secured together. Often power cable **224** is longer than supply tube **28***a* to allow the power pack **222** to be placed at a more distal location to the sterile field at which the irrigator **220** is being used than bag **26**. The adhesive employed to secure the supply tube **28***a* and power cable **224** is selected to allow these conduits to be readily separated to the extent needed to facilitate the placement of the power pack **222** outside of the sterile field.

The power pack **222**, as seen in FIGS. **14** and **15**, includes a housing **230** formed out of two shells **232** and **234** and a base plate **246**. Shells **232** and **234** are formed to provide the housing **230** with an indicator face **236** that extends diagonally away from the bottom surface of the power pack **222**. A handle **238** with a finger hole **240** extends downwardly below the portion of the housing **230** that defines indicator face **236**. Finger hole **240** performs two functions. First, it provides an opening for a person to grasp the power pack **222** so that it can be easily handled. Secondly, finger hole **240** serves as a opening which allows the power pack **222** to be mounted to a horizontally extending arm **242** of an IV pole **244** in a surgical suite (FIG. **13**).

A base plate **246** is secured between shells **232** and **234** and forms the bottom surface of the power pack **222**. A DC power plug **248** is mounted to base plate **246** to provide a connection between a charger, (not illustrated) and the power pack **222**. When the power pack **222** is charged, base plate **246** is positioned against a complementary surface of the charger from which a charger plug, complementary to plug **2483**, extends.

Power pack **222** is further shaped so that socket **228** to which power cable plug **226** is connected is also fitted to base plate **246**. This arrangement ensures that, when the power pack **222** is plugged into the charger, it cannot simultaneously be used to energize the handpiece **22***a*. This prevents current from being directly supplied from the charger, which may not have the voltage protectors required for real-time patient connection, to the handpiece **22***a*.

Internal to the power pack **222** is a cluster of rechargeable cells **252**. In the depicted version of the invention, power pack **222** is provided with seven series connected NiCad cells **252**. Each cell **252**, when fully charged can develop a

US 6,179,807 B1

13

potential of 1.2 Volts. A foam pad separates cells 252 from shell 234. A circuit board 254 is mounted below the portion of the housing 230 that defines indicator face 236. Circuit board 254 carries the components forming the circuitry that regulates the charging and discharging of cells 252. FIG. 15 further illustrates the label 256 positioned over indicator face 236 and the label 258 positioned over the side of the housing 230.

In preferred versions of the invention, power pack 222 is designed to have a center of gravity that is below and aligned with the center of finger hole 240. This construction facilitates the balancing of the power pack 222 when it is suspended from arm 242 of the IV pole 244.

FIG. 16 is a block diagram of the circuitry internal to power pack 222 that controls the charging and discharging of cells 252. The DC power plug 248, represented as opposed terminals, is connected to a cell charger 264. The cell charger 264 charges the cells 252 at one of two rates as a function of the potential across the cells.

Power pack 222 is configured to provide a pulse width modulated DC signal to handpiece 22a. The pulse is nominally one of two widths and is a function of the setting of the spring 66 internal to handpiece 22a. More particularly, when spring 66 is connected to conductor 60a, pulses having a relatively long "on" period are applied to the handpiece 22a; these pulses function as a high speed drive signal to the handpiece. When spring 66 is connected to conductor 62a, pulses having a relatively short "on" period are applied to handpiece 22a; these pulses function as a low speed drive signal to the handpiece. The potential of the low speed drive signal applied to motor 34 is further reduced to the extent spring 66 is in series with resistor 68.

The potential across the cells 252 is applied to handpiece 22a through either power conductor 60a or 62a and ground conductor 64a, all internal to power cable 224. The positive terminal of the cluster of cells 252 is connected to either power conductor 60a or power conductor 62a through a slow speed driver 266. Ground conductor 64a is selectively tied to the ground internal to the power pack 222 through a FET 268. The on/off period of FET 268 controls the width of the DC pulses applied to the handpiece 22a.

The on/off state of FET 268 is set by a speed regulator 270. The output signal produced by speed regulator 270 is itself a function of signals received from an oscillator 272; and a slow speed detector 274. Speed regulator 270 further monitors the potential across the cells 252 to adjust pulse width as a function of cell potential.

Oscillator 272 produces a constant frequency output signal. The output signal produced by oscillator 272 is, however, forced to ground if a power down circuit 276 determines that the voltage across the cluster of cells 252 has fallen below a set potential. The slow speed detect circuit 274 produces a slow speed signal based on the detection of one of either two signals states. First, slow speed detector 274 produces a slow speed signal when the slow speed driver 266 produces a signal indicating current is being supplied to the handpiece 22a through low speed power conductor 62a. Secondly, slow speed detector 274 produces the slow speed signal when it determines that the potential across the cluster of cells 252 has fallen below a set potential.

FIGS. 17A and 17B, when assembled together, form a schematic drawing of the electrical components internal to the power pack 222. Cell charger 264 includes a voltage suppressor 282 that is tied across the opposed terminal of the DC power plug 248. Whenever the potential across the DC

14

power plug 248 exceeds a preset voltage, voltage suppressor 282 establishes a closed circuit across the power plug 248 to prevent excessive voltages from being applied to the other components internal to the power pack 222. A full-wave bridge rectifier 284 is also tied across the terminals of the DC power plug 248. Rectifier 284 performs two functions. First, it allows an AC signal to be applied to the power pack 222 for recharging the cells 252. Secondly, in the event the polarities of the DC signal applied to power plug 248 are reversed, it ensures that the positive signal is still applied to the other components of the cell charger 248. A filter capacitor 286 is tied between the output terminal of rectifier 284 and ground to minimize voltage variations in the signal, the rail voltage, distributed downline from the rectifier. In the illustrated version of the invention, the rail voltage is further filtered by a capacitor 287 also tied between the rectifier 284 and ground. In preferred versions of the invention, an 18 to 35 VDC signal or a 15 to 25 VAC signal is applied to cell charger 264 in order to charge cells 252.

The rail voltage from rectifier 284 is applied to the V+ terminal of a charging chip 288 designed regulate the charging of cells 252. One particular charging chip 288 that can be employed as part of this invention is the MAX713 manufactured by Maxim. The signal from rectifier 284 is applied to charging chip 288 through a resistor 290 and a forward biased LED 292. The emission of light by LED 292 serves as an indication that a charging current is being applied to the power pack 222. Not shown are the program pin Connections and voltage divider associated with charging chip 288 that are used to set the various signal transitions of the charging chip described hereinafter.

The actual current employed to charge cells 252 comes from rectifier 284 through a buck converter consisting of FET 294, inductor 296 and diode 298. The FET 294 and inductor 296 are series connected together and are connected to the cells 252 through a forward biased diode 302. Diode 298 is a reverse biased catch diode that is connected between the junction of FET 294 and inductor 296 and ground. The signal that turns FET 294 on and off is based on a DRIVE (DRV) signal generated by charging chip 288. The DRIVE signal is applied to a resistor 304 and from the resistor to the emitter of transistor 306. The collector of transistor 306 receives the rail voltage from rectifier 284 through a resistor 308. The base of transistor 306 is tied to the cathode of diode 292 to receive the V+ signal. Collectively, resistors 304 and 308 and transistor 306 level shift the rail voltage to a set voltage below rail voltage. In some versions of the invention, this difference is approximately 10 VDC. The actual times at when the level-shifted voltage is present at the collector of transistor 306, is a function of the assertion of the DRIVE signal.

The signal present at the collector of transistor 306 is applied to the bases of two series-connected transistors 310 and 312 that act as current drivers. The collector of transistor 310 is tied to rectifier 284 to receive the rail voltage. The emitter of transistor 310 is tied to the emitter of transistor 312. The collector of transistor 312 is tied to ground. The current-boosted signal present at the junction of emitter-emitter junction of transistors 310 and 312 is applied to the gate of FET 294 through a resistor 314.

Charging chip 288 asserts the DRIVE signal to cause the cells 252 to be charged at either a slow, "trickle," rate or a fast rate. The rate at which the charging chip 288 allows the cells to be charged is a function of the potential across the cells, current flow through the cells and the period of time cell charger 264, operates in at the fast rate. Charging chip 288 has BAT+ and BAT+ terminals that are connected

US 6,179,807 B1

15 16

directly across the cells **252** through which the chip monitors the potential across the cells. A capacitor **307** is also tied across the cells **252**. The negative terminal of the cells **252** is connected to ground through a resistor **316**. Charging chip **288** has a ground terminal that is connected to ground at the point resistor **316** is connected to ground. Charging chip **288** thus measures current flow through cells **252** as a function of the voltage between its BAT+ and ground terminals. The charging chip basis its charging of the cells **252** in part on this current flow measurement.

The charging chip **288** also asserts a FAST-CHARGE ( FCHG) signal whenever it is charging the cells **252** at the trickle rate. The FAST-CHARGE signal is applied to the emitter of a transistor **320** through a resistor **322**. The collector of transistor **320** receives the rail voltage from rectifier **284** through a forward biased LED **324**. The base of transistor **320** is tied to the cathode of LED **292**.

When cells **252** integral with power pack **222** are initially charged, cell charging chip **288** trickle charges the cells. This is accomplished by cycling the DRIVE signal so that it is on a relatively small fraction of the time. When the DRIVE signal is on, FET **294** is turned on to allow inductor **296** to charge. During this part of the charging cycle current flows to the cells **252** so as to charge the cells. During trickle rate charging, the DRIVE signal is cycled at a rate so that when FET **294** is turned off, inductor **296** fully discharges through diode **298**. Consequently, during subsequent cycles when FET **294** is on, less current flows through inductor **296** to the cells **252**. In one version of the invention, the current supplied to the cells during trickle rate charging is 0.062 Amps.

During trickle rate charging, the FAST-CHARGE signal is asserted high by charging chip **288**. Consequently there is no current flow through transistor **320** and LED **324**. The LED **324** thus does not emit light.

Charging chip **288** monitors the potential across the cells **252** to determine if it reaches a level at which the cells can accept a higher current charge without being damaged. In one particular version of the invention, for the cells **252** to be fast charged, they must each have a potential of 0.4 Volts. Once charging chip **288** determines this potential, 2.8 Volts for the seven cells, has been reached, the on cycle time for asserting the DRIVE signal is increased; the cell charger **264** enters the fast charge mode.

The increase in the on cycle time for the DRIVE signal causes a like increase in the total percent of time in each cycle FET **294** is turned on. Specifically, charging chip **288** asserts the DRIVE signal for sufficient periods of time so that FET **294** is turned on for sufficient periods of time to ensure that inductor **296** does not fully discharge. Thus, during the periods of time FET **294** is turned on, there is substantially higher current flow to the cells **252** than when the cell charger **264** is operated in the trickle mode. In one particular version of the invention, when cell charger **264** is operated in the fast charge mode, current flow to the cells **252** is approximately 0.5 Amps.

When the cell charger **264** is in the fast charge mode, charging chip **288** negates the FAST-CHARGE signal low. The negation of the FAST-CHARGE signal turns on transistor **320** which, in turn, causes current to flow through LED **324**. The current flow through LED **324** serves to cause the LED to emit a light indicating that the power pack **222** is being fast charged.

Cell charger **264** stays in the fast charge mode until one of three events occur. One event is the sensing by the charging chip **288** of a drop in the voltage across cells **252**.

This voltage drop is interpreted by the charging chip **288** that the cells **252** are fully charged a an evidenced by the drop in current out of the cells. Secondly, charging chip **264** monitors the cells **252** for the voltage across the cells. In some versions of the invention, if this voltage reaches 14 Volts, the cell charger **264** ceases fast mode charging of the cells **252**. Thirdly, charging chip **288** monitors the time the cell charger **264** is in the fast charge mode. If the time significantly exceeds the total time expected to fully charge the cells **252**, fast mode charging is terminated In one version of the invention, the time for fully charging the cells is approximately 180 minutes; in these versions of the invention charging chip **288** is programmed to terminate fast mode charging after approximately 264 minutes. Once fast mode charging is terminated, charging chip **288** continues to assert the DRIVE signal necessary to trickle mode charge the cells **252**. The continual trickle mode charging of the cells **252** prevents the cells from losing their charge.

The charging/discharging circuit internal to power pack **222** also includes a voltage regulator **328**. Voltage regulator **328** is connected to the positive terminal of the cluster of cells **252**. The voltage regulator produces a constant level +5 VDC signal that is used as a reference voltage and an operating voltage by the other components internal to the power pack **222**.

The slow speed driver **266** is connected to the positive terminal of the cluster of cells **252**. Conductor **60**a, the conductor over which the high speed drive signal is supplied to the handpiece **22**a, is connected directly to the cells **252** through the slow speed driver **266**. Conductor **62**a, the conductor over which the low speed drive signal is supplied to the handpiece **22**a, is connected to cells **252** through a forward biased diode **330**. A resistor **332** is connected across the extension of conductor **60**a internal to slow speed driver **266** and the cathode of diode **330**.

Slow speed driver **266** also includes a transistor **334**. The emitter of transistor **334** is tied to the anode of diode **330**. The base of transistor **334** is tied to the cathode of diode **330** through a resistor **336**. The collector of transistor **334** is tied to the slow speed detector **274** to provide a signal whenever current flow to the handpiece is through conductor **62**a.

The slow speed detector **274** includes a comparator **338** that provides a specific signal to indicate if the low voltage drive signal is to be outputted by power pack **222**. The signal present at the collector of transistor **334** is applied to the noninverting input of comparator **338** through a resistor **339**. In the illustrated version of the invention, the signal from transistor **334** is offset by the signal present at the junction of two series-connected resistors **340** and **342** which are connected between the +5 VDC source and ground. It will further be noted that a capacitor **343** is tied across resistor **342**. Capacitor **343** filters out transient noise in the signal present at the junction of resistors **339**, **340** and **342**. Other capacitors are likewise tied to certain of the other resistors tied to ground. Since the position and purpose of these capacitors are understandable, they will not be further illustrated or described to minimize the complexity of this description and the accompanying drawings.

The voltage across the cluster of cells **252** is applied to the inverting input of comparator **338**. More particularly, the voltage across the cells **252** is applied to comparator **338** through a resistor **344**. A resistor **346** is tied between the inverting input of comparator **338** and ground. A feedback resistor **348** is tied between the output of comparator **338** and the noninverting input to provide hysteresis damping of the transitions of the output signal from the comparator.

17 18

Oscillator 272 includes a comparator 352. The oscillator 272 also includes a voltage divider consisting of series-connected resistors 354 and 356 that are connected between the +5 VDC source and ground. The voltage present at the junction of resistors 354 and 356 is applied to the noninverting input to the comparator 352. The inverting input of comparator 352 is tied to ground through a capacitor 358. A resistor 360 provides a feedback loop between the output of comparator 352 and its noninverting input. A resistor 362 provides a feedback look between the output of comparator 352 and is inverting input. Oscillator 272, when energized, produces a triangle-wave output signal having a frequency between 1.0 K Hz and 2.0 K Hz and, more particularly, approximately 1.3 K Hz.

Power down circuit 276 employs a comparator 364 to monitor the voltage across cells 252. The cell voltage is applied to the noninverting input of comparator 364 through a resistor 366. A resistor 368 is tied between the noninverting input of the comparator 364 and ground to provide the appropriate level adjustment to the signal applied to the comparator. The signal from rectifier 284 is also applied to the noninverting input of comparator 364 through a forward biased diode 370 and a resistor 372.

A reference voltage is applied to the inverting input of comparator 364. This voltage is the voltage present at the junction of series-connected resistors 374 and 376 which are connected between the +5 VDC source and ground.

A feedback resistor 378 is connected between the output of comparator 364 and its noninverting input. A diode 380 is connected between output of comparator 364 and the junction of oscillator comparator 352 and capacitor 358. Diode 380 is reverse biased relative to comparator 364.

Speed regulator 270 provides the signal that turns FET 268 on and off. The on/off signal to FET 268 is produced by a comparator 384. The input to the noninverting input of comparator 384 is the signal present at the junction of comparator 352, capacitor 358 and diode 380. One input to the inverting input of comparator 384 is the output signal from comparator 338 of the slow speed detector 274. The signal from comparator 338 is applied to comparator 384 through a resistor 386. A second input to comparator 384 is the voltage across the cells 252 which is applied to the comparator 384 through a resistor 388. The signal from resistor 388 is a compensation signal which compensates for the changes in the signal from the slow speed detector 274 as function of voltage changes across the cells 252.

The signal applied to the inverting in-put of comparator 384 is level adjusted by the signal present at the junction of series connected resistors 390 and 392. Resistors 390 and 392 form a voltage divider between the +5 VDC source and ground. A resistor 394 can be placed in parallel across resistor 392 by the closing of a switch 396 tied between resistor 394 and ground. Resistor 394 and switch 396 allows the signal presented to comparator 384 to be adjusted to allow further control of the on-period of the pulse width modulated signal produced by the power pack 222.

The output signal of comparator 384 is applied to the gate of FET 268 through a resistor 398. A diode 400 is reverse biased between the conductors internal to power pack 222 that are connected to power conductor 60a and ground conductor 64a. A capacitor 402 is connected between the anode of diode 400 and ground.

When handpiece 22a is operated at high speed, current flows from cells 252 directly through the slow speed driver 266 to conductor 60a. Consequently there is no current flow through diode 330. As a result, transistor 334 is turned off

and the slow speed driver forwards a zero-voltage signal to the slow speed detector 274. As long as the potential across the cells 252 remains above a select potential, the signal present at the inverting input of the comparator 338 of slow speed detector 274 will be greater than the signal present at the noninverting input. Comparator 338 thus outputs a zero-voltage signal to comparator 384 of the speed regulator 270.

The output signal from oscillator 272 is the signal applied to the noninverting input of comparator 384. During the periods when the oscillator output signal is above the signal present at the inverting input, comparator 384 generates a +5 VDC signal that turns on FET 268. As discussed above, during fast operation of the handpiece 22a, speed regulator 270 presents a zero-voltage signal to the noninverting input of comparator 384. Thus, when the irrigator 220 is in this state, comparator 384 asserts a switch signal to turn FET 268 on for relatively long periods of time. For example, in one version of the invention, FET 268 has an on duty cycle of approximately 85% of each period of the output signal generated by the oscillator 272. This ensures that a relatively high average voltage is presented to the motor 34 as the high speed drive signal.

When the irrigator 220 is operated at slow speed, current flow to the handpiece 22a from cells 252 through diode 330 and conductor 62a. The current flow through diode 330 turns transistor 334 on. The turning on of transistor 334 presents a positive voltage to the noninverting input of comparator 338 of slow speed detector 274. The voltage from transistor 334, when combined with the voltage across resistor 342, is greater than the voltage present at the inverting input of comparator 338. Thus comparator 338 will assert a slow speed signal, a +5 VDC signal, to the inverting input of comparator 384.

The rise in the voltage presented to the inverting input of comparator 384 reduces the percent of time the voltage at that inverting input is greater than the output signal of oscillator 272 presented to the noninverting input. Thus, the percent of time comparator 384 asserts the drive signal to turn on FET 268 is reduced. In some preferred versions of the invention, the on duty cycle of FET 268, falls to approximately 70% of the period of the output signal from the oscillator 272. The increased off time of FET 268 causes power pack 222 to present a relatively low voltage signal, the low speed drive signal, to the handpiece 22a. The potential of the drive signal actually presented to the motor 34 will, of course, be function of the position of spring 66 relative to resistor 68.

It should also be understood that speed regulator 270 also adjusts the on duty cycle of FET 268 as a function of the voltage across cells 252. As the voltage across the cells 252 drops owing to their discharge, the signal presented to the inverting input of comparator 384 through compensation resistor 388 drops. The drop in the level of this signal serves to cause the duty cycle with which the comparator asserts a positive-voltage signal to increase. Thus, as the potential across the cells 252 drops, the on duty cycle of FET 268 increases to ensure that a drive signal with a substantially constant voltage is presented to the handpiece 22a as long as the potential across the cells stays above a given minimum level.

Slow speed detector 274 also asserts the slow speed signal to speed regulator 270 whenever the voltage across the cells 252 drops below a select potential. More particularly, as result of the voltage drop across the cells 252, the signal presented to the inverting input of comparator 338, will

US 6,179,807 B1

19

drop. If the signal at this inverting input falls sufficiently, it will be below the signal present at the noninverting input. If this drop in relative signal strength occurs, comparator 338 will assert the slow speed signal even though the irrigator is set for fast speed operation. Should this occur, the low speed drive signal will be presented to the handpiece 22$a$ through conductor 60$a$. In one preferred version of the invention, the components forming the slow speed detector 274 are selected to cause the detector to assert the slow speed command signal when the potential across the cells falls below 7.4 VDC.

The power down circuit 276 inhibits operation of the power pack 222 when the potential across the cells 252 drops to a level below which further discharge might cause damage to the cells. More particularly, as long as the voltage across the cells 252 remains above a select level, the signal present at the noninverting input of comparator 364 will be above the voltage of the signal present at the inverting input. Comparator 364 will thus output a signal that will prevent forward biased current flow through diode 380. In some preferred versions of the invention, comparator will assert an output signal as long as the voltage across the cells 252 remains above approximately 6.0 VDC.

If, however, the voltage across cells 252 falls below the set value, the signal present at the noninverting input of comparator 364 will be less than the signal present at the inverting input. The output of comparator 364 will go to ground. Consequently, current will flow through diode 380 and a ground signal will thus be presented to the noninverting input of comparator 384 of speed regulator 270. Since the signal present at the inverting input of comparator 384 is a positive-voltage signal, the output of comparator 384 will likewise be at ground and hold FET 268 in the off state. The turning off of FET 268 prevents current flow from the power pack 222 to the handpiece 22$a$.

When the power pack 222 is placed back in its charger, the signal from rectifier 284 is applied to the noninverting input of comparator 364 through diode 370 and resistor 372. The signal from the rectifier 284 will be of sufficient potential to overcome the positive feedback that is supplied to the noninverting input through resistor 378. Thus, the signal from the rectifier 284 causes comparator 364 to again assert a positive-voltage signal.

Irrigator 220 has the same basic advantages as previously described irrigator 22. Irrigator 220 further includes a power pack 222 that can be used to energize the handpiece 22$a$. In some situations it may be more economical to provide this power pack 222 than a use-once battery pack.

Moreover, owing to the separation of power cable 224 from supply tube 28$a$, power pack 222 may be held outside of the sterile field in which the other components of the irrigator 220 are used. Thus, the power pack 222 need not be subjected to the sterilization practices used to sterilize medical instruments placed in the sterile field. This further serves to reduce the costs of supplying an energization current to the handpiece 22$a$ of irrigator 220 of this invention.

The power pack 222 itself is especially designed to facilitate its repetitive use. The circuitry internal to the power pack 222 ensures that, even when the handpieces 22$a$ with which it is used are operated at low speed, the cells 252 are evenly discharged. Consequently, the individual cells 252 do not develop separate internal electro-chemical "memories" regarding the magnitude of the charges they store. This ensures that when the power pack 222 is recharged, all the cells 252 will recharge to the greatest

20

extent possible. The full recharging of the cells 252 ensures the power pack 222 will, even after numerous rechargings, be able to deliver the potential required to operate the handpiece 22$a$ at high speed.

Also, the power pack 222 is configured so that when the charge falls, the width of the drive signal increases. Thus, the potential of the drive signal applied to the handpiece remains constant even though the voltage across the cells may be dropping. Since this potential does not vary for, a given trigger setting the discharge of fluid from the handpiece 22$a$ remains constant for a given trigger setting even as the potential across the cells 252 falls. The person using the irrigator 220 of this invention thus is not required to engage in real time adjustment of the trigger setting as a result of the discharge of the cells.

Moreover, once the potential across the cells 252 falls below a first level, slow speed detector 274 causes the power pack to produce low voltage drive signals to the handpiece 22$a$. This accomplishes two tasks. First, it conserves the charge stored in the power pack 222 to increase the period of time with which it can be used. Secondly, by preventing fast speed operation of the irrigator 220, it provides an indication to medical personnel that the power pack 222 will soon be discharged to the point where it can no longer supply an energization voltage to the handpiece 22$a$.

The power down circuit 276, as discussed above, prevents operation of the power pack when such operation could potentially cause damage to cells 252. Moreover, often after NiCad cells are discharged, the potential across the cells increases. Power down circuit 276 prevents reactivation of the power pack 222 when the cells 252 are in this state. Thus, power down circuit 276, inhibits the use the power pack 222 even though the real-time potential across the cells 252 provides an impression that they are storing enough charge to energize a handpiece 22$a$ for a significant period of time.

FIGS. 18 and 19 illustrate an alternative nozzle assembly 410 that can be fitted to the front end of discharge tube 32 of the tip assembly 30 of this invention. Nozzle assembly 410 includes a cylindrical base 412 that is secured over the open end of discharge tube 32. Base 412 has a front face 414 that is formed with a number of openings 416 through which the irrigating fluid is discharged. A post 418 extends forward from the center of face 414.

A rotating spray head 420 is secured to post 418. The spray head has a body formed out of a number of spaced apart shoulder sections 422. In preferred versions of the invention, the number of shoulder sections 422 equals the number of openings 416 formed in the base 412 of the nozzle assembly 410. The shoulder sections 422 are formed to have bottom surfaces 423 that extend diagonally outwardly from the center of the spray head 420. A nose 424 extends forward from the center of base where the shoulder sections 422 meet. In the illustrated version of the invention, nose 424 is formed with a slight outwardly projecting taper to facilitate the manual grasping and rotation of the spray head 420. The surface of the nose 424, however, does not subtend the spaces between the shoulder sections 422 through which the fluid stream flows.

Spray head 420 is formed with an axially extending bore 426 to facilitate the fitting of the spray head over post 418. The post 418 is formed with its own locking head 428, that is larger in diameter than the post itself, to hold the spray head 420 to the base 412. Nose 424 of the spray head 420 is formed with a counterbore 430 in which the locking head 428 of the post is seated. Typically, the spray head 420 is snap secured over post 418. While not illustrated, in some

US 6,179,807 B1

21

preferred version of the invention, locking head 428 and the portion of nose 424 that defines counterbore 430 are formed with interlocking teeth for holding the spray head in a specific position on the post 418.

A tip assembly 30 in which nozzle assembly 410 is installed is used like a standard tip assembly. When the medical personnel want a direct discharge of irrigating fluid onto a body site, spray head 420 is set on post 418 so that the interstitial spaces between the shoulder sections 422 are aligned with openings 416. When spray head 420 is so positioned, the irrigation fluid will be directly discharged onto the body site at which the tip assembly 30 is directed.

When diffused spray is desired, spray head 420 is reset so that shoulder sections 422 are aligned with openings 416. The fluid discharged through the openings thus strikes the base surfaces 423 of the shoulder sections and is diverted radially outwardly toward the surface of the splash shield 181 that define discharge chamber 210 (FIG. 10A.) The fluid is reflected off the splash shield 181 and flows towards the body site.

Tip assembly 30 with nozzle assembly 410 provides either a direct or diffused spray of irrigating fluid. This allows real time adjustment of the spray pattern without requiring medical personnel to change tip assemblies. Still another advantage of this version of tip assembly 30 is that since the tip assembly can be used to deliver irrigating fluid in two spray patterns, the need to keep two separate tip assemblies, that only differ by nozzle design, is eliminated.

Also, nozzle assembly 410 of this invention diffuses the discharged irrigation fluid after the fluid has already been discharged from the discharge tube 32. It does not impose a restriction on fluid flow while the irrigating fluid is in the discharge tube 32. Thus, nozzle assembly 410 of this invention, when employed to diffuse fluid flow, does not impose a pressure drop on the fluid as it is discharged which can adversely effect the efficiency of the pump 24

The foregoing description has been directed to several preferred embodiments of the invention. It should be clear that the structure of the invention may differ from what has been described. For example, there is no requirement that all versions of the invention employ the described tip lock;. Other versions of the invention may employ other tip locks and even other tip assemblies. Also, there is no requirement that handpiece 22 be manufactured out of two opposed shells. In some versions of the invention, the handpiece may consist of a single piece housing that is formed with a channel in which the drain tube 50 is fitted. In these, as well as other versions of the invention, it may be desirable to employ other means to secure the drain tube in the housing. For example, it may be desirable to employ an adhesive to bond the drain tube to a wall internal to the housing that forms the channel in which the drain tube is seated.

It should likewise be understood that not all versions of the handpiece of this invention may include pumps and complementary motors for providing the discharge force for the fluid pulses. In some versions of the invention, the fluid may actually be pumped from a pump that is separate from the handpiece. In these versions of the invention, supply tube 28 or some conduit connected to supply tube 28 may be connected directly to the discharge head of the handpiece.

Furthermore, in versions of the invention in which the on/off and speed control is employed, the trigger structure may be different from what has been described. In some versions of the invention, the trigger may be a press-button that is normally biased to hold the complementary wiper in the off state. Alternatively, the trigger may be a component

22

that is integrally formed with the body handpiece. In these versions of the invention, the trigger may be a cantilever arm that is integrally molded as part of the body of the handpiece. This arm would be connected to the wiper so that movement of the arm would result in displacement of the wiper. In these versions of the invention, owing to the molding of the cantilever arm, when the arm is its normal, static state it would hold the wiper in off position. The application of manual force to deflect the arm would move the wiper to position in which the wiper would electrically connect the motor to the batteries or power pack.

Also, the tip assembly may be structurally different from what has been described. For instance, in some version of the invention, discharge tube 32 may be provided with an outwardly extending ring that forms a seal with the splash shield 181 and suction tube 48 is formed with an annular groove in which a complementary seal integral with the splash shield seats. It should further be recognized that some tip assemblies may not even have suction tubes. Alternative nozzles may also be provided. For example, the nozzle may be integrally formed with the discharge tube. Also, while the necks of the discharge tube and suction tube are shown as being separated from the bodies of these tube by distinct steps, that need not always be the case.

Moreover, in some versions of the invention, it may be desirable to mount a slidable splash shield to the tip assembly. Typically, but not always, these tip assemblies do will not include a suction tube. In these versions of the invention, the splash shield will move along the length of the discharge tube. An O-ring may be mounted in the portion of the splash shield seated around the discharge tube to prevent back leakage of irrigating fluid.

Also, it may be desirable to provide some sort of locking mechanism to hold the splash shield to the rest of the tip assembly. For example, the opposed surfaces of the splash shield 181 that form slit 183 can be provided with a complementary boss-in-bore that form a snap lock. Also, the channels 215 may not be required. In the place of the channels, small bores may be formed in the portion of the spray shield 181 that define discharge chamber 210. Furthermore different constructions of the adjustable nozzle are possible. In some nozzles constructed according to this invention, it may be possible to set the rotating spray head to an intermediate position in which it deflects only a fraction of the fluid stream discharged out of the fixed base of the nozzle.

Also, while one particular trigger assembly for regulating the potential of the drive signal applied to the motor 34 has been disclosed, it should be clear that others may be employed. Thus, in some versions of the invention, resistor 68 may be eliminated. In these versions of the invention, the number of different speeds at which the irrigator would operate would be a function of the number of separate power conductors tied from the battery pack or rechargeable power pack to the handpiece. If, for example, there were three power conductors, than the irrigator would only operate at three speeds. In the power pack employed with these versions of the invention, the necessary modifications would have to be made to its internal regulator to determine through which of the three conductors there was current flow. It would similarly be necessary to design the speed regulator to ensure that it could cause three different PWM drive signals to be produced.

Alternative constructions of the trigger assembly are also possible. The loop in the spring 66 may not always be necessary to define a pivot point for the spring. Still in other

US 6,179,807 B1

23

versions of the invention, other members may be employed as the wiper that provides contact at various positions along resistor **68** and with contact **70**. In most versions of the invention, it is contemplated that the wiper be formed of material that, in addition to being conductive, is also flexible.

Also, some trigger locks may be designed to hold the trigger in intermediate positions in addition to the position required for high speed operation.

It should similarly be recognized that the power pack may employ alternative circuitry for charging cells **252**. For example, it may desirable to build an alternative power pack with a plug that allows it to be coupled to a conventional 120 VAC wall outlet. In these versions of the invention, the power pack may then incorporate a step-down transformer to lower the AC signal to a level at which it can be rectified. Likewise, alternative circuitry for ensuring that the cells **252** are uniformly discharged and/or are not excessively discharged may be employed. For example, in some versions of the invention it may be desirable to provide a number of different voltage regulators to the power conductors for providing drive signals of different potentials. Alternatively, the power conductors may be connected to a switchable voltage regulator. In this version of the invention, the voltage produced by the regulator would be based on the determination of which power conductor was serving as the conduit over which the drive signal was being applied to the handpiece **22a**. Alternatively, zener diodes may be used to set the voltage of the drive signal applied to the handpiece **22a** from the power pack **222.**

Therefore, it is the object of the appended claims to cover all such modifications and variations as come within the true spirit and scope of the invention.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

**1**. A medical irrigator comprising:

a handpiece, said handpiece having: a body having a front end; a discharge head in the body that is directed toward the front end of the body through which fluid is discharged;

and a drain tube mounted in said body so as to have an open end adjacent the front end of said body; and

a tip assembly for connection to said handpiece, said tip assembly including: a discharge tube having a first neck that is seated in said discharge head; and a suction tube that is attached to said DRAIN tube, said suction tube having a second neck that is seated in said open end of said drain tube.

**2**. The irrigator of claim **1**, wherein said drain tube is a single-piece tube having a first section mounted in said body of said handpiece and a second section that extends beyond said handpiece for connection to an external suction unit.

**3**. The irrigator of claim **1**, further including a pump disposed in said handpiece wherein said pump forces fluid through said discharge head and said discharge tube.

**4**. An irrigating handpiece for use with a discharge tube, said irrigating handpiece comprising:

a body shaped to have a handgrip and a front end spaced from said handgrip, said front end formed with an opening for receiving the discharge tube;

an open-ended discharge head in said body from which irrigation fluid is discharged, said discharge head being located adjacent the front end of said body and being dimensioned to receive the discharge tube; and

a tip lock seated in said front end of said front end of said body, said tip lock having: a face plate located forward

24

of said discharge head, said face plate being positioned so that the discharge tube extends across said face plate; and a flexible biasing member extending between said face plate and said body for holding said face plate in a static position relative to said discharge tube so that when said face plate is so positioned, said face plate engages a complementary surface of the discharge tube.

**5**. The irrigation handpiece of claim **4**, wherein said face plate and said biasing member of said tip lock are integrally formed as a single unit.

**6**. The irrigation handpiece of claim **5**, wherein said biasing member is a spring arm.

**7**. The irrigation handpiece of claim **4**, further including a drain tube seated in said body that extends from said front end for receiving a suction tube.

**8**. The irrigation handpiece of claim **4**, further including a pump disposed in said body wherein said discharge head is part of said pump and said pump forces irrigation fluid through said discharge head.

**9**. An irrigating handpiece for receiving a tip assembly having a discharge tube and a suction tube, said irrigating handpiece comprising:

a body shaped to have a handgrip, a front end spaced from said handgrip, and a channel that extends from said front end towards said handgrip;

a discharge head fitted in said body, said discharge head having an opening to which the discharge tube is coupled and through which fluid is discharged into the discharge tube; and

a single-piece drain tube, said drain tube having a fist section that is disposed in said channel and that has an open end adjacent said front end of said body for receiving the suction tube and second section integral with said first section that extends out from said body.

**10**. The irrigating handpiece of claim **9**, wherein: said channel is contained within an opening formed in an outer surface of said body so that said first section of said drain tube is at least partially visible from outside of said body; and said drain tube is formed from transparent tubing.

**11**. The irrigating handpiece of claim **9**, wherein said body is formed from two shell sections and said first section of said drain tube is disposed between said shell sections.

**12**. The irrigating handpiece of claim **9**, wherein said channel extends at least partially through said handgrip of said body.

**13**. The irrigating handpiece of claim **9**, further including a tip lock movably secured to said front end of said body for removably securing the tip assembly to said handpiece.

**14**. A tip assembly for use with an irrigating handpiece, said tip assembly including:

an elongated discharge tube having a circular outer surface with an outer diameter, a front end, and a rear end opposite said front end;

a first neck integrally formed with said rear end so as to extend rearwardly therefrom;

an annular seal disposed over an outer surface of said first neck; and

a tab integrally formed with said discharge tube that extends away from said outer surface of said discharge tube, said tab being located adjacent said rear end of said discharge tube.

**15**. The tip assembly of claim **14**, further including a suction tube that is connected to said discharge tube by at least one web and that has a front end adjacent said front end of said discharge tube and a rear end adjacent said rear end of said discharge tube.

25

16. The tip assembly of claims **14**, further including a spray shield that is removably secured over said first end of said discharge tube and said first end of said suction tube.

17. The tip assembly of claim **15**, wherein said suction tube has an outer surface having a diameter, an inner wall having a diameter and a second neck that extends rearwardly from said rear end of said suction tube, said second neck having an outer surface with a diameter less than said diameter of said outer surface of said suction tube and an inner wall with a diameter equal to the diameter of the inner wall of said suction tube.

18. The irrigator of claim **1**, further including a lock assembly integral with said handpiece for releasably holding said tip assembly to said handpiece.

19. The irrigator of claim **1**, wherein said second neck has an outer surface and said drain tube and said suction tube are collectively dimensioned so that the outer surface of said second neck abuts an adjacent inner surface of said drain tube.

20. The irrigator of claim **19**, wherein the outer surface of the second neck of said suction tube has a tapered profile such that outer surface has small diameter adjacent an open rear end of said suction tube and an increasing diameter distal from the open rear end.

21. The irrigator of claim **20**, wherein said suction tube has a main portion located forward of said second neck and said suction tube is shaped to have et constant inner diameter from the open end of said suction tube, through said second neck and through at least a section of said main portion adjacent said second neck.

22. The irrigator of claim **1**, further including a supply tube that is connected to said handpiece and that is in fluid communication with said discharge head through which the fluid is supplied to said discharge head.

23. A medical irrigator comprising:

a handpiece, said handpiece including: a body having a front end; a discharge head through which irrigation fluid flows, said discharge head having an opening adjacent the front end of the body through which the irrigation fluid is discharged; and a drain tube mounted in said body through which a suction is drawn, the drain tube having an open front end located adjacent the opening of said discharge head; and

a tip assembly, said tip assembly having: a discharge tube with an open rear end, the rear end of said discharge tube being seated in the opening of said discharge head so that irrigation fluid flows directly from the discharge head into the discharge tube; and a suction tube, said suction tube having an open rear end with a circumferentially extending outer surface, the rear end of said suction tube being seated in the front end of said drain tube and, said drain tube and said suction tube being collectively dimensioned so that the outer surface of the rear end of said suction tube abuts an adjacent inner surface of the front end of said drain tube.

24. The irrigator of claim **23**, further including a lock assembly integral with said handpiece for releasably holding said tip assembly to said handpiece.

25. The irrigator of claim **23**, wherein said drain tube is a single-piece tube having a first section mounted in said handpiece body and a second section that extends out of said handpiece body for connection to an external suction unit.

26. The irrigator of claim **23**, wherein said suction tube is formed to have a main body and a neck, said neck forms the rear end of said suction tube, said main body and said neck each have an outer diameter and an inner diameter and wherein the outer diameter of said neck is less

26

than the outer diameter of said main body and the inner diameter of said neck and the inner diameter of a section of said main body adjacent said neck are identical.

27. The irrigator of claim **26**, wherein the outer surface of the rear end of said suction tube has a tapered profile such that the outer diameter of the rear end of said suction tube increases distally from the opening in the rear end.

28. The irrigator of claim **23**, wherein: said suction tube is formed so as to have a main portion contiguous with the rear end; the rear end and said main portion of said suction tube each have an inner diameter; and the rear end and an adjacent section of the main portion of said suction tube have a constant inner diameter.

29. The irrigator of claim **23**, further including a supply tube that is connected to said handpiece and that is in fluid communication with said discharge head through which the irrigation fluid is supplied to said discharge head.

30. The irrigator of claim **23**, further including a pump disposed in said handpiece wherein, said pump forces the irrigation fluid through said discharge head and said discharge tube.

31. The irrigating handpiece of claim **4**, wherein said face plate is formed with an opening through which the drain tube extends and an edge surface of said face plate that defines the opening selectively engages the complementary surface of the drain tube.

32. The irrigating handpiece of claim **31**, wherein said face plate is formed so that the opening in said face plate is circumferentially enclosed by said face plate.

33. The irrigator of claim **4**, further including a supply tube that is connected to said handpiece and that is in fluid communication with said discharge head through which the irrigation fluid is supplied to said discharge head.

34. An irrigating handpiece for use with a discharge tube, said irrigating handpiece including:

a body, said body having a first end, the first end being formed with an opening in which the discharge tube is inserted;

a discharge head located in said body, said discharge head having an open end in said body adjacent the first end in which the discharge tube is received and through which irrigation fluid is discharged into the discharge tube; and

a tip lock mounted to said body, said tip lock including:

a lock plate having an engagement surface, said lock plate being movably mounted to the first end of said body so as to have a first position in which the engagement surface engages a complementary surface of the discharge tube to prevent release of the discharge tube and a second position in which the engagement surface is spaced from the discharge tube to allow release of the discharge tube;

a biasing member extending between said body and said lock plate for holding said lock plate in the fist position; and

a manually displaceable release button connected to said lock plate, said release button being connected to said lock plate so that displacement of said release button results in displacement of said lock plate from the first position to the second position.

35. The irrigating handpiece of claim **34**, wherein said lock plate, said biasing member and said release button of said tip assembly are formed as a one-piece component.

36. The irrigating handpiece of claim **34**, wherein said lock plate is shaped to define an opening through which the discharge tube is inserted and the engagement surface of said lock plate at least partially defines the opening.

US 6,179,807 B1

27 28

**37.** The irrigating handpiece of claim **36**, wherein said lock plate is formed so that the opening through which the discharge tube is inserted is circumferentially surrounded by said lock plate.

**38.** The irrigation handpiece of claim **34**, wherein said lock plate is shaped so that a surface opposite the engagement surface has a beveled profile.

**39.** The irrigating handpiece of claim **34**, wherein said release button is a plate that is integrally formed with said lock plate.

**40.** The irrigating handpiece of claim **34**, further including a drain tube mounted in said body for receiving a suction tube.

**41.** The irrigating handpiece of claim **34**, further including a supply tube that is connected to said handpiece and that is in fluid communication with said discharge head through which the irrigation fluid is supplied to said discharge head.

**42.** The irrigating handpiece of claim **34**, further including a pump disposed in said handpiece wherein, said pump forces the irrigation fluid through said discharge head and said discharge tube.

**43.** The irrigating handpiece of claim **9**, further including a supply tube that is connected to said body and that is in fluid communication with said discharge head through which the fluid is supplied to said discharge head.

**44.** The irrigating handpiece of claim **9**, further including a pump disposed in said body wherein, said pump forces the fluid through said discharge head and said discharge tube.

**45.** An irrigating handpiece for receiving a tip assembly having a discharge tube and a suction tube, said irrigating handpiece including:

a body at least partially shaped to form a handgrip and a front end for receiving the discharge tube and the suction tube;

a lock assembly mounted to the front end of said body for releasably securing the discharge tube and the suction tube to said body;

a discharge head disposed in said body, said discharge head having an open end adjacent the front end of the body for receiving the discharge tube wherein, said discharge head receives irrigation fluid and discharges the irrigation fluid through the open end into the discharge tube; and

a single piece drain tube, said drain tube having a first end mounted in said body and a second end integral with the first end that extends outside of and away from said body, the first end of said drain tube being adjacent the front end of said body and being in fluid communication with the suction tube.

**46.** The irrigating handpiece of claim **45**, wherein the first end of said single drain tube is positioned adjacent the front end of said body and has an opening for receiving the suction tube.

**47.** The irrigating handpiece of claim **45**, wherein: said body is formed to define a channel; and the first end of said drain tube is fitted in the channel.

**48.** The irrigating handpiece of claim **45**, wherein: said body is formed with an elongated opening; the first end of said drain tube is fitted in said body to be visible through the elongated opening; and said drain tube is formed from transparent tubing.

**49.** The irrigating handpiece of claim **48**, wherein the elongated opening and said drain tube extend at least partially through the handgrip of said body.

**50.** The irrigating handpiece of claim **45**, wherein said drain tube extends at least partially through the handgrip of said body.

**51.** The irrigating handpiece of claim **45**, further including a supply tube that is connected to said handpiece and that is in fluid communication with said discharge head through which the irrigation fluid is supplied to said discharge head.

**52.** The irrigating handpiece of claim **45**, further including a pump disposed in said handpiece wherein, said pump forces the irrigation fluid through said discharge head and said discharge tube.

**53.** The irrigating handpiece of claim **14**, wherein said tab is formed to have a tapered surface that faces towards the rear end of the discharge tube that extends away from the outer surface of the discharge tube towards the front end of the discharge tube and a stepped surface that faces towards the front end of the discharge tube that extends perpendicularly away from the adjacent outer surface of the discharge tube.

**54.** A tip assembly for use with an irrigating handpiece, said tip assembly including:

an elongated discharge tube having a front end, and a rear end opposite said front end;

a first neck integrally formed with the rear end of said discharge tube so as to extend rearwardly therefrom;

an elongated suction tube secured to said discharge tube, said suction tube having a front end adjacent the front end of said discharge tube and a rear end adjacent the rear end of said discharge tube, wherein the rear end of the suction tube has inner and outer diameters; and

a second neck integrally formed with the rear end of said suction tube so as to extend rearwardly therefrom, said second neck having a tapered profile so as to have an outer diameter that decreases rearwardly from the rear end of said suction tube and an open end wherein, said second neck has an inner diameter and the inner diameter of the rear end of said suction tube and of the inner diameter of said second neck are identical.

* * * * *

US007144383B2

(12) **United States Patent**

Arnett et al.

(10) Patent No.: **US 7,144,383 B2**

(45) Date of Patent: **\*Dec. 5, 2006**

(54) **SURGICAL/MEDICAL IRRIGATING HANDPIECE WITH VARIABLE SPEED PUMP, INTEGRATED SUCTION AND BATTERY PACK**

(75) Inventors: **Jeffery D. Arnett**, Kalamazoo, MI (US); **Nicholas V Gately**, Portage, MI (US); **David H. Grulke**, Battle Creek, MI (US); **Ruth A. Hilsbos**, Saline, MI (US); **James L Sertic**, Kalamazoo, MI (US)

(73) Assignee: **Stryker Corporation**, Kalamazoo, MI (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/838,890**

(22) Filed: **May 4, 2004**

(65) **Prior Publication Data**

US 2004/0210186 A1 Oct. 21, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/460,705, filed on Dec. 14, 1999, now Pat. No. 6,746,419, which is a continuation of application No. 09/009,657, filed on Jan. 20, 1998, now Pat. No. 6,022,329, which is a continuation of application No. 08/559,133, filed on Nov. 17, 1995, now Pat. No. 5,718,668, which is a continuation of application No. 08/049,144, filed on Apr. 19, 1993, now Pat. No. 5,470,305.

(51) Int. Cl.
*A61M 3/00* (2006.01)
*A61M 3/02* (2006.01)

(52) U.S. Cl. ........................ **604/35**; 604/153; 604/246; 604/902; 601/155; 601/161

(58) Field of Classification Search ................ 601/155, 601/154, 160–165; 604/153, 246, 631, 902, 604/19, 28, 30–35, 119; 239/93, 320, 239, 239/263.1, 526
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 509,220 A | 11/1893 | Gustafson |
| 602,666 A | 4/1898 | Schroeder |
| 738,503 A | 9/1903 | Waters |
| 790,353 A | 5/1905 | Estlingen |
| 1,317,851 A | 10/1919 | Arnett |
| 1,503,279 A | 7/1924 | Nixon |
| 1,538,007 A | 5/1925 | Schellin |
| 1,846,596 A | 2/1932 | Hertzberg |

(Continued)

FOREIGN PATENT DOCUMENTS

DE 24 16 099 4/1975

(Continued)

OTHER PUBLICATIONS

Copy of Ethicon, Pfizer/Valley Lab and Bard/Davol photos (10 photos) Jun. 25, 1993.

(Continued)

*Primary Examiner*—Danton DeMille

(57) **ABSTRACT**

A medical/surgical irrigating handpiece with both a discharge line through which fluid is applied to the site and a suction line through which the discharge fluid is drawn away. The handpiece has a variable speed pulse pump. A single, variable-speed motor actuates the pump to regulate the pumping rate. Power to actuate the motor comes from a battery pack that remote to the handpiece. A control mechanism attached to the handpiece regulates the energization signal applied to the motor so as to regulate motor speed.

**46 Claims, 17 Drawing Sheets**



## US 7,144,383 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 2,012,886 A | 8/1935 | Lowry | 3,993,054 A | 11/1976 | Newman |
| 2,112,629 A | 3/1938 | Lloyd | 4,007,739 A | 2/1977 | Bron et al. |
| 2,139,653 A | 12/1938 | Belfrage | 4,030,495 A | 6/1977 | Virag |
| 2,197,995 A | 4/1940 | Crowley | 4,030,498 A | 6/1977 | Tompkins |
| 2,243,285 A | 5/1941 | Pope | 4,061,142 A | 12/1977 | Tuttle |
| 2,243,299 A | 5/1941 | Travers | 4,099,527 A | 7/1978 | Howell |
| 2,494,088 A | 1/1950 | Dulity | 4,111,391 A | 9/1978 | Pilolla |
| 2,531,793 A | 11/1950 | Sulek | 4,123,091 A | 10/1978 | Cosentino et al. |
| 2,595,491 A | 5/1952 | Schweikert | 4,205,676 A | 6/1980 | Humphrey et al. |
| 2,634,885 A | 4/1953 | North | 4,215,476 A | 8/1980 | Armstrong |
| 2,662,485 A | 12/1953 | Ilfrey | 4,236,889 A  * | 12/1980 | Wright ........................ 433/86 |
| 2,684,049 A | 7/1954 | Hollis | 4,248,589 A | 2/1981 | Lewis |
| 2,727,678 A | 12/1955 | Henderson | 4,250,872 A | 2/1981 | Tamari |
| 2,733,713 A | 2/1956 | Kabnick | 4,257,416 A | 3/1981 | Prager |
| 2,781,154 A | 2/1957 | Meredith | 4,267,947 A | 5/1981 | Wasserstrom |
| 2,802,466 A | 8/1957 | Thomas | 4,275,726 A | 6/1981 | Schael |
| 2,847,007 A | 8/1958 | Fox | 4,276,023 A | 6/1981 | Phillips et al. |
| 2,874,696 A | 2/1959 | Bried | 4,278,078 A | 7/1981 | Smith |
| 2,908,273 A | 10/1959 | Huston | 4,282,867 A | 8/1981 | Du Toit |
| 2,993,654 A | 7/1961 | Norton | 4,289,158 A | 9/1981 | Nehring |
| 3,001,288 A | 9/1961 | Freedman | 4,290,454 A | 9/1981 | Shetler |
| 3,014,623 A | 12/1961 | Horn et al. | 4,294,251 A | 10/1981 | Greenwald et al. |
| 3,039,272 A | 6/1962 | Frick | 4,300,748 A | 11/1981 | Kreeley |
| 3,044,465 A | 7/1962 | Anderson et al. | 4,301,971 A  * | 11/1981 | Cornelius et al. ........... 239/351 |
| 3,048,121 A | 8/1962 | Sheesley | 4,313,699 A | 2/1982 | Steele |
| 3,065,749 A | 11/1962 | Brass | 4,314,560 A | 2/1982 | Helfgott et al. |
| 3,070,089 A | 12/1962 | Dick | 4,346,869 A | 8/1982 | MacNeill |
| 3,135,259 A | 6/1964 | Evans | 4,350,477 A | 9/1982 | Mazal |
| 3,208,145 A | 9/1965 | Turner | 4,395,205 A | 7/1983 | McCullough |
| 3,227,158 A | 1/1966 | Mattingly | 4,424,010 A | 1/1984 | McCullough |
| 3,237,306 A | 3/1966 | Staunt | 4,424,055 A | 1/1984 | Herman |
| 3,263,618 A | 8/1966 | Carpenter | 4,428,345 A | 1/1984 | Bertsch et al. |
| 3,295,371 A | 1/1967 | Smith | 4,428,748 A | 1/1984 | Peyman et al. |
| 3,316,845 A | 5/1967 | Schumann | 4,436,495 A | 3/1984 | McCullough |
| 3,353,537 A | 11/1967 | Knox et al. | 4,445,819 A | 5/1984 | Walling |
| 3,359,909 A | 12/1967 | Johnson et al. | 4,449,827 A | 5/1984 | Karkiewicz |
| 3,393,673 A | 7/1968 | Mattingly | 4,451,069 A | 5/1984 | Melone |
| 3,416,567 A | 12/1968 | VonDardel et al. | 4,460,358 A | 7/1984 | Somerville et al. |
| 3,425,410 A | 2/1969 | Cammack | 4,468,221 A | 8/1984 | Mayfield |
| 3,426,743 A | 6/1969 | Chesnut et al. | 4,472,120 A | 9/1984 | McCullough |
| 3,448,766 A | 6/1969 | Schuele | 4,482,345 A | 11/1984 | Chow et al. |
| 3,452,746 A | 7/1969 | Shanhouse | 4,484,769 A | 11/1984 | Lacey |
| 3,484,121 A | 12/1969 | Quinton | 4,489,750 A | 12/1984 | Nehring |
| 3,508,546 A | 4/1970 | Rogers et al. | 4,493,694 A | 1/1985 | Wuchinich |
| 3,515,130 A | 6/1970 | Tsujino | 4,502,502 A | 3/1985 | Krug |
| 3,561,433 A | 2/1971 | Kovach | 4,508,532 A | 4/1985 | Drews et al. |
| 3,601,164 A | 8/1971 | Bruce | 4,509,507 A | 4/1985 | Yabe |
| 3,605,556 A | 9/1971 | Erdmann | 4,512,066 A | 4/1985 | McCullough |
| 3,635,607 A | 1/1972 | Grise | 4,515,532 A | 5/1985 | Walling |
| 3,653,377 A | 4/1972 | Rebold | 4,519,385 A | 5/1985 | Atkinson et al. |
| 3,702,141 A | 11/1972 | Wetterhorn | 4,526,573 A | 7/1985 | Lester et al. |
| 3,703,170 A  * | 11/1972 | Ryckman, Jr. .............. 601/162 | 4,534,758 A | 8/1985 | Akers et al. |
| 3,713,533 A | 1/1973 | Reimels | 4,535,773 A | 8/1985 | Yoon |
| 3,731,411 A | 5/1973 | Barber et al. | 4,537,182 A | 8/1985 | Otani |
| 3,731,676 A | 5/1973 | Rebold | 4,537,209 A | 8/1985 | Sasa |
| 3,749,090 A | 7/1973 | Stewart | D281,535 S | 11/1985 | Atkinson et al. |
| 3,762,411 A | 10/1973 | Lloyd et al. | 4,552,130 A | 11/1985 | Kinoshita |
| 3,765,802 A | 10/1973 | Leitermann et al. | 4,553,957 A | 11/1985 | Williams et al. |
| 3,768,472 A | 10/1973 | Hodosh et al. | 4,561,431 A | 12/1985 | Atkinson |
| 3,771,522 A | 11/1973 | Waysilk et al. | 4,561,856 A | 12/1985 | Cochran |
| 3,784,235 A | 1/1974 | Kessler et al. | 4,580,816 A | 4/1986 | Campbell et al. |
| 3,794,031 A | 2/1974 | Bloom | 4,583,531 A | 4/1986 | Mattchen |
| 3,853,245 A | 12/1974 | Branch | 4,592,749 A | 6/1986 | Ebling et al. |
| 3,861,383 A | 1/1975 | Kovach | 4,596,558 A | 6/1986 | Smith et al. |
| 3,883,074 A | 5/1975 | Lambert | 4,601,710 A | 7/1986 | Moll |
| 3,889,675 A | 6/1975 | Stewart | 4,604,089 A | 8/1986 | Santangelo et al. |
| 3,895,741 A | 7/1975 | Nugent | 4,621,770 A | 11/1986 | Sayen |
| 3,949,753 A | 4/1976 | Dockhorn | 4,634,420 A | 1/1987 | Spinosa et al. |
| 3,965,934 A | 6/1976 | Rosenberg | 4,635,621 A | 1/1987 | Atkinson |
| 3,982,540 A | 9/1976 | Ross | 4,647,738 A | 3/1987 | Diamond |
| 3,986,266 A | 10/1976 | Vellender | 4,655,197 A | 4/1987 | Atkinson |
| | | | 4,655,744 A | 4/1987 | Thistle et al. |
| | | | 4,655,752 A | 4/1987 | Honkanen et al. |

US 7,144,383 B2

Page 3

| | | |
|---|---|---|
| 4,655,754 A | 4/1987 | Richmond |
| 4,655,765 A | 4/1987 | Swift |
| 4,662,829 A | 5/1987 | Nehring |
| 4,667,655 A | 5/1987 | Ogiu et al. |
| 4,692,140 A | 9/1987 | Olson |
| 4,696,669 A | 9/1987 | Menhusen |
| 4,705,500 A | 11/1987 | Reimels et al. |
| 4,741,678 A | 5/1988 | Nehring |
| 4,748,970 A | 6/1988 | Nakajima |
| 4,759,349 A | 7/1988 | Betz et al. |
| 4,764,165 A | 8/1988 | Reimels et al. |
| 4,765,165 A | 8/1988 | Reimels et al. |
| 4,765,588 A | 8/1988 | Atkinson |
| 4,776,840 A | 10/1988 | Freitas et al. |
| 4,799,481 A | 1/1989 | Transue et al. |
| 4,817,599 A | 4/1989 | Drews |
| 4,857,068 A | 8/1989 | Kahn |
| 4,872,837 A | 10/1989 | Issalene et al. |
| 4,892,469 A | 1/1990 | McCullough et al. |
| 4,911,621 A | 3/1990 | McCullough et al. |
| 4,925,450 A | 5/1990 | Imonti et al. |
| 4,927,340 A | 5/1990 | McCullough |
| 4,935,005 A | 6/1990 | Haines |
| 4,941,872 A | 7/1990 | Felix et al. |
| 4,957,483 A | 9/1990 | Gonser et al. |
| 4,978,282 A | 12/1990 | Fu et al. |
| 4,982,739 A | 1/1991 | Hemstreet et al. |
| 5,019,038 A | 5/1991 | Linden |
| 5,037,431 A | 8/1991 | Summers et al. |
| 5,046,486 A | 9/1991 | Grulke et al. |
| 5,049,071 A | 9/1991 | Davis et al. |
| 5,053,002 A | 10/1991 | Barlow |
| 5,054,947 A | 10/1991 | Frank et al. |
| 5,057,015 A | 10/1991 | Fleer |
| 5,098,387 A | 3/1992 | Wiest et al. |
| 5,098,405 A | 3/1992 | Peterson et al. |
| 5,100,058 A | 3/1992 | Wei |
| 5,120,305 A | 6/1992 | Boehringer et al. |
| 5,142,723 A | 9/1992 | Lustig |
| 5,147,292 A | 9/1992 | Kullas et al. |
| 5,170,779 A | 12/1992 | Ginsberg |
| 5,176,629 A | 1/1993 | Kullas et al. |
| 5,186,714 A | 2/1993 | Boudreault et al. |
| 5,188,591 A | 2/1993 | Dorsey, III |
| 5,195,958 A | 3/1993 | Phillips |
| 5,195,959 A | 3/1993 | Smith |
| 5,197,460 A | 3/1993 | Ito |
| 5,203,769 A | 4/1993 | Clement et al. |
| 5,224,929 A | 7/1993 | Remiszewski |
| 5,244,459 A | 9/1993 | Hill |
| 5,261,905 A | 11/1993 | Doresey, III |
| 5,269,750 A | 12/1993 | Grulke et al. |
| 5,281,214 A | 1/1994 | Wilkins et al. |
| 5,295,956 A | 3/1994 | Bales et al. |
| 5,303,735 A | 4/1994 | Cerola et al. |
| 5,305,735 A | 4/1994 | Welden |
| 5,322,503 A | 6/1994 | Desai |
| 5,322,506 A | 6/1994 | Kullas |
| 5,333,603 A | 8/1994 | Schuman |
| 5,334,140 A | 8/1994 | Phillips |
| 5,336,238 A | 8/1994 | Holmes et al. |
| 5,348,555 A | 9/1994 | Zinmanti |
| 5,380,277 A | 1/1995 | Phillips |
| 5,388,612 A | 2/1995 | Cerola et al. |
| 5,391,145 A | 2/1995 | Dorsey |
| D358,200 S | 5/1995 | Cerola |
| 5,431,676 A | 7/1995 | Dubrul et al. |
| 5,447,494 A | 9/1995 | Dorsey, III |
| 5,449,357 A | 9/1995 | Zinmanti |
| 5,470,305 A | 11/1995 | Arnett et al. |
| 5,484,402 A | 1/1996 | Saravia et al. |
| 5,487,649 A | 1/1996 | Dorsey, III et al. |
| 5,514,089 A | 5/1996 | Walbrink et al. |
| 5,522,796 A | 6/1996 | Dorsey, III |
| 5,562,640 A | 10/1996 | McCabe et al. |
| 5,573,504 A | 11/1996 | Dorsey, III |
| 5,578,000 A | 11/1996 | Greff et al. |
| 5,586,977 A | 12/1996 | Dorsey, III |
| 5,607,391 A | 3/1997 | Klinger et al. |
| 5,609,573 A | 3/1997 | Sandock |
| D385,889 S | 11/1997 | Kullas et al. |
| 5,707,351 A | 1/1998 | Dorsey, III |
| 5,718,668 A | 2/1998 | Arnett et al. |
| 5,746,721 A | 5/1998 | Pasch et al. |
| 5,792,098 A | 8/1998 | Felix et al. |
| 5,792,108 A | 8/1998 | Felix et al. |
| 5,807,313 A | 9/1998 | Delk et al. |
| 5,810,770 A | 9/1998 | Chin et al. |
| 5,827,218 A | 10/1998 | Nguyen et al. |
| 5,924,448 A | 7/1999 | West |
| 5,941,851 A | 8/1999 | Coffey et al. |
| 6,022,329 A | 2/2000 | Arnett et al. |
| 6,059,754 A | 5/2000 | Pasch et al. |
| 6,095,772 A | 8/2000 | Ramey et al. |
| 6,099,494 A | 8/2000 | Henniges et al. |
| 6,106,494 A | 8/2000 | Saravia et al. |
| 6,156,004 A | 12/2000 | Tremaine et al. |
| 6,162,194 A | 12/2000 | Shipp |
| 6,176,847 B1 | 1/2001 | Humphreys, Jr. et al. |
| 6,179,807 B1 | 1/2001 | Henniges et al. |
| 6,200,292 B1 | 3/2001 | French et al. |
| 6,213,970 B1 | 4/2001 | Nelson et al. |
| 6,352,527 B1 | 3/2002 | Henniges et al. |
| 6,358,224 B1 | 3/2002 | Tims et al. |
| 6,371,934 B1 | 4/2002 | Jackson et al. |
| 6,394,996 B1 | 5/2002 | Lawrence et al. |
| 6,471,668 B1 | 10/2002 | Henniges et al. |
| 6,485,452 B1 | 11/2002 | French et al. |
| 6,623,445 B1 | 9/2003 | Nelson et al. |
| 6,626,827 B1 | 9/2003 | Felix et al. |
| 6,685,667 B1 | 2/2004 | Delk et al. |
| 2001/0025160 A1 | 9/2001 | Felix et al. |
| 2002/0082557 A1 | 6/2002 | Jackson et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 258 901 | 3/1988 |
| FR | 1 325 670 | 3/1963 |
| GB | 1 264 138 | 2/1972 |
| GB | 2 063 674 A | 6/1981 |
| WO | WO81/01794 | 7/1981 |
| WO | WO81/02335 | 8/1981 |
| WO | WO85/03982 | 9/1985 |
| WO | WO86/04247 | 8/1986 |
| WO | WO91/12830 | 9/1991 |
| WO | WO92/21388 | 12/1992 |
| WO | WO93/17733 | 9/1993 |
| WO | WO94/13335 | 6/1994 |
| WO | WO94/19030 | 9/1994 |
| WO | WO94/23773 | 10/1994 |

OTHER PUBLICATIONS

KLI DeCherney Hysteroscopy Pump believed published before Apr. 19, 1993.

Marlow—Unique Products for Advanced Operative Laparoscopy 790—5M.

Select One—™ Minimal Access Surgery System, Introducing theVAC—™ Handcontrolled Suction Irrigation Instrument, ConMed Aspen Surgical Systems, Conmed Jul. 1992, 10M.

Select One—™ Minimal Access Surgery System, The Modular Instrument System for Surgical Endoscopy, SelectOne System by ConMed, Aspen Surgical Systems believed published before Apr. 19, 1993.

Davol—Endo-Flo™ Irrigator, Bard, Davol Inc.; instruction booklet # 041002-0, 9011R, Nov. 1990.

Count On US (Introducing Over 100 Precision Crafted Quality Endosurgery Instruments), Davis+Geck, 1993.
Essar® Suction Irrigator, Why do I need the *Essar* Suction Irrigator? Stewart Research, Inc. believed published before Apr. 19, 1993.
"Simultaneous pulsatile lavage and/or irrigation with suction . . .", Pulsatile Lavage Debridement System, brochure No. 82-010-5150-0146/2.5M CISS Zimmer, Inc., Snyder Labs Inc, 1982.
Nezhat-Dorsey™ Hydro-Dissection™ Information Booklet Installation/Operating Instructions for "Quick-Disconnect" Probe Tips (2 sheets) believed published before Apr. 19, 1993.
Suction/Irrigator Is No Longer An Issue, Hydro-Dissection System, 556529 PP ICM Jul. 1992, Karl Stroz Gmbh & Co. Tuttlengen, West Germany.
A Fully Integrated Laparoscopic Irrigation and Instrumentation System, Cabot Medical, Langhorne, PA Apr. 1992, 10M, L/T (4 sheets).
Advances In Pelviscopy, The Irrigation Pump System, Cabot Medical, Langhorne, PA Apr. 1990 (3 sheets).
InteliJET™, Fluid Management System User' Manual, Smith & Nephew Dyonics Inc., copyright 1992, PN1060170.
Davol, Arthro-Flo® , Instructions For Use, 038657-0 901R C.R. Bard, Inc. Cranston RI, Jan. 1990.
Davol, Arthro-Flo High-Flo Irrigator, Bard, OP-AF0015000 Aug. 1992 5M C.R. Bard Inc. Cranston, RI.
3M Fluid Control System, For Precise Control of all Arthroscopic Procedures, 70-2008-5458-9, 1992 3M.
Davol, Instructions for Use, Simpulse—™ Suction/Irrigator, BARD, 034089-0 (2 sheets) Jan. 1985.
"Introducing the multi-functional instrument for virtually every laparoscopic case", USSC, Auto Suture Company, Copyright 1992, 556529 pp. 10M Jul. 1992.
Davol's Answers to Plaintiff's First Set of Interrogatories dated Jan. 7, 1996.
Davol's Supplemental Answers to Plaintiff's First Set of Interrogatories dated Feb. 14, 1997.
Deposition of Roger E. Darois, pp. 1-177, with index pp. 1-19 and correction and signature papers 1-3, dated May 7, 1997.

Rule 26(a) (2) Expert Report of Dr. Harrith M: Hasson Relating to Davol's Defenses to Stryker's Infringement Claims Under the '402 Patent dated Oct. 29, 1997 including Exhibits A-D.
Rule 26 (a) (2) Expert Report of Roger E. Daris Relating to Davol's Defenses to Styrker's Infringment Claims Under the '402 Patent dated Oct. 30, 1997 including exhibits A-D.
Rule 26 (a) (2) Rebuttal Expert Report of Dr. Harrith M. Hasson, M.D. Relating to Stryker's Infringement of United States Patent No. 5 391 145 and United States Patent No. 5 586 977, dated Dec. 8, 1997.
Deposition of Harrith M. Hasson, pp.1-281 with index pages 1-32 dated Feb. 13, 1998.
Davol's Supplemental Answers to Plaintiff's First Set of Interrogatories dated Feb. 14, 1997.
Ruling on Claim Construction Disputes dated Apr. 24, 1998.
Trial-vol. IV. IV, Nov. 17, 1998: (Hope-Cross; Darois-direct, voir dire, Cross) multi-channel fiber-optic rotary multipage 35-43 (actual pp. 524-785).
Trial-vol. V, Nov. 18, 1998 (Darois-direct) multipage 623-785; actual pp. 3-44.
Memorandum Opinion and Order Denying Motion for Judgment as a Matter of Law dated May 26, 1999.
Arthur D. Little (Tsals) Dec. 8, 1992 letter to Davol.
Bard (Brad Cilley) Oct. 16, 1992 fax to John Skreenock.
Arthur D. Little (Tsals) Nov. 12, 1992 fax to John Skreenock (Davol).
Arthur D. Little (Tsals) Dec. 17, 1992 letter to John Skreenock.
Arthur D. Little (Tsals) Jan. 28, 1993 letter to John Skreenock.
Saline Pump Development Program, Davol Inc., Jan. 18, 1993, Cambridge, MA.
Teltech Nov. 2, 1992 search for John Skreenock re Scroll Pumps.
Arthur D. Little (Sword) Sep. 8, 1992 letter to Albert Solis.
Davol (Silva) Jan. 4, 1993 letter to Arthur D. Little.
Saline Scroll Pump Development Program.
Scroll Technology in Medical Products.

* cited by examiner

Case: 13-1668 Case: PARTICIPANTS ONLY Document: 239.8 Filed: 01/22/2014



FIG.1



FIG. 2

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 24 18 Filed: 01/22/2014 Page: 241 Filed: 01/22/2014



FIG.4

FIG.3



FIG.4B

FIG.4C

FIG.4A

FIG. 5



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 4 Page: 244 Filed: 01/22/2014 Page: 244 Filed: 01/22/2014



FIG.7

FIG.6

FIG.13

FIG.9

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 24-18 Page: 245 Filed: 01/22/2014



FIG. 8



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 247 Filed: 01/22/2014





FIG.16

FIG.17



Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 250 Filed: 01/22/2014



FIG. 18C

Case: 13-1668 CASE PARTICIPANTS ONLY Document: 18 Page: 251 Filed: 01/22/2014



FIG. 20



FIG. 21



A386

Case: 13-1668 Case: 13-668 PARTICIPANTS ONLY Document: 253 8 Page: 253 Filed: 01/22/2014 Filed: 01/22/2014



FIG. 22A





FIG. 23A

FIG. 23B

US 7,144,383 B2

**1**

## SURGICAL/MEDICAL IRRIGATING HANDPIECE WITH VARIABLE SPEED PUMP, INTEGRATED SUCTION AND BATTERY PACK

This is a continuation of Ser. No. 09/460,705, filed Dec. 14, 1999, now U.S. Pat. No. 6,746,419, which is a continuation of Ser. No. 09/009,657, filed Jan. 20, 1998, now U.S. Pat. No. 6,022,329, issued Feb. 8, 2000 which is a continuation of Ser. No. 08/559,133, filed Nov. 17, 1995, now U.S. Pat. No. 5,718,668, issued Feb. 17, 1998 which is a continuation of Ser. No. 08/049,144, filed Apr. 19, 1993, now U.S. Pat. No. 5,470,305.

### FIELD OF THE INVENTION

This invention relates to a surgical irrigation with a built in pulsing pump.

### BACKGROUND OF THE INVENTION

Grulke et al U.S. Pat. No. 5,046,486, assigned to the Assignee of the present invention, discloses a surgical pulsed irrigation handpiece which produces a pulsed irrigation liquid output capable of loosening and floating debris at a surgical site for subsequent removal (as by suction). This prior irrigation handpiece has been on the market for several years and has proved generally effective for its intended use and hence has been popular in the surgical community.

However, in a continuing effort to improve on existing devices of this general kind, the present invention has been developed. As compared to the above-mentioned prior device, a pulsed irrigation handpiece embodying the present invention is producible at lower cost, produces sharper liquid pulse transients (particularly the pulse "off" transient), requires no connection to any operating room power source (e.g. compressed air) or to an external pump, and instead is self-contained, requires only external connection to a irrigation liquid source (e.g. conventional irrigation liquid bag), provides better suction (when suction is required), is more compact, and is conveniently shaped to be held either as a pistol or a wand (by the handle or barrel).

Other objects, purposes and advantages of the invention will be apparent to those acquainted with apparatus of general kind upon reading the following description and inspecting the accompanying drawings.

### SUMMARY OF THE INVENTION

A pulsed irrigation handpiece comprises pulsed irrigation liquid outlet means for applying liquid pulses to a surgical site, pump means reciprocatingly drivable for pumping pulses of irrigation liquid through said outlet means, powered drive means for reciprocatingly driving said pump means and housing means containing said pump means and drive means.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a pictorial view of a handpiece embodying the invention.

FIG. **2** is a laterally exploded pictorial view of the FIG. **1** handpiece.

FIG. **3** is an enlarged elevational view of the FIG. **1** handpiece with the leftward housing part removed.

**2**

FIG. **4** is a view similar to FIG. **3** but with the suction hose removed, the left drive unit shell part removed and the drive unit exposed in central cross-section, such that FIG. **4** approximates a central cross-sectional view of the FIG. **1** handpiece.

FIG. **4A** is an enlarged fragment of FIG. **4** detailing the rearward portion of the handle.

FIG. **4B** is an enlarged fragmentary pictorial view, taken from the front, of the electrical contact support posts seen in FIG. **4A**.

FIG. **4C** is an enlarged fragmentary exploded pictorial view of the electrical contacts, associated with the FIG. **4B** posts and associated electrical conductors from the battery supply.

FIG. **5** is an enlarged, exploded, pictorial view of the drive unit of FIG. **2**.

FIG. **6** is a sectional view substantially taken on the line **6—6** of FIG. **5**, and provides a top view of the bottom drive unit shell part of FIG. **5** (the rightward one of FIG. **2**) with the drive components removed to show the interior configuration of that shell part.

FIG. **7** is a sectional view substantially taken on the line **7—7** of FIG. **5**, and provides a view similar to FIG. **6** but showing the interior configuration of the other drive unit shell part (the upper one in FIG. **5** and leftward one in FIG. **2**).

FIG. **8** is an enlarged central cross-sectional view of a tip unit usable with the handpiece of FIG. **2** and showing same installed in a pump unit shown in central cross-section substantially as in FIG. **4**.

FIG. **8A** is a reduced size, fragmentary, side elevational view of the apparatus of FIG. **8**.

FIG. **8B** is a pictorial view of the apparatus of FIG. **8A**.

FIG. **9** is an end elevational view of the drive unit, taken from the right end in FIGS. **2** and **3**.

FIG. **10** is a sectional view substantially taken on the line **10—10** of FIG. **5** and showing the drive unit with one shell part (the left one in FIG. **2** and top one in FIG. **5**) removed to show the motor and transmission.

FIG. **11** is an elevational view of the drive train substantially taken on the line **11—11** of FIG. **10**.

FIG. **12** is a central cross-sectional view substantially taken on the line **12—12** of FIG. **10**.

FIG. **13** is a fragmentary cross-sectional view substantially taken on the line **13—13** of FIG. **10**.

FIG. **14** is a cross-sectional view substantially taken on the line **14—14** of FIG. **10**.

FIG. **15** is a sectional view substantially taken on the line **15—15** of FIG. **10**.

FIG. **16** is an exploded pictorial view of the pump unit of FIG. **2** in an enlarged scale.

FIG. **17** is a front end elevational view of the pump unit of FIG. **16** taken substantially from the left side of FIGS. **2–4** and **16**.

FIG. **18** is a central cross-sectional view of the pump unit of FIG. **17** taken substantially on the line **18—18** of FIG. **17**.

FIG. **18A** is a fragment of FIG. **18** showing the pump unit at the beginning of an intake stroke.

FIG. **18B** is a fragment of FIG. **18** showing the pump nearing the end of an output pulse.

FIG. **18C** is a fragmentary enlargement of FIG. **18** showing the valve member.

FIG. **19** is a fragmentary cross-sectional view showing the connection of the pump unit to the liquid supply hose.

FIG. **20** is a pictorial view of the electric power supply unit connected to the FIG. **2** handpiece.

US 7,144,383 B2

3

FIG. 21 is a left end view of the FIG. 20 electric power supply unit.

FIG. 22 is an exploded pictorial view of the electric power supply unit of FIG. 20.

FIG. 22A is an electrical schematic of the FIG. 2 handpiece and FIG. 20 electric power supply unit.

FIG. 23 is a central cross-sectional view taken substantially on the line 23—23 of FIG. 22.

FIG. 23A is an enlarged fragmentary pictorial view of the support structure for battery contacts at the forward (left in FIG. 23) end of the electric power supply casing.

FIG. 23B is an enlarged pictorial view similar to FIG. 23A but showing the support structure for battery contacts at the rearward (rightward in FIG. 23) end of the power supply casing.

FIG. 24 is a sectional view substantially taken on the line 24—24 of FIG. 22 and showing the electric power supply unit with its top cover removed.

FIG. 25 is a sectional view substantially taken on the line 25—25 of FIG. 22 and showing the underside of the cover of the power supply casing.

FIGS. 26, 27 and 28 are enlarged pictorial views of battery components of FIG. 22.

FIG. 29 is an enlarged fragmentary pictorial view of an embodiment of the liquid supply and electric wiring harness of the apparatus of FIGS. 2 and 20 but showing a modification in the attachment of the electrical and liquid handling components.

In the following detailed discussion the terms "up", "down", "right" and "left", and variations thereon, refer to structural elements in their positions in specified drawing figures.

## DETAILED DESCRIPTION

A pulsed irrigation handpiece 10 (FIGS. 1 and 2) embodying the invention comprises a hand-held housing 11 having a handle 12 and a barrel 13 which extends forward from the upper end of the handle 12 at about a 130° to 150° (here about 145°) angle thereto.

The housing 11 is hollow and, for convenience in assembling the handpiece 10, is constructed as laterally opposed concave left and right housing parts 14 and 15 (FIG. 2). The housing parts 14 and 15 are preferably molded rigid plastic elements held together rigidly by any convenient means, here comprising undercut snap fit tabs 16 protruding from the top and bottom edges of the right housing part 15 to snap over an interior edge flange (not shown) on the top and bottom edge of the left housing part 14. If desired, precise registry together of the two housing parts can be assisted by laterally projecting pins 20 distributed along the edges of one housing part (here the left housing part 14) piloted in holes 21 (FIG. 4) in the opposed edges of the other housing part (here 15). Upon completion of assembly of the handpiece 10, the two housing parts 14 and 15 may be adhesively bonded together. The handpiece is intended to be a disposable item and therefore access to the interior of the housing for purposes of repair is not needed.

Drive Unit

The drive unit 25 (FIGS. 2–15) is self contained in its own shell 26 (FIG. 2). For convenience in assembly, the shell 26 comprises two opposed concave shell parts 30 and 31 respectively disposed to the left and right in FIG. 2. The shell parts 30 and 31 are preferably of rigid molded plastics material. When the drive unit 25 has been assembled, as in FIGS. 2 and 9, the shell parts 30 and 31 are held fixedly together by any convenient means, here by resilient snap

4

connection of generally U-shaped clips 32, molded in spaced relation along the perimeter edge of the shell part 31 which overlap the perimeter edge of the shell part 30 and snap over tabs 33 protruding therefrom, as seen in FIGS. 5–7. Precise location of the shell parts 30 and 31 with respect to each other is assisted by locator pins 34 fixedly protruding from the shell part 31 and holes 35 in the opposed portions of the shell part 30.

A single conventional DC energizable electric motor 36 (FIGS. 4 and 5) is snugly housed in the space between the left and right (FIG. 2) shell parts at the rear (left in FIGS. 5–7, 10 and 12) thereof. The motor 36 is snugly axially located between the rear end wall and a transverse internal bulkhead 41 of the shell 26 (FIGS. 5–7, 10 and 12). The rear end wall 40 and bulkhead 41 have opposed parts in the left and right shell parts 30 and 31, as seen in FIGS. 6 and 7.

Rear and front bosses 42 and 43 respectively extend rearward and forward from the cylindrical casing 44 of the motor 36, as seen in FIGS. 10 and 12), and are supported in corresponding coaxial recesses 45 and 46 in the rear end wall 40 and bulkhead 41 respectively, so as to support the motor casing 44 with respect to the shell 26. A flat 47 on the rear boss 42 (FIG. 9) co-acts with a corresponding flat in the surrounding recess 45 to prevent rotation of the motor casing 44 with respect to the shell parts 30 and 31, such that the motor 36 is antirotationally fixed within the shell 26.

The drive unit 25 further includes a transmission 50 (FIG. 5) coaxial with and forward of the motor 36. The transmission includes a reciprocating link member 51 and is driven from the forward extending, rotating output shaft 52 of the motor 36. The shaft 52 extends coaxially forward through the front boss 43 (FIG. 12) of the motor 36.

The transmission 50 (FIGS. 5 and 12) includes a pinion gear 53 fixed on the motor shaft 52 for rotation thereby, and a face gear 54 which, as seen in FIG. 12, underlies the pinion gear 53. The face gear 54 has a relatively large diameter central disk 56 carrying upward facing teeth 55 engaging corresponding teeth on the pinion gear 53 for rotation thereby. The face gear 54 includes a secondary pinion gear 57 fixed coaxially beneath the disk 56, and of substantially lesser diameter, which in turn drives a relatively large diameter output gear 60.

It will be understood that the pinion gear 53, face gear 54, secondary pinion 57 and output gear 60 are all provided with a full circumferential (360°) set of teeth, so that continuous rotation of the motor shaft 52 results in continuous rotation of the output gear 60. For convenience in drawing, some or all the gear teeth are not shown in various of the drawings, the toothed meshing connection of the gears therein thus being only schematically shown. See for example FIGS. 4, 10, 12, 13 and 14.

An output shaft 61 is fixed to and coaxially upstanding from the output gear 60 (FIG. 12) and fixedly rotatably drives an eccentric member 62 (FIGS. 5, 10 and 12) spaced above the output gear 60. In this embodiment, the output shaft is of rectangular cross-section to maximize its torque transmitting capability.

The eccentric member 62 comprises a radially extending disk 63 (FIG. 5) coaxial with the output shaft 61 and fixedly surmounted by an eccentric circular cylinder 64 eccentrically rotatable with the output shaft 61.

The link member 51 is generally T-shaped, as seen in FIG. 13, having a plate-like body 70 overlying the disk 63 of the eccentric member 62 and lying at right angles to the output shaft 61, and further having a plate-like fork 71 fixed at the rightward (FIGS. 5, 10, 12 and 13) end of the plate-like body 70 and extending in a plane substantially parallel to the

A391

US 7,144,383 B2

5

output shaft **61**. The plane of the plate-like fork **71** is perpendicular to the intended direction of reciprocating movement of the link member **51**. The body **70**, at its end portion remote from the fork **71**, has an oblong through opening **72** snugly radially receiving the rotating eccentric cylinder **64** of the eccentric member **62**, as seen in FIG. 10. More particularly, the length direction of the oblong opening **72** extends parallel to the plane of the fork **71** and is of sufficient length to accommodate 360° rotation of the eccentric cylinder **64** without movement of the body **70** parallel to the plane of the fork **71**. On the other hand, the width of the oblong opening **72**, namely in a direction perpendicular to the plane of the fork **71**, corresponds substantially to the diameter of the eccentric cylinder **64**, providing a sliding clearance between the body **70** and eccentric cylinder **64**, so that rotation of the eccentric cylinder **64** will result in reciprocation of the link member **51** in a direction perpendicular to the plane of the fork **71**.

The plate-like body **70** includes a thickened rim **73** (FIG. 5) around the oblong opening **72** and may thus be said to form a yoke for coaction with the eccentric cylinder **64**. The side edges of the body **70** are preferably also thickened to form parallel longitudinal guide rails **74** (FIG. 10).

The above discussed moving elements of the transmission **50** are located and movably supported within the shell **26** as follows. The face gear **54** has coaxial downward and upward (FIGS. 5–7, 10 and 12) extending stub shafts **75** and **76** respectively rotatably supported in coaxial bearing bosses **80** and **81** respectively fixed on the opposing faces of the shell parts **31** and **30** (FIGS. 6, 7 and 12). Similarly, the output gear **60** and the eccentric member **62** have respective downward and upward extending stub shafts **82** and **83** coaxial with the output shaft **61** and rotatably supported in respective cylindrical bearing bosses **84** and **85** in the respective shells **31** and **30** (FIGS. 5–7 and 12). The link member **51** is slidably guided for reciprocation in a notch **90** (FIGS. 5 and 7) in the peripheral wall **91** of the left (upper in FIG. 5) shell part **30**. The notch **90** has parallel opposed guide faces **92** (FIG. 7) spaced apart to snugly slidably guide therebetween the opposite guide rails **74** of the link member **51**, and thus spaced at substantially the maximum width of the link member. The thickness of the link member is guided for reciprocation between the peripheral edge **93** of the right (lower in FIG. 5) shell **31** and the width wall **94** (FIGS. 5 and 7) of the other shell part **30**.

The central length axis LA (FIG. 10) of the link member intersects the central length axis MA of the motor shaft **52** at the axis SA of the output shaft **61** and stub shaft **83** (FIGS. 10 and 12), at an angle equal to the angle between the central length axis of the handle **12** and barrel **13** of the housing **11**. Moreover, the length axes of the handle and barrel also intersect at the axis SA of the output shaft **61** when the drive unit **25** is installed in the handpiece housing **11** as hereafter discussed. In effect then, the link member longitudinal axis LA and motor shaft axis MA define the length axis of the barrel **13** and handle **12**, respectively, when the drive unit **25** is installed in the handpiece housing **11**.

The drive unit **25** is located within the handle **12**, as follows. As seen in FIGS. 3 and 4, transverse ribs **95** are molded into the interior surface of the handle **12** at opposing locations in the left and right housing parts **14** and **15** (FIGS. 2–4). For drawing convenience, only the ribs in the right housing part **15** are shown, the ribs in the left housing part **14** being compatible. The ribs **95** locate the drive unit **25** in the rightward/leftward direction in FIG. 2. Further, the drive unit shell bosses **84** and **85** (FIG. 5) protrude sideways from the drive unit shell and are pivotally received in correspond-

6

ing hollow cylindrical bosses, one of which is shown at **96** in FIG. 2, and which extend toward each other from the interior of the left and right housing parts **14** and **15**. The hollow cylindrical boss **96** of the left housing part **14** is not shown but is opposed to and compatible with the housing part **96** shown in the right housing part **15** of FIG. 2. The drive unit **25** is thus, except for the lateral positioning defined by the ribs **95**, pivotally located within the handpiece housing **11** and is thus capable of some pivotal floating in the housing to achieve proper alignment of the longitudinal movement axis LA (FIG. 7) of the link member **51** with respect to the barrel **13** and a pump unit **100** (FIGS. 2–4 and 16–18) located in the barrel **13** as hereafter discussed.

Pump Unit

Turning now to the pump unit **100**, attention is directed to FIGS. 2–4 and 16 as well as 18. The pump units includes a bellows **101** including an axially expandable and contractable, reciprocating, bellows wall **114** (FIG. 18) and a forwardly extending, rigid annular flange wall **102**. Such flange wall **102** is loosely telescoped over a rigid, rearwardly extending annular flange **103** of a rigid, forwardly extending coaxial bellows housing **104**.

The bellows **101** and bellows housing **104** are preferably of molded plastics material. A resilient O-ring **105** (FIGS. 16 and 19) is snugly radially disposed between the radially opposed, axially extending annular flanges **102** and **103**, to create a fluid seal therebetween and hence between the bellows **101** and bellows housing **104**, to prevent fluid leakage therebetween. The bellows **101** and bellows housing **104** have respective axially spaced radially extending steps **106** and **107** joined to the respective annular flanges **102** and **103** and axially spaced apart at a distance substantially greater than the diameter of the O-ring **105**, as seen in FIG. 19. The axial extending flanges **102** and **103** and radially extending steps **105** and **106** define an annular chamber **110** in which the O-ring **105** is axially loosely, and radially snugly and sealingly, disposed. Note that the radially opposed surfaces of the axially extending annular flanges **102** and **103** are cylindrical, such that neither has an annular groove in which the O-ring seats. Thus, the O-ring is free to roll on the radially opposed cylindrical surfaces of the axially extending flanges **102** and **103** and the O-ring **105** does not significantly interfere with axial separation of the bellows **101** and bellows housing **104** from each other.

Instead, such axial separation is prevented, as hereinafter further discussed, by a forwardly-rearwardly (leftwardly-rightwardly in FIG. 2) spaced pair of ribs **111** (FIG. 2) extending radially inward from the interior wall of the right housing part **15** and a corresponding, laterally opposed pair of mirror imaged ribs (not shown) extending laterally inward from the interior wall of the left housing part **14**. Such ribs **111** are also schematically indicated in FIG. 18.

The rear (right in FIG. 19) end of the bellows housing axial flange **103** abuts the radially extending step **106** of the bellows **101** and the forward (leftward in FIG. 19) end of the bellows axial flange **102** axially abuts a radial flange **112** which extends radially outward from and forwardly from the bellows housing step **107**. The forward end of the bellows axial flange **102** thus radially overlaps the bellows housing step **107** in snug but axially slidable relation thereto. A small forwardly extending annular rib **113** protrudes forwardly from the bellows radial step **106** toward the O-ring **105** to prevent rearward escape of the O-ring **105** from the space between the axially extending flanges **102** and **103**, in the event of slight axial shifting of the bellows **101** and bellows housing **104** away from each other.

US 7,144,383 B2

5

output shaft **61**. The plane of the plate-like fork **71** is perpendicular to the intended direction of reciprocating movement of the link member **51**. The body **70**, at its end portion remote from the fork **71**, has an oblong through opening **72** snugly radially receiving the rotating eccentric cylinder **64** of the eccentric member **62**, as seen in FIG. 10. More particularly, the length direction of the oblong opening **72** extends parallel to the plane of the fork **71** and is of sufficient length to accommodate 360° rotation of the eccentric cylinder **64** without movement of the body **70** parallel to the plane of the fork **71**. On the other hand, the width of the oblong opening **72**, namely in a direction perpendicular to the plane of the fork **71**, corresponds substantially to the diameter of the eccentric cylinder **64**, providing a sliding clearance between the body **70** and eccentric cylinder **64**, so that rotation of the eccentric cylinder **64** will result in reciprocation of the link member **51** in a direction perpendicular to the plane of the fork **71**.

The plate-like body **70** includes a thickened rim **73** (FIG. 5) around the oblong opening **72** and may thus be said to form a yoke for coaction with the eccentric cylinder **64**. The side edges of the body **70** are preferably also thickened to form parallel longitudinal guide rails **74** (FIG. 10).

The above discussed moving elements of the transmission **50** are located and movably supported within the shell **26** as follows. The face gear **54** has coaxial downward and upward (FIGS. 5–7, 10 and 12) extending stub shafts **75** and **76** respectively rotatably supported in coaxial bearing bosses **80** and **81** respectively fixed on the opposing faces of the shell parts **31** and **30** (FIGS. 6, 7 and 12). Similarly, the output gear **60** and the eccentric member **62** have respective downward and upward extending stub shafts **82** and **83** coaxial with the output shaft **61** and rotatably supported in respective cylindrical bearing bosses **84** and **85** in the respective shells **31** and **30** (FIGS. 5–7 and 12). The link member **51** is slidably guided for reciprocation in a notch **90** (FIGS. 5 and 7) in the peripheral wall **91** of the left (upper in FIG. 5) shell part **30**. The notch **90** has parallel opposed guide faces **92** (FIG. 7) spaced apart to snugly slidably guide therebetween the opposite guide rails **74** of the link member **51**, and thus spaced at substantially the maximum width of the link member. The thickness of the link member is guided for reciprocation between the peripheral edge **93** of the right (lower in FIG. 5) shell **31** and the width wall **94** (FIGS. 5 and 7) of the other shell part **30**.

The central length axis LA (FIG. 10) of the link member **51** intersects the central length axis MA of the motor shaft **52** at the axis SA of the output shaft **61** and stub shaft **83** (FIGS. 10 and 12), at an angle equal to the angle between the central length axis of the handle **12** and barrel **13** of the housing **11**. Moreover, the length axes of the handle and barrel also intersect at the axis SA of the output shaft **61** when the drive unit **25** is installed in the handpiece housing **11** as hereafter discussed. In effect then, the link member longitudinal axis LA and motor shaft axis MA define the length axis of the barrel **13** and handle **12**, respectively, when the drive unit **25** is installed in the handpiece housing **11**.

The drive unit **25** is located within the handle **12**, as follows. As seen in FIGS. 3 and 4, transverse ribs **95** are molded into the interior surface of the handle **12** at opposing locations in the left and right housing parts **14** and **15** (FIGS. 2–4). For drawing convenience, only the ribs in the right housing part **15** are shown, the ribs in the left housing part **14** being compatible. The ribs **95** locate the drive unit **25** in the rightward/leftward direction in FIG. 2. Further, the drive unit shell bosses **84** and **85** (FIG. 5) protrude sideways from the drive unit shell and are pivotally received in correspond-

6

ing hollow cylindrical bosses, one of which is shown at **96** in FIG. 2, and which extend toward each other from the interior of the left and right housing parts **14** and **15**. The hollow cylindrical boss **96** of the left housing part **14** is not shown but is opposed to and compatible with the housing part **96** shown in the right housing part **15** of FIG. 2. The drive unit **25** is thus, except for the lateral positioning defined by the ribs **95**, pivotally located within the handpiece housing **11** and is thus capable of some pivotal floating in the housing to achieve proper alignment of the longitudinal movement axis LA (FIG. 7) of the link member **51** with respect to the barrel **13** and a pump unit **100** (FIGS. 2–4 and 16–18) located in the barrel **13** as hereafter discussed.

Pump Unit

Turning now to the pump unit **100**, attention is directed to FIGS. 2–4 and a6 18. The pump unit includes a bellows **101** including an axially expandable and contractable, reciprocating, bellows wall **114** (FIG. 18) and a forwardly extending, rigid annular flange wall **102**. Such flange wall **102** is loosely telescoped over a rigid, rearwardly extending annular flange **103** of a rigid, forwardly extending coaxial bellows housing **104**.

The bellows **101** and bellows housing **104** are preferably of molded plastics material. A resilient O-ring **105** (FIGS. 16 and 19) is snugly radially disposed between the radially opposed, axially extending annular flanges **102** and **103**, to create a fluid seal therebetween and hence between the bellows **101** and bellows housing **104**, to prevent fluid leakage therebetween. The bellows **101** and bellows housing **104** have respective axially spaced radially extending steps **106** and **107** joined to the respective annular flanges **102** and **103** and axially spaced apart at a distance substantially greater than the diameter of the O-ring **105**, as seen in FIG. **19**. The axial extending flanges **102** and **103** and radially extending steps **105** and **106** define an annular chamber **110** in which the O-ring **105** is axially loosely, and radially snugly and sealingly, disposed. Note that the radially opposed surfaces of the axially extending annular flanges **102** and **103** are cylindrical, such that neither has an annular groove in which the O-ring seats. Thus, the O-ring is free to roll on the radially opposed cylindrical surfaces of the axially extending flanges **102** and **103** and the O-ring **105** does not significantly interfere with axial separation of the bellows **101** and bellows housing **104** from each other.

Instead, such axial separation is prevented, as hereinafter further discussed, by a forwardly-rearwardly (leftwardly-rightwardly in FIG. 2) spaced pair of ribs **111** (FIG. 2) extending radially inward from the interior wall of the right housing part **15** and a corresponding, laterally opposed pair of mirror imaged ribs (not shown) extending laterally inward from the interior wall of the left housing part **14**. Such ribs **111** are also schematically indicated in FIG. **18**.

The rear (right in FIG. 19) end of the bellows housing axial flange **103** abuts the radially extending step **106** of the bellows **101** and the forward (leftward in FIG. 19) end of the bellows axial flange **102** axially abuts a radial flange **112** which extends radially outward from and forwardly from the bellows housing step **107**. The forward end of the bellows axial flange **102** thus radially overlaps the bellows housing step **107** in snug but axially slidable relation thereto. A small forwardly extending annular rib **113** protrudes forwardly from the bellows radial step **106** toward the O-ring **105** to prevent rearward escape of the O-ring **105** from the space between the axially extending flanges **102** and **103**, in the event of slight axial shifting of the bellows **101** and bellows housing **104** away from each other.

US 7,144,383 B2

7          8

The above mentioned radially inward extending ribs **111** of the handpiece housing **11** snugly axially oppose and sandwich therebetween the bellows radial step **106** and bellows housing radial flange **112** to positively prevent axial separation of the bellows **101** from the bellows housing **104**, when the pump unit **100** is installed in the housing **11**.

The above-mentioned bellows wall **114** extends rearward from the inner periphery of the radially extending annular step **106** of the bellows **101** (FIG. **18**) and consists of an axially collapsible and extensible, flexible, wave cross-section, peripheral wall **114**. The bellows wall **114** surrounds an axially expansible and contractible pumping chamber **115**. At the rear end of the bellows **101**, a radially extending drive end wall **116** closes the rear end of the bellows wall **114** and pumping chamber **115**. A stub **120**, having a radially enlarged head **121**, is fixed to and extends coaxially rearwardly from the drive end wall **116**.

To axially reciprocatingly drive (repetitively axially contract and expand) the bellows **101**, the above discussed link member **51** (FIG. **5**) of the drive unit **25** has its fork **71** provided with a central, radially opening, generally U-shaped slot **122** (FIGS. **11–13**). The slot **122** divides the fork **71** into a pair of tines **123** (FIG. **11**). The slot **122** opens leftwardly in FIG. **2**, namely away from the rightward housing part **15** and toward the leftward housing part **14**. Thus, with the drive unit **25** located in the right housing part **12** as seen in FIG. **3**, the pump unit **100** can be inserted into the rightward housing part **15**, with the stub **120** (FIG. **18**) inserted in the slot **122** of the fork **71** (FIG. **11**) so as to trap the tines **123** axially between the drive end wall **116** and head **121** of the bellows **101**, as generally indicated in FIGS. **3** and **4**. To prevent the bellows stub **120** from accidentally radially escaping out the open end of the slot **122** in the fork **71**, the central portion **124** (FIG. **11**) of the slot **122** is undercut by inward tapering of an intermediate portion **125** of the slot **122** as seen in FIG. **11**. The tapered portion **125** of the slot **122** (FIG. **11**) defines a snap fit detente for resiliently trapping the bellows stub **120** in the drive unit slot **122**. Thus, to install the bellows stub **120** in the slot **122**, the bellows stub **120** must be resiliently forced through the tapered portion **125** of the slot **122** and upon passing the latter, the stub resiliently snaps into the central portion **124** of the slot. The inner ends of the tapered portion **125** of the slot resiliently maintain the stub radially inboard thereof, in the central portion **124** of the slot **122**.

The stub **120** and hence the bellows **101**, and indeed the entire pump unit **100**, is thus freely rotatable about its length axis with respect to the fork **71**, so that the circumferential orientation of the drive unit **25** and the pump unit **100** is determined by the location thereof in the housing. The drive unit **25** and pump unit **100** are thus, to an extent, free to circumferentially float with respect to each other, about the connection of the stub **120** and fork **71**, without interfering with the circumferential location of the drive unit **25** and pump unit **100** in the housing **11**. Further, the edges of the slot **122**, in particular of the central portion **124** thereof, are rounded in cross-section, as is the stub **120**, to permit a modest amount of angular adjustment between the length axes MA and LA of the drive unit **25** and pump unit **100** and to allow the drive unit **25** and pump unit **100** to easily settle into their proper operating positions in the housing **11**.

A cylindrical plug **126** is coaxially fixed to the interior side (left side in FIG. **18**) of the bellows drive end wall **116** by a coaxial, rearward extending, undercut pin **127** snap fitted in a forwardly (leftwardly in FIG. **18**) opening recess in the stub **120**. The plug **126** has a diametral slot **130** opening forward from its front end and which faces forward

toward a resilient valve member **131** (FIGS. **16** and **18**) to maintain liquid communication between the central and radially outer portions of the pumping chamber **115**.

The bellows **101** is thus a single element which carries out four different functions, namely sealing at the forward end, changing the pump chamber size in the middle thereof, the rearend acts as a piston and as a drive point. In addition, the front annular flange **102** helps locate the pump unit with respect to the housing barrel.

The pump unit **100** further includes a valve member **131**, which is a one piece member of suitable resilient material and which by itself constitutes the entire moveable inlet and outlet valve system for the pump unit **100**. More particularly, the valve member **131** comprises a short tubular central portion **132** (FIG. **18**) which coaxially connects a forward (leftward in FIG. **18**) tapering, duck bill type, outlet valve **133** and a rearwardly and radially outwardly extending umbrella type, inlet valve **134**. The umbrella valve **134** is annular and has a central opening **135** which communicates coaxially from the pumping chamber **115** in the bellows **101** forwardly through the tubular central portion **132** and outlet duck bill valve **133** of the valve member **131**.

The bellows housing **104** comprises a rear (right in FIGS. **18** and **18C**) facing recess having a perimeter defined by the annular flange **103** of the bellows housing **104** and a rear facing radial wall **136** which defines the front end of the pumping chamber **115**. The umbrella valve **134** lies coaxially in the resulting recess **103**, **136**. The forward facing perimeter **137** of the umbrella valve **134**, in its closed condition shown in FIGS. **18** and **18C**, presses forward against the radial wall **136** to seal thereagainst. The valve member **131** is held against the right (rearward) movement away from the bellows housing wall **136** by axial interference between a rightward facing, radially outward extending, annular step **140** (FIG. **18C**) at the rear (right) end of the duck bill valve **133**, and a radially inward extending, leftward facing, annular flange **141** of the bellows housing **104**. The radially inward directed, annular flange **141** is axially interposed between, and forms a port **142** between, the rear facing recess **103**, **136** and a coaxial, forwardly extending, cylindrical, irrigation liquid outlet, discharge, conduit **143** (FIGS. **18** and **18C**). The tubular central portion **132** of the valve member **131** extends snugly axially through the port **142**.

To install the valve member **131** in the bellows housing **104**, the tapered outlet duck bill valve **133** is pushed forward through the port **142**, the bellows valve step **140** snaps forwardly (leftwardly in FIG. **18C**) past the bellows housing flange **141**, and the sealing perimeter **137** of the umbrella valve **134** is thereby pulled forwardly resiliently against the rearward facing bellows housing wall **136**, leaving the valve member **131** with its duck bill valve **133** and umbrella valve **134** both in their closed condition shown in FIGS. **18** and **18C**.

The bellows housing **104** further includes an annular liquid jacket **144** (FIGS. **18** and **18C**) surrounding the rear portion of the liquid outlet conduit **143** and defining radially therebetween an annular liquid inlet chamber **145** (FIGS. **18**, **18C** and **19**). The inlet chamber **145** communicates between a radial inlet port **146** (FIGS. **16** and **19**), which opens radially outward through the side of the bellows housing **104**, and an annular space **147** (FIG. **18C**). The annular space **147** is bounded by the forward face **150** and tubular central portion **132** and sealing perimeter **137** of the umbrella valve **134** and the radial face **136** of the recess **103**, **136** of the bellows housing **104**.

9

Thus, a rightward pullback of the bellows head **121** axially expands the bellows, from its FIG. 18A position towards its FIG. 18 position. This reduces the pressure within the bellows. This in turn keeps the duck bill valve **133** closed and pulls the sealing perimeter **137** of the umbrella valve **134** rightwardly away from the bellows housing recess radial wall **136** and draws liquid from the port **146** through the annular inlet chamber **145**, around the perimeter **137** of the open umbrella valve and into the interior of bellows.

On the other hand, a leftward push forward of the bellows head **121** axially compresses the bellows from its FIG. 18 position toward its FIG. 18B position and raises the pressure in the bellows, to close the umbrella valve **134** and open the duck bill valve **133** and force a pulse of liquid out of the bellows forwardly through the duck bill valve **133** and liquid outlet conduit **143**.

Irrigation liquid is drawn to the inlet port **146** of the bellows housing **104** through an elbow **151** (FIG. 19). The outlet end **152** of the elbow and the inlet port **146** are cylindrical, with the elbow outlet end **152** being a snug axially sliding fit in the inlet port **146**. An axially elongate, annular groove **153** in the outer periphery of the elbow outlet **152** houses a seal ring, here an O-ring, **154** which bears sealing and rollingly on the radially opposed and surrounding surface of the inlet port **146** to prevent liquid leakage out of the elbow **151** at its interface with the inlet port **146**. The elbow **151** is not mechanically interlocked with the inlet port **146** but can slide in and out with respect thereto. The elbow **151** is held in place with its outlet end **152** sealingly within the port **146** by bearing of a portion **155** (FIG. 4) of the handpiece housing barrel **13** against the outboard surface **156** of the elbow **151**, with the pump unit installed in the handpiece housing **11**. The elbow **151** here fixedly carries a pair of parallel fins **157** (FIGS. 16, 17 and 19). The fins **157** extend radially from the rear inlet end portion of the elbow **151** and axially sandwich therebetween the flanges **106** and **112** of the bellows **101** and bellows housing **104**, at least to help the housing ribs **111** (FIG. 18) fins **157** prevent axial separation of the bellows and bellows housing. The housing ribs **111** and fins **157** are more or less evenly circumferentially located around the bellows **101** and bellows housing **104**.

An elongate flexible irrigation liquid supply hose **160** (FIGS. 2, 4, 16, 17, 19, 22, 23, 25 and 29) has a forward end **161** which telescopes sealing and fixedly over the rear end **162** of the elbow **151** as seen in FIGS. 19 and 29. Although an annular barb is shown at **162** (for example in FIG. 19) a barbless, cylindrical end **162** is satisfactory. In the assembled handpiece, the irrigation liquid hose **160** extends rearward from the elbow **151** (FIG. 4) in the barrel **13** of the housing and angles downwardly and rearwardly along the bottom of the handpiece handle **12** to exit rearwardly and downwardly through a hole **163** (FIG. 2) in the bottom end wall **164** of the handpiece housing **11**. A clamp plate **165** (FIGS. 2, 3 and 4) of bent cross-section has a perimeter groove **166** for receiving the edges of the hole **163** in the housing bottom end wall **164**, such that the clamp plate **165** is trapped in and partly closes the hole **163** in the bottom end **164** of the housing handle **12** when the housing is fully assembled. A notch **167** (FIG. 2) in the rightward end of the clamp plate **165** permits exit therethrough of irrigation liquid supply hose **160** from the handpiece housing **11** and snugly and frictionally grips such hose, without crushing or collapsing it, so that such hose **160** cannot easily be pulled out of the housing **11** or off the elbow **151**.

The irrigation liquid hose **160**, the inlet line, integrally therewith, a smaller diameter rib **170** (FIGS. 2, 16, and 17)

10

A plurality (here three) insulated electrical conductors (wires) **171** have intermediate portions contained within and extending the length of the rib **170**. Forward end portions of the insulated wires **171** emerge from the forward end of the rib **170** and carry conventional electrically conductive connectors **175**. The forward end of rib extend through the notch **167** (FIG. 2) and ends just inside the bottom portion of the handle of the housing **11**, as seen in FIG. 4. The forward ends of the conductors, carrying the connectors **175**, extend into the lower portion of the handpiece handle **12**. Thus, as apparent from the above description, rib **170** functions as a cable through which conductors **171** extend from the battery pack to the handpiece housing **11**.

The insulated electrical conductors **171** extend along the length of the central portion of the liquid supply hose **160** and have rear ends provided with respective electrically conductive connectors **176** (FIGS. 22 and 29), such that electric current can flow from a given rear connector **176** through its corresponding insulated electrical conductor **171** and to its corresponding front electrically conductive connector **175** in a conventional manner. Short rear portions of the conductors **171** are loose and moveable with respect to the liquid supply hose **160** as seen in FIGS. 22 and 29.

The electrical connectors **175** and **176** are conventional crimp type connectors.

Instead of being molded in or otherwise constrained within the generally circular cross section rib **170** in FIG. 2, the elongate central portion of the insulated electrical conductors **171** may be fixed side by side, in a flat array, to the outside of the liquid hose **160**, as shown in FIGS. 22 and 29, and such can be accomplished by adhesive bonding or by any other convenient means.

The hose **160**, **170** thus serves the dual use of conveying both irrigation liquid and electric operating power.

The length of the central portion of the liquid hose **160**, to which the insulated conductors **170** are fixed, preferably extends several feet (for example 8 to 10 feet) from the handpiece **10**. The rear end **177** (FIGS. 22 and 23) of the liquid hose is here provided with a fitting **180** of hollow tubular construction open to actual liquid flow therethrough. The fitting **180** comprises a forward end portion **181** (FIG. 23) fixed sealingly telescoped in the rear end **177** of the liquid hose **160**, a square central flange **182** (FIG. 22) and a rear end portion (or "spike") **183** having a sharpened tip **184**. The tip **184** is capable of conventional insertion into a conventional source S (FIG. 22) of irrigation liquid, for example a conventional supply bag, for conveying irrigation liquid therefrom forward into the hose **160**. The square flange **182** prevents rotation of the fitting **180** in the casing **191**, which helps when removing the spike **183** from the liquid supply bag. In the embodiment shown, the rear end portion **183** is covered by a protective cap **185** prior to use so that the sharpened tip **184** will not accidentally be dulled.

Thus, the length of the liquid supply hose **160** allows the irrigation liquid source S to be located at a distance from the handpiece and thus out of the way of the surgical personnel at the operating table where the handpiece **10** is to be used.

Electrical Power Supply Unit

To provide operating electrical power to the motor **36**, a compact, self contained electrical supply unit **190**, a battery pack, (FIGS. 20–25) is fixed on the rear portion of the liquid hose 16O. The power supply unit is thus located remotely from the handpiece **10**, adjacent to the source S of irrigation liquid.

The power supply unit **190** comprises a casing **191** preferably of rigid molded plastics material. The casing **191** here comprises a relatively deep, substantially rectangular

US 7,144,383 B2

11

pan **192** (FIG. 2) whose top (as oriented in FIGS. **22** and **23**) is fixedly closed by a cover **193**. The pan **192** has front and rear end walls **194** and **195** (FIGS. **23**, **23A** and **24**) having fixed upward opening slots **200** each defined by a laterally spaced, opposed pair of U-shaped flanges **201** (FIGS. **23A** and **23B**). The slots **200** are undercut in that each has a mouth **202** laterally narrower than the remainder of the slot **200** and communicating between the remainder of the slot **200** and the interior cavity of the pan **192**. The undercut slots **200** are of constant cross-sectional size and shape vertically (i.e. into and out of the page in FIG. **24** and up and down in FIG. **23**).

For convenient reference in the drawings, the reference numerals **200** and **201** are suffixed, so that the undercut slots and U-shaped flanges on the front pan wall **194** are indicated by the reference characters **200F** and **201F** and the undercut slots and U-shaped flanges on the rear pan wall **195** are indicated at **200R** and **201R**.

The U-shaped flanges **201F** defining the slots **200F** on the forward end wall **194** start substantially from the pan bottom wall **196** and extend a bit less than half way up the front end wall **194**.

On the other hand, the U-shaped flanges **201R** of the slots **200R** on the rearward end wall **195** of the pan are spaced above the bottom wall **196** of the pan upon respective block-like pillars **203** which define an up-facing bottom **204** for each of the U-shaped flanges **201R** on the rear pan wall **195**.

Rising from bottom wall **196** of the pan between the two central pillars **203** to a height below the bottoms **204** of the slots **200R** thereof, is a central block **205** from which forwardly extends, along the pan bottom wall **196**, a T-shaped flange **206** (FIG. **23B**) of constant cross section vertically and defining a pair of vertically open and laterally oppositely opening grooves **207** disposed immediately forward from the two central pillars **203** on the rear pan wall **195**.

Two such undercut slots **200F** are spaced symmetrically side by side on the front pan wall **194**. Similarly, and at the same effective lateral spacing, two such slots **200R** are spaced laterally side by side on the pan rear wall **195**.

Springy, electrically conductive sheet metal battery contacts of three different kinds are indicated at **210** and **211** and **212** and FIGS. **26**, **27** and **28** respectively.

A pair of such contacts **210** are provided and each comprises a generally rectangular foot **213** adapted to snugly slide down into a respective undercut slot **200F** at the pan front wall **194**. Each foot **213** is provided with resilient toes **214** angled out of the plane of the foot **213** and adapted to bite against the interior of the corresponding undercut slot **200F** to fix the corresponding battery contact **210** in place therein.

Similarly, each of a pair of battery contacts **212** (FIG. **28**) has a resilient fork-shaped foot **215** adapted to fit snugly and slidingly down into the corresponding undercut groove **200R** at the rear wall **195** of the pan **192** and with springy toes **216** for fixedly gripping the interior of the corresponding undercut slot **200R**.

In a generally similar manner the single, low speed battery contact **211** (FIG. **27**) has a resilient U-shaped foot **217** for sliding down over the T-shaped flange **206** (FIG. **23B**), with springy toes **218** bent out of the plane of the foot **217** for bitingly engaging the walls of the grooves **207** of the T-shaped flange **206**.

Each of the battery contacts **210**, **211** and **212** thus slides with its corresponding foot into the desired location with respect to the grooves **200F**, **200R** and **207** and locks fixedly

12

therein. This is generally indicated in FIGS. **22**–**24**. The battery contacts **210**, **211** and **212** have respective resilient fingers **221**, **222** and **223** (FIGS. **26**, **27** and **28** respectively), two each for the battery contacts **210** and **211** and one each for the battery contacts **212**. Such fingers **221**, **222** and **223** protrude from the respective slots **200F**, **200R** and **207** into the interior of the pan **192** for electrically contacting batteries **230** (FIG. **22**) to be housed in the pan **192**. Further, the battery contact **211** and each of the battery contacts **212** (FIGS. **27** and **28** respectively) have an upstanding terminal (**224** and **225** respectively) of simple rectangular shape for releasable telescoped engagement within a respective one of the connectors **176** at the rear ends of the three insulated electrical conductors **171** (FIG. **22**).

Turning now to the arrangement of the batteries **230** within the pan **192**, one embodiment according to the invention advantageously uses batteries of a kind widely available in retail stores, namely AA size alkaline batteries. In addition to their wide availability to the public, these batteries advantageously are inexpensive, have a long shelf life and provide full operating voltage until almost fully discharged. In the embodiment shown, eight such batteries **230** are provided and are individually indicated at B1, B2, B3, B4, B5, B6, B7 and B8. As shown in FIGS. **22**–**24**, ribs **231** extending circumferentially within the pan **192** cradle the batteries **230** fixedly but removably within the pan **192**. The polarity of the eight batteries is indicated by "plus" signs marked thereon. As seen in the drawings, the batteries **230** are arranged in four rows of two head-to-tail batteries each. Four of the batteries **230** lie in the bottom (FIGS. **22** and **23**) of the pan in two rows of two each and the remaining four batteries **230** lie on top of those.

The ends of the battery rows bear variously on the above discussed battery contacts **210**, **211** and **212** as generally indicated for example in FIG. **22** and also in the schematic circuit drawing in FIG. **22A**. More particularly, the four batteries B1, B2, B3 and B4 defining a vertical plane nearest to the viewer in FIG. **23** are connected in series from the near connector **212** leftwardly through the top row of batteries, down through the near upstanding connector **210** and thence rightwardly through the bottom pair of batteries to the lower rear connector **211**. The remaining four batteries B5–B8 are arranged in a vertical plane behind above-mentioned batteries B1–B4. More particularly, the batteries B5–B8 connect in series from the far side of the lower rear connector **211** forwardly (leftwardly in FIG. **22**) to the far connector **210**, upwardly therethrough, and then rearwardly back to the far upper connector **212**.

The cover **193** (FIGS. **23** and **25**) has plural, laterally extending, depending ribs **232** (FIGS. **23** and **25**) intended to seat upon the uppermost batteries B1, B2, B7 and B8 and fix the batteries B1–B8 in the pan with the cover **193** fixed in its normal closed position atop the pan **192**. The cover is fixedly securable atop the pan by any convenient means, such as snap fit connectors, a portion of which are generally shown in **233** in FIG. **22**, and generally like those discussed above with respect to the handpiece housing **11**, as at **16**, and as generally discussed with respect to the drive unit shell **26**, as at **32**, **33**.

The aforementioned rear end **177** of the hose **160** extends through the casing **191** along the horizontal parting plane between the pan **192** and cover **193**, and so lies close adjacent the topmost batteries B1, B2, B7 and B8.

Hollow front and rear bosses **234** and **235** (FIGS. **23** and **25**) extend forward and rearward respectively, from the casing **191**. At the parting plane between the pan **192** and cover **193**, the bosses **234** and **235** are notched (for example

US 7,144,383 B2

13

at **236** in FIG. **22**) for extension therethrough of the rear end **177** of the liquid hose **160**. The rear hollow boss **235** is sized and shaped to receive radially therein the square flange **182** (FIG. **23**) on the rear end of the liquid hose **160**, and thereby axially fix the rear end of the liquid supply hose **160** within the casing **191** and nonrotatably fix the fitting **180** to the battery casing **191**. The notch **236** in the front boss portion **234** on the cover **193** is indented by one or more small recesses **237** for receiving axially therethrough the rib **170** containing the insulated electrical conductors **171**, whose rear end connectors **176** are respectively fixed to the terminals **224** and **225** of the battery contacts **211** and **212**.

Trigger Unit

The handpiece **10** further includes a trigger unit **240** (FIGS. **2**–**4**) for controlling actuation of the motor **36** and, by extension, pump unit **100**. The trigger unit **240** comprises a generally L-shaped trigger member **241** (FIGS. **2**, **4** and **4A**), that functions as a control switch, and that comprises an elongate trigger lever **242**. The upper, forward (leftward in FIGS. **2** and **4**) end of the trigger lever is pivoted by laterally extending integral pins **243** pivotally receivable in suitable holes in laterally opposed bosses (one of which is shown in FIG. **2**) in the opposed lower edges of the housing parts **14** and **15**, near the rear end of the barrel **13**. Snapping together of the two housing parts **14** and **15** thus captures the pivot pins **243** and pivotally mounts the trigger with respect to the handpiece housing.

The trigger lever **242** includes a transverse ridge **245** (FIG. **4**) near to but spaced rearwardly from the pivot pins **243** and facing the underside of the barrel **13** and adapted to bear on the underside thereof in the manner of a fulcrum. By far the major length **246** of the trigger lever **242** is to the rear (right in FIG. **4**) of the fulcrum ridge **245**. This rearward trigger part **246** is relatively rigid in the portion thereof spaced at least somewhat to the rear of the fulcrum ridge **245**. Such rigidity is assisted by a forward facing longitudinal reinforcement rib **247** extending rearward along the front face of the trigger lever **242** from a point near the fulcrum ridge **245**. The front of the trigger lever **242**, to the rear of the fulcrum ridge **245** is, in the embodiment shown, provided with transversely extending ribs **248** to provide the user with a non-slip grip of the trigger lever **242**.

The trigger lever **242** is bendable near the fulcrum ridge **245**, both to the front and rear thereof, in a resilient manner. In this way, the resilience of the trigger lever tends to hold it in its forward, inactive position shown in FIG. **4**, with the fulcrum ridge **245** bearing on the underside of the handpiece barrel **13**. On the other hand, when the user grips the handle **12** and squeezes the trigger lever **245** toward it, in the direction indicated by the arrow TA in FIG. **4**, the trigger lever bends in the region of the fulcrum ridge **245**, tending to straighten from its relaxed convexly forwardly curved configuration of FIG. **4**, so that the rear face of the trigger lever can be pulled into the dotted line position **242P**, substantially against the front face of the handle **12**. Upon release of the trigger by the user, the natural resilience of the trigger lever **242** unbends it back to its solid line forward position shown in FIG. **4**. Accordingly, the trigger naturally returns forward to its non-operative position without need for a separate return spring.

The trigger arm **251** fixedly carries a thumb **250** (FIG. **4A**) intermediate it ends in the housing handle **15** and which interferes with the housing wall adjacent the hole **252**, to prevent the resilient restoring force of the trigger lever **242** from pulling the trigger arm **251** leftwardly (FIG. **4A**) out of the housing handle **12**.

14

A plank-like switch contact support arm **251** (FIGS. **2**, **4** and **4A**) protrudes substantially at a right angle from the rear, or bottom, of the trigger lever **242** and extends upwardly and rearwardly (in FIG. **4**) into the lower portion of the handle **12**, loosely through a hole **252** (FIG. **4A**) in the opposing bottom wall of the handle. A plate-like electrically conductive contact blade **253** fixedly extends through the thickness of the arm **251**, and has a front portion exposed towards said motor and a rear portion exposed toward the bottom end **164** of the handpiece handle.

A pair of rectangular posts **255** and **256** protrude fixedly into the interior of the handle **12** from the inside of the right housing part **15**, about midway between the drive unit **25** and the housing bottom end **164** (FIGS. **4A** and **4B**). Each post **255** and **256** includes a T-shaped flange **260** extending substantially forward toward the drive unit **25**. Each T-shaped flange **260** defines a pair of oppositely facing grooves **261** (FIG. **4C**).

Electrically conductive, spring-like metal contacts **262** and **263** (FIGS. **4A** and **4C**) each have a substantially U-shaped foot **264** for reception on the T-shaped flange **260** of the corresponding posts **255** and **256**. The contacts **262** and **263** further each have a substantially rectangular, projecting terminal **265** for telescopic fixing thereon, in electrically conductive relation, a corresponding one of the front connectors **175** of the three insulated electrical conductors **171**. The electrical contacts **262** and **263** further respective, generally L-shaped, plate-like, flexible contact leaves **266** and **267** (FIG. **4C**). The contact leaves **266** and **267** extend toward the drive unit **25** as seen in FIG. **4A**.

Protruding rearwardly from the motor **36** are a pair of electrically conductive contacts **270** and **271** (FIGS. **4A** and **9**). The contact **271** is a conventional terminal (like those at **224**, **225** and **265**) for receiving one of the front connectors **175** in fixed and electrically conductive relation thereon.

In contrast, the contact **270** is an elongate, springy rectangular piece, bent intermediate its ends in dogleg fashion, and angling from the rear end of the motor **36** rearwardly and somewhat rightwardly (in FIG. **4A**) to a free end portion spaced near the contact leaves **266** and **267**.

Gradual pressing of the trigger lever **242** toward the handle housing (rightwardly in FIGS. **4** and **4A**) moves the arm **251** and hence the contact blade **253** progressively further into the handle **12** through a series of positions, three of which are indicated in broken lines at **253A**, **253B** and **253C** in FIG. **4A**.

The free (rightward in FIG. **4A**) end of the arm **251** is beveled at **272** to help it ride over the contacts **266** and **267** as the trigger lever **242** is sequentially squeezed more and more toward the handle **12**. The arm **251** is progressively resiliently bent, like a leaf-spring, as its free end rides over the fixed contacts **266** and **267**, to firmly press its contact blade **253** against the latter.

Thus, as the trigger lever **242** is pressed toward the handle **12**, the beveled free end of the arm **251** rides over the contact leaf **266** past its dotted line position **253A** and toward its dotted line position **253B**. As the free arm end approaches position **253B**, the contact blade **253** slides into electrical contact with the contact leaf **266** and the motor contact **270** to establish electrical connection therebetween. The motor contact **270** resiliently bends to allow continued travel of the contact blade **253** and arm **251** further into the handle, as indicated in dotted line at **270B**, and to press firmly against the contact blade **253**. Given only a light pull on the trigger lever **242**, the arm **251** and contact blade **253** tend to stop in the position indicated in dotted lines at **253B**, by reason of the free end of the arm **251** colliding with the contact leaf

US 7,144,383 B2

13

at 236 in FIG. 22) for extension therethrough of the rear end 177 of the liquid hose 160. The rear hollow boss 235 is sized and shaped to receive radially therein the square flange 182 (FIG. 23) on the rear end of the liquid hose 160, and thereby axially fix the rear end of the liquid supply hose 160 within the casing 191 and nonrotatably fix the fitting 180 to the battery casing 191. The notch 236 in the front boss portion 234 on the cover 193 is indented by one or more small recesses 237 for receiving axially therethrough the rib 170 containing the insulated electrical conductors 171, whose rear end connectors 176 are respectively fixed to the terminals 224 and 225 of the battery contacts 211 and 212.

Trigger Unit

The handpiece 10 further includes a trigger unit 240 (FIGS. 2–4) for controlling actuation of the motor 36 and, by extension, pump unit 100. The trigger unit 240 comprises a generally L-shaped trigger member 241 (FIGS. 2, 4 and 4A), that functions as a control switch, and that comprises an elongate trigger lever 242. The upper, forward (leftward in FIGS. 2 and 4) end of the trigger lever is pivoted by laterally extending integral pins 243 pivotally receivable in suitable holes in laterally opposed bosses (one of which is shown in FIG. 2) in the opposed lower edges of the housing parts 14 and 15, near the rear end of the barrel 13. Snapping together of the two housing parts 14 and 15 thus captures the pivot pins 243 and pivotally mounts the trigger with respect to the handpiece housing.

The trigger lever 242 includes a transverse ridge 245 (FIG. 4) near to but spaced rearwardly from the pivot pins 243 and facing the underside of the barrel 13 and adapted to bear on the underside thereof in the manner of a fulcrum. By far the major length 246 of the trigger lever 242 is to the rear (right in FIG. 4) of the fulcrum ridge 245. This rearward trigger part 246 is relatively rigid in the portion thereof spaced at least somewhat to the rear of the fulcrum ridge 245. Such rigidity is assisted by a forward facing longitudinal reinforcement rib 247 extending rearward along the front face of the trigger lever 242 from a point near the fulcrum ridge 245. The front of the trigger lever 242, to the rear of the fulcrum ridge 245 is, in the embodiment shown, provided with transversely extending ribs 248 to provide the user with a non-slip grip of the trigger lever 242.

The trigger lever 242 is bendable near the fulcrum ridge 245, both to the front and rear thereof, in a resilient manner. In this way, the resilience of the trigger lever tends to hold it in its forward, inactive position shown in FIG. 4, with the fulcrum ridge 245 bearing on the underside of the handpiece barrel 13. On the other hand, when the user grips the handle 12 and squeezes the trigger lever 245 toward it, in the direction indicated by the arrow TA in FIG. 4, the trigger lever bends in the region of the fulcrum ridge 245, tending to straighten from its relaxed convexly forwardly curved configuration of FIG. 4, so that the rear face of the trigger lever can be pulled into the dotted line position 242P, substantially against the front face of the handle 12. Upon release of the trigger by the user, the natural resilience of the trigger lever 242 unbends it back to its solid line forward position shown in FIG. 4. Accordingly, the trigger naturally returns forward to its non-operative position without need for a separate return spring.

The trigger arm 251 fixedly carries a thumb 250 (FIG. 4A) intermediate it ends in the housing handle 15 and which interferes with the housing wall adjacent the hole 252, to prevent the resilient restoring force of the trigger lever 242 from pulling the trigger arm 251 leftwardly (FIG. 4A) out of the housing handle 12.

14

A plank-like switch contact support arm 251 (FIGS. 2, 4 and 4A) protrudes substantially at a right angle from the rear, or bottom, end of the trigger lever 242 and extends upwardly and rearwardly (in FIG. 4) into the lower portion of the handle 12, loosely through a hole 252 (FIG. 4A) in the opposing bottom wall of the handle. A plate-like electrically conductive contact blade 253 fixedly extends through the thickness of the arm 251, and has a front portion exposed towards said motor and a rear portion exposed toward the bottom end 164 of the handpiece handle.

A pair of rectangular posts 255 and 256 protrude fixedly into the interior of the handle 12 from the inside of the right housing part 15, about midway between the drive unit 25 and the housing bottom wall 164 (FIGS. 4A and 4B). Each post 255 and 256 includes a T-shaped flange 260 extending substantially forward toward the drive unit 25. Each T-shaped flange 260 defines a pair of oppositely facing grooves 261 (FIG. 4C).

Electrically conductive, spring-like metal contacts 262 and 263 (FIGS. 4A and 4C) each have a substantially U-shaped foot 264 for reception on the T-shaped flange 260 of the corresponding posts 255 and 256. The contacts 262 and 263 further each have a substantially rectangular, projecting terminal 265 for telescopic fixing thereon, in electrically conductive relation, a corresponding one of the front connectors 175 of the three insulated electrical conductors 171. The electrical contacts 262 and 263 further have respective, generally L-shaped, plate-like, flexible contact leaves 266 and 267 (FIG. 4C). The contact leaves 266 and 267 extend toward the drive unit 25 as seen in FIG. 4A.

Protruding rearwardly from the motor 36 are a pair of electrically conductive contacts 270 and 271 (FIGS. 4A and 9). The contact 271 is a conventional terminal (like those at 224, 225 and 265) for receiving one of the front connectors 175 in fixed and electrically conductive relation thereon.

In contrast, the contact 270 is an elongate, springy rectangular piece, bent intermediate its ends in dogleg fashion, and angling from the rear end of the motor 36 rearwardly and somewhat rightwardly (in FIG. 4A) to a free end portion spaced near the contact leaves 266 and 267.

Gradual pressing of the trigger lever 242 toward the handle housing (rightwardly in FIGS. 4 and 4A) moves the arm 251 and hence the contact blade 253 progressively further into the handle 12 through a series of positions, three of which are indicated in broken lines at 253A, 253B and 253C in FIG. 4A.

The free (rightward in FIG. 4A) end of the arm 251 is beveled at 272 to help it ride over the contacts 266 and 267 as the trigger lever 242 is sequentially squeezed more and more toward the handle 12. The arm 251 is progressively resiliently bent, like a leaf-spring, as its free end rides over the fixed contacts 266 and 267, to firmly press its contact blade 253 against the latter.

Thus, as the trigger lever 242 is pressed toward the handle 12, the beveled free end of the arm 251 rides over the contact leaf 266 past its dotted line position 253A and toward its dotted line position 253B. As the free arm end approaches position 253B, the contact blade 253 slides into electrical contact with the contact leaf 266 and the motor contact 270 to establish electrical connection therebetween. The motor contact 270 resiliently bends to allow continued travel of the contact blade 253 and arm 251 further into the handle, as indicated in dotted line at 270B, and to press firmly against the contact blade 253. Given only a light pull on the trigger lever 242, the arm 251 and contact blade 253 tend to stop in the position indicated in dotted lines at 253B, by reason of the free end of the arm 251 colliding with the contact leaf

US 7,144,383 B2

15

267. In this "B" position, electric current is fed to the motor 36 only from half the battery collection, namely batteries B1, B2, B3 and B4 in FIG. 22A. The motor 36 thus runs at only a preselected fraction of its full speed and the pump unit 100 outputs irrigation liquid pulses at a desired frequency and amplitude, which are less than the maximum available. The apparatus is thus operated in its low output mode. The colliding of the free end of the trigger arm 251 with the contact leaf 267 gives tactile feedback to the user, that the low output mode of the handpiece has been selected.

Further pulling in of the trigger lever 242 by the user causes the beveled free end of the arm 251 to bend rightwardly (FIG. 4A) the contact leaf 267 to a dotted line position indicated at 267C, allowing the free end of the arm 251 to override the contact leaf 267, such that the contact blade 253 moves into its "full-pull" dotted line position 253C and further bends the motor contact 270 its dotted line position 270C. In this final position, the contact blade 253 establishes electrical contact between the motor contact 270 and the contact leaf 267, thereby applying the full series voltage of all eight of the batteries B1–B8 to the motor 36 to operate the latter at its full speed and thereby drive the pump unit 100 at its full output, namely to provide irrigation liquid pulses out of the pump unit 100 at maximum pulse amplitude and frequency.

When the user releases the trigger lever 242, the resiliently bent trigger lever 242, due to its inherent resilience, springs back from its fully pulled-in position indicated in broken lines at 242P, to its solid line rest position indicated at 242 (FIG. 4A). The electrical connection between the contact 262 or 263 and the contact 270 is broken.

Suction Hose

A flexible suction hose 280 (FIGS. 2 and 3) is led along within the housing (within the lower part of the housing in FIG. 3) past the drive unit 25 and pump unit 100. The above-mentioned clamp plate 165 includes a tubular structure molded thereinto and defined by a forward nipple 282 in the handle 12 and, in coaxial fluid communicating relation therewith, a rearward nipple 283 which extends rearwardly out of the bottom end 164 of the handpiece handle 12. The rear end portion 281 of the suction hose 280 is sealingly and fixedly telescoped over the front nipple 282. A conventional flexible hose, not shown, is conventionally and sealing telescopable over the rear nipple 283 for connecting same to a conventional suction source, as schematically indicated at SS in FIG. 3.

The front end portion 284 of the suction nose 280 is sealingly telescoped over a rearward opening nipple 285 on a short suction conduit 286 (FIGS. 2, 3, 16, 17 and 18). The suction conduit 286 (FIG. 18) is fixed side by side, in piggyback fashion, on the periphery of the irrigation liquid conduit 143 and hence is a part of (preferably an integral plastic molded part of) the bellows housing 104.

The clamp plate 165 serves several purposes. It provides a suction hose connection, bears on the irrigation liquid hose where it enters the handpiece housing, and helps align the rear (rightward in FIG. 4) end wall portions of the housing halves as they are assembled together, and in so doing, is itself fixed on the housing. In addition, the clamp plate 165 is of one piece, preferably a plastic molding, and is partially recessed into the handpiece so that it does not make the handpiece look any bigger.

Tip Unit

A tip unit 291 (FIGS. 8, 8A and 8B) is releasably fixable on the front end of the handpiece 10 and extends forward therefrom for applying irrigation liquid pulses and/or suction to a surgical site indicated schematically at SU in FIGS. 8

16

and 8B. The tip unit 291 (FIG. 8) comprises a coupling 292, a front cover 293 fixed to the front of the coupling 292, and an elongate hollow wand 294 extending forwardly from the coupling and front cover for aiming at a surgical site SU. The coupling 292, cover 293 and wand 294 are preferably one piece molded plastic units. The wand 294 is preferably of clear plastics material.

The tip unit 291, and more specifically the coupling 292, is releasably fitted in fluid tight relation to the front of the bellows housing 104 of the pump unit 100 and is releasably latched within the open front end of the handpiece housing barrel 13 as hereinafter discussed.

More particularly, the coupling 292 (FIG. 8) comprises a shallow, forward opening cup 295 having a flat base wall 296 from which forwardly extends a shallow peripheral wall 297, thereby defining a forward opening recess 300. Coaxial irrigation liquid nipples 301 and 302 extend fixing rearwardly and forwardly, respectively, from the base wall 296 and together define a coaxial bore 303 therethrough and through the base wall 296. The rear nipple 301 is snugly but slidably receivable rearwardly into the open front portion of the liquid outlet conduit 143 of the bellows housing 104. An O-ring 304 seats in an annular groove outward facing on the rear nipple 301 and sealingly engages the interior of the liquid outlet conduit 143 to prevent irrigation liquid leakage therebetween.

The wand 294 includes a coaxial, relatively small diameter, irrigation liquid outlet tube 305 which at its rear end is telescoped fixedly and sealingly within the bore 303 of the front and rear nipples 301 and 302 for receiving a pulsed flow of irrigation liquid from the irrigation liquid outlet conduit 143 of the bellows housing 104.

The coupling 292 further includes a suction nipple 306 fixedly extending rearward from the base wall 296 in spaced parallel relation with the irrigation liquid nipple 301. The suction nipple 306 is snugly insertable rearwardly coaxially into the front opening suction conduit 286 of the bellows housing 104. An O-ring 310 is axially sandwiched between the rear end of the suction nipple 306 and a front facing annular step 311 at the rear end of the suction conduit 286 to prevent leakage therebetween.

The coupling 292 further includes a leaf spring-like, generally U-shaped latch arm 312 which extends rearward from the peripheral portion of the base wall 296, curves radially outwardly and forwardly, and extends forward past the front cover 293, in radially outwardly spaced relation from the wand 294. A wedge-shaped, transverse ridge 313 on the exterior base of the latch arm 312 is approximately centered between the front and rear ends of the latch arm. A circumferentially extending, radially inward protruding rib 314 (FIGS. 2, 3 and 8) on the interior face and at the open front end of the right housing part 15 (at the front end of the barrel 13) opposes the latch arm 312, immediately ahead of the ridge 313, with the tip unit 291 installed on the front end of the handpiece 10 as shown in FIG. 8. The ridge 313 has a front facing step which abuts interferingly with the housing rib 314 to releasably block removal of the tip unit from its installed condition shown in FIG. 8. To remove the tip unit from the front end of the handpiece, the user simply presses radially inward against the forward protruding end portion 315 of the springy latch arm 312, sufficient to radially inward displace the ridge 313 out of interfering relation with the rib 314 and thereby unlatch the tip unit from the front end of the handpiece. This allows forward removing the tip unit 291 from the open front end of the handpiece barrel 13 and removing of the irrigation liquid

US 7,144,383 B2

17

and suction nipples **301** and **306** from the liquid outlet conduit **143** and suction conduit **286** of the bellows housing **104**.

The tip unit **291**, or any alternative tip unit having a substantially identical coupling and front cover, can be installed operatively on the front end of the handpiece **10** by inserting same into the open front end of the handpiece barrel **13** so that the nipples **301** and **306** enter the liquid and suction conduits **143** and **286** respectively, to their position shown in FIG. **8**. During this installation, the forward facing slope of the wedge cross-section transverse ridge **313** slides rearwardly past the housing rib **314**, bending the springy latch arm **312** radially inward as generally indicated by the arrow L in FIG. **8**, so that the wedge cross-section ridge **313** can snap rearwardly past the rib **314** at the open front end of the housing barrel **13**. Thus, the tip unit **314** can be slid axially into the front end of the barrel **13** and upon reaching its innermost position latches itself against unintended removal. In its installed condition of FIG. **8**, the tip unit is substantially rigidly fixed with respect to the front end of the bellows housing **104** and hence with respect to the handpiece barrel **13**.

The front cover **293** (FIG. **8**) comprises a plate **320** which extends radially of the wand **294** and of the length axes of the barrel **13** and the pump unit **100**. The peripheral shape of the plate **320** conforms to the cross-sectional shape of the front end of the barrel **13**, so that the perimeter of the plate **320** is substantially flush with the outer periphery of the open front end of the barrel **13**, and so that the plate **320** effectively covers the open front end of the barrel **13**. The peripheral shape of the plate **320** and cross-sectional shape of the front end of the barrel **13** in one embodiment is generally D-shaped, with a generally flat underside and a convexly curved top and sides. The plate **320** is not intended to seal the open front end of the barrel **13** and so need not tightly abut same. Since the peripheral wall **297** of the cup **295** fits easily within the open front end of the barrel **13**, the plate **320** extends radially outwardly beyond the cup **295**, as seen in FIGS. **8**, **8A** and **8B**.

The front cover **293** includes an annular flange **322** extending axially rearwardly therefrom, radially snugly into the cup **295** of the coupling **292** to bottom rearwardly and sealingly against a resilient gasket **321** which is disposed against the front face of the base wall **296** of the cup **295**. Respective holes in the gasket **321** loosely surround the front nipple **302** and leave fully open the communication between the interior of the suction nipple **306** and the interior of the cup **295**. The front cover **293** further includes a further annular flange **323** extending fixedly and forwardly from the plate **320** in coaxial alignment with the through hole **324** in the plate **320**.

The rearward annular flange **322** of the front cover **293** is fixedly secured within the cup **295** of the coupling **292** by any convenient means, for example by snap fit connectors on the opposing faces of such flange **322** and the peripheral wall **297** of the cup **295**. For example, the cup peripheral wall **297** may be provided with several circumferentially spaced rectangular holes **325** (FIGS. **8A** and **8B**) for snap fit reception therein of small radially outward extending protrusions schematically indicated at **326** on the outside of the rearward annular flange **322**.

The wand **294** further includes a relatively large diameter elongate suction tube **330** (FIGS. **8A** and **8B**) which loosely coaxially surrounds the irrigation liquid outlet tube **305** (FIG. **8**) and extends substantially to the front end of the latter. The rear end portion **331** of the suction tube **330** is radially enlarged to provide a radially shallow, axially

18

elongate flange protruding radially outward therefrom and which is axially trapped between the plate **320** and the gasket **321** backed by the base wall **296**. This serves to rigidly fix the suction tube **330** with respect to the coupling **292** and front cover **293**. A port **332** in the sidewall of the suction tube **330** near its rear end communicates with a loosely surrounding annular chamber **333** defined between the plate **320** and base wall **296** of the front cover **293** and coupling **292** respectively.

The front end of the irrigation liquid tube **305** is held coaxially fixed within the front end portion of the surrounding suction tube **330** by any convenient means, such as radial, circumferentially spaced, webs **334** (FIG. **8**). Accordingly, with a tip unit **291**, of the general type above described, installed on the front end of the handpiece, as shown in FIG. **8**, irrigation liquid pulses from the pump **100** pass forwardly within the liquid tube **305** and are projected from the front (left in FIG. **8**) end thereof, as schematically indicated by the arrows PL. At the same time, liquid and particulate debris at the surgical site SU are drawn into the front (left in FIG. **8**) end of the suction tube **330**, pass rearwardly along the length thereof, through the port **332** into the chamber **333** and rearwardly through the nipple **306** and suction nipple **285**.

With the exception of a few components such as the motor **44**, the various electrically conductive contacts, the elongate insulated conductors, the various seal rings (for example **105**, **154**, **304** and **310**, the gasket **321**, as well as the suction and irrigation liquid hoses, the remaining major components, while possibly manufacturable of a variety of materials, are economically manufacturable of available molded plastics materials. For example, the valve member **131** may be of rubber or a synthetic substitute or similar resilient plastic. Similarly, the bellows **101** is preferably molded of a suitable resilient plastic material capable of the bellows expansion and contraction movements shown in the drawings. The trigger unit **240** and the latch arm **312**, while of substantially rigid plastics material, are elastically bendable to the extent required to suit the present description. Similarly, components to be snap-fitted together are substantially rigid but have sufficient resilience to permit the required described snap fitting.

The present invention can be constructed at relatively low cost and is thus practically manufacturable as a disposable tool, both the handpiece **10** itself and the accompanying electric power supply unit **190** being disposable after use with a single surgery patient.

OPERATION

The apparatus is quickly and easily assembled. The drive unit **25** (FIG. **12**) is assembled by, in effect, "dropping in" elements in proper sequence into the right (lower in FIG. **12**) shell **31** and covering same with the other shell **30**. More particularly, output gear **60**, face gear **54** and motor **36** (with attached pinion gear **53** and electric contacts **270** and **271**) are "dropped" into their respective locations in the upturned shell part **31**, in that sequence. The rectangular shaft **61**, topped by the eccentric member **62**, drops into the corresponding hole in the output gear **60** and the link member **51** drops onto the eccentric member. The other shell part **30** is then snap fitted over the filled shell part **31**, completing the drive unit **25**.

The pump unit **100** is assembled by coaxially telescoping together its elements shown in FIG. **18** and then plugging into the inlet port **146** (FIG. **19**) the elbow **151** with the O-ring **154** and hose **160** assembled thereon.

US 7,144,383 B2

19

The stub **120** (FIG. **18**) of the drive unit **100** can then be snapped into the slot **122** of the drive unit fork **71** (FIG. **2**) to connect the drive unit **25** operatively to the pump unit **100**. The suction hose **280** can then be connected to the pump unit nipple **285** and to the nipple **282** on the clamp plate **165**. Thereafter, the two assemblies above described can be laid into the rightward (FIG. **2**) housing part **15** in the following order, namely liquid hose **160** (FIG. **4**), drive unit **25** and pump unit **100** (FIG. **3**) and, last, suction hose **280** and clamp plate **165**.

The trigger unit **240** is then placed, with its rightward (FIG. **2**) pivot stub **243** located in the corresponding boss **244** in the rightward housing part **15**, and its arm **251** inserted through the hole **252** (FIG. **4**A) into the interior of the handle portion of the rightward housing part **15**, as seen in FIGS. **4** and **4**A. The trigger arm **251** is "covered" by the rear portion **281** of the suction hose **280** in FIG. **3**. The electrical contacts **262** and **263** are placed on their respective posts **255** and **256** in the rear portion of the rightward housing part **15** and the three forward electrical connectors **175** are secured respectively to the mentioned contacts **262** and **263** and the motor contact **271** (FIG. **4**A). Thereafter, the leftward (FIG. **2**) housing part **14** can be snap fitted to the rightward housing part **15** to close same and enclose the above mentioned apparatus, shown in FIG. **3**, therein.

In the thus assembled handpiece, the drive unit is fixedly located by engagement of its drive axis bosses **84** and **85** (FIG. **5**) in corresponding bosses in the housing parts **14** and **15** (see for example at **96** in housing part **15** in FIG. **2**). Location of the drive unit **25** is assisted by the ribs **95** within the housing parts **14** and **15** and by snug resilient engagement of the drive unit **25** by the hoses **160** and **280** which flank it.

The drive unit shell **26** is configured to maintain the proper tolerances between meshing gears and related parts. Location of all the drive unit parts in the drive unit shell **26** reduces the need to maintain close tolerances in the larger and less specialized handle housing **11**. Even the housing tolerances, for locating the pump unit **100** with respect to the drive unit **25** in the housing **11**, need not be close since the bellows **101** are flexible enough to bend or otherwise distort to absorb minor mis-alignment or angulation of the recip-rocation axis of the link member **51** with respect to the length axis of the pump unit **100**. Indeed, the ribs **95** in the housing **11** permit pivoting of the drive unit **25** about the axis of the bosses **96** to allow the drive unit **25** and pump unit **100** to settle into their own working relative orientation. Accordingly, the precision in the handpiece housing **11** can be concentrated in aspects of fitting together of the two housing halves.

The electric power supply unit **190** (FIG. **22**) is quickly and easily assembled. More particularly, the feet of the respective battery contacts **210**, **211**, **212** (FIGS. **26**–**28**) are slid downward into their respective grooves (FIGS. **23**A and **23**B) in the pan **192** (FIG. **22**) with their protruding toes resiliently gripping the sides of the grooves. The rear connectors **176** are connected to the battery contact fingers **224** and **225** in the order shown in FIG. **22**A. The batteries B1–B8 are then slipped down into the pan in the orientation shown in FIG. **22** and into electrically conductive engagement with the battery contacts **210**, **211** and **212** indicated in FIG. **22**A. The rear portion of the liquid hose **160** is laid atop the batteries as indicated in FIG. **23**, with the square flange **182** nonrotatable in the boss **235**, and the cover **193** is snap fitted atop the liquid hose **160** and battery filled pan **192**, as

20

shown in FIG. **23**, to complete assembly of the power supply unit. The cap **185** is pressed onto the sharpened tip **184** to protect it prior to use.

The result is a disposable pulsed irrigation handpiece unit which is entirely self-contained, including its own power supply, and which is ready for use upon having its sharpened tip **184** plugged into a conventional irrigation liquid supply bag or the like, and a conventional manner.

It should be noted that virtually the entire handpiece **10** and power supply unit **190** can be assembled without need for any adhesives, the parts going together with friction or snap fits or, in the case of the joinder of the bellows housing **104** to the bellows **100** and elbow **151**, by being held together by surrounding structure which in turn is snap fitted together. This greatly eases and speeds assembly. A minor exception is that the fitting **180** is here adhesively fixed to the hose **160**.

To use the handpiece assembly in surgery, the cap **185** (FIG. **23**) is removed from the pointed tip **183**, which is then plugged into a standard output fitting on a conventional irrigation liquid supply bag. The power supply unit **190**, being fixed to the rear end of the irrigation liquid hose **160**, can be allowed to simply hang from the irrigation liquid supply bag (not shown but schematically indicated at S in FIG. **22**). By providing a substantial length of irrigation liquid hose **160** (for example 10 feet), the liquid supply bag S and power supply unit **190** can be located well out of the way of the surgical team during use of the handpiece **10** at the surgical site. Even then, the power supply unit **190** is compact as compared to the adjacent conventional irriga-tional liquid supply bag (being very little larger than the eight conventional double AA batteries that it houses).

If suction will be desired at the surgical site, the handpiece nipple **283** (FIG. **3**) can be connected by a conventional hose not shown to a conventional suction source SS (FIG. **3**).

A variety of tip units **291** of differing characteristics (e.g. differing irrigation liquid spray patterns, etc.) may be made available for alternative mounting on the handpiece **10**. One example is shown in FIGS. **8**, **8**A and **8**B.

In any event, the user selects a tip unit **291** having a wand **294** of desired configuration, and rearwardly inserts its coupling **292** into the front end of the handpiece **11**. More particularly, the nipples **301** and **306** of the tip unit are inserted coaxially rearwardly, in sealed relation (see FIG. **8**) in the conduits **143** and **286** respectively of the bellows housing **104**. The resilient latch arm **312** enters the barrel **13** of the handpiece housing **11** adjacent to the bellows housing **104** until the plate **320** of the front cover **293** abuts the front end of the handpiece housing barrel **13**. In the last part of this tip installation movement, the wedge shaped ridge **313** (FIG. **8**) on the latch arm **312** snaps past the rib **314** of the housing barrel **13** to positively prevent forward removal of the tip unit from the handpiece.

To use the apparatus for irrigation of a surgical site, the user grips the handpiece, either by the handle **12**, in a pistol-like manner, or where the barrel **13** joins the handle **12**, in a wand like manner. In either position, the user has one or more fingers that can bear on and press inwardly the trigger lever **242** from its inoperative rest position shown in solid line in FIG. **4**A forward and through its low speed and high speed positions indicated in broken lines at **253**B and **253**C in FIG. **4**A. In the first operative position **253**B, the blade **253** connects the low speed (here six-volt) contact **266** to the motor contact **270**. On the other hand, in the fully depressed condition of the trigger, indicated at **253**C, the blade **253** connects the high speed, 12 volt contact **267** with

US 7,144,383 B2

21

the motor contact **270**. Accordingly, the user can select between "off", lower power pulsing and high power pulsing.

In one embodiment pump stroke was about ¼". In one embodiment shown, the motor speed was about 15,000 rpm and the speed reduction afforded by the transmission was about 15-1, providing the eccentric with about 1,000 rpm speed.

Depending on the flow resistance of the particular tip unit attached to the handpiece, the liquid pulse frequency may change. In one example, a handpiece according to the invention produced about 1200 pulses per minute, dispensing about 1600 ml per minute of irrigation liquid in about 1.3 ml liquid pulses. The positive drive of the pump unit by the drive unit and the location of the pump unit, near the front end of the barrel **13** and in direct engagement with the tip unit, provides liquid pulses at the output of the tip unit which have sharp rise and fall slopes. Thus, the relationship of liquid pulse amplitude to time approximates a square wave form, more so than for example, the aforementioned device of U.S. Pat. No. 5,046,486. Further, the force applied to the pulses by the present apparatus is higher (somewhat above one Newton) than in that prior art device, at the full power position of the trigger.

In one embodiment according to the invention, a tab **316** (FIGS. **1** and **8**B) extends forward from the front plate **320** of the front cover **293**, on the opposite side of the wand **294** from the latch arm **312**. To release the latch arm **312** from the housing **11**, the user can thus simply simultaneously grip with opposite fingers and pinch toward each other the latch arm **312** and tab **316**. In other words the tab **316** provides base toward which to pinch, or pull, the latch arm **312** to release the tip unit **291** from the handpiece **11**.

In the present invention, the liquid and suction nipples of the tip unit connect directly to the pump unit **100**, and do not contact any part of the handpiece housing **11**. Accordingly, neither the pump unit **100** nor tip unit **291** need fit with close tolerances the handpiece housing **11**. The connection of the tip unit to the handpiece housing is merely to latch the tip unit against loss from the handpiece housing and to casually cover the open front end of the handpiece housing. Accordingly, the liquid tight fit is between the nipples of the tip unit and conduits of the pump unit, not with the housing.

Although a particular preferred embodiment of the invention has been disclosed in detail for illustrative purposes, it will be recognized that variations or modifications of the disclosed apparatus, including the rearrangement of parts, lie within the scope of the present invention.

The invention claimed is:

1. A medical irrigator comprising:
   a housing shaped to be hand held and having a front end;
   an inlet tube extending to said housing;
   a pulse pump capable of operating at a variable rate disposed in said housing and having an outlet conduit that opens to the housing front end, said pump configured to receive fluid from said inlet tube and discharging the fluid through said outlet conduit;
   a single electric motor disposed in said housing and connected to said pump for actuating said pump, said motor operable at variable speeds to control the pumping rate of said pump;
   a control assembly disposed in said housing to regulate the speed of said motor;
   a suction tube disposed in said housing that has an open end adjacent the front end of said housing that extends away from the front end;
   a battery pack separate from said housing; and

22

a flexible conductor assembly extending from said battery pack to said housing for supplying energy stored in said battery pack to said motor.

2. The medical irrigator of claim **1**, wherein said control assembly has a switch that is moveably mounted to said housing, said control assembly configured so that:
   when said switch is in a first position, said control assembly does not supply an energization signal to said motor;
   when said switch is in a second position, said control assembly supplies a first energization signal from said battery pack to said motor; and
   when said switch is in a third position, said control assembly supplies a second energization signal from said battery pack to said motor.

3. The medical irrigator of claim **2**, wherein said switch is pivotally attached to said housing.

4. The medical irrigator of claim **3**, wherein said switch is configured to move:
   from the first position and to the second position; and
   from the second position to the third position.

5. The medical irrigator of claim **2**, wherein said switch is configured to move:
   from the first position and to the second position; and
   from the second position to the third position.

6. The medical irrigator of claim **1**, wherein said pump is bellows pump.

7. The medical irrigator of claim **1**, wherein said housing is formed to have: a handle; and a barrel integral with and located above said handle that extends forward from said handle, said barrel having the housing front end from which said pump discharges fluid and from which said suction tube extends.

8. The medical irrigator of claim **1**, wherein said pump is a reciprocating pump.

9. The medical irrigator of claim **1**, wherein said inlet tube extends from said battery pack to said housing.

10. A medical irrigator having:
   a housing shaped to be hand held, said housing having a front face shaped to receive a medical/surgical tip assembly;
   a discharge conduit disposed in said housing that opens into the front face of said housing and a suction tube that extends from the housing front face, both said discharge conduit and said suction tube being configured to be connected to separate conduits integral with the tip assembly;
   an inlet line connected to said housing;
   a pump disposed in said housing connected to receive fluid from said inlet line and pump fluid out through said discharge conduit, said pump being a pulse pump that operates at a variable rate;
   a single, variable speed electric motor in said housing that is connected to said pump that actuates said pump so as to regulate the pumping rate of said pump;
   a conductor assembly including a plurality of flexible conductors, said conductor assembly having a distal end disposed in said housing and a proximal end spaced from said housing;
   a battery pack separate from said housing, said battery pack attached to said conductors at the proximal end of said conductor assembly; and
   a switch assembly mounted to said housing for selectively establishing a connection between at least one of said conductors and said motor, said switch assembly having a switch element moveably attached to said handle, said switch assembly being configured so that:

US 7,144,383 B2

23

when said switch element is in a first position, said switch assembly does not supply an energization signal to said motor;

when said switch element is in a second position, said switch assembly supplies a first energization signal from said battery pack to said motor; and

when said switch element is in a third position, said switch assembly supplies a second energization signal from said battery pack to said motor.

**11.** The medical irrigator of claim **10**, wherein said switch element is pivotally attached to said housing.

**12.** The medical irrigator of claim **10**, wherein said switch element is configured to move:

from the first position and to the second position; and

from the second position to the third position.

**13.** The medical irrigator of claim **10**, wherein:

said conductor assembly includes: a first conductor over which a first energization signal from said battery pack is supplied; and a second conductor over which a second energization signal from said battery pack is supplied; and

said switch assembly is configured so that:

when said switch element is in the second position, said switch assembly connects said first conductor to said motor; and

when said switch element is in the third position. said switch assembly connects said second conductor to said motor.

**14.** The medical irrigator of claim **10**, wherein said switch assembly includes a single conductive member that is directly connected to said motor.

**15.** The medical irrigator of claim **10**, wherein said pump is a bellows pump.

**16.** The medical irrigator of claim **10**, wherein said switch element is pivotally attached to said housing.

**17.** The medical irrigator of claim **10**, wherein said pump is a reciprocating pump.

**18.** The medical irrigator of claim **10**, wherein said inlet tube extends from said battery pack to said housing.

**19.** The medical irrigator of claim **10**, wherein:

said inlet line is a flexible hose that extends from outside said housing into said housing; and

said conductor assembly is attached to said hose so that at least a portion of said conductor assembly extends along said hose.

**20.** A medical irrigator comprising:

a housing shaped to have a front end;

a suction tube disposed in said housing having an inlet end that opens from the front end of said housing;

a pulse discharge pump that operates at a variable rate disposed in said housing having an inlet and discharge conduit, the discharge conduit opening towards the front end of said housing;

an inlet line that extends into said housing that is in fluid communication with the pump inlet;

a single electric motor disposed in said housing and connected to said pump to actuate said pump, said motor operating at variable speeds to regulate the pumping rate of said pump;

a battery pack separate and spaced from said housing that contains at least one battery that stores energy for energizing said motor;

a flexible cable that extends from said battery pack to said housing for supplying energy from said battery pack to said motor; and

a control assembly integral with said housing, said control assembly having a switch member moveably mounted

24

to said housing and said control assembly being configured to apply a variable energization signal from said battery pack to said motor so as to control the speed of said motor and regulate the pumping rate of said pump.

**21.** The medical irrigator of claim **20**, wherein said control assembly is configured so that said switch member moves sequentially from a first position to a second position and from the second position to a third position and:

when said switch member is in the first position, the switch member does not establish a connection between said cable and said motor;

when said switch member is in the second position, the switch member establishes a connection between said cable and said motor to cause a first energization signal to be applied to said motor; and

when said switch member is in the third position, the switch member establishes a connection between said cable and said motor to cause a second energization signal to be applied to said motor.

**22.** The medical irrigator of claim **20**, wherein:

said cable includes a first conductor over which a first energization signal is available from said battery pack and a second conductor over which a second energization signal is available from said battery pack; and

said control assembly is configured so that switch member can be selectively positioned to: connect neither of said cable conductors to said motor; connect the first said cable conductor to said motor; or connect the second said cable conductor to said motor.

**23.** The medical irrigator of claim **22**, wherein said control assembly is configured to sequentially move from the position in which neither said cable conductors are connected to said motor to the position in which said first cable conductor is connected to said motor and to the position in which the second said cable conductor is connected to said motor.

**24.** The medical irrigator of claim **20**, wherein said pump is a reciprocating pump.

**25.** The medical irrigator of claim **20**, wherein said pump is a bellows pump.

**26.** The medical irrigator of claim **20**, wherein said inlet line extends from said battery pack to said housing.

**27.** The medical irrigator of claim **20**, wherein:

said inlet line is a flexible hose that extends from outside said housing into said housing; and

said cable is attached to said hose so that at least a portion of said cable extends along said hose.

**28.** A medical irrigator comprising:

a housing having a front face shaped to receive a medical tip assembly;

a pulse discharge pump that operates a variable rate, said pump having an inlet and an outlet, the outlet opening into the front face of said housing so as to be in fluid communication with a first conduit of the tip assembly;

a suction tube in said housing having an open end located adjacent the front face of said barrel so as to be in fluid communication with a second conduit of the tip assembly;

a single, variable speed electrical motor disposed in said housing connected to said pump for actuating said pump at variable rates;

a battery unit separate from said housing for supplying energy to said motor;

a control assembly mounted to said housing and connected to said battery unit and to said motor for supplying a variable potential energization signal to said motor, said control assembly having a single switch member that is moveably attached to said hous-

**A403**

US 7,144,383 B2

25      26

ing that selectively makes/breaks a connection between said battery unit and said motor and establishes the potential of the energization signal supplied to said motor.

**29**. The medical irrigator of claim **28**, wherein said control assembly is configured so that said switch member moves sequentially from a first position to a second position and from the second position to a third position and:

when said switch member is in the first position, the switch member does not establish a connection between said battery unit and said motor;

when said switch member is in the second position, the switch member establishes a connection between said battery unit and said motor to cause a first energization signal to be applied to said motor; and

when said switch member is in the third position, the switch member establishes a connection between said battery unit and said motor to cause a second energization signal to be applied to said motor.

**30**. The medical irrigator of claim **28**, wherein said control assembly has a first contact over which a first energization signal is available from said battery unit and a second contact over which a second energization signal is available from said battery unit and said control assembly is configured so that said switch member can be selectively positioned to: connect neither of said contacts to said motor; connect the first said contact to said motor; or connect the second said contact to said motor.

**31**. The medical irrigator of claim **30**, wherein said control assembly contacts are statically mounted to said housing.

**32**. The medical irrigator of claim **30**, wherein said control assembly is configured so that said switch member moves sequentially from:

a position in which no energization signal-supply contacts are connected to said motor to a position in which said first contact is connected to said motor; and

from the position in which said first contact is connected to said motor to a position in which said second contact is connected to said motor.

**33**. The medical irrigator of claim **28**, wherein said pump is a reciprocating pump.

**34**. The medical irrigator of claim **28**, wherein said pump is a bellows pump.

**35**. The medical irrigator of claim **28**, wherein a flexible cable extends from said battery unit to said control assembly.

**36**. The medical irrigator of claim **28**, wherein said housing includes a handle and a barrel that extends above and projects forward of said handle, said barrel having the front face of said housing.

**37**. The medical irrigator of claim **28**, wherein:

a flexible hose extends from outside said housing into said housing through which fluid is supplied to the pump inlet; and

a flexible cable extends from said battery unit to said housing, said cable being connected to said control assembly and being attached to said hose so that at least a portion of said cable extends along said hose.

**38**. A medical irrigator, said irrigator comprising:

a housing having a front face shaped to receive a medical tip assembly;

a pulse discharge pump disposed in said housing that operates at a variable rate, said pump having an inlet and an outlet, the outlet opening into the front face of said housing so as to be in fluid communication with a first conduit of the tip assembly;

a suction tube in said housing having an open end located adjacent the front face of said housing so as to be in fluid communication with a second conduit of the tip assembly;

a single, variable speed electric motor disposed in said housing connected to said pump for actuating said pump at variable rates;

a battery pack separate from said housing containing at least one battery;

a flexible cable that extends from said battery pack to said housing, said flexible cable having at least one conductor over which an energization signal from said at least one battery is supplied; and

a control assembly attached to said housing and connected between said at least one conductor and said motor for supplying a variable potential energization signal to said motor, said control assembly having a single switch member that is moveably attached to said housing that selectively makes/breaks a connection between said at least one conductor and said motor and that establishes the potential of the energization signal supplied to said motor.

**39**. The medical irrigator of claim **38**, wherein said control assembly is configured so that said switch member moves sequentially from a first position to a second position and from the second position to a third position and:

when said switch member is in the first position, the switch member does not establish a connection between said at least one conductor and said motor;

when said switch member is in the second position, the switch member establishes a connection between said at least one conductor and said motor to cause a first energization signal to be applied to said motor; and

when said switch member is in the third position, the switch member establishes a connection between said at least one conductor and said motor to cause a second energization signal to be applied to said motor.

**40**. The medical irrigator of claim **38**, wherein:

said cable has a first conductor over which a first energization signal is available from said at least one battery and a second conductor over which a second energization signal is available from said at least one battery; and

said control assembly is configured so that switch member can be selectively positioned to: connect neither of said cable conductors to said motor; connect the first said cable conductor to said motor; or connect the second said cable conductor to said motor.

**41**. The medical irrigator of claim **40**, wherein said control assembly has a first contact to which said first cable conductor is attached and a second contact to which said second cable conductor is attached and said contacts are statically mounted to said housing.

**42**. The medical irrigator of claim **40**, wherein said control assembly is configured so that said switch element moves sequentially from:

a position in which no energization signal-supplying conductors are connected to said motor to a position in which said first cable conductor is connected to said motor; and

from the position in which said first cable conductor is connected to said motor to a position in which said second cable conductor is connected to said motor.

US 7,144,383 B2

27

**43**. The medical irrigator of claim **38**, wherein an inlet hose extends from said battery pack to said housing, said inlet hose being connected to the pump inlet.

**44**. The medical irrigator of claim **38**, wherein said housing is shaped to have a handle and a barrel integral with said handle that is located above and projects forward of said handle.

**45**. The medical irrigator of claim **44**, wherein said motor is disposed in said housing handle.

28

**46**. The medical irrigator of claim **38**, wherein:

a flexible hose extends from outside said housing into said housing through which fluid is supplied to the pump inlet; and

said cable is attached to said hose so that at least a portion of said cable assembly extends along said hose.

\* \* \* \* \*

A405

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing BRIEF OF DEFENDANTS-APPELLANTS ZIMMER, INC. AND ZIMMER SURGICAL, INC. using the Court's CM/ECF filing system. Counsel registered with the CM/ECF system were served by operation of the Court's CM/ECF system per Fed. R. App. P. 25 and Fed. Cir. R. 25(c) on January 22, 2014.

      Gregory J. Vogler
      McAndrews Held & Malloy Ltd.
      500 W Madison St., 34th Fl.
      Chicago, IL 60661
      (312) 775-8000
      gvogler@mcandrews-ip.com


                                   /s/ Kay Wylie

## CERTIFICATE OF COMPLIANCE
## UNDER FED. R. APP. 32(a)(7)(C)

I certify that the foregoing BRIEF OF DEFENDANTS-APPELLANTS' ZIMMER, INC. AND ZIMMER SURGICAL, INC. contains 13,921 words as measured by the word-processing software used to prepare this brief.

Dated: January 22, 2014

/s/ Garth D. Baer
Garth D. Baer
Counsel for Zimmer, Inc. and
Zimmer Surgical, Inc.